**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-21376-KING/REID**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**CEREBRAL, INC. et al.,**

      **Defendants.**

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS KYLE ROBERTSON; ALEX MARTELLI; GERMAN ECHEVERRY;**
**ZEALTHY, INC; GRONK, INC; AND BRUNO HEALTH, P.A.'S**
**JOINT MOTION TO DISMISS THE AMENDED COMPLAINT**

<u>**TABLE OF CONTENTS**</u>

**Page**

PRELIMINARY STATEMENT.................................................................................................1

RELEVANT FACTUAL BACKGROUND ...........................................................................4

    A.    Mr. Robertson and Cerebral.................................................................................4

    B.    Cerebral's Privacy and Data Security Practices ................................................5

    C.    Cerebral's Cancellation Practices .......................................................................8

    D.    Cerebral's Marketing Practices...........................................................................9

    E.    Zealthy's Practices and Policies .........................................................................9

    F.    Causes of Action................................................................................................11

LEGAL STANDARD ...........................................................................................................12

ARGUMENT .........................................................................................................................13

    A.    The FTC Act Section 5 Claims Against All Defendants Should Be
           Dismissed. .........................................................................................................13

           1.    The Cerebral-Related Data Claims Against Mr. Robertson (Counts
                  I-III) Fail. ...............................................................................................15

           2.    The Cerebral-Related Customer Review Claim Against Mr.
                  Robertson and Mr. Martelli (Count V) Fails. .............................................23

           3.    The Cerebral-Related Cancellation Claim Against Mr. Robertson
                  (Count IV) Fails. ......................................................................................26

           4.    The Claim Regarding Zealthy's General Sales And Marketing
                  Against Mr. Robertson, Dr. Echeverry, And Zealthy (Count VIII)
                  Fails.........................................................................................................28

    B.    The ROSCA Claims (Counts VII, IX) Should Be Dismissed. .............................31

           1.    The Amended Complaint does not Adequately Plead Knowledge
                  by Mr. Robertson or Dr. Echeverry. ..........................................................32

           2.    Neither Cerebral Nor Zealthy Offers a Negative Option Feature. ............33

           3.    Cerebral And Zealthy Satisfied ROSCA's Disclosure, Consent and
                  Cancellation Requirements........................................................................35

C.    The Opioid Act Claim (Count VI) Regarding Cerebral Should Be
      Dismissed. ................................................................................................................40

      1.    The Amended Complaint Fails to Plead Knowledge. ................................40

      2.    The Amended Complaint Fails to Implicate the Opioid Act. .....................41

CONCLUSION ................................................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*AMG Cap. Mgmt. v. F.T.C.*, 593 U.S. 67 (2021) ........................................................13, 14

*Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229 (10th Cir. 2016) .........................18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................12

*Auto-Owners Ins. Co. v. G&D Constr. Grp., Inc.*, 588 F. Supp. 3d 1328 (N.D. Ga. 2022) ..........31

*Baker v. City of Madison*, 67 F.4th 1268 (11th Cir. 2023) ...............................................8

*Baxter v. Intelius, Inc.*, 2010 WL 3791487 (C.D. Cal. Sept. 16, 2010) ........................................36

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)........................................................12

*BHRS Grp., LLC v. Brio Water Tech., Inc.*, 553 F. Supp. 3d 793 (C.D. Cal. 2021) .....................24

*Casper Sleep, Inc. v. Nectar Brand LLC*, 2020 WL 5659581 (S.D.N.Y. Sept. 23, 2020)..............25

*Chaparro v. Carnival Corp.*, 693 F.3d 1333 (11th Cir. 2012) ........................................12

*Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562 (11th Cir. 1994)...........................13

*Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534 (S.D.N.Y. 2018)........................................................26

*Davis v. Skullcandy, Inc.*, 2018 WL 1415192 (D. Utah Mar. 21, 2018) ........................................19

*Donnenfeld v. Petro Home Servs.*, 2017 WL 1250992 (D.N.J. Mar. 24, 2017) ...........................27

*Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505 (11th Cir. 1988)...................................................13

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)........................................................39

*F.T.C. by James v. Quincy Bioscience Holding Co., Inc.*, 389 F. Supp. 3d 211 (S.D.N.Y. 2019) ........................................................17

*F.T.C. v. AdvoCare Int'l, L.P.*, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) ...........................15

*F.T.C. v. Am. Precious Metals, LLC*, 2012 WL 13114034 (S.D. Fla. Apr. 12, 2012) ..................12

*F.T.C. v. Am. Tax Relief LLC*, 2012 WL 8281722 (C.D. Cal. Aug. 8, 2012) ...............................22

*F.T.C. v. Amazon.com, Inc.*, 2024 WL 2723812 (W.D. Wash. May 28, 2024).............................38

*F.T.C. v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019)...........................................32, 38

*F.T.C. v. DIRECTV, Inc.*, 2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) ......................................25

iii

*F.T.C. v. D-Link Sys., Inc.*, 2017 WL 4150873 (N.D. Cal. Sept. 19, 2017) ................................22

*F.T.C. v. Health Formulas, LLC*, 2015 WL 2130504 (D. Nev. May 6, 2015) .............................34

*F.T.C. v. Hornbeam*, No. 17-3094 (N.D. Ga. May 1, 2024) ........................................................15

*F.T.C. v. Inc21.com Corp.*, 475 F. App'x 106 (9th Cir. 2012) .........................................................34

*F.T.C. v. Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010) ...................................................34

*F.T.C. v. Johnson*, 96 F. Supp. 3d 1110 (D. Nev. 2015) .........................................................34, 35

*F.T.C. v. Kochava Inc.*, 671 F. Supp. 3d 1161 (D. Idaho 2023) ........................................................22

*F.T.C. v. LendingClub Corp.*, 2018 WL 11436309 (N.D. Cal. Oct. 3, 2018) ...............................24

*F.T.C. v. Match Grp., Inc.*, 2022 WL 877107 (N.D. Tex. Mar. 24, 2022) .............................31, 40

*F.T.C. v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008)............................26

*F.T.C. v. Primary Grp., Inc.*, 713 F. App'x. 805 (11th Cir. 2017) ................................... 14, 20, 22

*F.T.C. v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019).................................. 13, 16, 24, 27

*F.T.C. v. Swish Mktg*, 2010 WL 653486 (N.D. Cal. Feb. 22, 2010) .................................. 18, 26, 31

*F.T.C. v. Tashman*, 318 F.3d 1273 (11th Cir. 2003) ........................................................ 13, 24, 26

*F.T.C. v. Wash. Data Res.*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012).................................................17

*Horsley v. Feldt*, 304 F.3d 1125 (11th Cir. 2002) ...............................................................................8

*In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010) ............................41

*In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189 (N.D. Ga. 2019) ............................................22

*In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148 (D.N.J. Dec. 7, 2009) ...........23

*In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949 (D. Or. Nov. 24, 2021) ............27

*In re Marriott Int'l, Inc.*, 31 F.4th 898 (4th Cir. 2022) ................................................................22, 23

*In re Vistaprint Corp. Mktg. & Sales Pracs. Litig.*, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009)..........................................................................................................................36, 37

*Krinsk v. SunTrust Banks, Inc.*, 2010 WL 11475608 (M.D. Fla. Jan. 8, 2010) .............................20

*LabMD, Inc. v. F.T.C.*, 894 F.3d 1221 (11th Cir. 2018) .........................................................14, 25

*Luke v. Gulley*, 975 F.3d 1140 (11th Cir. 2020) ...................................................................................8

*Marksman Sec. Corp. v. P.G. Sec., Inc.*, 2020 WL 12188373 (S.D. Fla. June 25, 2020)..............24

*Mullinax v. United Mktg. Grp., LLC*, 2011 WL 4085933 (N.D. Ga. Sept. 13, 2011)...................36

*Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298 (11th Cir. 2022) ........................27

*Papasan v. Allain*, 478 U.S. 265 (1986) ....................................................................................4

*Perret v. Wyndham Vacation Resorts, Inc.*, 846 F. Supp. 2d 1327 (S.D. Fla. 2012) ...................12

*Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252 (11th Cir. 2009) .................................................21

*Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551 (S.D. Fla. 1990) .................................33

*Tew v. Chase Manhattan Bank, N.A.*, 741 F. Supp. 220 (S.D. Fla. 1990) ...................................33

*United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152 (C.D. Cal. 2021) ...............................38

*United States v. Planes*, 2019 WL 3024895 (M.D. Fla. July 11, 2019) ......................................33

*Verbena Prods. LLC v. Pierre Fabre Dermo-Cosmetique USA, Inc.*, 2020 WL 2988587
    (S.D. Fla. Feb. 28, 2020) ....................................................................................................25

*West Virginia v. Env't Prot. Agency*, 597 U.S. 697 (2022) .......................................................30

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001) ................................................28

## **STATUTES**

15 U.S.C. § 45d(a) ..............................................................................................................40

15 U.S.C. § 57b(a)(2) .........................................................................................................14

15 U.S.C. § 8401 ...........................................................................................................34, 38

15 U.S.C. § 8403 ...............................................................................................31, 33, 35, 37

15 U.S.C. §§ 45(m) .................................................................................................14, 32, 40

## **OTHER AUTHORITIES**

F.T.C. Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed.
    Reg. 60822, 60826 (Nov. 4, 2021) .......................................................................................39

Restatement (Third) of Agency § 5.03 cmt. g (2006) ................................................................33

## **RULES**

16 C.F.R. § 310.2(w) ...........................................................................................................34

## PRELIMINARY STATEMENT

Kyle Robertson has dedicated his career to a single goal:  providing healthcare access to the people left behind by the modern healthcare system.  That is why, in 2019, he cofounded Cerebral, building it from an aspiration into a lifeline for Americans seeking easy-to-access, stigma-free, affordable mental health care and medication management services.  By the time Mr. Robertson left the company in May 2022, Cerebral had helped nearly a million patients grappling with depression, anxiety, and other issues.  In 2023, Mr. Robertson started Zealthy, a new venture driven by the same goal of improving access to high-quality healthcare, with Dr. German Echeverry serving as Zealthy's Senior Medical Director.[1]  Although Zealthy is still in the early stages of development, it already has delivered accessible, affordable care to thousands of patients.

Apparently, no good deed goes unpunished.  Mr. Robertson's important work making healthcare accessible, and the national media attention he received at Cerebral, put him on the radar screen of the Federal Trade Commission, which seems determined to ruin Mr. Robertson financially and reputationally, along with his fledgling healthcare company, Zealthy; former Zealthy employee, Dr. Echeverry; and former Cerebral employee, Alex Martelli (who has no connection to Zealthy or Dr. Echeverry).

Premised on suspect legal theories and threadbare factual allegations, the Amended Complaint—now being prosecuted by DOJ Civil Division on referral from the FTC—asserts claims under the FTC Act that, at bottom, arise from (i) Zealthy's mere existence and (ii) the following four alleged incidents at Cerebral:

---

[1]  Zealthy, Gronk, and Bruno Health are referred to, collectively, as "Zealthy" unless otherwise specified.  *See* AC ¶¶ 11–18 (allegations regarding corporate relationships among Zealthy, Gronk, and Bruno Health).

1.  A technical data-sharing error at Cerebral, which was not discovered until the year after Mr. Robertson's departure;

2.  Isolated data-security issues at Cerebral, some of which occurred after Mr. Robertson's departure;

3.  Cancellation issues that resulted in certain customers not receiving refunds; and

4.  Alleged manipulation of online reviews in July 2020.

Prior to initiating this litigation, the government entered into a separate settlement with Cerebral. Having resolved this case with Cerebral, it is unjustified by policy, unsupported by the record, and unreasonable by any measure for the government to now pursue the same claims against former Cerebral employees and an entirely different company and its current and former employees.

In any event, the Amended Complaint falls well short of stating claims against Mr. Robertson, Mr. Martelli,[2] Zealthy, and Dr. Echeverry.[3]  The Court should dismiss each count against each defendant for three principal reasons.

*First*, even if Cerebral's or Zealthy's practices amounted to a violation of Section 5, the government cannot impute liability to Mr. Robertson, Mr. Martelli, or Dr. Echeverry.  Individual liability under Section 5 requires (i) knowledge and control of the alleged misconduct and, critically, (ii) an ongoing or imminent violation.  The Amended Complaint fails to satisfy its pleading burden (which is subject to Rule 9(b)) as to both requirements.  Mr. Robertson and Mr. Martelli are no longer at Cerebral, and the alleged conduct there has ended.  *See* ECF No. 33.  Nor

---

[2]  Mr. Martelli joins only the portions of this motion that relate to the narrow set of allegations against him.  The includes portions of the Preliminary Statement referencing him, Section D of the Factual Background, and the Legal Standard, Sections A.2. and C of the Argument section, and the Conclusion.  He takes no position with respect to the remainder of this Motion.

[3]  Dr. Echeverry joins only the portions of this motion that relate to the narrow set of allegations against him.  This includes portions of the Preliminary Statement referencing him, Sections E and F of the Factual Background, Section A.4 of the Argument section, and Section B of the Argument section with regard to Count IX of the Amended Complaint.  He takes no position with respect to the remainder of this Motion.

do the government's conclusory allegations against Zealthy suggest any actual or imminent wrongdoing, especially with respect to customer reviews and data security. Mr. Martelli does not work at Zealthy or with Mr. Robertson in any capacity. Dr. Echeverry's relationships at Zealthy, Bruno Health, and with Mr. Robertson likewise ended before the Amended Complaint was filed. Moreover, even while Mr. Robertson was still at Cerebral, he had no direct involvement in the highly technical privacy and data security processes at issue—having hired security experts and professionals to oversee those areas—much less knowledge of any related issues, many of which were not even known or did not even occur until after he left.

*Second*, regardless of what the individual Defendants knew, the Amended Complaint fails to plead any unfair or deceptive act or practice in the first place. The data privacy and security claims relate to Cerebral's (i) inadvertent sharing of "personal health information" due to a technical error that was not discovered until 2023, after Mr. Robertson had left Cerebral; and (ii) isolated security deficiencies (since remedied) that unintentionally exposed customer files to former employees and consultants. These unintentional and limited alleged lapses by Cerebral do not amount to unfair or deceptive acts or practices within the meaning of Section 5 of the FTC Act. Meanwhile, the government's claims regarding Cerebral's alleged "manipulation" of customer reviews seek to dramatize ordinary business practices while failing to plead any substantial injury or material misrepresentation, which Section 5 requires.

The claims as to Zealthy fare even worse. After a long investigation, the most the government can point to are (i) unspecified anonymous complaints about Zealthy (a normal occurrence for any business) that are completely unrelated to the Cerebral incidents, and (ii) expansive disclosures in Zealthy's terms and conditions regarding how it may handle customer information. The deficiency is alarming.

*Third*, the government's ROSCA and Opioid Act claims fail for all the reasons its Section 5 claims fail—and more. The Opioid Act requires an underlying unfair or deceptive act or practice, which the Amended Complaint fails to plead. Moreover, these claims are inapplicable. The government fails to plead any connection between the alleged conduct and any "substance abuse treatment," which the Opioid Act requires. ROSCA is inapplicable because neither Cerebral nor Zealthy employs a "negative option," which is when a company treats a customer's silence as an acceptance of an offer. Cerebral and Zealthy customers affirmatively agree to a subscription with a disclosed price. A multi-month subscription plan is not a negative option, provided the user agrees to it. And even if ROSCA did apply (it doesn't), both Cerebral and Zealthy comply because they provide adequate disclosures and a simple cancellation mechanism.

## RELEVANT FACTUAL BACKGROUND[4]

### A.   Mr. Robertson and Cerebral

In 2019, Kyle Robertson cofounded Cerebral, Inc., a healthcare company dedicated to providing patients online healthcare treatment. AC ¶¶ 34, 40. The idea for Cerebral came from Mr. Robertson's own difficulty getting help during a severe bout of depression and anxiety. The path to getting care was littered with roadblocks—excessively long waiting lists, inconvenient appointment times, battles with insurance companies, and all the other headaches that have become so common, yet so pernicious, in the modern American healthcare system. Mr. Robertson was determined to make things easier for people dealing with mental health issues, and during his three-year stewardship as CEO, Cerebral grew from a "small start-up with a limited number of

---

[4] Because a court must accept as true the allegations in a complaint, Mr. Robertson, Mr. Martelli, Dr. Echeverry, and Zealthy merely recite the Amended Complaint's allegations without confirming or controverting their veracity. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[F]or the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true.").

employees" into a national success that works with "hundreds of thousands of patients nationwide struggling with depression, anxiety, and other issues." *Id.* ¶¶ 34, 41.

As with many successful CEO's, Mr. Robertson was involved in many aspects of Cerebral's business. *Id.* ¶ 41. He oversaw a number of its core functions, had a hand in setting key policies and making key decisions, and was involved in managing multiple aspects of its day-to-day operations. *Id.* ¶¶ 24, 46. He was less involved in areas where he lacked expertise. For example, Mr. Robertson is not a medical doctor, so prescription practices were not within his bailiwick. Nor is Mr. Robertson a coder, software engineer, or privacy or data-security expert. Mr. Robertson ultimately had visibility into those functions as CEO, but his primary responsibility was to ensure these departments were well staffed with qualified and responsible employees— including teams of healthcare professionals, product managers, engineers, and marketing specialists—who could handle Cerebral's day-to-day operations and make decisions outside of Mr. Robertson's expertise. *Id.* ¶ 45. This was important throughout the company, and in particular with regard to Cerebral's compliance and security functions, where Mr. Robertson employed security engineers and multiple levels of compliance managers, *id.* ¶ 50, as well as several roles at the director or higher level to ensure adequate oversight and authority. These included a Chief Integrity and Compliance Officer, a Vice President of Product and Engineering, a Chief Information Security Officer, a Head of Engineering, a Head of Legal, a President, and a Chief Operating Officer. *Id.* ¶¶ 8, 46, 50, 114, 135. Under Mr. Robertson's stewardship, Cerebral allocated millions of dollars to the company's security and compliance functions. *Id.* ¶ 109 (budgeting $6.7 million for Safety & Quality and Security & IT).

### B. CEREBRAL'S PRIVACY AND DATA SECURITY PRACTICES

Because of the importance of and stigma associated with mental health treatment, Mr. Robertson and Cerebral sought to provide treatment that was both "secure and discreet." *Id.* ¶¶ 56–

57.  Recognizing that consumers needed to know that the treatment they sought would be private, Cerebral included notices across its platforms that treatment through Cerebral was "private, secure, and non-judgmental."  *Id.* ¶ 56.

To that end, Cerebral adopted a thorough Privacy Policy, requiring users' agreement prior to signing up for Cerebral's services.  *Id.* ¶ 70.  The Privacy Policy explicitly stated that users' protected health information ("PHI") would not be "us[ed] or disclos[ed]" "for marketing purposes" without their authorization.  *Id.* ¶¶ 67–68.  Cerebral defined PHI to include information protected by the Health Insurance Portability and Accountability Act ("HIPAA") and "information about you, including demographic information, *that may identify you* and that relates to your past, present or future physical health or condition, treatment or payment for health care services."  *Id.* ¶ 67 n.1 (emphasis added).  This definition was provided in at least two separate locations— Cerebral's Privacy Policy and Notice of Privacy Practices—so that patients would know exactly which information was protected from disclosure.  *Id.*

The positive impact that Cerebral had on its users' lives encouraged the company to get the word out and let people know there was a cheaper, easier-to-access, and more convenient alternative to the current system of mental healthcare.  To target its marketing efforts efficiently and effectively, the company relied on aggregate, anonymized data collected from its existing user base.  The Privacy Policy spelled out how the company would use such data, making clear that users' personal information—but not their PHI—might be disclosed to third-party service providers for data analysis as well as other purposes.  *Id.* ¶¶ 66–67.

Beginning in 2020, Cerebral also specifically informed users through its Privacy Policy that it collected non-personal information and aggregate information through a tool called pixel tags.  *Id.* ¶ 69.  The Policy explained that these tools were designed to help Cerebral "understand

traffic patterns" and "enhance" users' "online experience." *Id.*  In particular, Cerebral disclosed that it used Facebook Pixel, which permitted Cerebral to collect information regarding consumers' usage activity and, as Cerebral noted, may permit Facebook, based on its own information and the users' actions (as well as the Pixel's settings) to connect the usage information to a Facebook account.  *Id.* ¶ 70.  Cerebral used Facebook Pixel along with Google Analytics and three other firms' cookies.  *Id.* ¶ 70.  While Cerebral disclosed that these online tools could share certain types of information with specified third parties, it did not retract or modify its assurance that users' PHI would not be used for marketing purposes without authorization.  *Id.* ¶¶ 68, 70.  And in fact, as discussed below, Cerebral did not intentionally disclose any of its users' PHI through these tools.

But no system is perfect.  Despite Cerebral's good-faith efforts to protect its patients' sensitive data, user data became accessible to outsiders in a manner inconsistent with the Privacy Policy.  During the summer of 2021, certain data in a shared electronic folder became accessible to persons unauthorized to view the data.  *Id.* ¶ 93.  A second inadvertent disclosure occurred between May and December 2021, when certain former employees' and contractors' login names and passwords continued to function for a period after their association with Cerebral had terminated, giving them access to confidential patient medical information.  *Id.* ¶¶ 94–95.  Cerebral remedied this issue in December 2021, but in January 2022, shortly before Mr. Robertson left the company, Cerebral discovered that certain former employees and contractors had accessed patients' records after they had been terminated.  *Id.* ¶¶ 96, 98.[5]

Additionally, in January 2023, seven months after Mr. Robertson's departure, Cerebral learned that an inadvertent technical error had caused its tracking technologies, e.g., Facevook

---

[5] The Amended Complaint alleges two additional incidents in July and September 2022.  AC ¶¶ 99, 100–02.  Mr. Robertson, however, left Cerebral in May 2022, *id*. ¶ 40, and the government pleads no plausible connection between these incidents and Mr. Robertson

Pixel, to "disclose[] certain information that may be regulated as protected health information" to its third-party marketing partners.  Declaration of Shane Anthony Grannum, Ex. A (Cerebral Notice of HIPAA Privacy Breach), at 1; AC ¶ 88.[6]

## C.   CEREBRAL'S CANCELLATION PRACTICES

Cerebral's website and app informed users they could "cancel anytime" after they had signed up for Cerebral's services.  *Id.* ¶¶ 124–25.  Near Cerebral's inception, this meant canceling through email, although users were also able to cancel through other channels.  *Id.* ¶¶ 130, 132. For a brief period in 2020, Cerebral tested a cancellation button in user profiles before returning to email cancellation.  *Id.* ¶¶ 131–32.  Cerebral continued to update and innovate its cancellation process and related disclosures, including introducing a cancellation assessment to gather information about why users were canceling their subscriptions in October 2020, and by adding an explicit explanation of how to cancel in its enrollment path in May 2022.  *Id.* ¶¶ 127–28, 133, 136–37.  Users could cancel at any time, but to ensure the cancellation was processed prior to the next subscription charge, Cerebral informed customers that they should submit their cancellation request by a certain time prior to the next charge.  *Id.* ¶¶ 130, 132–33.

Although Cerebral disclosed how to cancel a subscription and numerous users successfully did so, some users found the process cumbersome.  In response to user feedback, Cerebral, under Mr. Robertson's leadership, redesigned and reengineered its cancellation flow so that users once again could cancel their subscriptions by simply clicking a cancellation button.  *Id.* ¶ 134.  Cerebral

---

[6] The Amended Complaint incorporates Cerebral's Notice of HIPAA Privacy Breach through reference.  AC ¶ 89.  Accordingly, the Court may consider this exhibit since the Government referred to it in the Amended Complaint; the exhibit is central to the Government's claims; and its authenticity is not in question.  *See Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) (quoting *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)); *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020) (incorporating by reference document referred to in complaint).

implemented the new process in May 2022, nearly contemporaneously with Mr. Robertson's departure from the company. *Id.*

### D.   CEREBRAL'S MARKETING PRACTICES

At Cerebral, Mr. Martelli served as Group Product Manager and was responsible for certain Cerebral marketing efforts.[7] *Id.* ¶ 10.  Mr. Robertson and Mr. Martelli paid close attention to customer reviews of Cerebral's services and worked to ensure that, when patients were dissatisfied with their Cerebral experience, the company addressed their concerns.  To that end, when customers posted reviews expressing dissatisfaction with Cerebral, Mr. Robertson and Mr. Martelli directed user experience teams to offer discounts or refunds as part of their efforts to remedy those users' concerns. *Id.* ¶¶ 185–86.  Similarly, to help potential customers understand how effective Cerebral's services could be, when customers were satisfied with their experiences with Cerebral, Mr. Robertson and Mr. Martelli invited those customers to complete reviews.  *Id.* ¶¶ 188–89.  To raise the profile of positive reviews, Cerebral directed its employees to up-vote them as helpful.  *Id.* ¶ 194.  Mr. Martelli also notified review websites that certain negative reviews were inauthentic.  *Id.* ¶ 191.

The Amended Complaint further alleges that, in July 2020, Mr. Robertson directed Mr. Martelli and potentially other unspecified individuals to post reviews praising Cerebral's services as if they were patients.  *Id.* ¶¶ 177–78.

### E.   ZEALTHY'S PRACTICES AND POLICIES

Mr. Robertson left Cerebral in May 2022, but he remained committed to the mission of making healthcare accessible and affordable for everyone.  His next venture was Zealthy, a

---

[7]   Although the government alleges that Mr. Martelli was the "Director of Product," AC ¶ 10, and separately "an executive at Cerebral," *id*. ¶ 255, Mr. Martelli never held either the Director of Product position or any executive position within the company.

telemedicine company that provides medication and healthcare services, with Dr. Echeverry serving as Zealthy's Senior Medical Director and leading Bruno Health.[8]  *Id.* ¶¶ 14, 16, 200.  Like Cerebral, Zealthy users must complete a detailed questionnaire and provide significant personal information during enrollment, *id.* ¶ 233, and Mr. Robertson and Dr. Echeverry recognized the importance to customers that their information be safe and secure, especially when receiving care for sensitive medical conditions.  Zealthy's Privacy Policy was thorough and detailed, and it explained that unless explicitly described in the Privacy Policy, Zealthy would not disclose user data for promotional purposes. Ex. B (Zealthy Privacy Policy), at 3–5.[9]  The Policy informed users that in order to make Zealthy's services as effective as possible, it would use third-party tracking tools and advertisement companies.  AC ¶ 232.  The Amended Complaint does not allege any violation of this representation.

The services Zealthy provides can be costly when accessed through traditional medical providers.  When customers enroll for Zealthy's services, Zealthy provides estimates for the costs of various medications to help users understand how a Zealthy subscription can benefit them.  *Id.* ¶ 222.  But Zealthy's estimates are just that—estimates.  Despite Zealthy's best efforts, they may not always precisely predict the final cost to the customer, especially because Zealthy does not control whether certain medications are covered by certain insurers and because medication is not

---

[8]   Bruno Health helps provide telehealth services to Zealthy subscribers.  AC ¶ 18.

[9]   The Amended Complaint incorporates Zealthy's Privacy Policy by reference.  AC ¶ 230 (discussing the "Privacy Policy"); *see also supra* note 6 (applying the incorporation-by-reference doctrine).

included in the cost of Zealthy's subscription. *Id.* ¶¶ 222, 225. Zealthy discloses this to consumers at sign-up. Ex C (Zealthy Sign-up Excerpt 1), at 1; Ex. D (Zealthy Terms of Use), at 1.[10]

Zealthy's enrollment process is thorough. When registering for Zealthy's services, users must complete a detailed online questionnaire to ensure they receive the best possible medical care. *Id.* ¶ 233. Zealthy also allows its users to cancel at anytime and for any reason.

### F.   CAUSES OF ACTION

On April 12, 2024, acting pursuant to a referral from the FTC, the Consumer Protection Branch of DOJ's Civil Division filed a six-count Complaint. ECF No. 1. On May 31, 2024, the government filed the Amended Complaint with nine counts, as summarized below:

| Count | Statute | Focus of Claim | Defendants |
|:---:|:---|:---|:---|
| I | FTC Act Section 5—*deceptive* acts or practices | Cerebral's privacy practices | Cerebral and Mr. Robertson |
| II | FTC Act Section 5—*deceptive* acts or practices | Cerebral's data security practices | |
| III | FTC Act Section 5—*unfair* acts or practices | Cerebral's privacy and data security practices | |
| IV | FTC Act Section 5—*deceptive* acts or practices | Cerebral's cancellation practices | |
| V | FTC Act Section 5—*unfair and deceptive* acts or practices | Cerebral's customer reviews practices | Mr. Robertson and Mr. Martelli |
| VI | Opioid Act | Cerebral's privacy, data security, cancellation, and customer reviews practices | Cerebral, Mr. Robertson, and Mr. Martelli |

---

[10]   Zealthy's Enrollment Flow and Terms of Use are incorporated by reference. AC ¶ 222 (discussing the Zealthy sign-up process); *see also supra* note 6 (applying the incorporation-by-reference doctrine).

| Count | Statute | Focus of Claim | Defendants |
|:---:|:---|:---|:---|
| VII | ROSCA | Cerebral's privacy, data security, and cancellation practices | Cerebral and Mr. Robertson |
| VIII | FTC Act Section 5—*unfair and deceptive* acts or practices | Zealthy's costs of services, subscription terms, and privacy and cancellation practices | Zealthy, Mr. Robertson, and Dr. Echeverry |
| IX | ROSCA | | |

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct charged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 556). "Factual allegations that are 'merely consistent with a defendant's liability' fall sort of being facially plausible." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

Because the claims against Mr. Robertson, Dr. Echeverry, and Mr. Martelli (the "Individual Defendants") "sound in fraud," the Amended Complaint must also meet Federal Rule of Civil Procedure 9(b)'s heightened "particularity" pleading requirements. *F.T.C. v. Am. Precious Metals, LLC*, 2012 WL 13114034, at *4–5 (S.D. Fla. Apr. 12, 2012) (applying Rule 9(b) to claims brought under Section 5 of the FTC Act); *see also Perret v. Wyndham Vacation Resorts, Inc.*, 846 F. Supp. 2d 1327, 1333 (S.D. Fla. 2012) ("[Rule 9(b)] does not state that it only applies to claims for fraud; it says it applies to allegations of fraud."). To satisfy Rule 9(b)'s heightened requirements, "[t]he plaintiff's complaint must allege the details of the defendants['] allegedly fraudulent acts, when they occurred, and who engaged in them." *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19

F.3d 562, 568 (11th Cir. 1994) (citing *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505 (11th Cir. 1988)).

**ARGUMENT**

**A.    THE FTC ACT SECTION 5 CLAIMS AGAINST ALL DEFENDANTS SHOULD BE DISMISSED.**

The Amended Complaint asserts five unfair or deceptive act or practice claims under Section 5 over alleged issues with (i) Cerebral's data handling (Counts I–III against Mr. Robertson); (ii) Cerebral's consumer's review process (Count V against Mr. Robertson and Mr. Martelli); (iii) Zealthy's general sales and marketing (Count VIII against Mr. Robertson, Dr. Echeverry and Zealthy); and (iv) Cerebral's cancellation practices (Count IV against Mr. Robertson).

Under Section 13(b) of the FTC Act, claims for injunctive relief under Section 5 may be asserted only against a defendant who "is violating" or "is about to violate" the FTC Act. *AMG Cap. Mgmt. v. F.T.C.*, 593 U.S. 67, 76 (2021). Claims "based on long-past conduct" are not permitted "without some evidence that the defendant 'is' committing or 'is about to' commit another violation." *F.T.C. v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019). Notably, alleging a "reasonable likelihood that past violations will recur" is not enough. *Id.* at 156–57 (rejecting FTC's argument that "reasonable likelihood" of future violation is sufficient).

For its deceptive act claims, the government must allege that the Defendants are making or are about to make "a representation[] ... likely to mislead customers acting reasonably under the circumstances ... [that is] material." *F.T.C. v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). For its unfair practice claims, the government must allege that the Defendants are committing or are about to commit an injury on customers that "must be substantial; [] not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and ... that

13

consumers themselves could not reasonably have avoided." *LabMD, Inc. v. F.T.C.*, 894 F.3d 1221, 1229 (11th Cir. 2018).

Additionally, for its Section 5 claims against the Individual Defendants to survive, the government must allege that they "knew of the deceptive practices and either participated directly in those practices or had the authority to control them." *F.T.C. v. Primary Grp., Inc.*, 713 F. App'x. 805, 807 (11th Cir. 2017).

Monetary relief under the FTC Act, as relevant here, is available only for violations of cease and desist orders or enumerated rules, such as the Opioid Act or ROSCA. *AMG Cap. Mgmt.*, 593 U.S. at 67; *see also* 15 U.S.C. §§ 45(m), 57b(a)(2). The FTC has not issued an applicable cease-and-desist order; accordingly, monetary penalties may only be imposed for violations of the Opioid Act or ROSCA—not Section 5(a). *See* AC ¶¶ 282, 287 & p. 68.

As discussed below, each of the Amended Complaint's Section 5 claims fail for multiple reasons:

1. The Cerebral-related data claims against Mr. Robertson (Counts I-III) fail to allege ongoing or imminent violations, that Mr. Robertson had the required mental state, or even an underlying deceptive act or unfair practice. *See infra* § A.1.

2. The Cerebral-related review claim (Count V) against Mr. Robertson and Mr. Martelli fails to allege ongoing or imminent violations or an underlying deceptive act or unfair practice. *See infra* § A.2.

3. The Cerebral-related cancellation claim against Mr. Robertson (Count IV) fails to allege ongoing or imminent violations or the required mental state. *See infra* § A.3.

4. The claim regarding Zealthy's general sales and marketing against Mr. Robertson, Dr. Echeverry, and Zealthy (Count VIII) fails to allege Mr. Robertson's or Dr. Echeverry's knowledge or an underlying deceptive act or unfair practice. *See infra* § A.4.

1.     **The Cerebral-Related Data Claims Against Mr. Robertson (Counts I-III) Fail.**

(a)     *There Is No Basis For Injunctive Relief Against Mr. Robertson Over Years-Old Cerebral Conduct.*

The government cannot allege that Mr. Robertson is committing or is about to commit the alleged data security and privacy incidents that occurred at Cerebral.  Mr. Robertson is no longer with Cerebral, which appears to have resolved these issues in a settlement with the government.  *See* ECF No. 33.  Where, as here, "[e]very factual allegation that the FTC presents refers to past misconduct," claims for injunctive relief under Section 5 do not lie.  *See F.T.C. v. AdvoCare Int'l, L.P.*, 2020 WL 6741968, at *5 (E.D. Tex. Nov. 16, 2020) (dismissing Section 5 claims because "[t]he FTC has not alleged that the McDaniels are *currently* violating or *are about to* violate the law enforced by the FTC.").  Even if the Court finds that there were "large scale" violations at Cerebral, that would not justify injunctive relief against Mr. Robertson absent a showing of a "likelihood of future violations."  *See* First Am. Order, ECF No. 538 at 24–26, *F.T.C. v. Hornbeam*, No. 17-3094 (N.D. Ga. May 1, 2024) (denying injunctive relief).[11]  And there is no claim for injunctive relief where, as here, the Amended Complaint contains no plausible allegation—let alone proof—that Mr. Robertson currently is engaging (or is likely to do so) in any of the conduct alleged against Cerebral.

The Amended Complaint's tacked-on allegations regarding Zealthy fail to remedy this deficiency.  As discussed below in Section A.4, nothing in the Amended Complaint suggests "that [Zealthy] is currently engaging in unfair or deceptive practices similar to [Cerebral]," much less that Mr. Robertson is involved, as Section 5 requires.  Ex. L (*Hornbeam* Order), at 26.  The government does not even mention Zealthy's data security, and its allegations regarding Zealthy's

---

[11]   A copy of this order is enclosed for the Court's convenience as Exhibit L.

privacy practices boil down to (1) the company maintains a privacy policy and (2) that policy sets forth potential data usage practices. AC ¶ 230; Ex. B (Zealthy Privacy Policy), at 2–5.[12] On Mr. Robertson, the most the Amended Complaint alleges is that he was the CEO of Cerebral and is now the CEO of Zealthy. The notion that he or Zealthy will commit unfair or deceptive practices with respect to data security or privacy thus relies on a speculative and improper propensity inference, but "such speculation without any indication that the [Zealthy] is actually deceiving customers in a similar fashion as [Cerebral] did, or deceiving customers at all" cannot support liability. Ex. L (*Hornbeam* Order), at 26.

Mr. Robertson has no control over Cerebral or its privacy and data protection practices. Nor is there any plausible suggestion in the Amended Complaint that he is engaging in unfair or deceptive practices with Zealthy's privacy and data protection practices. There is no basis for an injunction. The Court can, and should, dismiss Counts I–III on that basis alone. *Shire ViroPharma, Inc.*, 917 F,3d at 26 (affirming dismissal of FTC complaint for failure to plead basis for injunctive relief).

        **(b)**   *The Amended Complaint Fails to Allege Mr. Robertson's Knowledge Of Cerebral's Incidents.*

Nor does the Amended Complaint allege Mr. Robertson's knowledge of the specific privacy and data security issues that allegedly occurred at Cerebral. These technical issues derive from coding-level glitches that resulted in inadvertent disclosure or the possibility of improper access to user data. The government lacks any basis to allege that Mr. Robertson was involved in or even knew about these details. Mr. Robertson was the CEO of Cerebral—not a privacy

---

[12]   The Amended Complaint incorporates Zealthy's Privacy Policy by reference. AC ¶ 230 (discussing the "Privacy Policy"); *see also supra* note 6 (applying the incorporation-by-reference doctrine).

engineer.  AC ¶ 34.  He had no expertise to click through the code, design the privacy architecture, or evaluate security tickets as incidents arose.  He approved budgets, oversaw departments, set strategic direction, empowered capable subject-matter experts, and had reporting obligations to the board of directors.  Such CEO-level involvement is "insufficient to show" the level of knowledge required for Section 5 liability.  *See F.T.C. by James v. Quincy Bioscience Holding Co., Inc.*, 389 F. Supp. 3d 211, 221 (S.D.N.Y. 2019) (allegations that executive "signed research agreements, pre-approved research proposals, and reviewed [d]efendants' advertising" were "insufficient to show" knowledge).

A brief review of the specific allegations compels this conclusion.  The Amended Complaint alleges Cerebral (1) inadvertently "released the confidential medical files of 880 patients to persons unauthorized to receive or view those files[,]" AC ¶ 93; (2) "allowed former employees and contractors access to the confidential electronic medical records of patients[,]" *id.* ¶ 94; and (3) provided "former employees or contractors" access to "patients' medication management records more than six days after the individuals had been terminated."  *Id.* ¶ 98.  The other data security allegations, *id.* ¶¶ 99–100, occurred after Mr. Robertson's departure and thus are irrelevant to his liability under Section 5.  *See F.T.C. v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1277 (M.D. Fla. 2012) (concluding that once an individual was terminated from the company, he no longer had control over any allegedly deceptive practices).  Likewise, once Mr. Robertson left Cerebral, he no longer controlled or had authority over Cerebral's data security and cannot be held liable for any alleged breaches.

The Amended Complaint makes no effort to plead that Mr. Robertson was involved in or even vaguely knew about these coding-level errors.  The government even concedes that there were numerous operational and reporting layers separating Mr. Robertson from the technical

coding-related details of Cerebral's privacy and data security implementation, including but not limited to engineers, compliance personnel, a Vice President of Product and Engineering, a Head of Engineering, a Chief Integrity and Compliance Officer, and a Chief Information Security Officer.  AC ¶¶ 8, 45, 46, 114.  Mr. Robertson's remoteness from these details counsels in favor of dismissal.  *Cf. Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1240 (10th Cir. 2016) (dismissing claims where complaint failed to establish knowledge of CEO who was separated by "four levels of management hierarchy" from alleged conduct).

The Amended Complaint's attempt to link Mr. Robertson to these issues only highlights further just how far removed he was.  The government alleges (i) Mr. Robertson personally approved a budget allocating millions of dollars to Safety & Quality and Security & IT, AC ¶ 109, and (ii) "[i]n some instances, [Mr. Robertson] overrode significant data security concerns raised by his top data security reports," but what these concerns were, the Amended Complaint does not say.  *Id.* ¶¶ 105–12, 114.  Yet, notwithstanding a "longstanding" investigation that relied on full cooperation from Cerebral, *see* AC ¶ 242; ECF No. 33 at 54–55 ("Defendant Cerebral, Inc. must fully cooperate with representatives of Plaintiff and the Commission in this case and in any investigation related to or associated with the transactions or the occurrences that are the subject of the Complaint."), the government does not even suggest these unspecified "significant data security concerns" have anything to do with the incidents it identifies as supposedly unfair and deceptive.  Nor can it explain why Mr. Robertson's approving *more than $6 million* for data security is insufficient or improper.  Because the government alleges "virtually no facts to tie [Mr. Robertson] to the [isolated security issues] or to suggest his knowledge moves from the conceivable to the plausible," dismissal is appropriate.  *F.T.C. v. Swish Mktg*, 2010 WL 653486, at *5–6 (N.D. Cal. Feb. 22, 2010) (dismissing Section 5 claim against company president because

defendant's corporate function, authority to sign documents, and large number of consumer complaints were insufficient to plead knowledge); *see also Davis v. Skullcandy, Inc.*, 2018 WL 1415192, at *5 (D. Utah Mar. 21, 2018) (dismissing claim against individual because allegations based on "executives' positions in the company and their presence at meetings" were insufficient to establish requisite knowledge).

The data privacy allegations fare no better. The government's data privacy claim is premised on Cerebral's purported sharing of "protected health information" or "PHI." AC ¶¶ 67 n.1, 71. Cerebral's Privacy Policy defined PHI as "information about [the user], including demographic information, that may identify you and that relates to your past, present or future physical health or condition, treatment or payment for health care services." *Id.* ¶ 67 n.1. As the Amended Complaint notes, since 2020, Cerebral assured users that their PHI "will not be used for any other purpose, including marketing, without [their] consent," *id.* ¶ 71, but then used "tracking tools (including tracking 'pixels')," which collected and sent Cerebral's patients PHI to third parties." *Id.* ¶ 74.

Critically, however, the Amended Complaint does not allege that any such conduct was intentional, much less that Mr. Robertson knew there was a conflict between Cerebral's disclosures and its practices. The government concedes the tracking technologies were intended to collect "non-personal information or aggregate information," in accordance with Cerebral's disclosures. *Id.* ¶ 69 (quoting Cerebral's Privacy Policy). It was an ***inadvertent technical error*** that caused the tracking technologies to "disclose[] certain information that may be regulated as protected health information." Ex. A (Cerebral Notice of HIPAA Privacy Breach), at 1.[13] Far from acting

---

[13] The Amended Complaint incorporates Cerebral's Notice of HIPAA Privacy Breach by reference. AC ¶ 89; *see also supra* note 6 (applying the incorporation-by-reference doctrine).

intentionally, Cerebral did not even *discover* the error until January 3, 2023—more than seven months after Mr. Robertson's departure.  *Id.*  Cerebral "promptly disabled, reconfigured, and/or removed the Tracking Technologies ... to prevent any such disclosures in the future and discontinued or disabled data sharing with any Subcontractors not able to meet all HIPAA requirements."  *Id.* at 2.  The fact that Cerebral subsequently discovered that its privacy disclosures did not square with how the tracking pixel actually worked does not support a plausible inference that they knew of the disconnect from the start.  *See Krinsk v. SunTrust Banks, Inc.*, 2010 WL 11475608, at *3 (M.D. Fla. Jan. 8, 2010) (after-the-fact discovery of falsity "cannot support a reasonable inference that [defendant] knew or should have known that the representations ... were false at the time they were made.").  To state a Section 5 claim against Mr. Robertson, the government must plausibly allege that Mr. Robertson was aware *at the time* of the disconnect between the privacy disclosures and the way the tracking pixel worked.  *Primary Grp., Inc.*, 713 F. App'x at 807.  The government thus resorts to obfuscation to address this gaping deficiency.

*First*, the Amended Complaint misleadingly uses a self-serving definition of "PHI" that ***is different from the term used in Cerebral's Privacy Policy***.  Cerebral's Privacy Policy (which the government quotes and refers to in other places in the Amended Complaint) defines PHI as information that may "identify you and that relates to your past, present or future physical health or condition, treatment or payment for health care services."  AC ¶ 67 n.1.  Yet the Amended Complaint inexplicably adopts a much broader definition of "PHI," relying on the deceptively similar, *sui generis* phrase "personal health information," *id.* ¶ 37, ***without acknowledging this massive expansion of a key term***.  The result of the government's definitional legerdemain is an apples-to-oranges comparison in which it suggests that Cerebral breached its disclosures by disclosing '***protected*** health information,' when the allegations relate only to the government's ill-

defined conception of '*personal* health information' that may or may not constitute 'protected health information' under Cerebral's disclosures.  This ambiguity renders the allegations vague and insufficient to state a claim.  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1268 (11th Cir. 2009) ("The vague and conclusory nature of these allegations is insufficient to state a claim for relief, and 'will not do.'").

*Second*, the Amended Complaint mischaracterizes the origins of the sensitive information Cerebral used in its marketing.  The government alleges Cerebral used "advertisement services [that] rel[y] on exploiting user PHI" (using the government's vague definition) to "re-target current Cerebral users" and target "new, potential users who were demographically similar to existing Cerebral users."  AC ¶ 75.  It asserts Cerebral used "data such as ... a user's online activity" for this targeting.  *Id.* ¶ 83.  But even taken at face value, these allegations describe Cerebral relying on data collected and made available by social media platforms like Facebook and search engines like Google.  Cerebral is a telehealth company, not a search engine—it does not track and store its users' "online activity."  *Id.*  Properly understood, this allegation does not suggest that Cerebral misused the PHI (using any definition) that its users entrusted to it; it alleges instead that Cerebral paid for access to data collected by companies like Facebook to learn which users click on links or topics related to Cerebral or "watched Cerebral videos."  *Id.* ¶ 82.  This does not implicate the data Cerebral collected from its users *at all*.

The fact that the Amended Complaint resorts to a misleading re-definition of the key term in Cerebral's Privacy Policy and a fundamentally flawed description of Cerebral's marketing technique reflects how weak its privacy claims are.  This misdirection cannot mask the absence of any plausible allegation that Mr. Robertson was aware of issues with Cerebral's privacy practices.

That is fatal to Counts I–III.  *Primary Grp., Inc.*, 713 F. App'x at 807 (individual liability under Section 5 of the FTC Act requires evidence that the individual "knew of the deceptive practices").

(**c**)   *The Amended Complaint Does Not Allege Unfair or Deceptive Conduct.*

An inadvertent disclosure of user data caused by a single, undiscovered technological error in a tracking pixel does not amount to an unfair practice nor deceptive act.  "The fact that a company has suffered a security breach does not demonstrate that the company did not place significant emphasis on maintaining a high level of security."  *In re Marriott Int'l, Inc.*, 31 F.4th 898, 903 (4th Cir. 2022) (quoting *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1221 (N.D. Ga. 2019)); *see also F.T.C. v. Am. Tax Relief LLC*, 2012 WL 8281722, at *5 (C.D. Cal. Aug. 8, 2012) ("unauthorized billings" that were "[i]solated occurrences" would not support Section 5 claim).  So too, here.  As the Amended Complaint concedes, during Mr. Robertson's tenure, he approved *millions of dollars* in spending to ensure Cerebral adequately safeguarded user data.  AC ¶ 109.  And the fact that—after years of investigating—the government could identify only *one* data privacy incident suggests that, contrary to the Amended Complaint's assertion, Cerebral actually did a pretty good job while Mr. Robertson was in charge.

The data security allegations are equally unimpressive.  At most, the Amended Complaint's allegations describe potential vulnerabilities that were remedied years ago.  *Id.* ¶¶ 93–94, 98, 104.  The Amended Complaint fails to "allege more than a mere possibility of consumer injury," much less that these years-old vulnerabilities were likely to result in consumer injury, as required for an unfair practice claim.  *F.T.C. v. Kochava Inc.*, 671 F. Supp. 3d 1161, 1172 (D. Idaho 2023); *see also F.T.C. v. D-Link Sys., Inc.*, 2017 WL 4150873, at *5 (N.D. Cal. Sept. 19, 2017) ("mere possibility of injury" is insufficient to maintain Section 5 claim).  The Amended Complaint concedes that Cerebral "devoted resources and took steps to strengthen the security of [its]

22

systems," *Marriott Int'l, Inc.*, 31 F.4th at 903, including through executive briefings, formal investigations, and Mr. Robertson's own approval of more than $6 million dollars to security-related departments.  AC ¶¶ 105–07.  The Amended Complaint merely alleges isolated breaches, neither of which make Cerebral's security representations "false or misleading."  *Marriott Int'l, Inc.*, 31 F.4th at 903 (concluding that an eventual data breach did not render privacy statements "false or misleading" where the company sought to protect personal data within its control); *see also In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *5–6 (D.N.J. Dec. 7, 2009) (same).

### 2. The Cerebral-Related Customer Review Claim Against Mr. Robertson and Mr. Martelli (Count V) Fails.

The Amended Complaint misguidedly asserts a deceptive act or practice claim against Mr. Robertson and Mr. Martelli based on their purported involvement in Cerebral's "prevent[ion] [of] customers from seeing a true and accurate depiction of [] reviews, opinions, and experiences of Cerebral's patients" on third-party review websites.  AC ¶ 188.  Specifically, the Amended Complaint alleges that Cerebral (i) "provid[ed] incentives to reviewers that were not adequately disclosed"; (ii) "suppress[ed] negative reviews"; and (iii) posted "fabricated online reviews."  *Id.* ¶ 176.  This claim fails because the government does not adequately plead that Mr. Robertson or Mr. Martelli are committing or about to commit these Cerebral-related violations, nor that such conduct constitutes a deceptive act or practice within the meaning of Section 5.

### (a) The Amended Complaint Fails to Plead an Ongoing or Future Violation.

As a threshold matter, the Amended Complaint identified conduct that allegedly occurred more than four years ago, "[i]n or about July 2020[,]" *id.* ¶ 177, and makes no effort beyond conclusory assertions to suggest that either Mr. Robertson or Mr. Martelli is involved, or is about

23

to be involved, in similar misconduct.[14]  Such "long-past conduct" cannot support a claim for relief under Section 5 or Section 13 of the FTC Act.  *Shire ViroPharma, Inc.*, 917 F.3d at 156, 161.

**(b)**  *The Amended Complaint Fails to Allege a Deceptive Act or Unfair Practice.*

The Amended Complaint's barebones allegations regarding customer reviews fall far short of stating a claim for unfair or deceptive practices.  The government fails to allege any key details, including how many reviews there were, when or where they were posted, how or why they were false, if they were ever published by any third-party sites, or if consumers were even exposed to them.  That does not suffice to plead a claim for relief under Section 5.  For example, in *F.T.C. v. LendingClub Corp.*, 2018 WL 11436309, at *13 (N.D. Cal. Oct. 3, 2018), the court dismissed a Section 5 claim where the FTC merely alleged unspecified "numerous instances" of "unauthorized charges" but did not state "how many or provide even a rough approximation" of the number of people allegedly injured.  *See also BHRS Grp., LLC v. Brio Water Tech., Inc.*, 553 F. Supp. 3d 793, 799 (C.D. Cal. 2021) (dismissing unfair practices claim over "false," "fraudulent," and "misleading" reviews for failure to allege sufficient facts); *Marksman Sec. Corp. v. P.G. Sec., Inc.*, 2020 WL 12188373, at *8 (S.D. Fla. June 25, 2020) (dismissing claim over "false reviews" due to plaintiff's failure to "provide the content of the reviews, the precise statements that [p]laintiff alleges to be misleading or when the statements were made").

Absent any key details regarding these reviews, the government fails to plead that the reviews (1) were "material" representations that were "likely to mislead customers acting reasonably under the circumstances," as required to state a deceptive act claim, *Tashman*, 318 F.3d

---

[14]   Indeed, with regard to Mr. Martelli, the Amended Complaint relies on his "continued presence in the telehealth field" as the basis for the assertion that he is engaged in ongoing similar conduct.  AC ¶ 255.

at 1277; nor (2) that they caused a "substantial" injury to consumers that "consumers themselves could not reasonably have avoided," as required for an unfair practice claim, *LabMD, Inc.*, 894 F.3d at 1229 (citation omitted).

Courts have also dismissed complaints with similar allegations outside the context of Section 5, where plaintiffs alleged "manipulation" of customer reviews with little more than mere speculation. *See, e.g.*, *Casper Sleep, Inc. v. Nectar Brand LLC*, 2020 WL 5659581, at *11 (S.D.N.Y. Sept. 23, 2020) ("Because Defendants' allegations that ... reviews were 'manipulated' are mere 'naked assertion[s]' devoid of further factual enhancement, ... [they] cannot survive a motion to dismiss."); *Verbena Prods. LLC v. Pierre Fabre Dermo-Cosmetique USA, Inc.*, 2020 WL 2988587, at *4 (S.D. Fla. Feb. 28, 2020) (dismissing FDUTPA claim over purported "false reviews" for failure to allege "disseminat[ion] to potential customers.").

These are not mere pleading deficiencies.  The notion that 'incentivized' and 'suppressed' reviews amount to Section 5 violations is a gross overreach.  The Amended Complaint alleges that Cerebral offered unhappy customers "refunds, discounts, and financial incentives," and that, in many cases, these customers "revised their reviews" afterwards. AC ¶¶ 185–86.  The government thus would have this Court conclude that redressing customer complaints is an unfair or deceptive practice.  That is absurd.  *See F.T.C. v. DIRECTV, Inc.*, 2018 WL 3911196, at *18 (N.D. Cal. Aug. 16, 2018) (finding that defendant's efforts to provide customers with instant rebates cut against FTC's claim that Defendant's advertisements were misleading).  And regarding the so-called "suppression" of customer reviews, the government alleges that Cerebral: (i) invited "satisfied patients" (but not dissatisfied ones) to leave reviews; (ii) "notif[ied] online websites" of potential "inauthentic" reviews; and (iii) "upvot[ed]" positive reviews as useful. AC ¶¶ 188, 191, 193–95. There is nothing deceptive or unfair about favoring positive coverage over negative coverage.  *See*

25

*Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 543 (S.D.N.Y. 2018) ("Moreover, spotlighting positive reviews is not false advertising.  Not only are positive reviews opinions, but simply indicating that a particular consumer was satisfied with a service plainly does not constitute a false or misleading statement.").  Nor can there be anything improper about flagging inauthentic reviews.

The best the government can do—after investigating these issues for more than a year—is to recite vague platitudes and put a sinister spin on customer service.  That does not suffice.

### 3.    The Cerebral-Related Cancellation Claim Against Mr. Robertson (Count IV) Fails.

#### (a)    *The Amended Complaint Fails to Allege Mr. Robertson's Involvement.*

The Amended Complaint also fails to plead any facts that plausibly suggest that Mr. Robertson knew that Cerebral continued to charge customers after they "asked Cerebral to cancel their subscriptions" and never provided a refund.  AC ¶ 119.  Once again, the Amended Complaint relies on general assertions about Mr. Robertson's role as CEO.  *See id.* ¶¶ 144–56.  At best, those broad, high-level allegations suggest that Mr. Robertson at one point favored cancellation by email rather than a cancellation button.  But a multi-step cancellation process only renders "cancel anytime" deceptive if consumers are charged without a refund after they indicate that they would like to cancel.  *See  F.T.C. v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1188 (N.D. Ga. 2008) (citing *Tashman*, 318 F.3d at 1277) (purported deceptive act must be "likely to mislead customers" and "material").  The Amended Complaint, however, is conspicuously silent regarding what Mr. Robertson knew about whether users received refunds.  After investigating this case for over a year, the government surely knows that Mr. Robertson had no idea that any user failed to receive a refund.  Its failure to allege that Mr. Robertson knew that Cerebral failed to provide refunds is fatal to Count V.  *Swish Mktg*, 2010 WL 653486, at *5–6 ("The Commission's

conclusory assertions of authority—untethered to virtually any supportive facts—do not support an inference of [Defendant's] involvement.").

(b)    *The Amended Complaint Fails to Allege a Continuing Violation.*

The Amended Complaint further fails to allege that Mr. Robertson "is violating or is about to violate" Section 5 by neglecting to adhere to certain cancellation representations. *Shire ViroPharma, Inc.*, 917 F.3d at 161 (cleaned up). The only alleged connection between Cerebral's cancellation practices and Mr. Robertson's current conduct is the bare allegation that Zealthy's customers have "complained" that they "continued to be charged while their requests to cancel subscriptions were ignored" and "had to cancel their credit cards … after their cancellation requests were ignored…." AC ¶¶ 239–40. But mere allegations of "on-line complaints [cannot] support a plausibility finding." *Donnenfeld v. Petro Home Servs.*, 2017 WL 1250992, at *5 (D.N.J. Mar. 24, 2017) (granting defendants' motion dismiss and finding plaintiff had failed to state a claim under Rule 12(b)(6)). Because "every large company can expect to have some consumer complaints ... courts typically reject the argument that customer complaints alleging circumstances that are contrary to defendant's representations independently suffice to establish the falsity of those representations." *In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949, at *9 (D. Or. Nov. 24, 2021) (cleaned up). And these allegations certainly do not satisfy Rule 9(b)'s requirements, as they do not specify "who" is complaining or "when" or "how" those complaints were made. *See Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1307 (11th Cir. 2022).

27

4. **The Claim Regarding Zealthy's General Sales And Marketing Against Mr. Robertson, Dr. Echeverry, And Zealthy (Count VIII) Fails.**

(a) *The Amended Complaint Has Not Alleged Any Unfair Practices or Deceptive Conduct at Zealthy.*

The Amended Complaint's Section 5 allegations against Zealthy are even more conclusory than its allegations against Cerebral. The Amended Complaint alleges that Zealthy (i) made misleading statements regarding the costs associated with its services, AC ¶¶ 221–25; (ii) failed to make adequate disclosure of "important terms" relating to fees, cancellation, and membership renewal in its Terms of Use page, *id.* ¶¶ 226-29; and (iii) failed to make adequate disclosure of terms in its Privacy Policy regarding use of private customer information, *id.* ¶¶ 230–35. But the Amended Complaint supplies no facts to support these claims.

Starting with cost, the Amended Complaint alleges that Zealthy misrepresented to customers what they "would generally pay," touted "low costs for initial months" before charging more, made unauthorized credit card charges; and led them to believe "they would generally be able to obtain insurance coverage for certain drugs." *Id.* ¶¶ 221–25. The only factual basis for each of these allegations is that some unidentified customers at some unidentified times complained to some unidentified entity about some unidentified experiences they had. *Id.* This falls far short of Rule 9(b)'s requirements. *See Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (requiring plaintiff to allege "the time and place of each such statement and the person responsible for making ... same").

The Terms of Use and Privacy Policy allegations fare no better. The Amended Complaint claims Zealthy broke the law by including in its Terms of Use terms relating to potential fees and charges, cancellations and refunds, and annual membership renewals that are "not part of the enrollment flow" and that customers "are not required to view in order to sign up." AC ¶ 227.

28

Likewise, Zealthy supposedly "hid[] key terms regarding their handling of users' sensitive, private information in the fine print of a Privacy Policy that is also not part of the enrollment flow and that customers who have enrolled may have never seen." *Id.* ¶ 230. Once again, the Amended Complaint leaves out the specifics required under Rule 9(b). It does not even include Zealthy's enrollment flow of which these policies are supposedly "not part." *Id.* ¶¶ 226, 230.

This is odd. Below is an excerpt of Zealthy's sign-up page that begins the enrollment flow. Ex. E (Zealthy Sign-up Excerpt 2), at 1.[15] The Terms of Use and the Privacy Policy are right there (see added red boxes).



---

[15] Zealthy's Enrollment Flow is incorporated by reference. AC ¶ 222 (discussing the Zealthy sign-up process); *see also supra* note 6 (applying the incorporation-by-reference doctrine).

Clicking on the Terms of Use, Zealthy customers would see a detailed explanation of its pricing model in its Terms of Use, which set out that users were responsible for knowing their own insurance benefits and covering the cost of any Zealthy services that their insurance does not reimburse.  Ex. D (Zealthy Terms of Use), at 6–9.  Likewise, Zealthy explains how it used promotional fees and customer data.  *Id.*  The Privacy Policy specifically allows Zealthy to "share [user] data with third-party vendors" and to "allow selected third parties to use tracking technology on the website."  Ex. B (Zealthy Privacy Policy), at 3–5.  The Privacy Policy goes on to tell users that, "[u]nless described in this Privacy Policy, [Zealthy does] not share, sell, rent, or trade any of your information with third parties for their promotional purposes."  *Id.*  Zealthy users—who had to agree to these policies to subscribe to Zealthy's services—had ample opportunity to read and understand their contents.[16]

Nowhere does the Amended Complaint allege an actual violation by Zealthy of any term in either of these policies.  Rather, the Amended Complaint's position is that the (ordinary and unremarkable) way these terms are presented is itself illegal.  If so, then much of e-commerce is illegal.  This Court should "hesitate before concluding that Congress meant to confer such authority."  *West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) (cleaned up).  If the government does not like the terms Zealthy offers and its users agree to, its recourse is to promulgate a rule, subject to notice-and-comment rulemaking—not to sue Zealthy, Mr. Robertson, and Dr. Echeverry.

Finally, with respect to Gronk, the Amended Complaint's claims are even more deficient.  Contrary to its allegation otherwise, Gronk is not doing business as Zealthy.  AC ¶ 13.  Gronk is a

---

[16]  By quoting and referring to Zealthy's terms of use and sign-up page, the Amended Complaint incorporated them by reference into the Amended Complaint.  *See supra* note 10.

Florida entity that was erroneously created and dissolved independently of Zealthy's creation and incorporation in Delaware.  Exs. F (Incorporation Documents), at 1–2, 5–6 and G (Dissolution Documents), at 1.[17]

> **(b)**    *The Amended Complaint Has Not Alleged Mr. Robertson's or Dr. Echeverry's Knowledge.*

As with all the Section 5 claims asserted against Mr. Robertson and Cerebral, the Amended Complaint fails to allege the mental state required to support Section 5 liability against an individual defendant.  The Amended Complaint fails to allege *anything* about Mr. Robertson's or Dr. Echeverry's  knowledge at all with respect to the Section 5 claims.  That requires dismissal of Count VIII.  *See Swish Mktg.,* 2010 WL 653486, at *5 (dismissing when "the complaint presents virtually no facts to tie [Defendants] to the [alleged] scheme or to suggest [their] knowledge moves from the conceivable to the plausible").

## B.    THE ROSCA CLAIMS (COUNTS VII, IX) SHOULD BE DISMISSED.

The Amended Complaint asserts ROSCA claims (i) against Mr. Robertson regarding Cerebral's privacy, data security, and marketing practices, and (ii) against Mr. Robertson, Dr. Echeverry, and Zealthy regarding Zealthy's privacy, data security, and marketing practices.

A claim under ROSCA requires particularized pleadings of (i) a "negative option" process; (ii) the lack of a "simple cancellation" mechanism, "express informed consent," or "disclosu[re] of all material terms of the transaction;" and (iii) a basis for individual liability.  *See F.T.C. v. Match Grp., Inc.*, 2022 WL 877107, at *9, 36 (N.D. Tex. Mar. 24, 2022) (citing 15 U.S.C. § 8403);

---

[17] The Court may take judicial notice of public dissolution and incorporation documents filed with secretaries of state on a motion to dismiss.  *See Auto-Owners Ins. Co. v. G&D Constr. Grp., Inc.*, 588 F. Supp. 3d 1328, 1331 n.3 (N.D. Ga. 2022) ("Courts can take judicial notice of public records maintained by a secretary of state.").

*F.T.C. v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 770 (7th Cir. 2019) (requiring a finding of personal liability under ROSCA); *see also* 15 U.S.C. § 45(m)(1)(A) (requiring "actual knowledge" to impose civil penalties).  The Amended Complaint's ROSCA claims fail because they do not allege (1) that Mr. Robertson or Dr. Echeverry had the knowledge required for individual liability; (2) facts showing the use of a negative option; or (3) inadequate disclosures or cancellation mechanisms.

### 1.    The Amended Complaint does not Adequately Plead Knowledge by Mr. Robertson or Dr. Echeverry.

Because the government cannot allege Mr. Robertson's or Dr. Echeverry's "knowledge" of the wrongful conduct necessary for injunctive relief or restitution, *see supra* § A.4.b, it necessarily fails to allege that either of them had "actual knowledge" that the alleged acts were "**unfair or deceptive and [were] prohibited by**" ROSCA, as required for monetary penalties. 15 U.S.C. § 45(m)(1)(A) (emphasis added).  The best the Amended Complaint can do to allege individual knowledge is to say that a news article about Cerebral once mentioned ROSCA and that Mr. Robertson (though apparently not Dr. Echeverry) "reviewed and discussed the article."  AC ¶ 52.  Remarkably, however, that stray reference to ROSCA occurred in the context of a quotation from a law professor in which she said, "There's nothing intrinsically wrong with charging people a recurring subscription fee even if they don't access the services" and, in any event, that *Cerebral was in compliance with ROSCA*.  Ex. H (Forbes Article), at 5.  The government thus appears to be suggesting that Kyle Robertson knew Cerebral was *violating* ROSCA—as required to state a claim—based on an article that says Cerebral was *complying* with the statute.  This is absurd.

The government's further attempt to impute this knowledge to Zealthy and Dr. Echeverry is even more tenuous.  The Amended Complaint alleges that knowledge can be imputed first from Mr. Robertson to Bruno Health, and then from Bruno Health to Dr. Echeverry.  AC ¶¶ 244–45.

32

Even if Mr. Robertson had the requisite knowledge, the second half of this attempted imputation chain is legally invalid.  Under the imputed knowledge rule, "the acts and knowledge of an agent are imputed to the principal." *Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1559 (S.D. Fla. 1990), *amended on other grounds*, 741 F. Supp. 220 (S.D. Fla. 1990).  But this rule does not work the other way around.  "[A] principal's knowledge 'is not imputed downward to an agent.'" *United States v. Planes*, 2019 WL 3024895, at *10 (M.D. Fla. July 11, 2019) (quoting Restatement (Third) of Agency § 5.03 cmt. g (2006)).  And, under Florida law, an officer of a corporation is an agent of the corporation.  *Tew*, 728 F. Supp. at 1559.  Thus, Dr. Echeverry (as Health Compliance Officer) would have been Bruno Health's agent, and Bruno Health's knowledge cannot be imputed downward to him.

The Amended Complaint also asserts that, based on their "close collaboration and Echeverry's compliance role, Robertson's knowledge of ROSCA issues is therefore imputed to Echeverry."  AC ¶ 246.  But there is no legal rule that, because one person works with another person, they can be assumed to know what the other one knows.  Such a rule would drastically expand the number of individuals who could be subject to financial penalties in ROSCA cases by essentially removing the protection offered by the statute's knowledge requirement.  And the Amended Complaint does not include a single allegation that ROSCA issues were ever discussed between Mr. Robertson and Dr. Echeverry, or that Dr. Echeverry even knew that ROSCA existed.  Thus, there is no basis to impute knowledge of ROSCA to Dr. Echeverry.

### 2.    Neither Cerebral Nor Zealthy Offers a Negative Option Feature.

ROSCA is inapplicable in any event.  The statute only applies to "services sold ... through a negative option feature," 15 U.S.C. § 8403, which is statutorily defined as "a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller *as acceptance of the offer*."  16 C.F.R.

§ 310.2(w) (emphasis added).  Essentially, a "negative option" occurs if there is no affirmative acceptance of an offer, such as when a company issues a seemingly free trial or product, and then takes the lack of affirmative rejection as an agreement to pay.  *See, e.g., F.T.C. v. Health Formulas, LLC*, 2015 WL 2130504, at \*2, \*16 (D. Nev. May 6, 2015) (credit monitoring subscription hidden in free credit check offer was "negative option"); *F.T.C. v. Johnson*, 96 F. Supp. 3d 1110, 1139 (D. Nev. 2015) (membership charges tacked onto free CD was "negative option"), *F.T.C. v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1007 (N.D. Cal. 2010) (15-day "free" trial that converted to paid offer absent "affirmative steps" was "negative option"), *aff'd*, 475 F. App'x 106 (9th Cir. 2012).  In describing the activity it attempts to prevent, ROSCA specifically identifies third-party sellers using data from retailers to sign up and charge "millions of American consumers for membership clubs the consumers did not want" and "[t]hird party sellers used a free trial period to enroll members, after which they periodically charged consumers until consumers affirmatively canceled the memberships."  15 U.S.C. § 8401(4), (8).

The Amended Complaint fails to allege either Cerebral or Zealthy employed a negative option feature.  Both offered a recurring subscription, which users accepted affirmatively at sign-up.  *See* AC ¶ 124 (depicting Cerebral signup as denoting it was "billed monthly"); *id.* ¶ 223 (describing how Zealthy informed customers of "costs for initial months of their services"); Ex. I (Cerebral Terms of Service), at 8–10; Ex. D (Zealthy Terms of Use), at 5–8.

A recurring subscription is not the same as a negative option, and the government overreaches by equating the two.  The former involves the kind of routine payments commonly seen with services like Spotify and Hulu or memberships at a fitness club or, as here, an online medical services company.  The latter is like Columbia House Records, the former mail-order music service that sent records (and later cassette tapes and CDs) that members were deemed to

have purchased if not returned in the mail.  The case law distinguishes between the two.  For example, in *F.T.C. v. Johnson*, the court explained that "there is a significant distinction between sites that clearly offer subscription-based or membership-based services to a consumer with a trial period and negative option on one hand, and sites that offer to ship a product for a one-time payment with a bundled membership trial period and negative option on the other.  In the first situation, ***the consumer is made aware of an ongoing obligation for use of the seller's service***."  96 F. Supp. 3d at 1141–42 (emphasis added).  Here, the distinction is even sharper.  The government does not even alleged that there was a trial period followed by a tacked-on membership—only that users signed up for and received a recurring subscription.  Thus, there is no negative option.

Indeed, the Amended Complaint includes no allegation whatsoever as to Zealthy's subscription terms or flow, except for the conclusory allegation that Zealthy uses "a rapid, online enrollment process that uses a negative option feature."  AC ¶ 200.  What is that enrollment process, and what about it is a negative option?  The Amended Complaint does not say.  The Amended Complaint thus does not provide a sufficient factual basis for a plausible allegation that Zealthy employed a negative option.  ROSCA is inapplicable.

### 3.   Cerebral And Zealthy Satisfied ROSCA's Disclosure, Consent and Cancellation Requirements.

Even if Cerebral or Zealthy did employ a negative option (they did not), they still satisfied ROSCA's disclosure, consent, and cancellation requirements.

***Disclosure and Consent***.  ROSCA only requires "text that clearly and conspicuously discloses all material terms of the transaction" and "consumer's express informed consent."  15 U.S.C. § 8403(1), (2).  Courts routinely dismiss disclosure-related claims on the pleadings where defendants provided, and consumers consented to, clear explanations of the relevant terms.

*See Mullinax v. United Mktg. Grp., LLC*, 2011 WL 4085933, at *8 (N.D. Ga. Sept. 13, 2011) (citations omitted) ("As the webpages proffered by defendant seem clear as to the relevant terms, they may well be fatal to plaintiff's claim, if proved to be authentic."); *In re Vistaprint Corp. Mktg. & Sales Pracs. Litig.*, 2009 WL 2884727, at *8 (S.D. Tex. Aug. 31, 2009) (dismissing claims where disclosures were "clear and in language that can be easily understood by anyone who is capable of placing an online order for business cards."); *Baxter v. Intelius, Inc.*, 2010 WL 3791487, at *4 (C.D. Cal. Sept. 16, 2010) (dismissing claims where "[d]efendants disclosed the full terms of the newly offered membership in the Offer Details section ... [and] [t]he disclosures combined with affirmative steps for acceptance are sufficient that, as a matter of law, the webpage is not deceptive.").  Here, both Cerebral and Zealthy clearly disclosed the relevant terms and required customers to take affirmative action to proceed.

The Amended Complaint appears to concede that both Cerebral and Zealthy provided full disclosure to users, who agreed to them during the enrollment process.  *See* AC ¶¶ 66 (Cerebral's signup required agreement to "payment terms and recurring billing policy), *id.* ¶ 227 (Zealthy's Terms of Use provided disclosure).  That is fatal to any disclosure-based ROSCA claim.  *See* 15 U.S.C. § 8403(1) (negative option not unlawful if defendant "provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information").

Additionally, both companies' enrollment processes clearly indicated that users would be "billed monthly," to which users agreed.  AC ¶ 124.  Regarding Zealthy, the Amended Complaint makes conclusory allegations that the Company failed to disclose "material terms" regarding pricing, but the only specific allegations are about Zealthy's *advertisements* regarding *estimated*

costs.  *Id.* ¶¶ 220–23.  There are no allegations that the Company failed to disclose material terms during the actual "transaction."  These disclosures are consistent with ROSCA.  15 U.S.C. § 8403.

The complexity of their enrollment processes only further indicates that both companies complied with ROSCA.  Both Cerebral and Zealthy required customers to navigate a lengthy enrollment process, during which they must answer a number of questions about their health status and demographics.  AC ¶ 61 ("Cerebral has required consumers visiting its websites or apps to create an account, providing personal information such as their name, phone number, email address, birthdate, and their interest in obtaining mental health treatment. Thereafter, in many instances, Cerebral has required consumers to complete an online assessment to answer detailed questions about themselves and their mental health, and then select a treatment plan."); *id.* ¶ 233 (Zealthy users were required to fill "out a detailed online questionnaire during the enrollment process.").  During these processes, both Cerebral's and Zealthy's Terms of Use were presented to consumers.  *Id.* ¶¶ 62–63, 226–227.  Any consumer capable of navigating Cerebral's or Zealthy's enrollment would understand the companies' multiple disclosures regarding their services and monthly pricing.  *See Vistaprint*, 2009 WL 2884727, at *6 (finding adequate disclosure in a case involving business card website where the disclosures were "easily understandable by anyone capable of making an online purchase of business cards").

Beyond the enrollment process and Terms of Use, other parts of both Cerebral's and Zealthy's websites further reiterated that users would be charged a monthly fee.  For example, Cerebral's Frequently Asked Questions page indicates on multiple occasions that the service was a monthly subscription.  Ex. J (Cerebral FAQ), at 1–2, 9, 12.  Zealthy's Frequently Asked Questions also indicates that it offers a membership with a monthly cost.  Ex. K (Zealthy FAQ

Excerpts), at 1–3.  There can be no legitimate argument that Cerebral and Zealthy did not adequately disclose the terms of their subscriptions.

Nor do the alleged privacy and data security issues give rise to liability under ROSCA. Even if the Amended Complaint contained adequate pleadings regarding privacy and data security issues (it does not), no court has recognized that such issues are 'material terms of the transaction' within the meaning of ROSCA.  ROSCA's material terms must be about the 'transaction' itself— that is, billing structure and costs, not each particular aspect of the product, service, or business, like security or data handling.  *See F.T.C. v. Amazon.com, Inc.*, 2024 WL 2723812, at *9 (W.D. Wash. May 28, 2024) (noting the FTC only raised three purportedly inadequately disclosed material terms "(1) that the free trial automatically converted into a paid subscription; (2) the monthly cost [] after the free trial ended; and (3) that consumers were enrolling [] at all.").

At its core, ROSCA is intended to prevent undisclosed charges for additional unwanted products.  *See* 15 U.S.C. § 8401 (declaring policy of preventing hidden "membership clubs" and "free trial periods" that automatically enroll members).  This is why courts focus on whether customers are aware (i) of the product or membership they are purchasing, and (ii) that they will be charged on a recurring basis absent cancellation.  *See e.g.*, *Credit Bureau Ctr., LLC*, 937 F.3d at 770 (failing to disclose credit-monitoring "service [defendant] provided in exchange for the subscription"); *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1165 (C.D. Cal. 2021) (failing to disclose that customer would be auto-renewed after free trial).  Under the government's construction, every online subscription service would be liable under ROSCA for every inadvertent technical glitch, disruption of service, or other deviation from its terms of service and applicable disclosures.  ROSCA is not an all-purpose enforcement tool for the FTC to police online merchants and service providers.

*Cancellation.*   There can be no legitimate argument the companies failed to employ a "simple mechanism" for cancellation, as required by ROSCA—it was far easier to cancel than it was to sign up.   Per the FTC's policy statement, websites should provide "cancellation mechanisms *at least as easy to use* as the method the consumer used to initiate the negative option feature."  F.T.C. Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg. 60822, 60826 (Nov. 4, 2021) (emphasis added).  To sign up, a Cerebral customer had to undergo a complex, multi-step evaluation before even arriving at the subscription page.  AC ¶ 61. To cancel, users only needed to send an email and complete a brief cancellation assessment to help Cerebral understand why they were canceling.  *Id.* ¶¶ 132–37.  Cerebral's sign-up process is far more time-consuming and complex than what the Amended Complaint alleges Cerebral required for cancellation.  *Id.* ¶ 63.  Further, much of the complained-of conduct regarding Cerebral's cancellation predates the FTC's November 2021 guidance, which should preclude enforcement of an unconstitutionally vague phrase like 'simple mechanism for cancelation.'  After all, an agency must provide "fair notice" of its standards "*prior* to the [conduct] in question."  *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 258 (2012) (emphasis added).

Meanwhile, the Amended Complaint makes no effort to describe Zealthy's cancellation processes, let alone plausibly allege they are inadequate and more onerous than the sign up process. Instead the Amended Complaint relies on vague references to unspecified anonymous consumer complaints, AC ¶¶ 237–40—which is insufficient, *see supra* § A.4.a—and a conclusory assertion that, compared to its signup process (which is itself not described), Zealthy's cancellation flow was not "similarly easy."  AC ¶ 238.  The government's failure to address these cancellation flows is fatal to its ROSCA claim against Zealthy, Mr. Robertson, and Dr. Echeverry.  *See Match Grp.,*

*Inc.*, 2022 WL 877107, at *4 (failure "to allege [defendant's] other five cancellation methods are also not simple" required dismissal of ROSCA claim.").

## C. THE OPIOID ACT CLAIM (COUNT VI) REGARDING CEREBRAL SHOULD BE DISMISSED.

The Amended Complaint asserts an Opioid Act claim against Mr. Robertson and Mr. Martelli regarding the Cerebral allegations.  The Opioid Act provides for special remedies beyond Section 5 of the FTC Act for any "unfair or deceptive act or practice with respect to any substance use disorder treatment service."  15 U.S.C. § 45d(a).  Because the Amended Complaint does not plead a separate deceptive act or unfair practice with respect to its Opioid Act claim, this claim fails for the same reasons that the Section 5 claims fail.  *See supra* § A.  The claim further fails because it does not allege (i) Mr. Robertson or Mr. Martelli had the requisite knowledge or (ii) a connection between the allegations and the Opioid Act.

### 1.    The Amended Complaint Fails to Plead Knowledge.

As with ROSCA, the government faces a high bar to plead knowledge sufficient to establish individual liability under the Opioid Act.  *See supra* § B.1. The government cannot carry this burden given that it fails to allege Mr. Robertson's or Mr. Martelli's knowledge sufficient to create individual liability, as described above.  *See supra* § A.[18]  Even if it had, the government makes no effort to allege that Mr. Robertson or Mr. Martelli even knew the Opioid Act existed, much less that they had "actual knowledge" the "*unfair or deceptive and [were] prohibited by*" the Opioid Act, as required for monetary penalties.  15 U.S.C. § 45(m)(1)(A) (emphasis added).

---

[18]   As the Amended Complaint fails to allege any knowledge of the Opioid Act or its violation, civil penalties are likewise unavailable.

### 2.      The Amended Complaint Fails to Implicate the Opioid Act.

Even if the government had pleaded a deceptive act or unfair practice (it has not), it does not allege any deceptive or unfair practice relating to substance use disorder treatments.  The government has not alleged that a single substance-abuse customer was exposed to or affected by any of the alleged misconduct.  The only reference to substance abuse treatments at all is to note that the alleged review manipulation occurred "throughout the time that Cerebral offered abuse treatment and services to thousands of patients," AC ¶¶ 183, 198, but the government does not provide any detail about how this alleged conduct supposedly had anything to do with substance abuse treatment, much less that individuals seeking substance abuse treatment saw the reviews. The Amended Complaint's "laundry list of alleged bad acts" incorporated by reference to its Opioid Act count is not sufficient to state a claim.  *In re Checking Acct. Overdraft Litig.*, 694 F. Supp. 2d 1302, 1327 (S.D. Fla. 2010).

### CONCLUSION

For the foregoing reasons and authorities, the Amended Complaint should be dismissed in full with prejudice.

## Local Rule 7.1(b)(2) Request for Hearing

The undersigned respectfully requests a thirty-minute hearing to be held on this Motion to Dismiss because a hearing would assist the parties in arguing their points and applicable case law.

Respectfully submitted,

DATED: August 6, 2024

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: */s/ Shane Anthony Grannum*

Shane Anthony Grannum (FBN: 1055050)
2601 South Bayshore Drive, Suite 1550
Miami, FL 33133
Telephone: (305) 301-1423
shanegrannum@quinnemanuel.com

William Burck (*pro hac vice*)
JP Kernisan (*pro hac vice*)
1300 Eye Street, N.W., Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Facsimile: (202) 538-8100
williamburck@quinnemanuel.com
jpkernisan@quinnemanuel.com

Daniel Koffmann (*pro hac vice*)
Robert Longtin (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
danielkoffmann@quinnemanuel.com
robertlongtin@quinnemanuel.com

*Counsel for Defendant Kyle Robertson*

**COFFEY BURLINGTON**

By: */s/ Fernando L. Tamayo*

Fernando L. Tamayo (FBN: 28530)
Amanda Marie Comas (FBN: 1031015)
2601 South Bayshore Drive, PH One
Miami, FL 33133
Telephone: (305) 858-2900
ftamayo@coffeyburlington.com
acomas@coffeyburlington.com
lmaltz@coffeyburlington.com
service@coffeyburlington.com

*Counsel for Defendants Kyle Robertson, Zealthy, Inc., Gronk, Inc., and Bruno Health, P.A.*

**GELBER SCHACHTER & GREENBERG, P.A.**

By: */s/ Gerald Greenberg*

Gerald Greenberg (FBN: 440094)
Chris Sundby (FBN: 1026060)
One Southeast Third Avenue, Suite 2600
Miami, FL 33131-1715
Telephone: (305) 728-0950
ggreenberg@gsgpa.com
csundby@gsgpa.com

**LONDON & STOUT P.C.**

Ellen London (*pro hac vice*)
Rachel Naor (*pro hac vice*)
1999 Harrison Street , Suite 2010
Oakland, CA 94612
Telephone: (415) 862-8485
elondon@londonstoutlaw.com
rnaor@londonstoutlaw.com

*Counsel for Defendant Alex Martelli*

**TACHE, BRONIS, CHRISTIANSON AND DESCALZO, P.A.**

By: */s/ Marissel Descalzo*

Marissel Descalzo (FBN: 669318)
150 S.E. Second Ave., Suite 600
Miami, FL 33131
Telephone: (305) 537-9565
Facsimile: (305) 537-9567
mdescalzo@tachebronis.com

**BOURELLY, GEORGE + BRODEY PLLC**

Andrew George (*pro hac vice*)
1050 30th  Street, N.W.
Washington, DC 20007
Telephone: (202) 341-8805
andrew.george@bgblawyers.com

*Counsel for Defendant German Echeverry, M.D.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of August, 2024, I electronically filed the foregoing with the Court via its CM/ECF electronic filing system, which generates notices of electronic filing on all counsel of record.

By: <u>*/s/ Shane Anthony Grannum*</u>
Shane Anthony Grannum
Fla. Bar No. 1055050
