**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 24-cv-21376-KING/REID**

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

CEREBRAL, INC. *et al.*,

      Defendants.

**PLAINTIFF THE UNITED STATES OF AMERICA'S OPPOSITION TO**
**<u>DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARDS ....................................................................................................... 2

    A.   Rule 12(b)(6) Prohibits Fact-Intensive Arguments Beyond the Four Corners of the Complaint........................................................................................................... 2

    B.   Rule 8(a)'s Pleading Standards Apply to the Complaint. ................................... 3

RELEVANT ALLEGED FACTS........................................................................................ 6

    A.   The Unlawful Acts and Practices of Cerebral, Robertson, and Martelli........................ 6

    B.   The Unlawful Acts of Zealthy, Bruno Health, Robertson, and Echeverry ..................... 8

ARGUMENT ....................................................................................................................... 9

I.   THE COMPLAINT ADEQUATELY PLEADS VIOLATIONS OF THE FTC ACT AGAINST ALL DEFENDANTS. ................................................................................... 9

    A.   Relevant Legal Standards for an FTC Act Claim ........................................... 10

    B.   The Complaint States Claims Against Robertson for Unfair and Deceptive Data Privacy and Data Security Practices (Counts I-III)....................................... 11

    C.   The Complaint States a Claim Against Robertson and Martelli for Deceptive and Unfair Marketing and Consumer Review Practices (Count V)................................. 17

    D.   The Complaint States a Claim Against Robertson for Deceptive Cancellation Practices (Count IV)............................................................................................ 21

    E.   The Complaint States a Claim Against Zealthy, Bruno Health, Gronk, Robertson, and Echeverry for Unfair and Deceptive Practices (Count VIII). ....................... 22

II.   INJUNCTIVE RELIEF IS WARRANTED AGAINST ALL DEFENDANTS FOR THEIR PATTERN OF UNFAIR AND DECEPTIVE ACTS AND PRACTICES........................... 27

    A.   Relevant Legal Standard for Injunctive Relief................................................ 27

    B.   Robertson and Martelli's Conduct Warrants Injunctive Relief....................... 30

    C.   Gronk's Conduct Warrants Injunctive Relief.................................................. 33

III. THE COMPLAINT ADEQUATELY PLEADS ROSCA VIOLATIONS BY ROBERTSON, ECHEVERRY, BRUNO HEALTH, ZEALTHY, AND GRONK. ........................................ 33

    A.   ROSCA Applies to Online, Automatically Recurring Subscriptions. ........................ 33

i

B.     ROSCA Requires Disclosure of "All Material Terms," Not Just Those Directly Related to Payment. ................................................................................................... 35

C.     The Complaint States Claims for Violations of ROSCA (Counts VII and IX). ............ 38

D.     The Complaint Adequately Pleads That Defendants Had Knowledge of ROSCA Violations. ................................................................................................... 44

IV. THE COMPLAINT ADEQUATELY PLEADS VIOLATIONS OF THE OPIOID ACT BY ROBERTSON AND MARTELLI. ....................................................................................... 47

A.     The Complaint States a Claim for Unfair and Deceptive Practices Related to the Provision of Substance Abuse Treatment. ................................................................. 47

B.     The Complaint Adequately Pleads That Robertson and Martelli Had Knowledge of Opioid Act Violations. ................................................................................................... 48

CONCLUSION ............................................................................................................ 49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.W. by & Through J.W. v. Coweta Cnty. Sch. Dist.*, 110 F.4th 1309 (11th Cir. 2024)............. 47

*Baxter v. Intelius, Inc.*, 2010 WL 3791487 (C.D. Cal. Sept. 16, 2010)....................................... 40

*Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732
     (11th Cir. 1998)................................................................................................................. 46

*Bodden v. Travelers Prop. Casualty. Co. of Am.*, 423 F. Supp. 3d 1341 (S.D. Fla. 2019).......... 24

*Bonner v. Chambers Cnty.*, 2006 WL 1731135 (M.D. Ala. June 19, 2006)........................... 47, 49

*Bryant v. Avado Brands, Inc.*, 187 F.3d 1271 (11th Cir. 1999).................................................... 33

*Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657 (11th Cir. 2015) ........................ 5, 17, 18

*Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632 (S.D.N.Y. 2016) ....................................... 20

*CFTC v. Matrix Trading Grp.*, 2002 WL 31936799 (S.D. Fla. Oct. 3, 2002)............................. 30

*Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087 (11th Cir. 2017)..................................... 46

*Conley v. Gibson*, 355 U.S. 41 (1957) ...................................................................................... 2, 4

*CFPB v. Ocwen Fin. Corp.*, 2019 WL 13203853 (S.D. Fla. Sept. 5, 2019)................................... 5

*Copeland v. Housing Auth. of Hollywood*, 358 F. App'x 144 (11th Cir. 2009) .......................... 14

*Cote v. Countrywide Home Loans, Inc.*, 2010 WL 11646975 (N.D. Ga. Feb. 11, 2010)............. 40

*Doe v. Royal Caribbean Cruises, Ltd.*, 2012 WL 920675 (S.D. Fla. Mar. 19, 2012) ........... 47, 49

*Doebereiner v. Sohio Oil Co.*, 893 F.2d 1275 (11th Cir. 1990)................................................... 35

*Durgin v. Mon*, 659 F. Supp. 2d 1240 (S.D. Fla. 2009)............................................................... 19

*Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243 (11th Cir. 2016)............................................... 2

*Farmer v. BarkBox, Inc.*, 2023 WL 8522984 (C.D. Cal. Oct. 6, 2023)....................................... 40

*FTC v. Alcoholism Cure Corp.*, 2011 WL 13137951 (M.D. Fla. Sept. 16, 2011)....................... 38

*FTC v. Am. Entm't Distribs., Inc.*, 2012 WL 12964783 (S.D. Fla. Aug. 31, 2012) ......... 11, 13, 26

*FTC v. Amazon.com*, 2024 WL 2723812 (W.D. Wash. May 28, 2024) ................................ passim

*FTC v. Capital Choice Consumer Credit*, 2004 WL 5149998 (S.D. Fla. Feb. 20, 2004) ........... 18

*FTC v. Cardiff*, 2021 WL 3616071 (C.D. Cal. June 29, 2021) ................................................. 43, 47

*FTC v. Direct Benefits Grp., LLC*, 2013 WL 3771322 (M.D. Fla. Jul. 18, 2013) ........................ 19

*FTC v. Directv, Inc.*, 2016 WL 5339797 (N.D. Cal. Sept. 23, 2016) ........................................... 36

*FTC v. Dluca*, 2018 WL 4775634 (S.D. Fla. Sept. 5, 2018) .......................................................... 4

*FTC v. Fleetcor Techs., Inc.*, 620 F. Supp. 3d 1313 (N.D. Ga. 2022) .......................................... 28

*FTC v. Freecom Commc'ns. Inc.*, 401 F.3d 1192 (10th Cir. 2005) ............................................... 5

*FTC v. Health Formulas, LLC*, 2015 WL 2130504 (D. Nev. May 6, 2015) .............. 34, 36, 39, 41

*FTC v. HES Merch. Servs. Co.*, 2014 WL 12611275 (M.D. Fla. Feb. 20, 2014) .................... 4, 13

*FTC v. Hornbeam Special Situations, LLC*, 308 F. Supp. 3d 1280 (N.D. Ga. 2018) ..... 4, 5, 34, 46

*FTC v. Hornbeam Special Situations, LLC*, 391 F.Supp. 3d 1218 (N.D. Ga. 2019) ............. 28, 29

*FTC v. Johnson*, 96 F. Supp. 3d 1110 (D. Nev. 2015) ........................................................... 34, 35

*FTC v. Kochava, Inc.*, 2024 WL 449363 (D. Idaho Feb. 3, 2024) ............................................... 16

*FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238 (M.D. Fla. 2016) ................................... 28, 30, 32

*FTC v. Lucaslaw Ctr.*, 2010 WL 11506885 (C.D. Cal. June 3, 2010) ........................................ 38

*FTC v. Match Grp., Inc.*, 2022 WL 877107 (N.D. Tex. Mar. 24, 2022) ............................... 34, 44

*FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167(N.D. Ga. 2008) ........................... 28, 29, 31

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ........................................... 45

*FTC v. NPB Advertising, Inc.*, 218 F. Supp. 3d 1352 (M.D. Fla. 2016) ...................................... 18

*FTC v. On Point Capital Partners*, 17 F. 4th 1066 (11th Cir. 2021) ..................................... 10, 26

*FTC v. Partners In Health Care*, 189 F. Supp. 3d 1356 (S.D. Fla. 2016) ....................... 13, 18, 45

iv

*FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257 (S.D. Fla. 2019) .................. 10, 11, 12, 19

*FTC v. Roca Labs, Inc*., 345 F. Supp. 3d 1375 (M.D. Fla. 2018)............................... 18, 19, 37, 38

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019 ....................................................... 29

*FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346 (S.D. Fla. 2019) ...................... 10, 24, 36

*FTC v. Simple Health Plans*, 2024 WL 473995 (S.D. Fla. Feb. 7, 2024) ............................. 11, 26

*FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999) .......................................... 20, 37

*FTC v. SPM Thermo-shield, Inc.*, 2020 WL 6545975 (M.D. Fla. Nov. 6, 2020).................. 28, 29

*FTC v. Sterling Precious Metals, LLC*, 2013 WL 595713 (S.D. Fla. Feb. 15, 2013) ............... 4, 5

*FTC v. Student Aid Ctr., Inc.*, 281 F. Supp. 3d 1324 (S.D. Fla. 2016) ........................................... 4

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)......................................................................... 10

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007) ....................... 12, 14, 45

*FTC v. USA Fin., LLC*, 415 F. App'x 970 (11th Cir. 2011) ......................................................... 28

*FTC v. Wolf*, 1996 WL 812940 (S.D. Fla. Jan. 31, 1996) ..................................................... 11, 26

*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015)............................................... 16

*FTC. v. Am. Precious Metals*, *LLC*, 2012 WL 13114034 (S.D. Fla., Apr. 12, 2012).................... 4

*FTC. v. IAB Mktg. Assocs.*, 746 F.3d 1228 (11th Cir. 2014) ................................................ 10, 13

*GoPlus Corp. v. Crown Equip. Corp.*, 533 F. Supp. 3d 1344 (S.D. Ga. 2021) .............................. 3

*Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297 (11th Cir. 2024)................................... 5, 18, 23

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999)............................. 5

*Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186 (11th Cir. 2018)................................. 3

In re Cliffdale Assocs., 103 F.T.C. 110 (1984)............................................................................. 36

*In re Jones*, 2007 WL 1725593 (Bankr. N.D. Ala. June 13, 2007) ............................................. 40

*In re LexinFinTech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949 (D. Or. Nov. 24, 2021).......... 32

v

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447 (D. Md. 2020) ............................................................................................................................... 38

*In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101 (S.D. Fla. 2019) ......................... 33

*In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489 (1st Cir. 2009) ...................................... 16

*In re Vistaprint Corp Mktg. & Sales Pracs. Litig.*, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) ............................................................................................................................... 40

*Interlink Prods. Int'l v. F&W Trading LLC*, 2016 WL 1260713 (D.N.J. March 31, 2016)......... 20

*Johnson v. City of Atlanta*, 107 F.4th 1292 (11th Cir. 2024).......................................................... 3

*Kalpackchian v. Bank of Am. Corp.*, 832 F. App'x 579 (11th Cir. 2020) ............................... 3, 24

*Luke v. Gulley*, 975 F.3d 1140 (11th Cir. 2020) ............................................................................ 3

*Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001)..................................................................... 2

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211 (11th Cir. 2008) ......................... 36

*New York by James v. Sirius XM Radio Inc.*, 2024 WL 2348206 (S.D.N.Y. May 23, 2024) ...... 43

*Orkin Exterminating Co. v. FTC*, 849 F.2d 1354 (11th Cir. 1988) .............................................. 10

*Russello v. United States*, 464 U.S. 16 (1983) ............................................................................. 36

*Sawinski v. Bill Currie Ford, Inc.*, 866 F. Supp. 1383 (M.D. Fla. 1994) ....................................... 2

*Scottsdale Ins. Co. v. Sec. Fire Prevention, Inc.*, 2011 WL 772779 (S.D. Fla. Feb. 28, 2011)...... 2

*SIG, Inc. v. AT & T Digital Life, Inc.*, 971 F. Supp. 2d 1178 (S.D. Fla. 2013) ............................. 3

*Stouffer Hotel Co. v. Tchrs. Ins. & Annuity Ass'n*, 737 F. Supp. 1553 (M.D. Fla. 1990) ........... 36

*Terra Towers Corp. v. Am. Tower Int'l*, 2023 WL 8476576 (S.D. Fla. Sept. 19, 2023).............. 36

*Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132 (S.D. Cal. 2021)............................... 40

*U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301 (11th Cir. 2002).............................. 44

*United States v. Dawson*, 64 F.4th 1227 (11th Cir.)..................................................................... 35

*United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 757 (C.D. Cal. 2020) ................................... 34

*United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152 (C.D. Cal. 2021) ........................... 42, 43

*United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131 (4th Cir. 1996) ........................................... 44

*United States v. Prochnow*, 2007 WL 3082139 (11th Cir. 2007) .................................................. 44

*Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222 (10th Cir. 2023) ............................. 20, 21

*Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001) ...................................................... 5

## Statutes

15 U.S.C. § 45 ................................................................................................................................. 10

15 U.S.C. § 45d ......................................................................................................................... 47, 48

15 U.S.C. § 8401 ............................................................................................................................. 34

15 U.S.C. § 8402 ............................................................................................................................. 34

15 U.S.C. § 8403 ................................................................................................................. 34, 38, 41

15 U.S.C. 8404 ................................................................................................................................ 47

Fla. Stat. § 607.1405 ....................................................................................................................... 33

## Regulations

16 C.F.R § 310 ................................................................................................................................ 35

## Rules

Fed. R. Civ. P. 8(a) ........................................................................................................................... 3

Fed. R. Civ. P. 9(b) ........................................................................................................................... 5

## Other Authorities

*Black's Law Dictionary* (9th ed. 2009) ..................................................................................... 35, 40

## INTRODUCTION

The Amended Complaint (referred to herein as the "Complaint") alleges that under the direction of its CEO, Kyle Robertson, Cerebral repeatedly promised its patients that it would protect their privacy and safeguard their sensitive medical information.  Relying on those promises, patients entrusted Cerebral with their personal health information. In return, Robertson repeatedly betrayed these patients' trust.  He failed to protect their medical information against multiple data security failures, and he knowingly exploited it for marketing purposes to maximize Cerebral's profits. This misconduct led to a massive disclosure of nearly 3.2 million users' sensitive medical information to at least twenty third parties.  *See* First Am. Compl. ("FAC") at ¶ 89.  Despite promising patients that they could cancel their Cerebral subscriptions at any time, Robertson also deliberately refused to let patients do so in a simple way and continued charging them after they requested cancellation.  When patients posted negative online reviews of Cerebral, he even directed his employees to fabricate fictitious positive reviews to dilute those valid complaints, assuring them that he was "fine w[ith] fake ones." *Id*. at ¶ 180. After he was terminated from Cerebral, he remained undeterred. Working with other bad actors, he continued to betray patients' trust at his new company (Zealthy) by violating the same consumer protection statutes that he violated at Cerebral: the Federal Trade Commission Act ("FTC Act") and the Restore Online Shoppers' Confidence Act ("ROSCA").

In their Motion to Dismiss, Robertson and his co-Defendants assert that the egregious misconduct alleged in the Complaint was not unfair or deceptive, labeling it "ordinary business practices" and "customer service," and complaining that "no good deed goes unpunished." Mot. at 1, 3, 26.  But these actions were not good deeds; they were deliberately unlawful and pervasive, and Defendants have exhibited no desire to reform.  Their repeated and widespread unlawful conduct will not stop until they are held accountable.

In furtherance of this attempt to wave off the United States' claims, Defendants cherry-pick a handful of allegations from the Complaint while claiming — inaccurately — that other key allegations are missing.  Even a cursory review of the Complaint disproves that claim.  In addition, Defendants raise numerous fact-intensive arguments improper for resolution at the motion-to-dismiss stage.  At the same time, they apply the wrong procedural standard to the Complaint, rely on inapposite case law (including cases rejected by courts within the Eleventh Circuit), and interpret ROSCA in a way that contradicts that statute's plain text.

All of these errors show that Defendants' Motion to Dismiss should be denied in full.

## LEGAL STANDARDS

### A.  Rule 12(b)(6) Prohibits Fact-Intensive Arguments Beyond the Four Corners of the Complaint.

A motion to dismiss is designed to test "the legal sufficiency of the complaint, not the weight of the evidence." *Sawinski v. Bill Currie Ford, Inc.*, 866 F. Supp. 1383, 1385 (M.D. Fla. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).[1]  Accordingly, the Court must "accept all factual allegations in [the] complaint as true and take them in the light most favorable to [the United States]." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). To deny a motion to dismiss, the Court need only determine that the Complaint "raise[s] a right to relief above the speculative level." *Scottsdale Ins. Co. v. Sec. Fire Prevention, Inc.*, 2011 WL 772779, at *1 (S.D. Fla. Feb. 28, 2011).  Dismissal is inappropriate unless it "appears beyond doubt that the plaintiff can prove no set of facts … which would entitle him to relief." *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

Because a motion to dismiss is not intended to resolve factual disputes, the Court properly

---

[1]  All emphases added and internal citations and quotation marks omitted unless otherwise indicated.

"confine[s] [its review] to the allegations within the complaint." *SIG, Inc. v. AT & T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1188 (S.D. Fla. 2013).   The limited exception to this rule is the incorporation-by-reference doctrine, which permits a Court to consider documents beyond the four corners of a complaint if they are both "(1) central to the plaintiff's claim; and (2) undisputed, meaning that [their] authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). This doctrine, however, does not permit a defendant to introduce every document so much as mentioned in a complaint.   To be central to a claim, a document must be a "necessary part" of proving up the cause of action.   *GoPlus Corp. v. Crown Equip. Corp.*, 533 F. Supp. 3d 1344, 1353 (S.D. Ga. 2021) ("[A] single reference does not automatically make [a document] central to [plaintiff's] claims.").   Moreover, a document is not "undisputed" unless it is an accurate, complete version of the document referenced in the complaint.   *See Kalpackchian v. Bank of Am. Corp.*, 832 F. App'x 579, 583 (11th Cir. 2020) ("[P]laintiff can dispute … [authenticity] simply by saying … [a document] is not the one referred to in her complaint."); *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002) (declining to incorporate an excerpt).

Even where a document is incorporated by reference, the Court must still "construe [it] in the light most favorable to [the United States] and resolve all reasonable inferences in …  favor" of denying the motion to dismiss.   *Luke v. Gulley*, 975 F.3d 1140, 1144-45 (11th Cir. 2020) (vacating dismissal of complaint where incorporated document did "not eliminate every reasonable inference" supporting claim); *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1197-98 (11th Cir. 2018) (vacating dismissal where court failed to interpret incorporated label in the light most favorable to plaintiff and credit allegations that certain portions of the label were false).

### B.  Rule 8(a)'s Pleading Standards Apply to the Complaint.

Federal Rule of Civil Procedure 8(a) sets forth the pleading standard that governs the

Complaint. Under Rule 8(a), a complaint need only provide "a short and plain statement," sufficient to "give the defendant fair notice of" a claim and "the grounds upon which it rests." *Conley*, 355 U.S. at 47.

Relying on a single case from 2012 — a case that is an outlier in this district — Defendants erroneously assert that the Complaint is instead subject to Rule 9(b).  *See* Mot. at 12 (citing *FTC. v. Am. Precious Metals*, *LLC*, 2012 WL 13114034 (S.D. Fla., Apr. 12, 2012)).  Defendants are wrong.  Indeed, no other court in this district has relied on, or even favorably cited, *American Precious Metals* in the more than twelve years since its publication.[2]  To the contrary, in recent years courts both in this district and throughout the Eleventh Circuit have consistently rejected the argument that claims under Section 5 of the FTC Act are subject to Rule 9(b).  *See, e.g.*, *FTC v. Dluca*, 2018 WL 4775634, at *1 (S.D. Fla. Sept. 5, 2018) ("[C]ourts in this district uniformly apply the pleading standard set forth in Rule 8(a) to claims under Section 5 of the FTCA.").[3]

The consensus in this district that Rule 9(b) does not apply to claims under the FTC Act recognizes, correctly, that Section 5 claims are not fraud claims.  Unlike a plaintiff raising a fraud claim, a plaintiff in a Section 5 action "need not prove scienter, reliance, or injury to establish a [Section] 5 violation."  *Sterling Precious Metals*, 2013 WL 595713, at *3.  Moreover, an FTC action is not "designed to remedy a singular harm, but [is] a government action brought to deter

---

[2] A search conducted on Westlaw shows that this case has not been cited in any subsequent opinion or trial court order in the Southern District of Florida or elsewhere.

[3] *See also, e.g.*, *FTC v. Student Aid Ctr., Inc.*, 281 F. Supp. 3d 1324, 1331-32 (S.D. Fla. 2016) ("Rule 9(b) does not apply because the complaint does not assert claims based on fraud or mistake."); *FTC v. Sterling Precious Metals, LLC*, 2013 WL 595713, at *3 (S.D. Fla. Feb. 15, 2013) ("A § 5 claim simply is not a claim of fraud as that term is … contemplated by Rule 9(b)."); *FTC v. HES Merch. Servs. Co.*, 2014 WL 12611275, at *2 (M.D. Fla. Feb. 20, 2014) ("The Court finds the conclusion [declining to apply Rule 9(b)] … superior."); *FTC v. Hornbeam Special Situations, LLC*, 308 F. Supp. 3d 1280, 1287 (N.D. Ga. 2018) ("Contrasting the elements of fraud with the elements of an FTC Act claim … warrants a conclusion that Rule 9(b) does not apply.").

deceptive acts and practices aimed at the public" on behalf of "consumers who purchased defendants' products and services over an extended period of time." *FTC v. Freecom Commc'ns. Inc.*, 401 F.3d 1192, 1203-04 n.7 (10th Cir. 2005).[4]  In light of these differences, courts have cautioned against extending Rule 9(b)'s pleading requirements to consumer protection claims in the absence of any "clear, binding directive from Congress, the Supreme Court, or the Eleventh Circuit." *See CFPB v. Ocwen Fin. Corp.*, 2019 WL 13203853, at *14 (S.D. Fla. Sept. 5, 2019).

Defendants provide this Court no reason to depart from the consensus among courts in this district that Rule 9(b) does not apply to claims under the FTC Act.  Nonetheless, even if Rule 9(b) applied, the Eleventh Circuit has repeatedly emphasized that "[s]pecificity under Rule 9(b) does not ... eliminate the concept of notice pleading." *Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 662 (11th Cir. 2015); *see also Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (same).  For that reason, the Eleventh Circuit disfavors dismissing complaints based on an alleged failure to comply with Rule 9(b) so long as "the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial" and the "plaintiff has substantial prediscovery evidence of those facts." *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1318 (11th Cir. 2024) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).  This is particularly true in the context of "prolonged multi-act schemes," where Rule 9(b) "permits a plaintiff to plead the overall nature of the fraud" accompanied by a limited set of illustrative examples. *Burgess*, 600 F. App'x at 662-63.

Moreover, even where Rule 9(b) applies, "knowledge[] and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  Accordingly, Defendants' arguments based

---

[4] Although non-binding, *Freecom Communications* has been found persuasive by courts within the Eleventh Circuit. *E.g.*, *Sterling Precious Metals*, 2013 WL 595713, at *3; *Hornbeam Special Situations*, 308 F. Supp. 3d at 1287.

on an alleged failure to plead issues of knowledge and control with heightened particularity (*see, e.g.*, Mot. at 2) are baseless, regardless of whether the Court applies Rule 8(a) or Rule 9(b).

**RELEVANT ALLEGED FACTS**

The Complaint (ECF No. 21) contains 68 pages of allegations, detailing the numerous ways in which Robertson and his co-Defendants at Cerebral and Zealthy manipulated vulnerable consumers in need of mental health treatment, substance abuse treatment, and other health care. The United States summarizes here only the main contours of their deceptive and unfair conduct.

**A.  The Unlawful Acts and Practices of Cerebral, Robertson, and Martelli**

Cerebral is a telehealth company, marketed to consumers seeking private and secure treatment for mental health concerns and substance abuse disorders.  FAC ¶ 34.  Cerebral operates through a "negative option" subscription service, in which consumers are charged a monthly fee for subscriptions that automatically renew unless the customer cancels them.  *Id.* ¶ 36.  Since 2019, hundreds of thousands of patients have used Cerebral's online service.  *Id.* ¶ 34.

Robertson co-founded Cerebral in 2019 and served as its CEO until he was fired in May 2022.  *Id.* ¶¶ 6, 40.  Robertson was intimately involved in "formulat[ing], direct[ing], control[ling]" Cerebral's policies and practices.  *Id.* ¶¶ 6, 42.  He drafted company policies, including policies "related to privacy [and] disclosure of user data."  *Id.* ¶ 7.  He also "defin[ed company] strategy;" directed the employees working on legal, compliance, and data-security issues; led Cerebral's marketing team; and approved Cerebral's budgets.  *Id.* ¶¶ 8, 42-50.  Defendant Alex Martelli worked alongside Robertson, focusing on growth and marketing.  *Id.* ¶¶ 10, 43.

As part of its provision of mental health services, Cerebral collected extensive personal health information.  *Id.* ¶ 37.  Cerebral claimed — falsely — that it "use[d] the latest information security to protect [this] data," so that patients could trust their personal information was "safe,

6

secure, and discreet." *Id.* ¶ 38; *see also id.* ¶¶ 39, 55-73.  In reality, driven by Robertson's unilateral focus on growth (*id.* ¶ 48), Cerebral and Robertson repeatedly and knowingly violated these promises to patients to keep their data secure (*see, e.g.*, *id.* ¶¶ 90-92, 105).  Throughout Robertson's tenure, Cerebral suffered from "chronic data security problems" that resulted in "dozens" of data breach incidents.  *Id.* ¶¶ 103-05.  For example, in 2021 "Cerebral released the confidential medical files of 880 patients."  *Id.* ¶ 93.  In a separate incident that same year, Cerebral failed to implement systems to stop former employees from accessing patient files after termination, resulting in a breach of at least 266 files.  *Id.* ¶ 94.  This problem remained unabated at least through January 2022, when 19 patient files were once again accessed by former employees.  *Id.* ¶ 98.  Even after Robertson was fired, the policies created under his leadership — such as having all employees share a single password to access patient files — resulted in further breaches.  *Id.* ¶¶ 100-02.

In addition to these data breaches, Robertson chose to intentionally misuse the personal health information of Cerebral's users to pursue profits and growth.  *See id.* ¶¶ 73-90.  Specifically, he "drove Cerebral's decision" to "integrat[e] third party tracking tools into its websites and apps" in order to have these tools collect personal health information from patients for the purposes of targeted advertising.  *Id.* ¶¶ 74-75, 77-84.  These tracking tools were used to "barrage" new and potential Cerebral customers with "aggressive" advertising on "search engines and social media." *Id.* ¶ 75.  Ultimately, Robertson's intentional misuse of private information caused the nonconsensual release of private information of 3.2 million users.  *Id.* ¶¶ 88-90.

Robertson and Martelli also drove Cerebral's growth by suppressing and manipulating patient reviews.  *See id.* ¶¶ 173-98.  Robertson and Martelli manipulated authentic reviews by (1) offering financial incentives to patients who posted negative reviews so that they would alter or remove them, (2) directing employees to "downvot[e]" negative patient reviews to bury them in

search results, and (3) falsely reporting valid reviews as inauthentic to have them removed. *Id.* ¶¶ 184-95. Robertson also went further, directing Cerebral employees to post fictitious positive reviews, emphasizing "I'm fine wi[th] fake ones." *Id.* ¶¶ 177-80. Martelli readily complied with this directive by drafting and posting multiple fake reviews praising Cerebral. *Id.* ¶ 181-82.

Robertson also undertook actions to ensure that, once enrolled, many patients could not cancel their subscription (*id.* ¶ 155), contravening the public claim that patients could "[c]ancel anytime" (*id.* ¶ 123). For example, Robertson directed Cerebral to remove its online cancellation option entirely. *Id.* ¶¶ 152-54. The resulting cancellation process caused confusion and frustration for an untold number of patients who were unable to cancel. *Id.* ¶¶ 158-70. And even after some patients were able to submit cancellation requests, they were subjected to continued charges totaling "over $8 million." *Id.* ¶¶ 119, 142.

Cerebral fired Robertson in May 2022, *id.* ¶ 40, but (as described below) he remains actively engaged in materially similar misconduct at Zealthy. Martelli also left Cerebral, but he continues to work in the digital health space at a company he describes on his LinkedIn as "Stealth Startup." *Id.* ¶ 255.

### B. The Unlawful Acts of Zealthy, Bruno Health, Robertson, and Echeverry

After Cerebral terminated him, Robertson founded Zealthy, another telehealth company, in partnership with Defendant German Echeverry. *Id.* ¶ 199. Using a negative option feature, Zealthy enrolls patients in automatically renewing subscriptions to telehealth services to help with issues such as weight loss, erectile disfunction, hair loss, and depression. *Id.* ¶¶ 14, 200. Those service are provided by Bruno Health. *Id.* ¶ 202. Echeverry is Bruno Health's President, Director, and Compliance Director, while Robertson is its CFO. *Id.* Robertson has been Zealthy's CEO, and Echeverry has served as Zealthy's Senior Medical Director. *Id.* ¶ 201.

Under their leadership, Zealthy and Bruno have repeated several of Cerebral's unlawful practices. They have made numerous false or misleading representations about the costs of their services, the services covered by those costs, a subscription's term and auto-renewal features, a consumer's ability to cancel and obtain a refund, the availability of insurance coverage, and the use and disclosure of consumers' private information. *Id*. ¶¶ 220-41, ¶¶ 290-91. Zealthy and Bruno Health have also failed to disclose several material terms of their subscriptions and instead have buried them in fine print and locations that patients are unlikely to see. Those hidden terms include subscription costs, whether medications were likely to receive insurance coverage, patients' ability to cancel their subscriptions and to obtain refunds, and how patients' personal data may be used and disclosed. *Id*. ¶¶ 220, 226-28, 230-34.

Moreover, Zealthy and Bruno Health have undertaken several unfair practices. They have charged patients for costs that they did not agree to pay (*id*. ¶¶ 224, 292); completely disregarded patients' cancellation requests (and continued charging them) (*id*. ¶ 292); made it challenging for patients to cancel (*id*. ¶¶ 292, 236-41); and tracked, collected, disclosed, and used consumers' sensitive personal data in ways that were not fully disclosed to consumers and that consumers did not knowingly authorize (*id*. ¶¶ 224, 231-35, 292).

## ARGUMENT

## I.   THE COMPLAINT ADEQUATELY PLEADS VIOLATIONS OF THE FTC ACT AGAINST ALL DEFENDANTS.

The Complaint brings six counts under Section 5 of the FTC Act for Defendants' deceptive and unfair acts and practices (Counts I–V and VIII). Defendants' motion to dismiss raises similar arguments against all six counts, claiming that each (1) fails to allege an unfair or deceptive act or practice and/or (2) fails to allege a basis for individuals to be held liable. Those arguments rely on mischaracterizations of the relevant legal standards and of the Complaint's allegations. Applying

9

the correct legal standards to the Complaint's actual allegations reveals that Defendants' arguments lack merit and Plaintiff's FTC Act claims adequately plead a pattern of deceptive and unfair acts and practices sufficient to sustain individual liability.

### A.  Relevant Legal Standards for an FTC Act Claim

#### 1.  <u>Unfair or Deceptive Acts and Practices</u>

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  An act or practice is deceptive when "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances[;] and (3) the representation was material."  *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003).  Courts address the question of whether a representation is likely to mislead consumers by considering the "overall, net impression rather than the literal truth or falsity" of the representation.  *FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1360 (S.D. Fla. 2019).  An act or practice is "unfair" under Section 5 if it is (1) "likely to cause substantial injury to consumers"; (2) "not reasonably avoidable by consumers"; and (3) "not outweighed by any countervailing benefits to consumers or competition."  *See* 15 U.S.C. § 45(n);  *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1285 (S.D. Fla. 2019).  A practice can be "unfair without being deceptive."  *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1367 (11th Cir. 1988).

#### 2.  <u>Individual Liability Under the FTC Act</u>

For an individual to be liable under Section 5, he needs to have only "some knowledge of the [deceptive] practices."  *FTC v. On Point Capital Partners*, 17 F. 4th 1066, 1083 (11th Cir. 2021); *see also FTC. v. IAB Mktg. Assocs.*, 746 F.3d 1228, 1233 (11th Cir. 2014) (requiring participation or control and "some knowledge" of the practices).  Knowledge can be shown by (1) "actual knowledge," (2) "reckless[] indifferen[ce] to the truth or falsity of ... misrepresentations," or (3) "an awareness of a high probability of fraud and intentionally avoid[ing] knowing the truth."

*FTC v. Simple Health Plans*, 2024 WL 473995, at *12 (S.D. Fla. Feb. 7, 2024).  Moreover, "[a]n individual's degree of participation in the business is probative of knowledge."  *Partners in Health Care Ass'n., Inc.*, 189 F. Supp. 3d at 1367. Individuals should know of deceptive conduct where the "misrepresentations at issue formed a central part of" their business and they participated in it.  *FTC v. Wolf*, 1996 WL 812940, at *8 (S.D. Fla. Jan. 31, 1996).  In such circumstances, it is "'simply not plausible that an individual with control over the company did not know of the deceptive practices."  *FTC v. Am. Entm't Distribs., Inc.*, 2012 WL 12964783, at *12 n.23 (S.D. Fla. Aug. 31, 2012).  In addition, an individual's direct participation in wrongdoing establishes liability.  *See Pointbreak Media*, 376 F. Supp. 3d at 1271.

## B. The Complaint States Claims Against Robertson for Unfair and Deceptive Data Privacy and Data Security Practices (Counts I-III).

Counts I-III allege that, as Cerebral's CEO, Robertson directed practices that violated Cerebral's assurances to users that their sensitive, personal data would be safeguarded from improper disclosure.  *See, e.g.*, FAC ¶¶ 38, 56-65, 86, 121.  By directing practices that flouted Cerebral's misleading assurances, Robertson violated the FTC Act.  Robertson's arguments to the contrary — *i.e.*, (1) that the data-security lapses were "isolated" mistakes and (2) that he lacked knowledge of those issues — ignore or blatantly mischaracterize the Complaint.  Robertson also repeatedly goes beyond the four corners of the pleading by engaging in inapposite, fact-intensive disputes that have no bearing on the sufficiency of the Complaint's allegations.

### 1. Robertson Directly Participated in and Had Knowledge of the Data Security and Data Privacy Violations by Cerebral.

Cerebral engaged in practices, at Robertson's direction, that flouted its strong data security and privacy assurances to its patients.  Instead of honoring those assurances, Cerebral intentionally disclosed and used its patients' most sensitive health information for marketing purposes (FAC ¶¶

73-92) and repeatedly mishandled and exposed that same information (*id.* ¶¶ 93-104).[5] By directing practices that undermined, and rendered misleading, Cerebral's assurances to patients, Robertson knowingly engaged in unfair or deceptive acts under Section 5. In seeking to avoid liability for his pattern of misconduct, Robertson primarily argues, despite his role as CEO and founder of a company that initially had only a small number of employees (*id.* ¶41), that he lacked knowledge of the unfair and deceptive acts and practices at Cerebral. Mot. at 16-21. This assertion fails on even a cursory review of the Complaint, which shows Robertson (1) directly participated in, (2) knew about, and (3) directed the relevant misconduct. Taken alone or in concert, these allegations more than meet the pleading standard to show knowledge.

First, the Complaint alleges Robertson's direct participation in the wrongdoing. For example, Robertson allegedly knowingly directed — and even micromanaged[6] — Cerebral's unauthorized use of tracking technologies, and he gave directives regarding data security practices that increased the risk of, and in some cases led to, foreseeable breaches. FAC ¶¶ 108-09, 111-14. Because he allegedly participated directly in shaping Cerebral's unfair and deceptive privacy and data security practices, Robertson is individually liable. *Pointbreak Media*, 376 F. Supp. 3d at 1271 (direct participation in deceptive practices establishes liability); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1272 (S.D. Fla. 2007) (holding executive who participated in making misleading representations liable). To be clear, the law does not require that Robertson have

---

[5] Robertson dwells on a semantic distinction between "personal health information" and "protected health information" (Mot. at 20-21), terms that are functionally interchangeable. *See, e.g.*, *Terms of Use*, https://cerebral.com/terms-and-conditions (last visited October 15, 2024) (referring to "personal health information"). In relation to allegations about the disclosure of telehealth patients' personal information, this distinction makes no difference to the legal analysis, nor do Defendants explain why it would.

[6] Robertson ignores the host of allegations indicating his direct, and knowing, control of these practices. *See, e.g.*, FAC ¶¶ 75-84 (alleging Robertson directed use of health data for targeting, set up targeting accounts, directed Pixel placement, reviewed ads, and formulated marketing strategy).

"personally perform[ed]" the unfair or deceptive acts. *HES Merch. Servs.*, 2014 WL 12611275, at *3. But that the Complaint alleges his personal, direct involvement incriminates him all the more resoundingly. *See, e.g.*, FAC ¶ 78 (targeted advertising accounts using patient data set up in Robertson's name); *id.* ¶ 79 (Robertson personally helped direct "Pixel placement" on website to collect patient data for targeted advertising); ¶ 106 (Robertson participated in discussions about security problems and responses); *id.* ¶ 110 (Robertson reviewed and approved company policies on data security and data breaches); *id.* ¶ 114 ("Robertson overrode significant data security concerns raised by his top data security reports.").

Second, in addition to his direct participation, other allegations more than satisfy the standard to show that Robertson plausibly had at least "some knowledge" of the misconduct. *IAB Mktg.*, 746 F.3d at 1233. After all, the allegations refer to data-security policies he approved (FAC ¶¶ 7, 44), information security teams he led (*id.* ¶¶ 8, 42, 45-46), related decisions he made (*id.* ¶¶ 75-84, 108, 111-112, 114), and relevant practices he directed (*id.* ¶¶ 73-84, 105-115). Even without these specific allegations, Robertson's "degree of participation in the business" as Cerebral's CEO is probative of the requisite knowledge. *Partners In Health Care*, 189 F. Supp. 3d at 1367. And where, as here, the practices at issue "formed a central part of the business," it is "simply not plausible that an individual with control over the company did not know of the deceptive practices." *Am. Entm't Distribs.*, 2012 WL 12964783, at *12, n.23 (granting summary judgment in favor of the FTC). Robertson's claim that he was not responsible for writing code (Mot. 16-17) is a strawman argument; he allegedly understood that Cerebral used tracking technologies to exploit users' personal health information for marketing purposes. FAC ¶¶ 73-87.

Third, Robertson does not even dispute that the Complaint alleges he had authority to direct and control Cerebral's policies and practices, waiving any arguments to the contrary. *See, e.g.*,

*Copeland v. Housing Auth. of Hollywood*, 358 F. App'x 144, 144 (11th Cir. 2009). Nor could he reasonably do so. *See Transnet Wireless*, 506 F. Supp. 2d at 1272 (holding the "authority to control the corporation and … participation [of CEO] is unquestionable."). Critically, however, the allegations establishing Robertson's authority are equally illustrative of his knowledge. For example, the Complaint elucidates Robertson's close control of Cerebral's practices related to data security and data privacy, including by reviewing and approving related policies (FAC ¶¶ 7, 44) and by controlling relevant staffing, budgetary, and strategic decisions (*id.* ¶¶ 45-48, 77-79, 114). The allegations suggest that Robertson had an outsized impact in directing Cerebral's data practices throughout his tenure, directly contradicting the claim of executive "remoteness" or multiple "reporting layers" that Robertson argues insulates him from knowledge of the misconduct at issue. Mot. at 17-18. As does the fact that Robertson founded Cerebral as a startup, with a "limited number of employees," all "under [his] supervision." FAC ¶ 41. While indicative of authority to control, this hands-on participation also supports a reasonable inference of knowledge.

## 2. The Complaint Alleges Deceptive and Unfair Data Security and Data Privacy Practices.

Contrary to Defendants' assertions, the Complaint plainly alleges deceptive and unfair data privacy and data security practices. Robertson attempts to evade his straightforward liability by disregarding the Complaint's allegations in favor of asking the Court to accept as true his inaccurate, self-serving characterizations of Cerebral's unlawful failures as mere good-faith mistakes. For example, Robertson argues that the data privacy allegations are reducible to a "technical error" or "glitch"[7] (Mot. at 16-17, 19), and that the alleged data security breaches were

---

[7] Robertson improperly bases his argument on the contents of a 2023 Cerebral disclosure notification letter. Mot. at 7-8. This letter is only glancingly referenced in the Complaint in reference to the scope and timeframe of the disclosure. FAC ¶ 89. Because the government does not rely on the letter to allege unfair or deceptive practices, the letter is not incorporated by

isolated incidents (*id.* at 22-23).  He even attempts to dispute the government's allegations regarding the mechanics of the tracking technology at issue, including by making a series of unfounded claims about how the Meta Pixel works (*id.* at 19-21).[8]  But even if they bore on the standards for FTC Act liability (they do not) or were appropriate to make on a motion to dismiss (they are not), these fact-driven defenses fail to engage with the actual allegations pleaded.

Contrary to Robertson's evasive retelling, the allegations describe Robertson's knowing direction of the systemic, hidden use of users' personal data — including their health data — for marketing purposes.  FAC ¶¶ 73-78, 83. And far from alleging isolated and unforeseeable data breaches, the government has alleged that Robertson (1) directed large-scale intentional disclosures of data belonging to millions of patients (*id.* ¶¶ 73-88); and (2) exposed Cerebral patients to numerous, significant data breaches[9] by failing to ensure that basic, critical safeguards were in place.  *See, e.g.*, FAC ¶¶ 91-115; *see also id.* ¶ 108 (Robertson was aware of "***chronic*** data security problems" but "failed to ensure that the company correct[ed] those problems").

Robertson is simply wrong to claim that these data security breaches cannot be unfair practices because — he says — they do not involve a substantial injury.  Numerous courts have found to the contrary.  *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 247 (3d Cir.

---

reference.  *See supra*, p. 3.  Even if it were, the Court must interpret the letter in the light most favorable to the United States and credit the Complaint's allegations that that dispute Cerebral's self-serving remarks in the letter about the disclosure's cause.  *See Luke*, 975 F.3d at 1144.

[8] For instance, Robertson argues that "Cerebral … [did] not track and store its users' online activity" via the Meta Pixel (Mot. at 21), but the Complaint precisely alleges that Cerebral tracked this data (FAC ¶¶ 74, 77, 88).  Robertson also argues that it only "paid for access to data collected by companies like Facebook" (Mot. at 21), but the Complaint alleges that Cerebral used data that it intentionally tracked from its own users (FAC ¶¶ 73-74, 77).

[9] Robertson argues that two of the alleged data security breaches occurred after he was fired.  *See* Mot. at 26.  But most of the alleged breaches occurred while he was CEO, and even breaches occurring in the months after his departure are plausibly traceable to his misconduct, given his failure to adopt basic data security safeguards and mitigate risks.  FAC ¶¶ 91-92, 104, 111-113.

2015) (deficient data security practices constituted unfair practice); *In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 498 (1st Cir. 2009) (same); *FTC v. Kochava, Inc.*, 2024 WL 449363, at *4 (D. Idaho Feb. 3, 2024) (finding substantial injury involving failure to protect private information from disclosure). Robertson's argument that the data breaches caused only the "possibility" of injury (Mot. at 22) is equally inapt, as the allegations include the disclosure of patient files belonging to hundreds of Cerebral patients (*see, e.g.*, FAC ¶¶ 93-94).

Moreover, Robertson's irrelevant, unfounded contentions regarding the mechanics of the Pixel technology contradict the allegations that, at Robertson's direction, **Cerebral**, and not Facebook, used the Pixel to intentionally track certain data from its patients (*id.* ¶¶ 73-74, 77, 83) including by choosing where to install the Pixel on its webpages (*id.* ¶ 79), and then deliberately chose to use that data to direct targeted advertisements. *Id.* ¶¶ 75, 77, 83. Robertson's attempt to trivialize the massive unauthorized disclosure of patient information through the use of Pixels at his direction — which lasted nearly three years and impacted millions of Cerebral users (*id.* ¶ 89) — as "a single, undiscovered technological error"[10] and "**one** data privacy incident" (Mot. at 22) (emphasis in original) is shocking, as is his conversion of this years-long campaign of alleged lawbreaking into a plaudit. *See id.* (arguing that Robertson "actually did a pretty good job.").

Robertson's self-absolving account of a CEO oblivious to engineering-line nuances, technical glitches, and innocuous, one-off breaches has no basis in — and is directly contrary to — the Complaint's allegations. Nor do Robertson's scattershot, fact-driven arguments hold any weight at the motion-to-dismiss stage. They fail to overcome the well-pleaded allegations

---

[10] Robertson contends that the allegations traffic in an after-the-fact falsity argument. Mot. at 20. But the Complaint clearly alleges that Robertson intentionally tracked and disclosed users' personal health information at the *same* time that Cerebral assured users it kept their data private. FAC ¶¶ 73-74, 86-87.

regarding his knowing direction of violative practices that harmed millions of telehealth patients.

### C. The Complaint States a Claim Against Robertson and Martelli for Deceptive and Unfair Marketing and Consumer Review Practices (Count V).

Counts V pleads a claim against Robertson and Martelli for their unfair and deceptive manipulation of online reviews, including their suppression of authentic negative reviews and their creation of fictitious reviews. Robertson and Martelli offer a bevy of arguments in support of their assertion that their misconduct was not unfair or deceptive. None withstands scrutiny.

First, Robertson and Martelli make the stunning argument that their deceptive acts were merely "customer service." Mot. at 26. This argument strains credulity in light of the Complaint's allegations. Count V alleges that Robertson and Martelli published positive reviews that were completely fictitious (FAC ¶¶ 177-83) and suppressed authentic negative reviews, including by causing websites to remove negative reviews by ***knowingly and falsely*** informing them that the reviews had not been authored by Cerebral's patients (*id.* ¶¶ 191-92) and manipulating the appearance of patients' comments by directing its own employees to "upvote" positive reviews and "downvote" negative reviews (*id.* ¶¶ 193-96). At trial, Defendants can argue that this misconduct is a "customer service" if they truly believe a jury will credit that argument. But at the pleading stage, these actions plausibly plead unfair and deceptive acts and practices.

Second, Robertson and Martelli argue that the Complaint lacks details about the reviews, such as "how many reviews there were, when or where they were posted, how or why they were false, if they were ever published by third party sites, or if consumers were ever exposed to them." Mot. at 24. But this argument ignores that Rule 8(a), not Rule 9(b), governs the Complaint, and that even in circumstances where Rule 9(b) does apply, that rule "does not … eliminate the concept of notice pleading." *See supra*, pp. 4-6 (quoting *Burgess*, 600 F. App'x at 662). It also ignores the Complaint's actual allegations, including, for example, allegations that beginning around July

17

2020, under Robertson's direction, Martelli posted reviews to trustpilot.com that were entirely fictitious and misleadingly impersonated real Cerebral patients, in order to influence consumers who were considering subscribing to its services.  *See* FAC ¶¶ 178, 181.  These allegations sufficiently "plead the overall nature of the fraud," provide "illustrative examples," *Burgess* 600 F. App'x at 662-63, and make Robertson and Martelli "aware of the particular circumstances for which [they] will have to prepare a defense at trial," *Gose*, 109 F.4th at 1318.[11]

Third, Robertson and Martelli argue that the Complaint fails to allege that the reviews were material representations that were likely to mislead consumers acting reasonably under the circumstances.  Mot. at 24-25.  But the Complaint actually does allege precisely that.  FAC at ¶¶ 278-79.  Moreover, claims "that significantly involve health" are presumed material, *FTC v. Roca Labs, Inc*., 345 F. Supp. 3d 1375, 1386 (M.D. Fla. 2018), as are claims "used to induce the purchase of a particular product or service," *Partners In Health Care*, 189 F. Supp. 3d at 1364. The compensation of testimonialists is also material.  *FTC v. NPB Advertising, Inc*., 218 F. Supp. 3d 1352, 1361 (M.D. Fla. 2016) (awarding summary judgment on Section 5 claim because defendant failed to disclose payments and gifts to testimonialists). And, an "inference of materiality may reasonably be made when a deceptive omission is found."  *FTC v. Capital Choice Consumer Credit*, 2004 WL 5149998, at *33 (S.D. Fla. Feb. 20, 2004).  The Complaint's allegations implicate all of those presumptions of materiality.  To induce patients to subscribe to Cerebral's healthcare services, Robertson and Martelli allegedly caused Cerebral employees to post fictitious reviews

---

[11] *Verbena Prod. LLC v. Pierre Fabre Dermo-Cosmetique USA*, 2020 WL 2988587 (S.D. Fla. Feb. 28, 2020), which Defendants cite (Mot. at 25) is inapposite. There, a notice sent to eBay was not sent to customers. *Id*. *4. Here, the reviews manipulated by Robertson and Martelli were public. Likewise, *Casper Sleep, Inc. v. Nectar Brand LLC*, 2020 WL 5659581 (S.D.N.Y. Sept. 23, 2020), does not support dismissal. The claim dismissed there "merely alleged that [the party] 'manipulates reviews' … without explaining how [it] accomplish[ed]" the manipulation. *Id*. *11.

and remove or alter the display of authentic patient reviews while failing to disclose material facts,

such as (1) that patients who revised or deleted their negative reviews did so because Cerebral had

given them incentives (FAC ¶¶ 175-76, ¶¶ 185-86); and (2) that people who posted positive

reviews, upvoted positive reviews, or downvoted negative reviews were not Cerebral's patients,

but its own employees (*id*. ¶¶ 177-83, 193-94).   To the extent that Defendants wish to dispute that

the alleged representations are material or likely to mislead, those are questions for the trier of fact,

not grounds for dismissing the Complaint.  *See Durgin v. Mon*, 659 F. Supp. 2d 1240, 1255 (S.D.

Fla. 2009).

Fourth, Robertson and Martelli contend that the Complaint fails to plead that their actions

"caused a substantial injury to consumers that consumers themselves could not reasonably have

avoided." Mot. at 25. But this contention fails. "An act or practice can cause 'substantial injury'

by doing a 'small harm to a large number of people.'"  *FTC v. Direct Benefits Grp., LLC*, 2013

WL 3771322, at *13 (M.D. Fla. Jul. 18, 2013) (quoting cases).  Count V adequately alleges that

injury.   Robertson and Martelli's alleged unlawful practices injured prospective patients of

Cerebral, including its patients who subscribed after reading reviews on various websites,

including those on which it promoted its services.  FAC ¶ 34.  Those practices were "systemic,"

pertained to multiple websites, and were widespread.  *Id*. ¶¶ 174, 180, 182, 185, 188, 192.  The

Complaint also does not allege that the reviews at issue have been deleted, so the unlawful conduct

plausibly continues to injure prospective patients today and into the future, as Cerebral continues

to operate.  *See Roca Labs*, 345 F. Supp. 3d at 1395 (finding suppression of negative reviews likely

to cause substantial injury).  Moreover, "consumers can reasonably avoid injury" only where they

have "a free and informed choice that would have enabled them to avoid the unfair practice."

*Pointbreak Media*, 376 F. Supp. 3d at 1285.  Here, the very nature of manipulated, suppressed,

and false reviews — which suggest to the reader that they are the unvarnished testimonial of an actual patient — means that patients could not have known of or avoided the deceptive practices.

Robertson and Martelli offer a scattershot of other arguments that, at bottom, simply mischaracterize the pleading.  For example, they assert they were simply "redressing customer complaints."  Mot. at 25.  But Count V arises in part from their ***failure to disclose*** that they gave incentives "***in exchange for*** positive promotion, and ***for removal of criticisms***."  FAC ¶ 175; *see also id*. ¶¶ 184-87.  That failure is a textbook unfair and deceptive practice.  *See, e.g.*, *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) ("Misrepresentations or omissions of material facts made to induce the purchase of goods or services constitute deceptive acts or practices that violate [Section 5].").[12]  Likewise, Robertson and Martelli assert that Cerebral merely "notified online websites of potential inauthentic reviews," (Mot. 25), but this assertion ignores the most critical allegation: they notified the websites of supposedly inauthentic reviews "despite knowing that many of ... [those reviews] ***were, in fact, authored by [Cerebral's] actual patients***."  FAC ¶ 191.

Robertson and Martelli also contend that their alleged direction to Cerebral's own employees to upvote positive reviews was simply "favoring positive reviews."  Mot. at 25.  But "upvoting an online review … is a way for ***users***" — not a business being reviewed — "to communicate that they found another person's review to be useful."  FAC ¶ 193. When Robertson and Martelli directed Cerebral's own employees to upvote certain positive reviews, they

---

[12] *See also Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222, 1238 (10th Cir. 2023) ("[Incentives] misled consumers about the number of reviews from unbiased customers and the true ratio of putative unbiased positive to negative reviews"); *Interlink Prods. Int'l v. F&W Trading LLC*, 2016 WL 1260713, at *8-9 (D.N.J. March 31, 2016) ("purposefully driv[ing] up … ratings by enlisting inherently biased professional reviewers" was deceptive); *Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 636, 644 (S.D.N.Y. 2016) (failing to disclose material connections in reviews was deceptive under statute "substantially modeled on the" FTC Act).

deliberately and deceptively skewed the placement and appearance of those reviews.  *See Vitamins Online*, 71 F.4th at 1237-38 (affirming ruling that "manipulation of ... reviews" by "block voting on the[ir] helpfulness" left a "misleading impression" for consumers).  Robertson and Martelli's strained attempts to spin their misconduct in a positive light do not warrant dismissal, particularly where they ignore that Robertson and Martelli also allegedly posted entirely fictitious reviews, which alone suffices to state a claim.  *See, e.g.* FAC ¶¶ 177-82.

### D. The Complaint States a Claim Against Robertson for Deceptive Cancellation Practices (Count IV).

Count IV brings a claim against Robertson arising from allegations that he and Cerebral represented to patients that they could cancel their Cerebral subscriptions any time, but in fact implemented a process that delayed and thwarted patients' attempts to cancel.

Robertson's only argument to the contrary is that the Complaint is supposedly "silent regarding what Mr. Robertson knew about whether users received refunds" when they cancelled their subscriptions, because — according to Robertson — "cancellation … [is only] deceptive if consumers are charged … after they indicate that they would like to cancel."  *See* Mot. at 26-27. This is a complete non-sequitur.  Count IV is not about whether consumers who cancelled received refunds; it instead alleges that Robertson and Cerebral deceptively represented to consumers that they could cancel any time but implemented processes to prevent or delay their ability to successfully cancel.

The Complaint is replete with well-pleaded allegations establishing that Robertson designed, oversaw, and received reports regarding Cerebral's efforts to suppress patients' ability to cancel, with the specific intent of minimizing cancellation and maximizing revenue.  *See* FAC ¶¶ 145-72.  For example, he "command[ed]" that the company "remove the cancellation button" on its website and instead permit patients to cancel only "by reaching out to … a specific

support email address that required time consuming interactions with a live agent." *Id.* ¶ 152-54. Robertson "require[d] [this] complex, multi-step process for cancellation" with the intent to "reduce cancellations by making them more challenging" to complete. *Id.* ¶ 153-54. These allegations suffice to plead that the claim users could "cancel anytime" was deceptive.

Even if Robertson were correct that his knowledge of consumers not receiving refunds was somehow relevant to Count IV's claim of deceptive cancellation practices, however, the Complaint's allegations provide ample reason to conclude that he had that knowledge. The Complaint expressly pleads that Robertson "controlled Cerebral's cancellation strategy from top to bottom" and was "briefed on all relevant aspects" of that strategy." FAC ¶ 154-55. Further, the Complaint alleges that Robertson's strategy to make cancellation difficult resulted in "collect[ing] several million dollars even after ... clients had asked Cerebral to cancel their subscriptions," much of which "has never been refunded to consumers." *Id.* ¶ 119; *id.* ¶ 142 ("Cerebral collected over $8 million from consumers after receiving their cancellation demands"). And the Complaint alleges that while Robertson was CEO, Cerebral was placed in a "Visa Dispute Monitoring Program" designed for companies that had a high rate of disputes initiated by customers who were unable to obtain refunds from the companies. *Id.* ¶¶ 171-72. Moreover, the Complaint expressly pleads that "Robertson deliberately made the cancellation process burdensome and challenging, while ***taking millions of dollars from vulnerable consumers***, including patients suffering from mental health problems, for subscriptions ***after they had asked [Cerebral] to cancel*** those subscriptions." *Id.* ¶ 39. Accordingly, even if Robertson was right that his individual liability required knowledge of unpaid refunds, the Complaint more than plausibly pleads such facts.

### E. The Complaint States a Claim Against Zealthy, Bruno Health, Gronk, Robertson, and Echeverry for Unfair and Deceptive Practices (Count VIII).

Count VIII asserts a Section 5 claim against Zealthy, Bruno Health, Gronk, Robertson, and

Echeverry for ongoing unfair and deceptive acts and practices at Robertson's second digital health startup, Zealthy.  Defendants argue that the Complaint lacks allegations of unfair and deceptive practices at Zealthy that satisfy the — inapplicable — standard of Rule 9(b), and that Robertson and Echeverry lacked knowledge of the alleged wrongdoing.  Mot. at 28-31.  Both arguments fail.

### 1.   **Zealthy's Alleged Pattern of Misconduct Constitutes Unfair and Deceptive Practices.**

Defendants Zealthy, Bruno Health, Gronk, Robertson, and Echeverry contend that Count VIII fails to allege their representations and practices are unfair or deceptive.  Not so.  Their contention is based only on their cherry-picked review of the Complaint, which ignores many of its relevant allegations.  For example, the Complaint alleges that these Defendants made several false or misleading representations about costs, the services covered by those costs, a subscription's term and auto-renewal features, a consumer's ability to cancel and obtain a refund, the availability of insurance coverage, and the use and disclosure of consumers' private information.  FAC ¶¶ 220-41, ¶¶ 290-91.  They also allegedly undertook several unfair practices like charging consumers for costs that they did not agree to pay; "disregarding consumers' cancellation requests;" "ma[king] it challenging for consumers to cancel; and tracking, collecting, disclosing, and using consumers' sensitive, personal data in ways that were not fully disclosed to consumers and that consumers did not knowingly authorize."  *Id*. ¶¶ 224, 236-41, 292.[13]  Contrary to Defendants' view, these actions are unfair practices and deceptive conduct.

Defendants try to justify their alleged unfair and deceptive practices by referencing what

---

[13] Contrary to Defendants' assertion (Mot. at 27), Rule 9(b) does not govern this claim.  But even if it did, the Complaint alleges that Robertson founded Zealthy in 2023 and, since that time, has made misrepresentations about cancellation, which are available for view on Zealthy's website by prospective customers.  FAC ¶ 220.  This puts Defendants on fair notice of "the particular circumstances for which [they] will have to prepare a defense."  *Gose*, 109 F.4th at 1318.

they claim are a screenshot from Zealthy's subscription enrollment process and copies of its terms of use and privacy policies (Mot. at 28-30). But Defendants do not establish that these materials are incorporated by reference into the Complaint and appropriate for consideration in the context of a motion to dismiss. *See supra*, p. 3. Indeed, the purported Terms of Use that Defendants submit states that it was "[l]ast updated May 29, 2024." ECF No. 66-5 at 2. But Count VIII alleges wrongdoing before that date, such that incorporation is improper. *See Kalpackchian*, 832 F. App'x at 583. In any event, "[d]isclaimers … are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression." *Simple Health Plans*, 379 F. Supp. 3d at 1362. Here, Defendants point to a small-print hyperlink at the bottom of what they label an "excerpt of Zealthy's sign-up page" and direct the Court to the fine print of a twenty-one-page Terms of Use and five-page Privacy Policy, which they assert without support constitute an "ordinary and unremarkable" e-commerce user experience. Mot. 29-30. Defendants' fact-intensive defenses are improper bases for a pre-discovery motion to dismiss. *See Bodden v. Travelers Prop. Casualty. Co. of Am.*, 423 F. Supp. 3d 1341, 1346 (S.D. Fla. 2019).

These same documents that Defendants improperly try to introduce also have no bearing on many of the allegations supporting Count VIII, including, for example, allegations that Defendants charged patients for undisclosed costs or costs substantially higher than those advertised. FAC ¶¶ 221-25. Charging patients more than they knowingly agreed to pay — including by charging patients' credit cards without their authorization (*id.* at ¶ 224) — is an unfair or deceptive act under Section 5. Similarly, Zealthy's obfuscation of its data-tracking and disclosure practices during enrollment (*id.* ¶¶ 233-35), and misrepresentations of its strict cancellation and refund policies (*id.* ¶ 227(b)) are unfair or deceptive acts — ***regardless*** of the

contents of its hyperlinked pages.  Mot. at 30.

Defendants' remaining argument is that the Complaint never alleges a violation of the Terms of Use and Privacy Policy's ***terms*** and that it instead alleges only that the "***way these terms are presented*** is itself illegal." *Id.*  This argument misconstrues the Complaint.  The Complaint's allegations do not rest on any illegality intrinsic to the terms themselves, but rather alleges Section 5 violations based on the fact that (1) the Terms of Use and Privacy Policy contain ***misleading representations*** that were not true in practice; and (2) these terms did not align with other representations Defendants made about the relevant practices elsewhere in Zealthy's enrollment flow, rendering those other representations inaccurate and misleading.[14]  For example, in response to allegations that they imposed undisclosed costs on patients, Defendants emphasize Zealthy's pricing model in its Terms of Use, which set out that patients were "responsible for ... covering the cost of any Zealthy services that their insurance does not reimburse."  Mot. at 30.  But Defendants do not and cannot explain how such a boilerplate provision absolves them of liability for elsewhere telling consumers that they could pay certain amounts for medications and services (whether or not covered by insurance) only to then charge up to ten times more.  FAC ¶¶ 221-25.  Moreover, the Complaint alleges that Defendants made misleading representations — outside of and contrary to the Terms of Use and Privacy Policy — that patients could "Cancel anytime" and obtain refunds, but Zealthy actually ignored their repeated cancellation requests (while still charging them).  *Id.* ¶¶ 229, 238-40, 292.

For these reasons, the Complaint sufficiently alleges unfair and deceptive practices.

---

[14] Defendants raise arguments against some of their alleged misleading representations and omissions (Mot. at 28), but they have waived any arguments in defense of their alleged unfair practices and other misrepresentations. *See* FAC ¶ 224 (unauthorized charges), *id.* ¶ 292 (disregarded cancellation requests); *id.* ¶ 290 (subscription term and auto-renewal), *id.* ¶¶ 229, 238-40, 290 (inability to cancel for a refund).  These undisputed allegations suffice to state a claim.

2.  **Robertson and Echeverry Knew of and Directed Zealthy's Misconduct.**

Robertson and Echeverry also contend that the pleading does not allege they knew of the unlawful practices at issue.  Mot. at 31. That contention fails.

For an individual to be liable under Section 5, he needs to have only "some knowledge of the deceptive practices."  *On Point Capital Partners*, 17 F. 4th at 1083.  "An individual's degree of participation in the business is probative of knowledge."  *Simple Health Plans*, 2024 WL 473995, at *12.  Individuals should know of deceptive conduct where the "misrepresentations at issue formed a central part of" their business and they participated in it.  *Wolf*, 1996 WL 812940, at *8.  In such circumstances, it is "simply not plausible that an individual with control over the company did not know of the deceptive practices." *Am. Entm't. Distribs.*, 2012 WL 12964783, at *12 n.23 (quoting cases).

Here, it is clearly alleged that Robertson and Echeverry had at least "some knowledge" of the alleged unlawful conduct.  Each was a leading executive at Zealthy and Bruno Health.  Robertson has been Zealthy's CEO, and Echeverry was its Senior Medical Director.  FAC ¶ 201.  Echeverry is Bruno Health's President, Director, and Compliance Officer,[15] while Robertson is its CFO.  *Id*. ¶ 202. The statements and practices at issue are core to Zealthy's operations and publicized on its website and enrollment flow.  *Id*. ¶¶ 227-29.

In addition, the Complaint alleges that both Defendants made the misleading representations and engaged in the unfair practices at issue.  *Id*. ¶¶ 289-92.  Each formed, directed, controlled, and participated in those practices.  *Id*. ¶¶ 15, 17, 19-20.  They worked closely together to start Zealthy, to "design [its] basic telehealth processes," and to direct its operations, including

---

[15] That Zealthy's website allegedly touts Echeverry as Bruno Health's "Compliance Officer" also raises a more than reasonable inference that he is familiar with laws and regulations related to disclosure of patient information.  FAC ¶ 202.

the seminal practices at issue.  *Id*. ¶¶ 16, 199, 201.  They were directly involved in its day-to-day practices, as shown by their statements that its employees "work closely under both" of them.  *Id*. ¶ 208.  Moreover, consumers have posted public complaints about Zealthy and Bruno Health's unlawful business practices.  *Id*. ¶¶ 21, 239-40, 247. Consequently, the Complaint sufficiently alleges that they had at least "some knowledge" of the deceptive practices.

## II.  INJUNCTIVE RELIEF IS WARRANTED AGAINST ALL DEFENDANTS FOR THEIR PATTERN OF UNFAIR AND DECEPTIVE ACTS AND PRACTICES.

As pleaded in the Complaint, Zealthy continues to actively operate and mislead consumers. *Id*. ¶¶ 250, 254.  Accordingly, Defendants Zealthy, Bruno Health, Echeverry,[16] and Robertson (in relation to his work at Zealthy) do not — and cannot — dispute that their alleged misconduct related to the operation of Zealthy (Count VIII) meets the standard for injunctive relief.

Defendants Robertson and Martelli, however, argue that Counts I-V fail to allege a basis for injunctive relief related to their misconduct at Cerebral, given that they no longer work at the company.  *See* Mot. 15-16, 23-24, 27.  Defendant Gronk also argues that injunctive relief is unwarranted against it based on its purported dissolution. *See* Mot. 30-31.  These arguments ignore the governing legal standard and rely on an incomplete picture of the Complaint's allegations; they should be rejected.

### A.  Relevant Legal Standard for Injunctive Relief

The "FTC Act authorizes [suit] ... when [the government] has reason to believe a defendant is violating or about to violate" the law.  *FTC v. SPM Thermo-shield, Inc.*, 2020 WL 6545975, at

---

[16] Echeverry claims to be a "former Zealthy employee" (Mot. at 1-2) but both when the Complaint was filed and still today he is listed as Zealthy's Medical Director on its website.  *See* https://www.getzealthy.com/providers/german-echeverry (last visited Oct. 15, 2024). In any case, ceasing conduct only after suit is not considered voluntary.  *See Student Aid Ctr.*, 281 F. Supp. 3d at 1338 (injunctive relief was not moot where defendant "ceased operating only after it was sued").

*1 (M.D. Fla. Nov. 6, 2020). Accordingly, even if a defendant's unlawful conduct has temporarily stopped, an injunction is appropriate if "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *FTC v. USA Fin., LLC*, 415 F. App'x 970, 975 (11th Cir. 2011); s*ee also FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1209 (N.D. Ga. 2008), *aff'd* 356 F. App'x 358 (11th Cir. 2009) ("[T]he fact that illegal conduct has ceased does not foreclose injunctive relief ... [so long as] the FTC is able to demonstrate that there is some cognizable danger of recurrent violation."); *FTC v. Hornbeam Special Situations, LLC*, 391 F.Supp. 3d 1218, 1223 (N.D. Ga. 2019) (denying motion to dismiss where past pattern of conduct supported "a reasonable inference that the behavior will reoccur in the future").[17]

Courts evaluating the likelihood of future violations in cases where a defendant's original conduct has allegedly ceased assess multiple factors, including the egregiousness of past misconduct, the isolated or recurrent nature of misconduct, intent, acknowledgment (if any) of wrongdoing, and the likelihood that a defendant's profession "will present opportunities for future violations." *FTC v. Lanier Law, LLC*, 194 F. Supp. 3d 1238, 1288-89 (M.D. Fla. 2016). Where these factors suggest that a defendant "is easily able to" resume misconduct, temporary cessation is "not adequate to protect against future violations." *FTC v. Fleetcor Techs., Inc.*, 620 F. Supp. 3d 1313, 1346 (N.D. Ga. 2022). For example, injunctive relief is necessary in situations where a defendant — like Robertson, after he was fired — creates a new corporate entity through which he continues to act. *USA Fin.*, 415 F. App'x at 975 ("[T]he transformation of Capital Financial

---

[17] Defendants attached to their Motion an order issued in the *Hornbeam* case, asserting that it supports their arguments. *See* Mot. at 15-16; ECF No. 66-13 (copy of order). The *Hornbeam* court, however, issued that order with the benefit of a full factual record after a 3-week bench trial. *See* ECF 66-13 at 1. Defendants ignore that the court had previously denied a motion to dismiss, finding that the FTC pleaded sufficient facts to warrant permitting its injunctive relief claims to proceed to discovery and trial. *See Hornbeam Special Situations*, 391 F. Supp. 3d at 1223.

into American Financial, [then] ... into USA Financial indicated a reasonable likelihood of future violations."); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1209-10 ("[I]t is readily apparent that [defendants'] current business endeavors could serve as a platform for continuing violations [despite no longer selling the product at issue].").

Rather than address these governing standards, Defendants point the Court to a single, out-of-circuit case to support their erroneous claim that the Complaint does not sufficiently plead a continuing violation. *See* Mot. at 13 (citing *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019)). But this argument ignores that the Eleventh Circuit has never adopted the reasoning of *Shire ViroPharma*. In fact, the few district courts in the circuit to have considered the case have found it unpersuasive. *See SPM Thermo-Shield*, 2020 WL 6545975, at *1 (declining to follow *Shire ViroPharma* and denying motion to dismiss based on claim that conduct had ceased); *Hornbeam Special Situations*, 391 F. Supp. 3d at 1223 (same).

In any case, even if *Shire ViroPharma* applied in the Eleventh Circuit, it is easily distinguishable. In *Shire ViroPharma*, the FTC sued five years after a drug manufacturer ceased its allegedly illegal conduct and two years after it had divested itself of the drug at issue. The Third Circuit held that conduct in the "distant past" did not satisfy the "about to violate" language of Section 13(b) of the FTC Act. *Shire ViroPharma*, 917 F.3d at 159. But the well-pleaded allegations of this case do not involve only conduct in the "distant past." Far from it, as set out below, the United States' allegations set out a pervasive and systemic pattern of misconduct, occurring in succession across multiple companies, and perpetrated by Defendants that continue to work in the telehealth space while steadfastly refusing to acknowledge any wrongdoing — for example, by referring to one of the largest unauthorized and deliberate disclosures of personal data in the past decade as a "glitch[]" (Mot. at 16).

### B.  Robertson and Martelli's Conduct Warrants Injunctive Relief.

In a misplaced attempt to avoid liability, Robertson and Martelli place great weight on the fact that they are "no longer with Cerebral." Mot. at 15, 23, 27.  But this strawman argument ignores the ample case law establishing that past conduct, coupled with the opportunity for future conduct, readily gives rise to a claim under the FTC Act for forward-looking relief.  *See, e.g*, *Lanier Law*, 194 F. Supp. 3d at 1289 (considering defendants' "continuous and persistent involvement" in violative practices, their "history of transforming from one business to another," and their continued attempts to "deny the wrongful nature of their conduct.").

Robertson and Martelli's illegal conduct at Cerebral "is highly suggestive of the likelihood of future violations." *CFTC v. Matrix Trading Grp.*, 2002 WL 31936799, at *12 (S.D. Fla. Oct. 3, 2002).  For example, their online review manipulation was "systemic" (FAC ¶¶ 174, 184) and so institutionalized that they established systems to track its results (*id.* ¶¶ 174, 182, 185, 188, 192).  Indeed, Robertson used his position as CEO to make clear to his employees that he was "fine" with manipulating consumers through "fake" reviews.  *Id.* ¶ 180.  Similarly, Robertson's actions in relation to data-security breaches and cancellation were intentional, chronic, and severe. *See, e.g.*, *id.* ¶ 39 ("Robertson deliberately made the cancellation process burdensome and challenging, while taking millions of dollars from vulnerable consumers … after they had asked [] to cancel [their] subscriptions."); *id.* ¶¶ 75, 87 (Robertson "helped direct the 2019 decision to deploy" tracking technologies using private patient information, which continued for "more than two-and-a-half years"); *id.* ¶ 114 ("Robertson overrode significant data security concerns raised by his top data security reports."); *id.* ¶¶ 156 ("[Robertson] repeatedly directed employees to introduce obstacles and challenges into Cerebral's cancellation process.").

This is not a circumstance, moreover, where a defendant has shown remorse or acceptance

of responsibility for their prior acts.  Far from it, Robertson and Martelli defend their unlawful conduct by blithely claiming that the creation of fictitious customer reviews was simply a good "business practice[]" and a "customer service."  Mot. at 3, 26.  Similarly, Robertson ignores the "chronic" data breaches (FAC ¶ 105) that plagued Cerebral, going so far as to claim that he "did a pretty good job" (Mot. at 22) by permitting — then failing to rectify — the release of hundreds of private medical files and deliberately disclosing over three million users' personal data for purposes of online tracking and targeted advertising (FAC ¶¶ 89, 93-98).

In light of these stunning refusals to acknowledge the seriousness of the misconduct alleged in the Complaint, it is unsurprising that both Defendants did not take their departure from Cerebral as an opportunity for reform.  Far from it, they doubled down on their work in the telehealth space (FAC ¶¶ 11, 255), giving them ample opportunity to continue their misconduct.  *See Nat'l Urological Grp.*, 645 F. Supp. 2d at 1209 (considering whether "defendants' current occupation position them to commit future violations").  After being fired in May 2022, Robertson quickly founded and took on the position of CEO at another telehealth company, Zealthy, that mirrors the business model of Cerebral.  *Id.* ¶ 11.  As CEO of Zealthy, Robertson has continued the same practices he developed at Cerebral related to data-security[18] and deceptive cancellation practices.[19] *See supra*, Pt. I.E.  And just as Cerebral's patients posted negative reviews while Robertson led it,

---

[18] In Zealthy's Terms of Use, Robertson has "hidden key terms regarding [] handling of users' sensitive, private information" in "fine print … that is … not part of the enrollment flow."  FAC ¶ 230.  "This Privacy Policy has permitted Zealthy [] to track, collect, and disclose users' highly sensitive personal information."  *Id.* ¶ 231.  In addition, Zealthy has "enrolled users through a sign-up process that has failed to clearly disclose … how users' personal data may be used."  *Id.* ¶ 220.

[19] At Zealthy, Robertson has "made representations … that have misled consumers regarding costs, services and the terms of subscriptions" (FAC ¶ 289), including false and misleading representations about consumers' ability to cancel and obtain refunds (*id.* ¶¶ 290, 291).  Robertson and Zealthy have also "disregard[ed] consumers' cancellation requests and made it challenging for consumers to cancel." *Id.* ¶ 292; *see also id.* ¶¶ 238-40.

Zealthy's patients have posted negative comments about its services while he leads that subsequent company.  *Id*. ¶ 247.  Accordingly, there is every reason to believe that — like at Cerebral — Robertson will be "alarmed by … negative reviews of [Zealthy]" and will once more "emphasize[] the importance and urgency" of suppressing these reviews, including by posting "fake ones." *Id*. ¶¶ 177, 179-80.  Similarly, Martelli continues to work in the "digital health space," focused on profitability and "growth" at a "Stealth startup." *Id*. ¶ 255.  His continuation in the telehealth field, still focused on maximizing company growth, gives ample reason to believe that he will repeat his intentional, repeated, and clearly deceptive misconduct at his new company. *See Lanier Law*, 194 F. Supp. 3d at 1289.

Moreover, Roberston's argument that the Court should disregard the bevy of consumer complaints about Zealthy (*see* FAC ¶ 238-40, 247) when evaluating the sufficiency of the Complaint's request for injunctive relief (*see* Mot. at 18-19, 27) misunderstands the law.  The primary case Robertson cites, *In re LexinFinTech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949 (D. Or. Nov. 24, 2021), stands for the unremarkable proposition that a plaintiff in securities fraud case cannot plausibly plead falsity of a public statement by pointing ***only*** to online complaints. *Id.* at *9.  But this is not a securities fraud case, it is a consumer-protection action, in which allegations of numerous consumer complaints make plausible that a company's practices were deceptive to the reasonable consumer.  In any case, *In re LexinFinTech* makes clear that consumer complaints can suffice to state a claim when offered in concert with "other sources." *Id.*  Here, allegations regarding the bevy of consumer complaints about Zealthy's deceptive practices (*e.g.*, FAC ¶¶ 222-25, 237-40) are coupled with direct allegations of wrongdoing at Zealthy (*e.g.*, *id.* ¶¶ 226-234, 289-292).  Moreover, these allegations are only one of many data points to support future relief. *See, e.g.*, *Lanier Law*, 194 F. Supp. 3d at 1288-89 (considering "past conduct," "recognition of the

wrongful nature of his conduct" (or lack thereof), and "opportunities for future violations").

### C.  Gronk's Conduct Warrants Injunctive Relief.

Gronk asserts that it is entitled to dismissal because it "was erroneously created and dissolved," asking the Court to take judicial notice of its articles of dissolution.  *See* Mot. at 30-31; ECF No. 66-8.  But the Court need not address whether these articles of dissolution are subject to judicial notice because the fact that dissolution papers were filed is irrelevant.  Florida law is clear that "[d]issolution of a corporation does not … [p]revent commencement of a proceeding by or against the corporation in its corporate name." Fla. Stat. § 607.1405(2)(e).  And the Complaint's allegations are that, despite formally filing for dissolution, Gronk "continues to do business."  FAC ¶¶ 13, 21.  Even if the Court were to take judicial notice as requested, such notice is limited to the fact that filing occurred, not the truth of its contents.  *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1129 (S.D. Fla. 2019); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999).  As a result, judicial notice of their filing would not defeat the Complaint's well-pleaded allegation that Gronk continues to operate as Zealthy.

### III.  THE COMPLAINT ADEQUATELY PLEADS ROSCA VIOLATIONS BY ROBERTSON, ECHEVERRY, BRUNO HEALTH, ZEALTHY, AND GRONK.

### A.  ROSCA Applies to Online, Automatically Recurring Subscriptions.

Defendants attempt to evade liability under ROSCA by arguing that their subscriptions do not involve negative options.  Mot. at 34.  But an online subscription that automatically renews until users affirmatively cancel it — *i.e.*, the type of subscription allegedly offered by Cerebral and Zealthy — is a negative option.  *See* FAC ¶ 36 (Cerebral has charged clients "on a recurring basis for subscriptions that automatically renew"); *id.* ¶ 227(c) (Zealthy's terms include "subscriptions ... [that] renew automatically").  That is because such subscriptions interpret "the customer's silence or failure to take an affirmative action … to cancel … as acceptance of the offer."  16 C.F.R

§ 310.2(w) (definition of "negative option" incorporated by ROSCA).

No court has ever endorsed Defendants' contrary position.  Indeed, it has been rejected as meritless.  *See United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 757, 761-62 (C.D. Cal. 2020) ("[Defendants'] automatic renewal default for its subscriptions *is a textbook example of a negative option feature* … [and] *ROSCA applies to automatic renewals*.").  Courts, including those within the Eleventh Circuit, routinely treat automatically recurring subscriptions as negative options.  *See, e.g.*, *Hornbeam Special Situations*, 308 F. Supp. 3d at 1296 (denying motion to dismiss where complaint alleged ROSCA violations involving negative option subscription that charged consumers monthly fees until they canceled); *FTC v. Amazon.com*, 2024 WL 2723812, at *23 (W.D. Wash. May 28, 2024) (denying motion to dismiss regarding auto-renewing subscription and describing ROSCA as comprising "federal regulatory requirements for auto-renewal offers"); *FTC v. Match Grp., Inc.*, 2022 WL 877107, at *2 (N.D. Tex. Mar. 24, 2022) (denying motion to dismiss relating to "subscription auto-renewals"); *FTC v. Health Formulas, LLC*, 2015 WL 2130504, at *16 (D. Nev. May 6, 2015) ("[R]ecurring payment plans … constitute negative option features.").[20]

Nor are Defendants correct (Mot. at 34-35) that ROSCA's definition of a negative option is limited to scenarios involving trial enrollment or product bundling.  In support of this spurious distinction, Defendants cite a case that does not even involve, much less analyze, ROSCA.  Mot. at 35 (citing *FTC v. Johnson*, 96 F. Supp. 3d 1110, 1139 (D. Nev. 2015)).  Nowhere in *Johnson*

---

[20] Defendants' argument regarding legislative intent (Mot. at 34) also misses the mark, citing excerpts from ROSCA's preamble that relate to a *different* subsection.  *See* 15 U.S.C. § 8402 (proscribing certain practices by third-party sellers).  The applicable subsection, 15 U.S.C. § 8403, applies to "[n]egative option marketing on the Internet" by "any person."  This scope aligns with ROSCA's broader aim of ensuring that "the Internet [marketplace] must provide consumers with clear, accurate information."  15 U.S.C. § 8401(2).

does that court purport to limit the definition of a negative option or hold that only subscriptions with free trial periods can constitute negative options.  To the contrary, in the portion of the case quoted by Defendants, the Court actually lists different kinds of negative options, ***including*** "subscription-based" services.  *Johnson*, 96 F. Supp. 3d at 1141-42 (quoted at Mot. at 35).

No court has ever held that ROSCA does not apply to online, automatically recurring subscriptions.  This Court should reject Defendants' invitation to flout the plain language of ROSCA and its operative definition of a negative option feature.

### B. ROSCA Requires Disclosure of "All Material Terms," Not Just Those Directly Related to Payment.

Defendants attempt to minimize their liability under ROSCA by arguing that its disclosure requirements apply narrowly to only material terms governing "billing structure and costs."  Mot. at 38.  This argument is without support and ignores basic canons of statutory interpretation.

First, Defendants' narrow reading of ROSCA ignores the statutory text, which refers to "all material terms of the transaction."   15 U.S.C. 5402(a).   Because ROSCA does not define "material," that term's ordinary meaning applies.  *See United States v. Dawson*, 64 F.4th 1227, 1236 (11th Cir.).  "Material" signifies anything that is "[o]f such a nature that knowledge of the item would affect a person's decision-making," "significant," or "essential."  *Black's Law Dictionary* (9th ed. 2009); *see also Doebereiner v. Sohio Oil Co.*, 893 F.2d 1275, 1276 (11th Cir. 1990) (interpreting "material" to mean "of real importance or great consequence").  Had Congress intended to limit "all material terms" to billing terms, it would have clearly legislated as much. Indeed, some FTC rules have enumerated specific categories of information deemed material.[21] The drafters of ROSCA, in contrast, chose not to take this approach, but instead to refer to "all

---

[21] *See, e.g.*, Telemarketing Sales Rule, 16 C.F.R § 310(a)(2)(i-x) (prohibiting misrepresentations for an enumerated list of material terms).

material terms *of the transaction*."  Where Congress chose not to include limiting language in

ROSCA, it is presumed to have "act[ed] intentionally and purposefully."  *Russello v. United States*,

464 U.S. 16, 23 (1983).  Defendants offer the Court no basis to graft into ROSCA a billing-specific

limitation that is not found in the text.[22]  Moreover, Defendants' suggestion (Mot. at 38) that no

court has treated the term "material," as used in ROSCA, as broader than just billing-related terms

is wrong.  In fact, courts have had no trouble applying ROSCA's disclosure requirements to terms

beyond billing — including to some of the very terms Defendants object to here.  *See, e.g.*, *Health

Formulas*, 2015 WL 2130504, at *10 (assessing cancellation and refund policies under ROSCA);

*FTC v. Directv, Inc.*, 2016 WL 5339797, at *3 (N.D. Cal. Sept. 23, 2016) (assessing cancellation

policy and promotional channel offer under ROSCA).

     Second, despite Defendants' misplaced hyperbole, the broad materiality standard presented

by ROSCA is neither unworkable nor unprecedented.  Mot. at 38.  Instead, it is routinely applied

in the context of the FTC Act where courts regularly distinguish "information that is important to

consumers and, hence, likely to affect their choice of, or conduct regarding, a product."  *In re

Cliffdale Assocs.*, 103 F.T.C. 110, *37 (1984); *see also N. Am. Med. Corp. v. Axiom Worldwide,

Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008) (a statement is material if it is "likely to influence the

purchasing decision").  This broad materiality standard turns on a fact-specific inquiry regarding

what facets of a good or service consumers attach importance to, regardless of subject matter.  *See

Simple Health Plans*, 379 F. Supp. 3d at 1360 ("If a significant number of prospective purchasers

---

[22] Defendants implausibly read a billing-specific limitation into the phrase "of the transaction," (Mot. at 38) but this is merely standard language specifying a given transaction.  *See Stouffer Hotel Co. v. Tchrs. Ins. & Annuity Ass'n*, 737 F. Supp. 1553, 1556 (M.D. Fla. 1990) (referencing "material terms of the transaction," including timing, content, and ancillary terms); *Terra Towers Corp. v. Am. Tower Int'l*, 2023 WL 8476576, at *1 (S.D. Fla. Sept. 19, 2023) (referring to "all the material terms of the … transaction" including the distributions of shares, towers, and sites).

are likely to attach importance to the representation … [it] is material.").

Under this well-established standard of materiality, the Complaint's allegations specify terms that were plausibly important to patients signing up for telehealth subscriptions online, including (1) costs; (2) treatment of their sensitive, personal data; (3) the availability of cancellations and/or refunds; and (4) whether the healthcare services provided would be covered by insurance. *See* FAC ¶¶ 285, 290, 292, 297.  These terms involve key aspects of recurring subscriptions for telehealth services and would plausibly impact a user's decision as to whether to sign up for Defendants' services.  As the Complaint alleges, Defendants themselves highlighted many of these aspects of their services on their websites and enrollment flows, underscoring that they understood their importance.  *See, e.g., id.* ¶¶ 38, 55-61, 65 (Cerebral's privacy and data security assurances); *id.* ¶¶ 123-25 (Cerebral's cancellation assurances); *id.* ¶ 229 (Zealthy and Bruno Health's cancellation assurances); *id.* ¶ 225 (Zealthy and Bruno Health's insurance coverage assurances).  Moreover, far from treating these terms as immaterial, many consumers complained specifically about them.  *See, e.g., id.* ¶¶ 158, 163, 237 (complaints regarding cancellation), *id.* ¶ 222 (complaints regarding costs), *id.* ¶ 225 (complaints regarding insurance).

Defendants never suggest that any of these specific issues would not be important to a reasonable consumer.  To the contrary, many the terms at issue are ***presumptively*** material in the FTC Act context.  For example, express or implied claims used to induce a purchase are treated as presumptively material.  *SlimAmerica*, 77 F. Supp. 2d at 1272.  Here, Defendants allegedly made representations to users regarding these terms that were designed to induce them to sign up — for example, touting strong privacy protections (FAC ¶¶ 38, 55-61, 65) and flexible cancellation policies (*id.* ¶¶ 123-125, 229).  Similarly, claims related to matters of health and safety are presumptively material.  *Roca Labs*, 345 F. Supp. 3d at 1386.  Some of the terms at issue relate to

37

such matters — for example, the protection of users' sensitive medical data (*id.* ¶¶ 38-39, 56-60) and the availability of health insurance coverage (*id.* ¶¶ 220, 225).  Moreover, some of the terms Defendants' object to, including refund and cancellation policies (*id.* ¶¶ 123-125, 215, 220, 227, 229), directly pertain to "billing structure and costs," illustrating that the Complaint states a claim under ROSCA even if the Court were to adopt Defendants' cribbed reading of materiality.

Additionally, far from breaking new ground (Mot. at 38), the terms that Defendants object to have been deemed material before.  This includes data privacy[23] and data security practices[24] (including specifically in the telehealth context) and cancellation or refund terms.[25]  And, at a minimum, any fact-intensive disputes over materiality are inappropriate for a motion to dismiss.  *See, e.g.*, *Alcoholism Cure Corp.*, 2011 WL 13137951, at *53 (assessing deposition testimony in evaluating whether certain privacy practices were material).

## C.  The Complaint States Claims for Violations of ROSCA (Counts VII and IX).

### 1.  <u>Defendants Allegedly Did Not "Clearly and Conspicuously" Disclose Material Terms.</u>

ROSCA requires that negative option sellers disclose material terms "clearly and conspicuously" prior to receiving consumers' billing information.  15 U.S.C. § 8403(1).  As alleged in the Complaint, Defendants have violated this stringent standard by burying disclosures

---

[23] *See, e.g.*, *Roca Labs*, 345 F. Supp. 3d at 1390-91 (company's "privacy promise" related to "private health information" was "presumptively material"); *FTC v. Alcoholism Cure Corp.*, 2011 WL 13137951, at *53 (M.D. Fla. Sept. 16, 2011), *aff'd sub nom. FTC v. Krotzer*, 2013 WL 7860383 (11th Cir. May 3, 2013) (similar).

[24] *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 479 (D. Md. 2020) (collecting cases and holding company's representations regarding data security practices were material).

[25] *FTC v. Lucaslaw Ctr.*, 2010 WL 11506885, at *6 (C.D. Cal. June 3, 2010), *aff'd sub nom. FTC v. Lucas*, 483 F. App'x 378 (9th Cir. 2012) ("[A] representation that consumers would receive a full refund is certainly material.").

in fine print and hyperlinked pages that consumers were unlikely to see, altogether omitting certain material terms from their disclosures, and obfuscating others through misleading representations.

Defendants err in conflating ROSCA's heightened disclosure requirements with garden variety contract formation principles. ROSCA's standard is not whether a negative option seller "provided full disclosure" or "failed to disclose" a term, or whether disclosures, if reviewed, were comprehensible. Mot. at 36-37. Under ROSCA, the quality, not the mere fact, of the disclosure is paramount. This includes the disclosure's prominence, location, and context. *See, e.g.*, *Amazon.com*, 2024 WL 2723812, at *10 (holding disclosures were not clear and conspicuous based on factors including size, location, and color because "a reasonable consumer … could miss [them]").

First, the Complaint alleges that Defendants have failed to provide conspicuous disclosures of material terms by burying them only in fine print (*see, e.g.*, FAC ¶¶ 63, 226-27) and in linked Terms and Conditions or policy pages that enrollees are not required to review and are unlikely to see at all (*see, e.g.*, *id.* ¶¶ 63-64, 226-227, 230). Defendants' hyperlinked pages, moreover, were alleged to be dense, lengthy, and contained terms not otherwise disclosed within Defendants' enrollment flows. *See, e.g.*, FAC at ¶¶ 62-63, 67, 69-70. Courts have held as a matter of law that such inconspicuous disclosures do not comply with ROSCA. *See, e.g.*, *Health Formulas*, 2015 WL 2130504, at *17 (finding disclosures contained in fine print or on separate, linked Terms and Conditions page "are not clear and conspicuous" under ROSCA); *Amazon.com*, 2024 WL 2723812, at *10 (holding that disclosures in fine print or on parts of page that are not prominent are not clear and conspicuous).[26] Defendants do not offer any support for the argument that their

---

[26] Courts assessing analogous disclosure standards under state auto-renewal laws have reached the same conclusion. *See Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1139-40 (S.D.

alleged use of hyperlinks and fine print is sufficient to meet this "clear and conspicuous" standard. And that argument strains credulity given that the plain meaning of "conspicuous" refers to items that are "clearly visible," "obvious," and "written [so that] a reasonable person ... ought to notice it." *Black's Law Dictionary* (9th ed. 2009).[27]   The Complaint's allegations make clear that a reasonable consumer would be susceptible to overlook the disclosures Cerebral and Zealthy buried in multi-page terms and conditions pages accessible only through hyperlinks.  *See In re Jones*, 2007 WL 1725593, at *5 (Bankr. N.D. Ala. June 13, 2007), *aff'd*, 279 F. App'x 825 (11th Cir. 2008) (holding that the sufficiency of disclosures is examined "from the standpoint of an ordinary consumer, not the perspective of … [a] federal judge or English professor").

In attempting to justify the adequacy of their disclosures, Defendants cite inapposite cases that do not involve ROSCA, do not analyze any analogous disclosure standard, and do not even address the use of hyperlinks or fine print.  Mot. at 35-36.  These cases are easily distinguishable because they involved webpage disclosures whose text was located prominently on the ***same page*** where a consumer enrolled, right next to the sign-up option.[28]  And because these cases involved analysis of only whether disclosures were deceptive — not inconspicuous — they have no substantive bearing on a ROSCA analysis.  *See Cote v. Countrywide Home Loans, Inc.*, 2010 WL 11646975, at *6 (N.D. Ga. Feb. 11, 2010) (whether consumer was deceived is irrelevant to

---

[27] Cal. 2021) (rejecting argument that hyperlink provided adequate disclosure, noting that "the terms themselves — not the access point to them — need to be [disclosed]"); *Farmer v. BarkBox, Inc.*, 2023 WL 8522984, at *4 (C.D. Cal. Oct. 6, 2023) (same).

[27] Defendants also argue only that terms related to billing were conspicuous, waiving any argument about the variety of other terms that the Complaint identifies as material.  *See* Mot. 35-37.

[28] *In re Vistaprint Corp Mktg. & Sales Pracs. Litig.*, 2009 WL 2884727, at *8 (S.D. Tex. Aug. 31, 2009) (noting "no allegation that the customer is directed to any [other] webpages …"); *Baxter v. Intelius, Inc.*, 2010 WL 3791487, at *4 (C.D. Cal. Sept. 16, 2010) (finding relevant terms were prominently disclosed right next to sign-up box).

showing violation of a statutory conspicuous disclosure requirement).

In addition to alleging inconspicuous disclosures that failed to comply with ROSCA, the Complaint alleges that Defendants have altogether omitted disclosures of certain key terms (*see, e.g.*, FAC ¶¶ 116, 121-22) or provided representations to consumers during enrollment that misled consumers as to Defendants' actual policies and practices, leaving even cautious consumers in the dark about material terms.  *See*, *e.g.*, *id.* ¶ 121 (misleading privacy assurances), *id.* ¶ 123 (misleading cancellation assurances), *id.* ¶ 229 (misleading cancellation, refund, and cost assurances).  For example, at relevant times, certain Defendants allegedly failed to disclose their extensive data tracking practices (*id.* ¶ 70 (Cerebral first disclosed use of tracking technologies in December 2020)), or the full costs of their subscriptions (*id.* ¶¶ 221-25 (Zealthy and Bruno Health have not disclosed full costs)).  These alleged omissions are plausible violations of ROSCA.[29]

### 2. Defendants Allegedly Failed to Provide "Simple Mechanisms" to Cancel Subscriptions.

Just as ROSCA protects consumers when they sign up for negative option subscriptions, it also protects their ability to easily exit those subscriptions by requiring "simple mechanisms for a consumer to stop recurring charges" — *i.e.*, a simple mechanism to cancel.  15 U.S.C. § 8403(3).  Defendants have violated this requirement by refusing to make it simple for consumers to cancel their subscriptions, including by implementing tricky and ineffective cancellation processes (FAC ¶¶ 39, 129-42, 150, 153-54, 160-61, 236-41), undertaking aggressive retention efforts (*id.* ¶¶ 136-37, 139), and failing to promptly honor cancellation requests (*id.* ¶¶ 140-42, 239-41).  These well-

---

[29] The allegations regarding inadequate disclosures also plausibly allege violations of ROSCA's requirement that sellers only bill consumers after first obtaining "express informed consent." (15 U.S.C. § 8403(2)).  *See Health Formulas*, 2015 WL 2130504, at *16 (inadequate disclosures "constitute evidence" of failure to "obtain consumers' express informed consent"); *Amazon.com*, 2024 WL 2723812, at *12 (failure to provide sufficient information regarding service indicates failure to obtain express, informed consent).

pleaded allegations amount to violations of ROSCA.

Defendants have allegedly run afoul of ROSCA's simple cancellation requirement in numerous ways, including by: (1) depriving consumers of the ability to easily cancel by the click of a button online (FAC ¶¶ 129-31,[30] 238-39); (2) restricting the availability of cancellation to certain forms of communication and times to make cancelling more onerous (*id.* ¶¶ 130-33, 238-39); (3) requiring consumers to complete multiple, unnecessary steps when trying to request cancellation, including correspondence with customer support representatives, completion of surveys, and navigation of retention offers (*id.* ¶¶ 130, 136-40, 239); (4) subjecting consumers to protracted, sometimes serial, exchanges with sales representatives instead of honoring straightforward cancellation requests (*id.* ¶¶ 129-30, 165-69, 239); and (5) continuing to bill many consumers after their submission of cancellation requests (*id.* ¶¶ 142, 162, 167, 239-40).

Courts have found that similar cancellation processes violated ROSCA because they were not "simple." *See, e.g.*, *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1169 (C.D. Cal. 2021) (granting summary judgment against company that did not provide easy option to cancel online, required interaction with customer service representatives, and subjected customers to retention pitches). Notably, the defendant in *MyLife.com* contended — as Defendants do here (Mot. at 39) — that it offered the option to submit an email request to cancel a subscription, but the court granted summary judgment against them. *MyLife.com*, 567 F. Supp. 3d at 1159. Even companies that, unlike Defendants, generally offered access to an online cancellation button have been found to have plausibly violated ROSCA. *See Amazon.com*, 2024 WL 2723812, at *13 (denying motion to dismiss where the complaint alleged consumers had to click through multiple

---

[30] The Complaint alleges that Robertson remarked that he was concerned that giving Cerebral consumers a cancellation button made it "really easy" to cancel. When he learned that that button increased patients' cancellation rates, he removed it. FAC at ¶131.

screens and scroll to bottom of final screen to locate cancel button).

Beyond the complexity of Defendants' cancellation processes, the Complaint also plausibly alleges violations of ROSCA because, even when consumers successfully submitted cancellation requests, they were not honored.  *See, e.g.*, FAC ¶¶ 141-42, 239-40.  A company's disregard of cancellation requests violates ROSCA.  *See, e.g.*, *MyLife.com*, 567 F. Supp. 3d at 1159-60 (holding cancellation was not simple where email requests to cancel were often disregarded and calls to customer service representatives were ineffectual); *FTC v. Cardiff*, 2021 WL 3616071, at *1 (C.D. Cal. June 29, 2021) (granting summary judgment where "even when [consumers] took [required] step, they were not always able to effectuate a cancellation."). Because Defendants never dispute that allegation that it failed to honor cancellation requests, the government has stated ROSCA claims.  Moreover, that many subscribers have allegedly been billed *after* submitting cancellation requests strongly shows that Defendants are alleged to have failed to provide a simple cancellation mechanism.  FAC ¶¶ 141-42, 239-40.

Defendants defend their cancellation processes by cherry-picking an informal guideline from an FTC policy statement, arguing that they do not violate ROSCA because their cancellation processes are "at least as easy to use as the method [for signing up]."  Mot. at 39.  But the question of whether a process is "easy" for a reasonable consumer (much less whether it is "as easy" as another process) is "an inherently fact-intensive issue" that is inappropriate for a motion to dismiss. *New York by James v. Sirius XM Radio Inc.*, 2024 WL 2348206, at *5 (S.D.N.Y. May 23, 2024). In any case, the Complaint alleges that subscribers could sign up with the click of a button online without needing to send a single communication.  *See* FAC ¶ 152 (consumers enrolled in Cerebral "with a few simple clicks of buttons."); *id.* ¶¶ 200, 238 (Zealthy has used "rapid, online enrollment process" and "online enrollment process").  In contrast, consumers were forced to engage in time-

consuming, sometimes iterative, exchanges with customer service representatives in order to cancel. *Id.* ¶¶ 129-30, 136-37 (Cerebral has required lengthy, multi-step process to cancel); *id.* ¶¶ 165-69 (Cerebral consumer complaints regarding cancellation challenges); *id.* at ¶¶ 237-40 (Zealthy consumer complaints regarding same). Accordingly, even if the Court treats this parity standard as having the force of law, the United States' well-pleaded allegations more than suffice.[31]

### D.  The Complaint Adequately Pleads That Defendants Had Knowledge of ROSCA Violations.

ROSCA authorizes civil penalties against a person or corporation "with actual knowledge or knowledge fairly implied on the basis of objective circumstances" of rule violations. 15 U.S.C. § 45(m)(1)(A). Implied knowledge is assessed under the objective standard of what "a reasonable person under the circumstances would have known." *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996); *United States v. Prochnow*, 2007 WL 3082139, at *3 (11th Cir. 2007) (executive who controlled operations and "did not personally know" of FTC Rule violations had implied knowledge because he "should have known" of misconduct). Robertson and Echeverry overlook the plausible allegations of their knowledge under either theory.

First, knowledge need only be pleaded generally. *See U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1308 (11th Cir. 2002); *see also supra*, pp. 5-6. Here, the pleading adequately alleges Robertson had the requisite knowledge of ROSCA violations while leading Cerebral. He was Cerebral's onetime head of Legal (FAC ¶ 42), was steeped in legal and regulatory issues (*id.* ¶¶ 44, 49-50, 52), and worked closely with its top compliance officials. *See*

---

[31] Defendants' reliance on *Match Grp.*, 2022 WL 877107, at *4, is misplaced. There, the court dismissed a ROSCA claim because the FTC failed to allege that five alternative cancellation methods were "not simple*." Id*. Here, the Complaint does not allege that Defendants' subscribers were provided with ***any*** alternative methods of cancellation — let alone ROSCA-compliant ones.

*id.* ¶¶ 8, 42, 50; *Partners In Health Care*, 189 F. Supp. 3d at 1367 (degree of participation in business affairs is probative of knowledge).  Robertson also allegedly directly participated in and steered Cerebral's relevant practices, such as its data privacy and cancellation practices. *See supra*, pp. 11-14, 21-22; *Transnet Wireless*, 506 F. Supp. 2d at 1271 (direct participation underscores knowledge).  Moreover, Cerebral's inadequate disclosures of key terms and complicated cancellation process generated scores of consumer complaints (*see id.* ¶¶ 51, 158-59, 162-69), and Robertson was aware of these complaints (*id.* ¶¶ 51, 158-159, 163, 177, 185); *Amazon.com*, 2024 WL 2723812, at *22-23 (holding knowledge of customer difficulties plausibly suggested ROSCA violation knowledge); *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1141 (9th Cir. 2010) (same).  These facts plausibly suggest knowledge of ROSCA violations.

Second, the pleading sufficiently alleges Robertson and Echeverry's knowledge while leading Zealthy and Bruno Health.  Indeed, Robertson's knowledge while at Zealthy includes not only what he had learned during his time as Cerebral's CEO, but the unavoidable awareness of ROSCA he gained as the subject of an active FTC investigation into his prior work at Cerebral and parallel ROSCA violations.  *See* FAC ¶¶ 242, 252.  While that investigation was ongoing, Robertson and Echeverry worked together closely to direct the online subscription and marketing practices of Zealthy and Bruno Health (*id.* ¶¶ 203-04, 217, 219), and their companies generated a steady stream of consumer complaints about those practices — all suggesting additional ROSCA violations.  *Id.* at ¶¶ 222-25 (consumer complaints regarding undisclosed costs), ¶¶ 237-40 (consumer complaints regarding difficulty of cancelling).

This knowledge is reinforced by Robertson and Echeverry's professional responsibilities.  *Amazon.com*, 2024 WL 2723812, at *22 (degree of participation in business affairs is probative of knowledge).  They played key leadership roles at Zealthy and Bruno Health, including compliance

responsibilities. *See* FAC ¶¶ 11, 20 (Robertson founded Zealthy, was Zealthy's CEO, and was Bruno Health's Chief Financial Officer); *id.* ¶¶ 19, 201-2, 245 (Echeverry's leadership roles at Bruno Health and Zealthy, including as Bruno Health's Compliance Officer). That their companies were premised on offering negative option subscription services further suggests these sophisticated actors were well aware of the cornerstone federal statute applicable to their business model. *Amazon.com*, 2024 WL 2723812, at *23 ("[A] reasonable executive overseeing a large subscription service … that offers auto-renewing subscriptions ... would know that there are … federal regulatory requirements for auto-renewal offers.").[32] These allegations more than surpass the modest threshold courts have applied in determining whether knowledge is plausibly pleaded at the motion-to-dismiss stage.[33]

Moreover, the knowledge of Robertson and Echeverry is imputed to Zealthy and Bruno Health. *Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998) (under Florida law, knowledge of corporate officers and directors is imputed to corporation); *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017) (under Florida law, knowledge of agent or employee is generally imputed to principal or employer). In disputing imputed knowledge, Defendants misread the Complaint. The Complaint alleges that Zealthy (led by Robertson) purported to be the agent of Bruno Health, rather than vice-versa. *See* FAC ¶¶ 209-13. Accordingly, Robertson and Zealthy's knowledge are not being imputed "downward." Mot. at 33. Even apart from a chain of imputation, the allegations plausibly

---

[32] Defendants misconstrue (Mot. at 32) the import of an allegation about Robertson's discussion of a news article. The allegation is not offered for the truth of the commentator's opinion but for Robertson's awareness of ROSCA. *See* FAC ¶¶ 52-53. In any case, the article is not central to any claim and therefore is not incorporated into the Complaint. *See supra*, p. 3.

[33] *See, e.g.*, *Amazon.com*, 2024 WL 2723812, at *23 (executives' participation in business affairs plausibly alleged knowledge); *Hornbeam Special Situations*, 308 F. Supp. 3d at 1288-89 (executives' control, day-to-day involvement, and operational knowledge supported liability).

suggest Defendants' implied knowledge and even **actual** knowledge.  Thus, Defendants' quibbles

regarding imputation do not change the analysis.

Defendants' arguments are futile in two larger respects.  First, the actual or implied

knowledge standard merely determines whether monetary penalties are warranted, not whether

underlying violations of ROSCA have been adequately alleged.  *See* 15 U.S.C. § 8404 (violation

of ROSCA triggers all available remedies under FTC Act); *Cardiff*, 2021 WL 3616071, at *2 (civil

enforcement actions concerning ROSCA violations may seek broad equitable relief).  Knowledge

bears on penalties, not on whether a ROSCA claim can proceed in the first instance.  *See Doe v.*

*Royal Caribbean Cruises, Ltd.*, 2012 WL 920675, at *2 (S.D. Fla. Mar. 19, 2012) ("[T]he test of

a complaint pursuant to a motion to dismiss lies in the claim, not in the demand."); *see also A.W.*

*by & Through J.W. v. Coweta Cnty. Sch. Dist.*, 110 F.4th 1309, 1315 (11th Cir. 2024) ("[T]he

selection of an improper remedy ... will not be fatal to a party's pleading if … the pleader may be

entitled to relief of some other type.").  Second, the allegations about Defendants' knowledge raise

fact questions that cannot be resolved on a motion to dismiss.  *See Bonner v. Chambers Cnty.*,

2006 WL 1731135, at *3 (M.D. Ala. June 19, 2006).

## IV.    THE COMPLAINT ADEQUATELY PLEADS VIOLATIONS OF THE OPIOID ACT BY ROBERTSON AND MARTELLI.

Count VI asserts violations of the Opioid Act against Robertson and Martelli.  The Opioid

Act makes it "unlawful to engage in an unfair or deceptive act or practice with respect to any

substance use disorder treatment service."  15 U.S.C. § 45d(a).  In response, Robertson and

Martelli argue that the Complaint fails to plausibly allege (1) violations of the Opioid Act, and (2)

that they had knowledge of such violations.  *See* Mot. at 40-41.  Both arguments are incorrect.

### A.    The Complaint States a Claim for Unfair and Deceptive Practices Related to the Provision of Substance Abuse Treatment.

Robertson and Martelli misleadingly assert that the "only reference to substance abuse

47

treatments" in the Complaint appears at Paragraphs 183 and 198.  *See* Mot. at 41.  That is flatly

wrong.  Actually, the Complaint alleges that, beginning in 2019, Cerebral "promoted or sold"

subscriptions for telehealth offerings to consumers seeking treatment for "substance use disorders

such as opioid use disorder and alcohol use disorder."  FAC ¶ 34.  "[T]housands of patients" used

Cerebral's service to receive such treatment for their substance abuse disorders.  *Id.*  Given the

social stigma associated with addiction, patients seeking "substance abuse treatment" prioritized

the ability to receive that treatment "online, rather than in-person, precisely because ... [of concerns

about] privacy and confidentiality."  *Id.* ¶ 121.  "[I]n connection with the promotion or sale of ...

substance use disorder treatment services, Cerebral and Robertson" made misleading

representations about Cerebral's data-privacy and cancellation practices.  *Id.* ¶¶ 257, 263, 267.

These representations were deceptive.  *See, e.g.*, *id.* ¶¶ 259-61.  Further, Robertson and Martelli

"suppress[ed] and manipulat[ed] negative online reviews" and "disseminat[ed] fictitious reviews"

about Cerebral's telehealth services at the time the company was offering substance abuse disorder

treatment.  *Id.* ¶¶ 183, 198.  These efforts to manipulate online reviews were led by "Martelli [and

undertaken] with Robertson's knowledge and approval."  *Id.* ¶ 191.

These allegations more than suffice to plausibly plead that Robertson and Martelli engaged

in "unfair or deceptive act[s] [and] practices with respect to ... substance use disorder treatment."

15 U.S.C. § 45d(a); *see supra*, Pt. I.C (detailing Robertson and Martelli's review manipulation).

### B.  The Complaint Adequately Pleads That Robertson and Martelli Had Knowledge of Opioid Act Violations.

Robertson and Martelli next argue that the Complaint fails to plead that they had sufficient

knowledge to be held individually liable.  They are wrong.  *See supra*, pp. 5-6 (knowledge must

be pleaded generally under either Rule 8(a) or Rule 9(b)).  The Complaint expressly pleads, for

example, that Martelli's actions in posting fictitious reviews and manipulating online sites to

remove negative (but accurate) reviews were "intentional[] and knowing[]." FAC ¶ 277; *see also id.* ¶ 180 ("I'm fine w[ith] fake ones"). It further alleges that Martelli undertook these actions with the "knowledge and approval" of Robertson in his role as CEO. *Id.* ¶ 191. This manipulation of online reviews occurred while Cerebral was actively soliciting patients with substance use disorder. *Id.* ¶ 34. And during this time, Martelli served as the "Director of Product" in charge of "Marketing-related efforts" (*id.* ¶ 10) while Robertson served as the company CEO (*id.* ¶ 6), making clear that they knew the company offered substance abuse treatment.

Robertson and Martelli assert a corollary argument that they allegedly lacked knowledge of the Opioid Act itself and therefore cannot be held liable for civil penalties. Mot. at 40. A fair reading of the Complaint shows otherwise, detailing numerous ways in which Robertson's leadership role gives rise to the reasonable inference that he was aware of relevant laws and regulations. *See supra*, pp. 44-46. Martelli was also a senior executive focused on marketing efforts related to telehealth medical services (FAC ¶ 10), including "promot[ing] and s[elling]" telehealth treatments for "substance use disorders" (*id.* ¶ 34). Consequently, it is reasonable to infer that he was familiar with FTC rules defining unlawful conduct in that space. More fundamentally, however, Defendants' argument is ill-fit to a pre-discovery motion to dismiss, given the fact-intensive nature of questions about knowledge. *See Bonner*, 2006 WL 1731135, at *3. Moreover, because this argument focuses on the availability of a particular remedy, not the legal sufficiency of a claim, it would not warrant dismissal of Count VI in any case. *See, e.g.*, *Doe*, 2012 WL 920675, at *2.

## CONCLUSION

For the foregoing reasons, Plaintiff the United States of America respectfully requests that the Court deny Defendants' Joint Motion to Dismiss in its entirety.

Dated: October 15, 2024

Respectfully Submitted,

**FOR THE FEDERAL TRADE COMMISSION:**

**FOR THE UNITED STATES OF AMERICA:**

Joshua S. Millard
Christopher J. Erickson
Attorneys
Federal Trade Commission
600 Pennsylvania Ave., N.W.
Mailstop CC-6316
Washington, D.C. 20580
(202) 326-2454 (Millard)
(202) 326-3671 (Erickson)
(202) 326-3197 (Facsimile)
jmillard@ftc.gov
cerickson@ftc.gov

Brian M. Boynton
Principal Deputy Assistant Attorney General
Civil Division

Burden H. Walker
Acting Deputy Assistant Attorney General

Amanda N. Liskamm
Director

Lisa K. Hsiao
Senior Deputy Director, Civil Chief

Zachary A. Dietert
Assistant Director

Markenzy Lapointe
United States Attorney
Southern District of Florida

Rosaline Chan
Assistant United States Attorney
Fla. Bar No. 1008816
United States Attorney's Office

99 N.E. 4th Street
Miami, Fl. 33132
Phone: (305) 961-9335
Rosaline.Chan@usdoj.gov

*/s/ Shana C. Priore*
Shana C. Priore (A5503157)
Francisco L. Unger (A5503216)
Joshua A. Fowkes (A5503218)
Amber M. Charles (A5503235)
Trial Attorneys
Consumer Protection Branch
U.S. Department of Justice
450 5th Street, N.W. Suite 6400-South
Washington, D.C. 20044
202-598-8182 (Priore)
202-742-7111 (Unger)
202-532-4218 (Fowkes)
202-307-3009 (Charles)
202-514-8742 (Facsimile)
Shana.C.Priore2@usdoj.gov
Francisco.L.Unger@usdoj.gov
Joshua.A.Fowkes@usdoj.gov
Amber.M.Charles@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 15, 2024, a true and correct copy of the foregoing document

was electronically filed and served on all counsel of record via the Court's CM/ECF system.

<u>*/s/ Shana C. Priore*</u>
Shana C. Priore
Trial Attorney

51