**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-21376-RAR**

| |
|---|
| **UNITED STATES OF AMERICA,** |
| **Plaintiff,** |
| **v.** |
| **CEREBRAL, INC. et al.,** |
| **Defendants.** |

**ORAL ARGUMENT REQUESTED**

**DEFENDANTS KYLE ROBERTSON; ALEX MARTELLI; GERMAN ECHEVERRY;**
**ZEALTHY, INC; GRONK, INC; AND BRUNO HEALTH, P.A.'S**
**JOINT MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................................ 1

RELEVANT FACTUAL BACKGROUND ........................................................................ 5

    A.    MR. ROBERTSON AND CEREBRAL .................................................. 5

    B.    CEREBRAL'S PRIVACY AND DATA-SECURITY PRACTICES ................... 6

    C.    CEREBRAL'S CANCELATION PRACTICES .................................................. 9

    D.    CEREBRAL'S MARKETING PRACTICES ..................................................... 9

    E.    ZEALTHY'S PRACTICES AND POLICIES ................................................... 10

    F.    CAUSES OF ACTION ...................................................................................... 12

LEGAL STANDARD .......................................................................................................... 13

ARGUMENT ....................................................................................................................... 15

    A.    THE FTC ACT SECTION 5 CLAIMS AGAINST ALL DEFENDANTS FAIL
            IN NUMEROUS RESPECTS ........................................................................... 15

        1.    The Cerebral-Related Privacy and Data-Security Claims Against
            Mr. Robertson (Counts I–III) Fail ............................................................. 18

            a.    The Government's Allegations of Years-Old Cerebral Conduct
                Provide No Basis for Injunctive Relief Against Mr. Robertson. .. 18

            b.    The Complaint Does Not Allege Deceptive or Unfair Conduct. .. 21

            c.    The Complaint Fails to Allege Mr. Robertson's Knowledge of
                Cerebral's Incidents. ...................................................................... 26

        2.    The Cerebral-Related Cancelation Claim Against Mr. Robertson
            (Count IV) Fails. ........................................................................................ 29

            a.    The Complaint Fails to Allege a Continuing Violation. .............. 29

            b.    The Complaint Fails to Allege Mr. Robertson's Knowledge. ...... 30

        3.    The Cerebral-Related Customer Review Claim Against Mr. Robertson
            and Mr. Martelli (Count V) Fails. ............................................................. 31

            a.    The Complaint Fails to Plead an Ongoing or Future Violation. .... 31

            b.    The Complaint Fails in Numerous Respects to Allege a Deceptive
                Act or Unfair Practice. ................................................................... 32

i

4.    The Claim Regarding Zealthy's General Sales and Marketing Practices Against Mr. Robertson, Dr. Echeverry, and Zealthy (Count VII) Fails. .. 33

    a.    The Complaint Alleges No Unfair Practices or Deceptive Conduct at Zealthy. ..................................................................................... 33

    b.    Count VII May Be Duplicative ..................................................... 39

    c.    The Complaint Has Not Alleged Mr. Robertson's or Dr. Echeverry's Knowledge of Any Violations at Zealthy........... 40

5.    The Claim Regarding Zealthy's Marketing and Consumer Review Practices Against Mr. Robertson and Zealthy (Count VIII) Fails. ........... 41

B.    THE FTC RULE CLAIM (COUNT IX) LIKEWISE FAILS. ............................ 41

C.    THE ROSCA CLAIMS (COUNTS VI, X) ARE ALSO FATALLY FLAWED. 42

1.    Cerebral and Zealthy Satisfied ROSCA's Disclosure, Consent, and Cancelation Requirements. ....................................................................... 43

    a.    Cerebral and Zealthy adequately disclosed all material terms of the transaction and obtained consumers' express informed consent. . 43

    b.    Cerebral and Zealthy provided a simple mechanism for cancelation. ................................................................................... 47

2.    The Complaint Fails to Plead Knowledge. ................................................ 49

CONCLUSION....................................................................................................... 51

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*American Dental Ass'n v. Cigna Corp.*,
605 F.3d 1283 (11th Cir. 2010) ................................................................. 32, 35

*American Fin. Servs. Ass'n v. F.T.C.*,
767 F.2d 957 (D.C. Cir. 1985)................................................................21, 25

*AMG Cap. Mgmt., LLC v. F.T.C.*,
593 U.S. 67 (2021)....................................................................................16, 48

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ....................................................................27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................13

*Auto-Owners Ins. Co. v. G&D Constr. Grp., Inc.*,
588 F. Supp. 3d 1328 (N.D. Ga. 2022) ........................................................39

*Baker v. City of Madison*,
67 F.4th 1268 (11th Cir. 2023) .......................................................................8

*Baxter v. Intelius, Inc.*,
No. 8:09-cv-1031, 2010 WL 3791487 (C.D. Cal. Sept. 16, 2010)........................................44

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................13

*Bell v. Royal Seas Cruises, Inc.*,
No. 19-cv-60752-RAR, 2020 WL 5639947 (S.D. Fla. Sept. 21, 2020) .................................38

*Bott v. Vistaprint USA Inc.*,
392 F. App'x 327 (5th Cir. 2010) .................................................................44

*Chaparro v. Carnival Corp.*,
693 F.3d 1333 (11th Cir. 2012) .....................................................................13

*Davis v. Avvo, Inc.*,
345 F. Supp. 3d 534 (S.D.N.Y. 2018)............................................................33

*Davis v. Skullcandy, Inc.*,
No. 2:16-cv-121, 2018 WL 1415192 (D. Utah Mar. 21, 2018)............................................28

*Donnenfeld v. Petro Home Servs.*,
No. 2:16-cv-882, 2017 WL 1250992 (D.N.J. Mar. 24, 2017) ...............................................30

*Dyson, Inc. v. Garry Vacuum, LLC*,
No. 10-cv-1626, 2010 WL 11595882 (C.D. Cal. July 19, 2010)............................................14

*F.T.C. v. Amazon.com, Inc.*,
No. 2:23-cv-932 (W.D. Wash. 2023), ECF No. 125 ..................................................14

*F.T.C. v. American Precious Metals, LLC*,
No. 11-cv-61072, 2012 WL 13114034 (S.D. Fla. Apr. 12, 2012) .........................................13

*F.T.C. v. American Tax Relief LLC*,
No. 2:11-cv-6397, 2012 WL 8281722 (C.D. Cal. Aug. 8, 2012) .........................................25

*F.T.C. v. Credit Bureau Ctr., LLC*,
937 F.3d 764 (7th Cir. 2019) .......................................................................43

*F.T.C. v. D-Link Sys., Inc.*,
No. 3:17-cv-39, 2017 WL 4150873 (N.D. Cal. Sept. 19, 2017).........................................14

*F.T.C. v. Ivy Cap., Inc.*,
No. 2:11-cv-283, 2011 WL 2118626 (D. Nev. May 25, 2011) .................................15

*F.T.C. v. LendingClub Corp.*,
No. 3:18-cv-2454, 2018 WL 11436309 (N.D. Cal. Oct. 3, 2018) .........................................32

*F.T.C. v. Lights of America, Inc.*,
760 F. Supp. 2d 848 (C.D. Cal. 2010) ..............................................................14

*F.T.C. v. Primary Grp.*,
713 F. App'x. 805 (11th Cir. 2017) ...............................................................17

*F.T.C. v. Quincy Bioscience Holding Co.*,
389 F. Supp. 3d 211 (S.D.N.Y. 2019)...............................................................26

*F.T.C. v. Roomster Corp.*,
654 F. Supp. 3d 244 (S.D.N.Y. 2023)...............................................................33

*F.T.C. v. Shire ViroPharma, Inc.*,
917 F.3d 147 (3d Cir. 2019)..................................................3, 16, 18, 21, 29, 31

*F.T.C. v. Swish Mktg.*,
No. 09-cv-3814, 2010 WL 653486 (N.D. Cal. Feb. 22, 2010) ...........................15, 28, 31, 41

*F.T.C. v. Tashman*,
318 F.3d 1273 (11th Cir. 2003) ..............................................................17, 21, 39

*F.T.C. v. Wash. Data Res.*,
856 F. Supp. 2d 1247 (M.D. Fla. 2012).............................................................22

iv

*F.T.C. v. Wash. Data Res., Inc.*,
  704 F.3d 1323 (11th Cir. 2013) ................................................................22

*FindWhat Inv. Grp. v. FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) ...............................................................13

*George v. McDonough*,
  596 U.S. 740 (2022)..................................................................................46

*Halperin v. Int'l Web Servs., LLC*,
  123 F. Supp. 3d 999 (N.D. Ill. 2015) .................................................30, 35

*Horsley v. Feldt*,
  304 F.3d 1125 (11th Cir. 2002) ..................................................................8

*In re Equifax Inc. Sec. Litig.*,
  357 F. Supp. 3d 1189 (N.D. Ga. 2019) .....................................................25

*In re LexinFintech Holdings Ltd. Sec. Litig.*,
  No. 3:20-cv-1562, 2021 WL 5530949 (D. Or. Nov. 24, 2021) ................25

*In re Marriott Int'l, Inc.*,
  31 F.4th 898 (4th Cir. 2022) .....................................................................25

*In re Vistaprint Corp Mktg. & Sales Pracs. Litig.*,
  No. 4:08-md-1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009)...................................44, 45

*Krinsk v. SunTrust Banks, Inc.*,
  No. 8:09-cv-909, 2010 WL 11475608 (M.D. Fla. Jan. 8, 2010) ...............28

*LabMD, Inc. v. F.T.C.*,
  894 F.3d 1221 (11th Cir. 2018) .................................................17, 21, 35

*Luke v. Gulley*,
  975 F.3d 1140 (11th Cir. 2020) ..................................................................8

*Marksman Sec. Corp. v. P.G. Sec., Inc.*,
  No. 0:19-cv-62467, 2020 WL 12188373 (S.D. Fla. June 25, 2020)...................................32, 41

*Mullinax v. United Mktg. Grp., LLC*,
  No. 1:10-cv-3585, 2011 WL 4085933 (N.D. Ga. Sept. 13, 2011)...........44

*Orkin Exterminating Co. v. F.T.C.*,
  849 F.2d 1354 (11th Cir. 1988) ................................................................36

*Papasan v. Allain*,
  478 U.S. 265 (1986).....................................................................................5

*Pelfrey v. Mahaffy*,
    No. 17-cv-80920, 2018 WL 3110794 (S.D. Fla. Feb. 2, 2018) ............................................14

*Perret v. Wyndham Vacation Resorts, Inc.*,
    846 F. Supp. 2d 1327 (S.D. Fla. 2012) .................................................................................13

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    568 U.S. 145 (2013)..............................................................................................................46

*Smith v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*,
    660 F. Supp. 3d 863 (N.D. Cal. 2023) .................................................................................14

*Temple v. Best Rate Holdings LLC*,
    360 F. Supp. 3d 1289 (M.D. Fla. 2018)................................................................................38

*Tew v. Chase Manhattan Bank, N.A.*,
    728 F. Supp. 1551 (S.D. Fla.) .........................................................................................50, 51

*United States v. Burgerim Grp. USA, Inc.*,
    No. 2:22-cv-825, 2024 WL 661189 (C.D. Cal. Jan. 19, 2024)..............................................14

*United States v. Planes*,
    No. 8:18-cv-2726, 2019 WL 3024895 (M.D. Fla. July 11, 2019).........................................51

*Utility Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014)..............................................................................................................48

*Vess v. Ciba-Geigy Corp.*,
    317 F.3d 1097 (9th Cir. 2003) .............................................................................................14

*Wagner v. First Horizon Pharmacy Corp.*,
    464 F.3d 1273 (11th Cir. 2006) ...........................................................................................15

*Wilding v. DNC Servs. Corp.*,
    941 F.3d 1116 (11th Cir. 2019) .......................................................................13, 32, 35, 42

**STATUTES**

15 U.S.C. § 45.................................................................................................................43, 49

15 U.S.C. § 53.....................................................................................................3, 16, 18, 39

15 U.S.C. § 8401..................................................................................................................45

15 U.S.C. § 8403................................................................................................43, 44, 46, 48

15 U.S.C. § 8404..................................................................................................................43

**RULES**

Fed. R. Civ. P. 9(b) .................................................................................................13, 23

**REGULATIONS**

16 C.F.R. § 310.2 ................................................................................................................43

F.T.C. Telemarketing Sales Rule,
    75 Fed. Reg. 48458 (Aug. 10, 2010).......................................................................46

F.T.C. Enforcement Policy Statement Regarding Negative Option Marketing,
    86 Fed. Reg. 60822 (Nov. 4, 2021)..........................................................................48

**OTHER AUTHORITIES**

Restatement (Third) of Agency § 5.03 cmt. g (Am. L. Inst. 2006) ................................51

Dissenting Statement of Commissioner Noah Joshua Phillips, *In the Matter of
    MoviePass, Inc.*, Commission File No. 1923000 (June 7, 2021) ............................46

Dissenting Statement of Commissioner Christine S. Wilson, Negative Option Rule, 88
    Fed. Reg. 24716, 24739 (Apr. 24, 2023) ................................................................47

## <u>INTRODUCTION</u>

This case is about governmental and regulatory overreach—the type that needlessly attempts to harm companies and entrepreneurs who provide valuable services to the public. This Court should reject the government's pursuit of stale and baseless claims against the Defendants.

Kyle Robertson co-founded Cerebral, an online health care company, in 2019 with the goal of providing patients with mental health care and medication management services that are stigma free, affordable, and easily accessible.  By the time Mr. Robertson left the company in May 2022, Cerebral had helped nearly one million patients grappling with depression, anxiety, and other issues.  The following year, Mr. Robertson started Zealthy, a new venture driven by the same goal of improving access to high-quality health care.[1]  Zealthy is still in the early stages of development, but it has already delivered accessible, affordable care to thousands of patients.

Unfortunately, the government's misguided regulatory claims in this case threaten to undermine those successes and leave patients worse off.  In May 2025, the Department of Justice— on referral from the Federal Trade Commission—filed the operative, ten-count Second Amended Complaint (the "Complaint" or "SAC") against Cerebral, Mr. Robertson, and Zealthy, as well as former Zealthy employee Dr. German Echeverry[2] and former Cerebral employee Alex Martelli.[3]

---

[1] This brief refers to Zealthy, Gronk, and Bruno Health, collectively, as "Zealthy" unless otherwise specified.  *See* SAC ¶¶ 10–17 (allegations regarding corporate relationships among Zealthy, Gronk, and Bruno Health).

[2] Dr. Echeverry joins only the portions of this motion that relate to the narrow set of allegations against him.  That includes portions of the Preliminary Statement referencing him, Sections E and F of the Factual Background (as they relate to Dr. Echeverry), Section A.4 of the Argument section, Section C of the Argument section with regard to Count IX of the Amended Complaint, and the Conclusion.  He takes no position with respect to the remainder of this motion.

[3] Mr. Martelli joins only the portions of this motion that relate to the narrow set of allegations against him.  That includes portions of the Introduction referencing him, Sections D and F of the Factual Background, the Legal Standard, Sections A.3 of the Argument section, and the Conclusion.  He takes no position with respect to the remainder of this motion.

ECF No. 119.  The Complaint claims that different combinations of those Defendants violated Section 5 of the FTC Act, the Restore Online Shoppers' Confidence Act (ROSCA), and the FTC's Rule on the Use of Consumer Reviews and Testimonial ("FTC Rule"). The government's claims mainly focus on alleged conduct by Cerebral that occurred several years ago and that has ceased.

While the government tries conjuring up the appearance of a weighty case through an overlong, overaggressive Complaint, at its core, this case largely pertains to harmless, isolated, or inadvertent matters, most stemming from the types of challenges that often arise with startups like Cerebral and Zealthy. In summary, all the government really alleges is that: (1) Cerebral conveyed certain information to Facebook and other companies based on commonplace pixel tracking technology with Cerebral's customers' consent; (2) Cerebral experienced certain isolated data-security breaches during Mr. Robertson's tenure of which Mr. Robertson was unaware; (3) cancelation issues at Cerebral resulted in some unspecified number of customers failing to receive refunds—again without Mr. Robertson's knowledge; (4) Mr. Robertson and Mr. Martelli allegedly influenced online reviews about Cerebral in July 2020; (5) some unspecified number of anonymous Zealthy users have complained about various aspects of the company's services; (6) Zealthy too experienced some number of isolated privacy and data-security breaches; and (7) Mr. Robertson allegedly influenced online reviews about Zealthy.

These allegations were weak to begin with, and to the extent the government had any legitimate qualms, they were with Cerebral itself.  Soon after it filed its First Amended Complaint, however, the government entered into a settlement with Cerebral that provides the government with an approximately $7 million monetary recovery as well as comprehensive injunctive relief. *See* ECF No. 33 at 13–55.  That should have been the end of the case.

Instead, the government has unnecessarily continued to press its claims against other Defendants who either no longer have a connection with Cerebral or never had such a connection in the first place.  But while the government has tacked a handful of allegations about Zealthy onto its overwhelmingly Cerebral-focused Complaint, it cannot begin to show that violations that allegedly occurred at Cerebral more than three years ago are still ongoing or imminently likely to recur at a different company that operates much differently—a fact underscored by the government's decision not to seek preliminary relief against any of the remaining Defendants during the 14 months the case has been pending.  *See F.T.C. v. Shire ViroPharma, Inc.*, 917 F.3d 147, 155 (3d Cir. 2019) (explaining that Congress adopted the provision of the FTC Act invoked by the government here specifically to address "ongoing or imminent illegal conduct" of the sort that would ordinarily be addressed by "a temporary restraining order or preliminary injunction").

As shown below, with Cerebral having settled and no longer a party to a lawsuit that largely centers upon its purported practices, the remaining pending claims are unsupported and legally tenuous. The decision to continue to press these remaining clams is unnecessary and contrived regulatory enforcement—and only undermines the Defendants' good faith efforts to help patients who have historically been underserved by the medical establishment. This Court should, therefore, dismiss the Complaint with prejudice, for the following reasons.

*First*, the Cerebral-related Section 5 claims fail because they do not allege an ongoing or imminent violation of the FTC Act.  The government brings its Section 5 claims under Section 13(b) of the Act, which provides only for injunctive relief and requires the government to prove that the defendant "is violating" or "is about to violate" the Act.  15 U.S.C. § 53(b)(1).  The government cannot make that showing with respect to its Cerebral-related claims because Mr. Robertson and Mr. Martelli are no longer at Cerebral, because the alleged conduct occurred

several years ago, and because Cerebral has ceased the alleged practices at issue.  These allegations fall well short of showing the kind of "existing or impending conduct" necessary to obtain injunctive relief. *See Shire ViroPharma,* 917 F.3d at 156, 160. The government attempts to revive these stale claims through allegations regarding Mr. Robertson's employment at Zealthy and Mr. Martelli's and Mr. Robertson's continued presence in the telehealth field, Second Am. Compl. ¶¶ 314–17 ("SAC"), but it cannot rely on Zealthy-related allegations to prop up claims that exclusively pertain to Cerebral's years-old historical (and dissimilar) conduct.

*Second*, the Section 5 claims fail for the additional reasons that they do not properly allege unfair or deceptive practices (including with Rule 9(b) particularity), and do not allege knowledge with respect to the individual defendants. The government's claims regarding Cerebral's data privacy and security practices are inadequate because consumers consented to Cerebral's data-sharing practices, because the government alleges only isolated data breaches, and because the government does not allege that Mr. Robertson was aware of those breaches. The claim regarding Cerebral's cancelation practices likewise fails to plausibly allege that Mr. Robertson knew that any customers failed to receive refunds. The claim regarding Cerebral's consumer-review practices is also flawed, as it makes no allegations of unfairness and does not otherwise comply with Rule 9(b).  And the claim regarding Zealthy's business and marketing practices does not identify any inconsistency between the company's representations and its actions, let alone show that Mr. Robertson or Dr. Echeverry had knowledge of such inconsistencies.

*Third*, the government's ROSCA and FTC Rule claims fail for many of the reasons identified above, as well as for additional reasons specific to each statutory scheme.  As for ROSCA, Cerebral and Zealthy both comply with the statute because they provide adequate disclosures, obtain consumer consent, and offer cancelation mechanisms that are at least as simple

as the corresponding sign-up process—a standard that the government itself previously embraced in guidance and cannot renounce suddenly now in a backward-looking enforcement action.  And as for the FTC Rule, the government fails to allege that Mr. Robertson had knowledge of this FTC Rule prior to the alleged violation.  Additionally, because the FTC Rule did not become effective until October 21, 2024, the government must allege with particularity that the conduct at issue occurred after this time.  But the government fails to do so.

## **RELEVANT FACTUAL BACKGROUND**[4]

### A.   **MR. ROBERTSON AND CEREBRAL**

In 2019, Kyle Robertson cofounded Cerebral, Inc., a healthcare company dedicated to providing patients with online healthcare treatment.  SAC ¶¶ 35, 41. The idea for Cerebral came from Mr. Robertson's own difficulty getting help during a severe bout of depression and anxiety. The path to getting care was littered with roadblocks—excessively long waiting lists, inconvenient appointment times, battles with insurance companies, and all the other headaches that have become so common, yet so pernicious, in the modern American healthcare system.  Mr. Robertson was determined to make things easier for people dealing with mental health issues, and during his three-year stewardship as CEO, Cerebral grew from a "small start-up with a limited number of employees" into a national success that works with "hundreds of thousands of patients struggling with depression, anxiety, and other issues."  *Id.* ¶¶ 35, 42.

As with most successful CEOs, Mr. Robertson was involved in many aspects of Cerebral's business.  *Id.* ¶ 42.  He oversaw a number of its core functions*,* had a hand in setting key policies and making key decisions, and was involved in managing multiple aspects of its day-to-day

---

[4] Defendants recite the allegations in the Complaint without conceding their truth. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[F]or the purposes of this motion to dismiss we must take all the factual allegations in the complaint as true.").

operations. *Id.* ¶¶ 7, 43, 46. He was less involved in areas where he lacked expertise.  For example, Mr. Robertson is not a medical doctor, so prescription practices were not within his bailiwick.  Nor is Mr. Robertson a software engineer or privacy or data-security expert.  Mr. Robertson ultimately had visibility into those functions as CEO, but his primary responsibility was to ensure that the relevant departments were well staffed with qualified and responsible employees—including teams of healthcare professionals, product managers, engineers, and marketing specialists—who could handle Cerebral's operations and make decisions outside of Mr. Robertson's expertise.  *Id.* ¶ 46.  That was important throughout the company, and in particular with regard to Cerebral's compliance and security functions, where Mr. Robertson employed security engineers and multiple levels of compliance managers.  *Id.* ¶¶ 47, 51.  Cerebral also had several roles at the level of director or higher to ensure adequate oversight.  These included a Chief Integrity and Compliance Officer, a Vice President of Product and Engineering, a Chief Information Security Officer, a Head of Engineering, a Head of Legal, a President, and a Chief Operating Officer.  *Id.* ¶¶ 7, 47, 51, 118, 139.  Under Mr. Robertson's stewardship, Cerebral allocated millions of dollars to the company's security and compliance functions.  *Id.* ¶ 109.

## B.   CEREBRAL'S PRIVACY AND DATA-SECURITY PRACTICES

Due to the importance of—and stigma associated with—mental health treatment, Mr. Robertson and Cerebral sought to provide care that was both "secure and discreet."  *Id.* ¶¶ 60–62.  Recognizing that consumers needed to know that the treatment they sought would be private, Cerebral included notices across its platforms that treatment through Cerebral was "private, secure, and non-judgmental."  *Id*. ¶ 60.

To that end, Cerebral adopted a thorough Privacy Policy, requiring users' agreement prior to signing up for Cerebral's services.  *Id.* ¶ 74.  The Privacy Policy explicitly stated that users' protected health information ("PHI") would not be "us[ed] or disclos[ed]" "for marketing

purposes" without their authorization.  *Id.* ¶ 72.  Cerebral defined PHI to include information protected by the Health Insurance Portability and Accountability Act ("HIPAA") and "information about you, including demographic information, that may identify you and that relates to your past, present or future physical health or condition, treatment or payment for health care services."  *Id.* ¶ 71 n.1.  That definition was provided in at least two separate locations—Cerebral's Privacy Policy and its Notice of Privacy Practices—so that patients would know exactly which information was protected from disclosure.  *Id.*

The positive impact that Cerebral had on its users' lives encouraged the company to get the word out and let people know there was a cheaper, easier-to-access, and more convenient alternative to the current system of mental health care.  To target its marketing efforts efficiently and effectively, the company relied on aggregate data collected from its existing user base.  The Privacy Policy spelled out how the company would use such data, making clear that users' personal information—but not their PHI—might be disclosed to third-party service providers for data analysis as well as other purposes.  *Id.* ¶¶ 70–71.

Beginning in 2020, Cerebral also specifically informed users through its Privacy Policy that it collected non-personal information and aggregate information through tools called pixel tags.  *Id.* ¶ 73.  The Policy explained that these tools were designed to help Cerebral "understand traffic patterns" and "enhance" users' "online experience."  *Id.*  In particular, Cerebral disclosed that it used Facebook Pixel, which permitted Cerebral to collect information regarding consumers' usage activity and, as Cerebral noted, may permit Facebook, based on its own information and the users' actions (as well as the Pixel's settings) to connect the usage information to a Facebook account.  *Id.* ¶ 74.  Cerebral used Facebook Pixel along with Google Analytics and three other firms' cookies.  *Id.*  While Cerebral disclosed that these online tools could share certain types of

information with specified third parties, it did not retract or modify its assurance that users' PHI would not be used for marketing purposes without authorization. *Id.* ¶¶ 72, 74. And in fact, as discussed below, Cerebral did not intentionally disclose any of its users' PHI through these tools.

Despite Cerebral's good-faith efforts to protect its patients' sensitive data, some of that data became accessible to outsiders in a manner inconsistent with the Privacy Policy. During the summer of 2021, unauthorized viewers gained access to certain data in a shared electronic folder. *Id.* ¶ 97. A second inadvertent disclosure occurred between May and December 2021, when certain former employees' and contractors' login names and passwords continued to function for a period after their association with Cerebral had ended, giving them access to confidential patient information. *Id.* ¶¶ 98–99. Cerebral remedied this issue in December 2021, but in January 2022, shortly before Mr. Robertson left the company, Cerebral separately discovered that certain former employees and contractors had accessed patients' records after leaving Cerebral. *Id.* ¶¶ 100, 102.[5]

Additionally, in January 2023, seven months after Mr. Robertson's departure, Cerebral learned that an inadvertent technical error had caused its tracking technologies (*e.g.*, Facebook Pixel) to "disclose[] certain information that may be regulated as protected health information" to its third-party marketing partners. Ex. A (Cerebral Notice of HIPAA Privacy Breach), at 1; SAC ¶ 92.[6]

---

[5] The Complaint alleges two additional incidents in July and September 2022. SAC ¶¶ 103, 104–06. Mr. Robertson left Cerebral in May 2022, however, *see id.* ¶ 41, and the government pleads no plausible connection between those incidents and Mr. Robertson.

[6] The Complaint incorporates Cerebral's Notice of HIPAA Privacy Breach by reference. SAC ¶ 93. The Court may consider the exhibit because the government referred to it in the Complaint; the exhibit is central to the government's claims; and its authenticity is not in question. *See Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)); *Luke v. Gulley*, 975 F.3d 1140, 1144 (11th Cir. 2020) (incorporating by reference document referred to in complaint).

### C.     CEREBRAL'S CANCELATION PRACTICES

Cerebral's website and app informed users that they could "cancel anytime" after they had signed up for Cerebral's services.  *Id.* ¶¶ 128–29.  Near Cerebral's inception, that meant canceling through email, although users were also able to cancel through other channels.  *Id.* ¶¶ 134, 136.  For a brief period in 2020, Cerebral tested a cancelation button in user profiles before returning to email cancelation.  *Id.* ¶¶ 135–36.  Cerebral continued to update its cancelation process and related disclosures, including by introducing a cancelation assessment in October 2020 to gather information about why users were canceling their subscriptions, and by adding an explicit explanation of how to cancel in its enrollment path in May 2022.  *Id.* ¶¶ 131–32, 137, 140–41.  Users could cancel at any time, but to ensure the cancelation was processed prior to the next subscription charge, Cerebral informed customers that they should submit their cancelation request by the close of business on the day before the billing date.  *Id.* ¶¶ 134, 136–37.

Although Cerebral disclosed how to cancel a subscription, and numerous users successfully did so, some users found the process cumbersome.  In response to user feedback, Cerebral redesigned and reengineered its cancelation flow so that users once again could cancel their subscriptions by simply clicking a cancelation button.  *Id.* ¶ 138.

### D.     CEREBRAL'S MARKETING PRACTICES

At Cerebral, Mr. Martelli served as Group Product Manager and was responsible for certain Cerebral marketing efforts.[7]  *Id.* ¶ 9.  Mr. Robertson and Mr. Martelli paid close attention to customer reviews of Cerebral's services and worked to ensure that, when patients were dissatisfied with their Cerebral experience, the company addressed their concerns.  To that end, when

---

[7] Although the government alleges that Mr. Martelli was the "Director of Product," SAC ¶ 9, and separately "an executive at Cerebral," *id.* ¶ 314, Mr. Martelli never held either the Director of Product position or any executive position within the company.

customers posted reviews expressing dissatisfaction with Cerebral, Mr. Robertson and Mr. Martelli directed user experience teams to offer discounts or refunds as part of their efforts to remedy those users' concerns. *Id.* ¶¶ 188–89. Similarly, to help potential customers understand how effective Cerebral's services could be, Mr. Robertson and Mr. Martelli invited satisfied customers to complete reviews. *Id.* ¶¶ 191–92. To raise the profile of positive reviews, Cerebral directed its employees to up-vote them as helpful. *Id.* ¶ 197. Mr. Martelli also notified review websites that certain negative reviews were inauthentic. *Id.* ¶ 194.

The Complaint further alleges that, in July 2020, Mr. Robertson directed Mr. Martelli and potentially other unspecified individuals to post reviews praising Cerebral's services as if they were patients. *Id.* ¶¶ 181–82. The Complaint also alleges that Cerebral employees down-voted negative reviews and that some of the reviews Mr. Martelli flagged as inauthentic were in fact legitimate. *Id.* ¶¶ 194–96.

### E.   ZEALTHY'S PRACTICES AND POLICIES

Mr. Robertson left Cerebral in May 2022, but he remained committed to the mission of making healthcare accessible and affordable for everyone. His next venture was Zealthy, a telemedicine company that provides medication and healthcare services, with Dr. Echeverry serving as Zealthy's Senior Medical Director and leading Bruno Health.[8] *Id.* ¶¶ 13, 15, 202. Like Cerebral, Zealthy requires users to provide significant personal information during enrollment, *id.* ¶ 237, and Mr. Robertson and Dr. Echeverry recognized the importance to customers of their information remaining safe and secure, especially when they were receiving care for sensitive medical conditions. Zealthy's Privacy Policy was thorough and detailed, and it explained that unless explicitly described in the Privacy Policy, Zealthy would not disclose user data for

---

[8] Bruno Health helps provide telehealth services to Zealthy subscribers. SAC ¶ 17.

promotional purposes.  Ex. B (Zealthy Privacy Policy), at 2–4.[9]  The Policy informed users that to make Zealthy's services as effective as possible, Zealthy would use third-party tracking tools and advertisement companies.  SAC ¶ 236.  The Complaint does not allege any violation of that representation.

The services Zealthy provides can be costly when accessed through traditional medical providers.  When customers enroll for Zealthy's services, Zealthy provides estimates for the costs of various medications to help users understand how a Zealthy subscription can benefit them.  *Id.* ¶ 225.  But Zealthy's estimates are just that—estimates.  Despite Zealthy's best efforts, they may not always precisely predict the final cost to the customer, especially because Zealthy does not control whether certain medications are covered by certain insurers and because medication is not included in the cost of Zealthy's subscription.  *Id.* ¶¶ 225, 228.  Zealthy discloses this to consumers at sign-up.  Ex. C (Zealthy Sign-up Excerpt), at 1; Ex. D (Zealthy Terms of Use), at 5.[10] Users are also required to select a box indicating that they understand this before purchasing specific medications, and the exact cost of those medications (if prescribed) is disclosed prominently on the screen when prospective patients request them.

Zealthy's enrollment process is thorough.  When registering for Zealthy's services, users must complete a detailed online questionnaire to ensure they receive the best possible medical care.  SAC ¶ 237.  Zealthy also allows its users to cancel at any time through a simple cancellation mechanism that is briefer than the sign-up mechanism. Ex. D (Zealthy Terms of Use), at 4.

---

[9] The Complaint incorporates Zealthy's Privacy Policy by reference.  SAC ¶ 234 (discussing the "Privacy Policy"); *see supra* note 6 (applying the incorporation-by-reference doctrine).

[10] Zealthy's Enrollment Flow and Terms of Use are incorporated by reference. SAC ¶ 223 (discussing the Zealthy sign-up process); *see supra* note 6 (applying the incorporation-by-reference doctrine).

### F.   CAUSES OF ACTION

On April 12, 2024, acting pursuant to a referral from the FTC, the DOJ filed a six-count Complaint.  ECF No. 1.  On May 31, 2024, the government filed the First Amended Complaint with nine counts.  ECF No. 21.  And on May 14, 2025, the government filed its Second Amended Complaint, ECF No. 119, with ten counts, as summarized below:

| Count | Statute | Focus of Claim | Defendant(s) |
|-------|---------|----------------|--------------|
| I | FTC Act Section 5—deceptive acts or practices | Cerebral's privacy practices | Mr. Robertson |
| II | FTC Act Section 5—deceptive acts or practices | Cerebral's data-security practices | |
| III | FTC Act Section 5—unfair acts or practices | Cerebral's privacy and data-security practices | |
| IV | FTC Act Section 5—deceptive acts or practices | Cerebral's cancelation practices | |
| V | FTC Act Section 5—unfair and deceptive acts or practices | Cerebral's customer review practices | Mr. Robertson and Mr. Martelli |
| VI | ROSCA | Cerebral's privacy, data-security, and cancelation practices | Mr. Robertson |
| VII | FTC Act Section 5—unfair and deceptive acts or practices | Zealthy's costs of services, subscription terms, and privacy and cancelation practices | Zealthy, Mr. Robertson, and Dr. Echeverry |
| VIII | FTC Act Section 5—unfair and deceptive acts or practices | Zealthy's customer review practices | Zealthy and Mr. Robertson |
| IX | FTC Rule on use of consumer reviews and testimonials | Zealthy's customer review practices | Zealthy and Mr. Robertson |

| X | ROSCA | Zealthy's costs of services, subscription terms, and privacy and cancelation practices | Zealthy, Mr. Robertson, and Dr. Echeverry |

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct charged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Factual allegations that are 'merely consistent with a defendant's liability' fall short of being facially plausible." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

In addition, where a plaintiff alleges "fraud or mistake," Fed. R. Civ. P. 9(b), it must state its claims with greater particularity. Specifically, under Rule 9(b), "a plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place and person responsible for the statement; (3) the content and manner in which these statements misled [individuals]; and (4) what the defendants gained by the alleged fraud." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1128 (11th Cir. 2019); *see also F.T.C. v. American Precious Metals, LLC*, No. 11-cv-61072, 2012 WL 13114034, at *3 (S.D. Fla. Apr. 12, 2012). When Rule 9(b) applies, a plaintiff's failure to satisfy its demands "is a ground for dismissal of a complaint." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citation omitted).

As the Eleventh Circuit has recognized, the applicability of Rule 9(b) depends on whether a complaint's factual allegations "sound in fraud," regardless of the particular causes of action the complaint ultimately invokes. *Wilding*, 941 F.3d at 1127; *see Perret v. Wyndham Vacation Resorts, Inc.*, 846 F. Supp. 2d 1327, 1333 (S.D. Fla. 2012) ("[Rule 9(b)] does not state that it only

applies to claims for fraud; it says it applies to allegations of fraud.").  A claim "sounds in fraud" if a plaintiff alleges "a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *Dyson, Inc. v. Garry Vacuum, LLC*, No. 10-cv-1626, 2010 WL 11595882, at *4 (C.D. Cal. July 19, 2010) (quoting *Vess v. Ciba-Geigy Corp.*, 317 F.3d 1097, 1103 (9th Cir. 2003)); *accord Pelfrey v. Mahaffy*, No. 17-cv-80920, 2018 WL 3110794, at *4 (S.D. Fla. Feb. 2, 2018).  That standard is met where a plaintiff's claims are "based on allegations of intentional and ongoing misrepresentations." *Dyson, Inc.*, 2010 WL 11595882, at *5; *see Smith v. GlaxoSmithKline Consumer Healthcare Holdings (US) LLC*, 660 F. Supp. 3d 863, 875 (N.D. Cal. 2023). As the government has previously acknowledged, "Rule 9(b)… applies [in suits brought by the FTC] if the FTC's…claim alleges a 'unified course of fraudulent conduct and relies entirely on that course of conduct' to support the claim—*e.g.*, if the claim is based on 'intentional and ongoing misrepresentations.' " Plaintiff's Opposition to Defendants' Motion to Dismiss Amended Complaint at 39, *F.T.C. v. Amazon.com, Inc.*, No. 2:23-cv-932 (W.D. Wash. 2023), ECF No. 125 (quoting *Dyson, Inc.*, 2010 WL 11595882, at *5).

Here, the government's deceptive-practices claims are subject to Rule 9(b) because they are based on allegations of intentional and ongoing misrepresentations.  *See e.g.*, SAC ¶¶ 40, 126, 152, 154, 158, 163, 176, 277 (alleging intentional or deliberate conduct); *see also id.* ¶ 80 ("In directing these targeted advertisement campaigns, Robertson flouted the company's express assurances to users while sacrificing their privacy interests to grow the company and expand its subscriber base.").  Numerous courts have held that Rule 9(b) applies to similar deceptive-practices claims asserted under Section 5.  *See, e.g.*, *American Precious Metals, LLC*, 2012 WL 13114034, at *3–5; *United States v. Burgerim Grp. USA, Inc.*, 2024 WL 661189, at *2 (C.D. Cal. Jan. 19, 2024); *F.T.C. v. Lights of America, Inc.*, 760 F. Supp. 2d 848, 853 (C.D. Cal. 2010); *see also F.T.C.*

*v. D-Link Sys., Inc.*, 2017 WL 4150873, at *1–2 (N.D. Cal. Sept. 19, 2017) (holding that Rule 9(b) applied to deceptive-practices claim under Section 5 where FTC alleged that company made misleading statements to consumers); *F.T.C. v. Ivy Cap., Inc.*, No. 2:11-cv-283, 2011 WL 2118626, at *3 (D. Nev. May 25, 2011) (holding that Rule 9(b) applied to Section 5 claim that "sound[ed] in fraud" (internal quotation marks omitted)); *F.T.C. v. Swish Mktg.*, No. 09-cv-3814, 2010 WL 653486, at *4 (N.D. Cal. Feb. 22, 2010) (observing that "it would be anomalous to suggest that a section 5 claim is free from Rule 9(b)'s heightened pleading requirement"). And the government's unfair-practices claims—as well as its ROSCA claims and its FTC Rule claim— are likewise subject to Rule 9(b) because they are grounded in the same allegedly deceptive conduct as the deceptive-practices claims. *See Wagner v. First Horizon Pharmacy Corp.*, 464 F.3d 1273, 1278 (11th Cir. 2006) (holding that where one claim is subject to Rule 9(b), other claims premised on the same conduct are necessarily subject to Rule 9(b) as well).

## **ARGUMENT**

### A.   **THE FTC ACT SECTION 5 CLAIMS AGAINST ALL DEFENDANTS FAIL IN NUMEROUS RESPECTS.**

The Complaint asserts seven claims under Section 5 for unfair or deceptive acts or practices in connection with: (1) Cerebral's privacy and data-security practices (Counts I through III against Cerebral and Mr. Robertson); (2) Cerebral's cancelation practices (Count IV against Cerebral and Mr. Robertson); (3) Cerebral's consumer review practices (Count V against Mr. Robertson and Mr. Martelli); (4) Zealthy's general sales and marketing practices (Count VII against Mr. Robertson, Dr. Echeverry, and Zealthy); and (5) Zealthy's marketing and customer review practices (Count VIII against Mr. Robertson and Zealthy).

As an important threshold matter, the Section 5 claims seeking a permanent injunction based upon historical, Cerebral-related conduct (Counts I–V) fail to state a claim because they do

not allege an ongoing or imminent violation of the FTC Act. While the government does not specify as such, these Section 5 claims are all brought solely under Section 13(b) of the Act, which provides *only* for injunctive relief and *only* against a defendant who "is violating" or "is about to violate" the FTC Act. 15 U.S.C. § 53(b)(1); *see AMG Cap. Mgmt., LLC v. F.T.C.*, 593 U.S. 67, 75 (2021) (Section 13(b) "does not authorize the Commission directly to obtain court-ordered monetary relief"). While the government also invokes Sections 5(m)(1)(A), 16(a), and 19 of the FTC Act as jurisdictional grounds for its claims in this action (SAC ¶ 1; *see* 15 U.S.C. §§ 45(m)(1)(A), 56(a), 57b), those sections, which provide for monetary relief and civil penalties, apply *only* to violations of cease-and-desist orders, which have not been issued in this case, and enumerated FTC rules, which are not at issue with respect to Counts I-V. These FTC Act provisions do not apply to the alleged violations of Section 5 at issue in these claims.

The Court must therefore examine the Cerebral-related Section 5 claims based on the criteria for seeking injunctive relief under Section 13(b). As shown below, because Mr. Robertson and Mr. Martelli are no longer at Cerebral, and because the alleged conduct there occurred years ago and has ceased, the government's claims for Cerebral-related violations of Section 5 must be dismissed. *See F.T.C. v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019) ("Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation.").

The Section 5 claims also fail—including the claims related to Zealthy (Counts VII–VIII)—because they do not allege unfair or deceptive practices (or do not do so with particularity), and because they do not allege knowledge with respect to the individual defendants. To allege a deceptive practice under Section 5, the government "must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the

circumstances, and (3) the representation was material." *F.T.C. v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). A representation or omission is material if it is of the kind usually relied on by a reasonably prudent person. *See FTC v. SlimAmerica, Inc*., 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999). To allege an unfair practice, the government must show a likely injury to customers that is "substantial" and is not "outweighed by any countervailing benefits to consumers or competition that the practice produces," and that "consumers themselves could not reasonably have avoided." *LabMD, Inc. v. F.T.C.*, 894 F.3d 1221, 1229 (11th Cir. 2018). In addition, for Section 5 claims against individuals, the government must allege that those individuals "knew of the deceptive practices and either participated directly in those practices or had the authority to control them." *F.T.C. v. Primary Grp.*, 713 F. App'x. 805, 807 (11th Cir. 2017) (per curiam). The government has failed to meet those standards with respect to each set of allegations, thereby providing an additional basis to dismiss the Section 5 claims.

As the following sections explain*, each of the Section 5 claims fails for multiple reasons:

1. The Cerebral-related privacy and data-security claims against Mr. Robertson (Counts I–III) fail to allege ongoing or imminent violations, an underlying deceptive act or unfair practice, or knowledge. *See* Section A.1, *infra*.

2. The Cerebral-related cancelation claim against Mr. Robertson (Count IV) fails to allege ongoing or imminent violations or knowledge. *See* Section A.2, *infra*.

3. The Cerebral-related review claim (Count V) against Mr. Robertson and Mr. Martelli fails to allege ongoing or imminent violations and fails in numerous respects to allege an underlying deceptive act or unfair practice. *See* Section A.3, *infra*.

4. The Zealthy-related claim against Mr. Robertson, Dr. Echeverry, and Zealthy (Count VII) fails to allege an underlying deceptive act or unfair practice, or that Mr. Robertson or Dr. Echeverry had knowledge. *See* Section A.4, *infra*.

5. The Zealthy-related claim against Mr. Robertson and Zealthy (Count VIII) fails to allege the underlying deceptive or unfair conduct with particularity or a likelihood of substantial consumer injury.

1.    **The Cerebral-Related Privacy and Data-Security Claims Against Mr. Robertson (Counts I–III) Fail.**

    *a.    The Government's Allegations of Years-Old Cerebral Conduct Provide No Basis for Injunctive Relief Against Mr. Robertson.*

As set forth above, to obtain its requested injunctive relief against Mr. Robertson for the alleged Section 5 violations, the government must show that Mr. Robertson "is violating" or "is about to violate" the FTC Act.   15 U.S.C. § 53(b)(1). This is because Section 13(b) injunctive relief is "prospective, not retrospective," and is intended to protect against "ongoing or future harm." *AMG Cap. Mngmt.*, 593 U.S. at 75-76. In pursuing a claim pursuant to Section 13(b), the government must establish there is "existing or impending conduct" that would violate Section 5. *See Shire ViroPharma*, 917 F.3d at 156. Here, the government cannot meet that burden regarding the alleged privacy and data-security incidents that occurred at Cerebral over three years ago, including because Mr. Robertson is no longer working at Cerebral and because Cerebral appears to have resolved any issues in a settlement with the government. *See* ECF No. 33 (Consent Judgment); *see also Goodley v. Greene*, 2021 WL 4244869, at *1 (S.D. Fla. Sept. 17, 2021) (Ruiz, J.), *aff'd*, 2022 WL 4113101 (11th Cir. Sept. 9, 2022) ("It is well established that courts may take judicial notice of court documents when a motion to dismiss is before the court.").

The Third Circuit considered a similar situation in *F.T.C. v. Shire ViroPharma*, in which the government sought an injunction for Section 5 violations based on alleged misconduct regarding a product of which the defendant had divested itself before the FTC brought suit.   917 F.3d at 149.  The FTC argued that the defendant could be enjoined under Section 13(b) because it continued to manufacture and market other products, and therefore "ha[d] the incentive and opportunity to continue to engage in similar conduct in the future." *Id.* at 160 (internal quotation marks omitted). The Third Circuit rejected the FTC's argument, holding that the misconduct regarding the divested product had ceased prior to the filing of the FTC's lawsuit, and that the

"vague allegations" in the complaint failed to show that the defendant was "violating" or "about to violate" the law.  *Id.*  More generally, the court explained, Section 13(b) requires allegations of "existing or impending conduct"; it is not enough for the FTC to allege "a reasonable likelihood that past violations will recur."  *Id.* at 156.

Here, the Complaint contains no plausible allegations that Mr. Robertson is currently engaged in, or likely to engage in, any of the conduct detailed in Counts I–III. The government's claims regarding Mr. Robertson's alleged involvement in Cerebral-related privacy and data-protection practices pertains to conduct that occurred *over three years ago.* These allegations regarding purported historical data practices—related to a company for which Mr. Robertson has not worked for years and which has agreed to a Section 13(b) injunction—fall well short of demonstrating "existing or impending conduct" prohibited under Section 5. To permit the government to use allegations of old Cerebral-related conduct to support a Section 13(b) injunctive claim against Mr. Robertson would improperly transform the scope and purpose of the statute.

Aware of this major deficiency in these injunctive claims, the government may attempt to argue that its threadbare allegations regarding Zealthy's data practices demonstrate that there is alleged ongoing conduct that must be remedied. But that will not save these claims. *First*, and most important, these claims are expressly predicated upon Cerebral-related allegations—and thus allegations of Zealthy-related practices cannot support these counts of the Complaint. Indeed, these causes of action reference only alleged conduct by Cerebral and Mr. Robertson *while he worked for Cerebral*. By way of example, Count I—alleging "deceptive privacy practices—is based exclusively upon Cerebral's purported misrepresentations regarding the privacy of Cerebral's services, that Cerebral keeps personal information confidential, and that Cerebral would not use personal information for marketing purposes, among other things. SAC ¶¶ 319-20. There is no

19

reference to Zealthy-related misrepresentations in this claim. The exact same holds for the other two claims—Counts II and III. They are solely predicated in Cerebral-related conduct. The government, therefore, cannot somehow attempt to use Zealthy-related allegations—which do not form the foundational basis for these claims—to support these causes of action.

*Second*, relatedly, the government cannot use Zealthy-related privacy and data-protection practices to support these Cerebral-related claims because (as discussed in detail below in Section A.4), Zealthy's alleged practices are fundamentally distinct from—and on their face, much less significant in scope and purported severity than—Cerebral's. For example, while its data-related allegations regarding Cerebral focused on its alleged unauthorized disclosure of customers' data for marketing purposes, SAC ¶¶ 77–78, the government does not allege that Zealthy engaged in any such unauthorized data sharing. Instead, it merely alleges that Zealthy's disclosures to customers regarding data privacy are "in the fine print of a Privacy Policy. *Id*. ¶ 234.  Similarly, while the government alleged that several years ago Cerebral released or allowed access to large numbers of patient files, *id*. ¶¶ 97-101, its allegations regarding Zealthy identify only a few instances where subscribers were able to briefly access other patients' information, *id*. ¶¶ 269, 271–74.  And the Complaint does not contend that these data issues are ongoing.

While the Court need not evaluate this because Zealthy-related allegations cannot be used to support these Cerebral-related claims, the Complaint also fails to allege that Mr. Robertson has the level of knowledge or involvement regarding Zealthy's alleged practices required to subject him to liability under Section 5. There are no substantive, non-boilerplate allegations that Mr. Robertson knew, participated in, or had the authority to control Zealthy's data privacy or security practices. The notion that Mr. Robertson will commit unfair or deceptive practices with respect to data security or privacy at Zealthy thus relies on mere "vague allegations" that he "has the incentive

and opportunity to continue to engage in similar conduct in the future." *Shire ViroPharma, Inc.*, 917 F.3d at 160 (internal quotations omitted). That is insufficient under Section 13(b), and the Court should dismiss Counts I–III on that basis alone.

### b. The Complaint Does Not Allege Deceptive or Unfair Conduct.

Counts I–III also fail to allege any deceptive or unfair conduct and can be dismissed on that basis as well. As explained, a deceptive practices claim must allege a material misrepresentation that was likely to mislead reasonable consumers. *See Tashman*, 318 F.3d at 1277. And an unfair practice requires a showing of likely and substantial injury that consumers cannot reasonably avoid and that is not outweighed by countervailing benefits. *See LabMD, Inc.*, 894 F.3d at 1229. The Complaint fails to satisfy those requirements because it alleges only purported isolated data breaches, which are insufficient to render misleading any statement that Cerebral made regarding its privacy and data-security practices. Likewise, the government alleges only "speculative harms," *American Fin. Servs. Ass'n v. F.T.C.*, 767 F.2d 957, 972 (D.C. Cir. 1985) (internal quotations omitted); it does not establish that any injury was likely or substantial.

Start with the representations that Cerebral allegedly made regarding its privacy and data-security practices. Cerebral told consumers that its services were "private," "secure," "confidential," and "discrete." SAC ¶¶ 60–63. Cerebral's Privacy Policy and Notice of Privacy Practices also informed consumers that their PHI would not be used or disclosed for marketing purposes without their consent, *id.* ¶¶ 71–72, though Cerebral notified consumers that non-personal and aggregate information might be collected through tracking tools such as pixel tags, *id.* ¶¶ 73–75. And on the "Telehealth Informed Consent" screen, Cerebral told consumers that the company employed software security protocols, but that "[i]n very rare events, security protocols could fail, causing a breach of privacy of personal medical information." *Id.* ¶ 76.

Given those representations, one would expect the government's deceptive practices claim to allege that Cerebral did not in fact employ security protocols or otherwise safeguard its users' data. Quite to the contrary, however, the Complaint concedes that Cerebral invested millions in safety and security under Mr. Robertson's direction. *Id.* ¶ 113. And it alleges only the following specific privacy and data-security lapses during Mr. Robertson's tenure: (1) between June and August 2021, Cerebral allegedly "released the confidential medical files of 880 patients to persons unauthorized to receive or view those files," *id.* ¶ 97; (2) between May and December 2021, Cerebral allegedly "allowed former employees and contractors access to the confidential electronic medical records of patients," resulting in the unauthorized access of 266 patient files, *id.* ¶ 98; (3) in January 2022, Cerebral allegedly discovered that "former employees or contractors" had access to "patients' medication management records more than six days after the individuals had been terminated," *id.* ¶ 102; and (4) with respect to PHI, Cerebral allegedly discovered in early 2023—more than seven months after Mr. Robertson left the company—that it had inadvertently disclosed consumer information to third-party marketing partners, *id.* ¶ 93.[11] As discussed below, these isolated data privacy issues—none of which involve any intentional or knowing conduct— do not render Cerebral's representations regarding its data privacy and security as misleading.

The government also makes vague allegations that Cerebral had "chronic data security problems." *Id.* ¶ 112; *see id.* ¶ 116. But the suggestion that there was room for improvement in Cerebral's protocols does not establish that the company violated the FTC Act by failing to keep user data secure. Moreover, Cerebral expressly warned patients that its "security protocols could

---

[11] The other data-security allegations, SAC ¶¶ 103–104, occurred after Mr. Robertson's departure and thus are irrelevant to his liability under Section 5. *See F.T.C. v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1277 (M.D. Fla. 2012) (finding that once an individual was terminated from the company, he no longer had control over any allegedly deceptive practices), *aff'd sub nom. F.T.C. v. Wash. Data Res., Inc.,* 704 F.3d 1323 (11th Cir. 2013).

fail" in "very rare events," *id.* ¶ 76, which is exactly what happened according to the Complaint. Nor does Cerebral's alleged decision to partner with an unspecified "third party with problematic data security practices," *id.* ¶ 118, suggest that any of its representations regarding data security were false or fraudulent.  The government alleges that the "partnership would expose users to a risk of breach," *id.*, but it does not explain why or how. *See* Fed. R. Civ. P. 9(b) (plaintiff must "state with particularity the circumstances constituting fraud or mistake").

Likewise, the government's claim regarding Cerebral's purported misrepresentations regarding the sharing of personal information with third parties is unsupported. Cerebral expressly notified its customers that it had the right to and may collect their data—including by using "pixel tags," "web beacons," "clear GIFS," or "similar means"—and disclose their information to third parties for unspecified purposes (which naturally includes marketing). *See* SAC ¶¶ 71, 73. In fact, Cerebral's Privacy Policy set out a detailed disclosure regarding the use of the Facebook tracking pixel, including that Facebook can connect customers' data with their Facebook account and use it for advertising purposes, as well as regarding the use of Google analytics and other third-party cookies. *Id*. ¶ 74. Having been expressly advised of Cerebral's data collection and disclosure policies, Cerebral's customers thus consented to Cerebral's data sharing practices and were not misled. Indeed, faced with putative class actions regarding the purported unauthorized use of Facebook or other pixel tracking technologies and with similar disclosures as those made here by Cerebral, courts typically find that the plaintiffs consented to conduct at issue and dismiss those lawsuits. *See, e.g., Smith v. Facebook*, Inc., 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017), aff'd, 745 F. App'x 8 (9th Cir. 2018) (dismissing all claims, including for wiretapping and invasion of privacy, based on plaintiff's consent to data-sharing) (collecting cases).

The government also has not alleged any materially harmful conduct in this respect. The allegations describe an arrangement in which third-party providers like Facebook collected data from Cerebral consumers using tracking tools like pixels, and then sold that data back to Cerebral. *See id.* ¶ 78 ("These tracking tools (including tracking 'pixels') collected and sent Cerebral's patients' PHI to third parties.  Those third parties then used that PHI to provide advertising, data analytics, or other services to Cerebral.").  The Complaint goes on to allege that Cerebral invested money in targeted advertisements under Mr. Robertson's leadership, and that Mr. Robertson was actively involved in Cerebral's targeted advertisement campaigns.  *See id.* ¶¶ 79–88. But there is nothing inherently harmful, however, about targeted advertising, especially where, as here, the customers are explicitly informed of and consent to the practice.

Relatedly, the government's allegations are also unsupported because they misleadingly rely on a definition of PHI that differs from the term used in Cerebral's Privacy Policy.  Cerebral's Privacy Policy defines PHI as information that may "identify you and that relates to your past, present or future physical health or condition, treatment or payment for health care services."  *Id.* ¶ 71 n.1.  Yet the Complaint inexplicably adopts a much broader definition of "PHI" that "includes full names; home and email addresses; phone numbers; birthdates; IP addresses; audio, images, and videos of clients; medical and prescription histories (including diagnoses); other specific health information, including treatment plans and treatment appointment dates; pharmacy and health insurance information; religious affiliations and beliefs; political affiliations and beliefs; sexual orientation; Social Security, payment account, and driver's license numbers; and information relating to criminal background checks."  *Id.* ¶ 38.  Given that sweeping definition, it is impossible to know whether a representation to safeguard PHI as Cerebral defines it is even inconsistent with a disclosure of PHI as the government defines it.  A patient's full name, for

example—without any information regarding their health or condition, treatment or payments—would seem to be PHI under the government's definition but not under Cerebral's.

The government is left, then, with isolated incidents in which user data and PHI were allegedly shared with unauthorized individuals and third parties. Those incidents do not establish that Cerebral acted inconsistently with the representations it made to consumers. Cerebral told its users that their information would be private and secure, but it expressly disclosed that its protocols might not be perfect. As the Fourth Circuit has explained in an analogous context, "[t]he fact that a company has suffered a security breach does not demonstrate that the company did not place significant emphasis on maintaining a high level of security." *In re Marriott Int'l, Inc.*, 31 F.4th 898, 903 (4th Cir. 2022) (quoting *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1221 (N.D. Ga. 2019)); *see F.T.C. v. American Tax Relief LLC*, No. 2:11-cv-6397, 2012 WL 8281722, at *5 (C.D. Cal. Aug. 8, 2012) ("unauthorized billings" that were "isolated occurrences" would not support Section 5 claim). Indeed, the government concedes that Cerebral "devoted resources and took steps to strengthen the security of [its] systems," *Marriott Int'l, Inc.*, 31 F.4th at 903, including through executive briefings, formal investigations, and Mr. Robertson's own approval of millions of dollars for security-related departments. SAC ¶¶ 109–11.

For similar reasons, the Complaint fails to allege more than "speculative harms," much less that Cerebral's privacy and data-security protocols were likely to result in substantial consumer injury, as is required for an unfair-practices claim. *American Fin. Servs. Ass'n*, 767 F.2d at 972 (internal quotations omitted). The government had years to investigate Cerebral's alleged privacy and data-security lapses, but it has not identified or pled concrete injuries that consumers suffered as a result of the alleged breaches discussed above. The government's failure to identify any evidence of consumer injury is particularly telling in light of its settlement with Cerebral, which

requires the company's full cooperation.   ECF No. 33 at 54–55.   If there were evidence of consumer injury, the government would already have access to it.   Nothing will be gained by allowing the government to continue its pursuit of the remaining defendants in this case—none of whom has any remaining connection to Cerebral.

       *c.   The Complaint Fails to Allege Mr. Robertson's Knowledge of Cerebral's Incidents.*

      If that were not enough, Counts I–III fail for the additional reason that they do not allege Mr. Robertson's knowledge of the specific privacy and data-security issues alleged in the Complaint.   *See Primary Grp.*, 713 F. App'x at 807 (FTC must allege that individual defendants "knew of the deceptive practices and either participated directly in those practices or had the authority to control them").   The technical issues on which the government relies derive from coding-level glitches that resulted in inadvertent disclosure or the possibility of improper access to user data.   The government lacks any basis to allege that Mr. Robertson was involved in or even knew about those details.   Mr. Robertson was the CEO of Cerebral, not a privacy engineer.   SAC ¶¶ 40–41.   He had no expertise to click through the code, design the privacy architecture, or evaluate security tickets as incidents arose. He approved budgets, oversaw departments, set strategic direction, empowered capable subject-matter experts, and had reporting obligations to the board of directors.   That type of CEO-level involvement, which would be present in virtually *every* case in which a company is found to have violated the FTC Act, is "insufficient to show" the level of knowledge required for imposing Section 5 liability on an individual.   *See F.T.C. v. Quincy Bioscience Holding Co.*, 389 F. Supp. 3d 211, 221 (S.D.N.Y. 2019) (allegations that executive "signed research agreements, pre-approved research proposals, and reviewed [d]efendants' advertising" were "insufficient to show" knowledge).

Returning to the specific lapses identified in the Complaint, there is no suggestion that Mr. Robertson was aware of: (1) the alleged release of 880 patient files in mid-2021, SAC ¶ 97; (2) the alleged unauthorized access of 266 patient files in late 2021, *id.* ¶ 98; (3) the alleged unauthorized access by former employees or contractors discovered in January 2022, *id.* ¶ 102; or (4) the alleged disclosure of PHI to third-party marketing partners, which was not discovered until 2023—long after Mr. Robertson had left Cerebral, *id.* ¶ 93. The government concedes, moreover, that there were numerous operational and reporting layers separating Mr. Robertson from the technical coding-related details of Cerebral's privacy and data-security implementation, including but not limited to engineers, compliance personnel, a Vice President of Product and Engineering, a Head of Engineering, a Chief Integrity and Compliance Officer, and a Chief Information Security Officer. *Id.* ¶¶ 7, 46, 47, 118. Mr. Robertson's remoteness from those details, and the failure to allege that he was aware of them, require dismissal. *Cf. Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1240 (10th Cir. 2016) (dismissing claims where complaint failed to establish knowledge of CEO who was separated by "four levels of management hierarchy" from conduct).

The Complaint's attempt to link Mr. Robertson to the alleged data-security breaches only highlights how far removed he was. The government alleges that Mr. Robertson personally approved a budget allocating millions of dollars to Safety & Quality and Security & IT, SAC ¶ 113, and that, "[i]n some instances," he "overrode significant data security concerns raised by his top data security reports," *id.* ¶¶ 109–16, 118. Yet notwithstanding a "longstanding" investigation that relied on Cerebral's full cooperation, *see id.* ¶ 248; ECF No. 33 at 54–55, the government does not suggest that those unspecified "significant data security concerns" had anything to do with the alleged breaches. Because the government identifies "virtually no facts to tie [Mr. Robertson] to the [isolated security issues] or to suggest his knowledge moves from the conceivable to the

plausible," dismissal is appropriate. *F.T.C. v. Swish Mktg*, 2010 WL 653486, at *6 (N.D. Cal. Feb. 22, 2010); *cf. Davis v. Skullcandy, Inc.*, 2018 WL 1415192, at *5 (D. Utah Mar. 21, 2018) (dismissing claim against individuals because allegations based on "executives' positions in the company and their presence at meetings" were insufficient to establish scienter).

The privacy allegations fare no better. As noted, the government concedes that tracking technologies like pixels were intended to collect "non-personal information or aggregate information," in accordance with Cerebral's disclosures. SAC ¶ 73. And although Cerebral later learned that PHI may have been disclosed to third parties, that possibility of disclosure resulted from an inadvertent technical error. Ex. A (Cerebral Notice of HIPAA Privacy Breach), at 1. Far from acting intentionally, Cerebral did not even discover the error until January 3, 2023—more than seven months after Mr. Robertson's departure. *Id.* Cerebral then "promptly disabled, reconfigured, and/or removed the Tracking Technologies…to prevent any such disclosures in the future and discontinued or disabled data sharing with any Subcontractors not able to meet all HIPAA requirements." *Id.* at 2. The allegation that Cerebral discovered in 2023 that it had accidentally disclosed PHI in a manner inconsistent with its stated policies does not support a plausible inference that Mr. Robertson knew of the breach more than half a year earlier. *See Krinsk v. SunTrust Banks, Inc.*, 2010 WL 11475608, at *3 (M.D. Fla. Jan. 8, 2010) (after-the-fact discovery of falsity "cannot support a reasonable inference that [defendant] knew or should have known that the representations…were false at the time they were made"). To state a Section 5 claim against Mr. Robertson, the government must plausibly allege that he was aware *at the time* that Cerebral's privacy policies misrepresented the manner in which the company's tracking technologies operated. Because the government makes no such allegations, Counts I–III fail.

### 2. The Cerebral-Related Cancelation Claim Against Mr. Robertson (Count IV) Fails.

#### a. The Complaint Fails to Allege a Continuing Violation.

For the same reasons set out above, the government's claim regarding Cerebral's cancelation policies cannot sufficiently allege that Mr. Robertson "is violating or is about to violate" Section 5. *Shire ViroPharma, Inc.*, 917 F.3d at 161. Mr. Robertson is no longer at Cerebral and has no control over the company's cancelation practices. And, importantly, over three years ago, Cerebral "revised its cancellation process to permit clients…to cancel their subscriptions by clicking a cancellation button" (SAC ¶ 138)—which the government maintains is an appropriate practice. Cerebral also appears to have resolved any issues regarding its historical cancellation policies in a settlement with the government. *See* ECF No. 33. Thus, the government's allegations against Mr. Robertson regarding Cerebral-related cancellation practices cannot plausibly establish "existing or impending conduct" by Mr. Robertson that would violate Section 5.

Again, we expect that the government may try to use Zealthy-related allegations to support this Cerebral-related cause of action. Like with Counts I-III, it cannot do that. This claim, like those, is also exclusively predicated on allegations regarding Cerebral's cancellation practices from several years ago. *See, e.g.* SAC ¶¶ 333-34. Thus, any allegations regarding Zealthy-related cancellation practices cannot be employed to somehow prop up this claim

Moreover, while they are not pertinent to this claim, the government offers only threadbare allegations regarding Zealthy's cancelation practices. And, in any event, those cancellation practices are distinct from Cerebral's, which, as alleged, involved a process by which customers were required to email notice of the cancellation to Cerebral by a certain time 1 or 2 business days prior to the start of the next billing period. SAC ¶¶ 136–37, 144. The Complaint does not allege that Zealthy had this type of cancellation process. Instead, the Complaint alleges that Zealthy's

cancellation mechanism was "broken for long periods of time" and employees were ordered not to provide refunds to customers, *id.* ¶¶ 243–45. These allegations are unique to Zealthy. The Complaint also alleges that Zealthy's customers have "complained" that they "continued to be charged while their requests to cancel subscriptions were ignored." *Id.* ¶ 243. And some unspecified Zealthy users have allegedly "had to cancel their credit cards altogether after their cancellation requests were ignored." *Id.* ¶ 246. But "[b]ecause every large company can expect to have some consumer complaints, courts typically reject the argument that customer complaints alleging circumstances that are contrary to defendant's representations independently suffice to establish the falsity of those representations." *In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949, at *8 (D. Or. Nov. 24, 2021) (internal quotations and citations omitted). The Court should follow that course here, rejecting the government's attempt to rely solely on "these unconfirmed…on-line complaints to support a plausibility finding." *Donnenfeld v. Petro Home Servs.*, No. 2:16-cv-882, 2017 WL 1250992, at *5 (D.N.J. Mar. 24, 2017).

The Zealthy allegations are especially inadequate, as they do not state with particularity that the company misrepresented consumers' ability to "cancel at anytime," which is the basis of the government's Section 5 claim against Cerebral. *See* SAC ¶¶ 333–34. "If all [the government] can submit after conducting such an investigation…is a list of anonymous and unsubstantiated user comments, [its] complaint badly flunks Rule 9(b)." *Halperin v. Int'l Web Servs., LLC*, 123 F. Supp. 3d 999, 1008 (N.D. Ill. 2015).

### b. The Complaint Fails to Allege Mr. Robertson's Knowledge.

The Complaint also fails to allege that Mr. Robertson knew that Cerebral continued to charge customers and did not provide a refund after they "asked Cerebral to cancel their subscriptions." SAC ¶ 123. Once again, the government relies on general assertions about Mr. Robertson's role as CEO. *See id.* ¶¶ 148–61. At best, those allegations suggest that

Mr. Robertson favored cancelation by email rather than a cancelation button.  But a multi-step cancelation process does not render deceptive a representation that consumers can "cancel at any time," particularly where consumers who were charged after submitting their cancelation request subsequently received refunds of those charges.  And the Complaint is conspicuously silent regarding whether Mr. Robertson knew that any users did not receive refunds.  Given the government's lengthy investigation in this case—which, per the terms of its settlement with Cerebral, required the company's full cooperation, ECF No. 33 at 54–55—the only plausible inference is that the government cannot show such knowledge.  The government relies instead on assumptions based on Mr. Robertson's position of authority, but such assumptions cannot ground a Section 5 claim. *See Swish Mktg*, 2010 WL 653486, at *5 ("The Commission's conclusory assertions of authority—untethered to virtually any supportive facts—do not support an inference of [Defendant's] involvement.").

### 3. The Cerebral-Related Customer Review Claim Against Mr. Robertson and Mr. Martelli (Count V) Fails.

#### a. The Complaint Fails to Plead an Ongoing or Future Violation.

Moving to the government's claim regarding Cerebral-related customer reviews, the Complaint once again fails to allege that Mr. Robertson and Mr. Martelli are "violating" or are "about to violate" Section 5. *Shire ViroPharma, Inc.*, 917 F.3d at 161. As with the prior claims, Count V again rests entirely on allegations regarding years-old conduct, with the only concrete instance relating to actions alleged to have occurred in July 2020—nearly four years prior to the filing of the Complaint.  *Id.* ¶ 181. This is not the stuff of "existing or impending conduct," *Shire ViroPharma, Inc.*, 917 F.3d at 156, and, like with Counts I-IV, requires dismissal of this claim.

        *b.  The Complaint Fails in Numerous Respects to Allege a Deceptive Act*
        *or Unfair Practice.*

The Complaint's barebones allegations regarding customer reviews also fail in numerous other respects.  As a preliminary matter, the government makes no allegation that Cerebral's practices were unfair.  Although the Complaint invokes the term several times in conclusory fashion, *see* SAC ¶¶ 179, 191, 200, 337, it never asserts that Cerebral's review practices were likely to cause substantial consumer injury, and such injury cannot be inferred from the government's vague allegations that the reviews in question may have reached an unspecified number of consumers.  *See F.T.C. v. LendingClub Corp.*, 2018 WL 11436309, at *13 (N.D. Cal. Oct. 3, 2018) (FTC failed to plead substantial injury where it did not allege "how many or provide even a rough approximation" of the number of people injured (emphasis omitted)).  Indeed, while Count V of the Complaint is styled "Unfair and Deceptive Marketing and Consumer Review Practices," the Count concludes by alleging only that Cerebral's "acts and practices related to review manipulation and marketing efforts constitute *deceptive* acts or practices."  SAC ¶ 341 (emphasis added).  It says nothing about unfairness.  *Contra, e.g.*, *id.* ¶ 354 (alleging both unfair and deceptive practices in the allegations under Count VII).  This Court should not fill in the gaps for the government, particularly given that the government has already amended its complaint.

The government's deceptive-practices claim also suffers from multiple flaws.  First, the Complaint contains no allegations regarding the content of Cerebral's representations, when they were made, or whether consumers even saw them.  Those failures are fatal under Rule 9(b), which requires the government to allege "the precise statements, documents, or misrepresentations made," "the time, place and person responsible for the statement," and "the content and manner in which these statements" were misleading.  *Wilding*, 941 F.3d at 1128 (quoting *American Dental Ass'n*, 605 F.3d at 1291); *see Marksman Sec. Corp. v. P.G. Sec., Inc.*, 2020 WL 12188373, at *8

(S.D. Fla. June 25, 2020) (dismissing misleading advertising claim based on "false reviews" for failure to satisfy Rule 9(b) where plaintiff failed to "provide the content of the reviews, the precise statements that [p]laintiff alleges to be misleading or when the statements were made").

Furthermore, the government overreaches by characterizing as deceptive Cerebral's alleged attempts to solicit reviews from satisfied customers and redress complaints from dissatisfied customers. Favoring positive coverage over negative coverage is not deceptive. *See Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 543 (S.D.N.Y. 2018) ("[S]potlighting positive reviews is not false advertising. Not only are the positive reviews opinions, but simply indicating that a particular consumer was satisfied with a service plainly does not constitute a false or misleading statement."). Nor is offering unhappy customers "refunds, discounts, and financial incentives," even if those customers "revise[] their reviews" afterwards. SAC ¶¶ 188–89. Although it may be deceptive to enter into an undisclosed agreement with a third party to leave positive reviews, *see F.T.C. v. Roomster Corp.*, 654 F. Supp. 3d 244, 263 (S.D.N.Y. 2023), the government makes no allegations that Cerebral entered into such an agreement here.

Finally, as noted above regarding the other prior counts, the Court should not permit the government to try to use Zealthy-related allegations to support this claim, which is exclusively related to Cerebral's alleged conduct

### 4. The Claim Regarding Zealthy's General Sales and Marketing Practices Against Mr. Robertson, Dr. Echeverry, and Zealthy (Count VII) Fails.

#### a. *The Complaint Alleges No Unfair Practices or Deceptive Conduct at Zealthy.*

The government's Section 5 allegations concerning Zealthy are just as conclusory as its allegations concerning Cerebral. The government alleges that Zealthy (1) made misleading statements regarding the costs associated with its services, SAC ¶¶ 224–28, 262–68; (2) did not adequately disclose "important terms" relating to fees, cancelation, and membership renewal in its

Terms of Use page, *id.* ¶¶ 230–33; (3) did not adequately disclose terms in its Privacy Policy regarding use of private customer information (and failed to secure customer data), *id.* ¶¶ 234–39, 270–71, and (4) engaged in illicit telemedicine practices, *id.* ¶¶ 275–78.   But the Complaint supplies no facts to support those claims.

Starting with cost, the government first alleges that Zealthy represented to consumers that they "would *generally* pay $25 with insurance or $150 without insurance, only to end up charging them multiples of those amounts." *Id.* ¶ 225 (emphasis added).   And the government contends that although Zealthy "led users to believe that they would *generally* be able to obtain insurance coverage for certain drugs,…numerous subscribers have complained that they were not able to receive insurance coverage." *Id.* ¶ 228 (emphasis added).   Those allegations fail to state a deceptive-practices claim for the simple reason that there is no inconsistency between a representation that consumers would *generally* pay only a particular amount and an assertion that consumers did not *always* pay only that amount.   Likewise, no inconsistency exists between the representation that consumers "would pay '$0' for their first 3 months, or no more than '$49' for their first month," on the one hand, and the allegation that Zealthy "charge[d] them much more, including by charging for multiple months upfront," *id.* ¶ 226, on the other. To be clear, these two statements are related to altogether different products offered by Zealthy. More importantly, there is a clear difference between the amount that a consumer pays per month and the number of months that a consumer is required to pay for at a time—a subscription might, for example, charge for an entire year up front, while also giving a consumer the first three months free. And the government identifies no facts suggesting that Zealthy either charged more than a certain amount that it said consumers would pay for a given month or made misrepresentations about the number of months for which consumers would be required to pay up front.

The government's pricing allegations also fail to satisfy Rule 9(b).  Along with its assertion regarding what consumers would "generally" pay, *id.* ¶ 225–26, the government also contends that "Zealthy's enrollment flow has led subscribers to believe they will be charged a flat fee of $49 for signing up, when in fact" they were charged for "the net cost of a three-month subscription."  *Id.* ¶ 262.  With respect to both allegations, the Complaint omits significant detail and fails to explain the precise statements from Zealthy that were "misleading."  Accordingly, all the government's deceptive-practices allegations about cost fail to state a claim because the government does not describe "the precise statements, documents, or misrepresentations made," "the time, place and person responsible for the statement," or "the content and manner in which these statements misled" users, as is required by Rule 9(b).  *Wilding*, 941 F.3d at 1128 (quoting *American Dental Ass'n*, 605 F.3d at 1291).  The Complaint offers only a partial account of what Zealthy told consumers they would pay, without any context regarding when and where those statements were made, or what other information was conveyed alongside them. The government also fails to identify the manner in which consumers were misled, relying instead on anonymous user complaints.  Here, too, "[i]f all [the government] can submit after conducting such an investigation.. is a list of anonymous and unsubstantiated user comments, [its] complaint badly flunks Rule 9(b)."  *Halperin*, 123 F. Supp. 3d at 1008.

The allegations regarding cost also fail to show an unfair practice.  As discussed above, the government cannot establish a likelihood of substantial injury based on unspecified claims of user dissatisfaction.  *See LendingClub Corp.*, 2018 WL 11436309, at *13.  And the Complaint also fails to allege that "consumers themselves could not reasonably have avoided" any alleged harms.  *LabMD, Inc.*, 894 F.3d at 1229.  As just explained, there is no allegation that Zealthy's representations were inconsistent with its practices, or that "free and informed" consumers could

not have understood what Zealthy's representations entailed. *See Orkin Exterminating Co. v. F.T.C.*, 849 F.2d 1354, 1365 (11th Cir. 1988) ("The Commission's focus on a consumer's ability to reasonably avoid injury stems from the Commission's general reliance on free and informed consumer choice as the best regulator of the market." (internal quotations omitted)).

The allegations concerning Zealthy's Terms of Use and Privacy Policy fare no better. The Complaint contends that Zealthy broke the law by including in its Terms of Use certain terms relating to potential fees and charges, cancelations and refunds, and annual membership renewals that are "not part of the enrollment flow" and that customers "are not required to view in order to sign up." SAC ¶ 230. This is not the case, as Zealthy requires its members who are signing up to agree to its specific terms, including its Consent to Telehealth, Privacy Policy, Notice of Privacy Practices, and Subscriptions, Cancellations, and Refunds Policy.

Likewise, according to the government, Zealthy "hid[] key terms regarding [its] handling of users' sensitive, private information in the fine print of a Privacy Policy that is also not part of the enrollment flow and that consumers who have enrolled may never have seen." *Id.* ¶ 234. Once again, the Complaint leaves out the specifics required under Rule 9(b). It does not even set out Zealthy's enrollment flow of which those policies are purportedly "not part." *Id.* ¶¶ 230, 234.

Below is an excerpt from the version of Zealthy's sign-up page that began consumers' enrollment flow (prior to any payment information or PHI being provided by the prospective customer) as of March 11, 2024, before the government filed its First Amended Complaint.[12] The Terms of Use and the Privacy Policy are right there (see added red boxes).

---

[12] Zealthy's Enrollment Flow is incorporated by reference. SAC ¶¶ 223-239 (discussing the Zealthy sign-up process); *see supra* note 6 (applying the incorporation-by-reference doctrine). The screenshot is taken from the last capture in the Internet Archive prior to the filing of the Amended Complaint. It is available at the following link: https://web.archive.org/web/20240311152117/

**You're on your way to better health.**

Let's see if Zealthy is right for you.

Create a free account to learn more.

You already have an account? Log in

 Continue with Apple

 Continue with Facebook

 Continue with Google

or

Email address *

Create a password *  👁‍🗨

**Continue with email**

By proceeding, I confirm that I am over 18 years old and agree to Zealthy's Terms and Privacy Policy.

Clicking on the Terms of Use, consumers would have seen a detailed explanation of Zealthy's pricing model, which set out that users were responsible for knowing their own insurance benefits and covering the cost of any Zealthy services that their insurance did not reimburse.  Ex. D (Zealthy Terms of Use), at 3–6.  Likewise, Zealthy explained how it used promotional fees and customer data.  *Id.*  The Privacy Policy specifically allowed Zealthy to "share [user] data with third-party vendors" and to "allow selected third parties to use tracking technology on the website."  Ex. B (Zealthy Privacy Policy), at 3–4.  The Privacy Policy went on to tell users that, "[u]nless described in this Privacy Policy, [Zealthy does] not share, sell, rent, or trade any of your information with third parties for their promotional purposes."  *Id.* at 4.  Zealthy users—who had

---

https://app.getzealthy.com/signup.  The live version of the page is available at the following link: https://app.getzealthy.com/signup.

to agree to these policies to subscribe to Zealthy's services—had ample opportunity to read and understand their content.[13]

Nowhere does the Complaint allege a violation by Zealthy of any term in either of these policies. Rather, the government's position is that the (ordinary and unremarkable) way that these terms were presented is itself unlawful. There is nothing unlawful, however, about linking to a company's terms of use and advising users that they agree to those terms by signing up. Indeed, this Court has explained that such "browsewrap" agreements are enforceable where—as here— the link to the terms and conditions is conspicuously placed and users are informed that taking a specific action constitutes acceptance of those terms. *See Bell v. Royal Seas Cruises, Inc.*, 2020 WL 5639947, at *6 (S.D. Fla. Sept. 21, 2020) (Ruiz, J.); *see also Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1303 (M.D. Fla. 2018) (noting, by contrast, that courts "will not enforce browsewrap agreements where the link to the website's terms [is] buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it").

The Complaint also adds allegations regarding Zealthy's "chargeback dispute rate." SAC ¶¶ 266–68. The government contends that Mr. Robertson directed efforts to "minimize" Zealthy's "chargeback dispute rate that is disclosed to financial organizations" to "deflect" these institution's "scrutiny." *Id.* ¶ 267–68. However, the government fails to explain how this conduct is grounds for a Section 5 violation. Indeed, Section 5 is concerned with the deception of "customers," not financial institutions. *See Tashman*, 318 F.3d at 1277.

Finally, with respect to Gronk, the Complaint's claims are also deficient for an even more basic reason. Contrary to the government's allegation otherwise, Gronk is not doing business as

---

[13] By quoting and referring to Zealthy's Terms of Use and Privacy Policy, the Complaint incorporated them by reference. *See supra* notes 9–10.

Zealthy.  SAC ¶ 12.  Gronk is a Florida entity that was erroneously created and dissolved independently of Zealthy's creation and incorporation in Delaware. Exs. E (Incorporation Documents), and F (Dissolution Documents).[14]  The government fails to state any claim against that dissolved entity, let alone one for injunctive relief.  Indeed, the government never explains how a nonexistent entity could be "violating" or "about to violate" the Act.  15 U.S.C. § 53(b)(1).

### b.  *Count VII May Be Duplicative*

Duplicative claims are those "that stem from identical allegations, that are decided under identical legal standards, and for which identical relief is available." *See MSP Recovery Claims Series 44, LLC v. State Farm Mut. Auto. Ins. Co*., 2023 WL 4683538, at *3 (S.D. Fla. Jul. 21, 2023). Courts should dismiss duplicative claims in the interests of judicial economy. *Id*. As noted, the government cannot use Zealthy-related allegations to support their Section 5 claims related to Cerebral's conduct (Counts I-V). To the extent that the government is permitted to do so, however, that renders Counts VII as duplicative of those Cerebral-related Section 5 counts. By way of example, Count VII asserts a deceptive and unfair practices claim against Zealthy and other Defendants based in part on Zealthy's alleged data privacy practices. SAC ¶¶ 349, 350 (alleged misleading statements regarding "terms in a page…that purports to give Zealthy…sweeping abilities to track, collect, use, and disclose consumers' data); 351 (alleged unfair practices involving "tracking, collecting, disclosing, and using consumers sensitive, personal data"). Meanwhile, Count I also asserts violations of Section 5 based on data privacy practices. If Zealthy-related allegations are permitted to support Count I, then Count VII is identical and duplicative of that cause of action. The same goes for the allegations in Count VII related to data security and

---

[14] The Court may take judicial notice of public dissolution and incorporation documents filed with secretaries of state on a motion to dismiss.  *See Auto-Owners Ins. Co. v. G&D Constr. Grp., Inc.*, 588 F. Supp. 3d 1328, 1331 n.3 (N.D. Ga. 2022) ("Courts can take judicial notice of public records maintained by a secretary of state.").

cancellation practices—which are duplicative of Counts II (data security) and IV (cancellation practices) if Zealthy-related allegations may color those claims.

### c. *The Complaint Has Not Alleged Mr. Robertson's or Dr. Echeverry's Knowledge of Any Violations at Zealthy.*

Finally, as with other counts discussed above, Count VII fails to allege the mental state required to support Section 5 liability against an individual defendant.  Indeed, the government fails to allege *anything* about Mr. Robertson's or Dr. Echeverry's knowledge with respect to Zealthy's alleged misconduct.  The relevant allegations in the Complaint merely describe the leadership roles that Mr. Robertson and Dr. Echeverry held at Zealthy and Bruno, and the relationship that they and the two companies had with each other.  SAC ¶¶ 201–219.  The government makes a conclusory assertion that "Echeverry knew or should have known about the Terms of Use" at Zealthy given his role as an executive there and his relationship with Mr. Robertson, *id.* ¶ 220, but it does not otherwise allege facts that would show that his actual role as "Senior Medical Director" or head of the "Bruno Health" clinical operation would have included any knowledge of or responsibility for Zealthy's Terms of Use.  Nor does the government allege that Mr. Robertson knew of the representations above or any alleged failure to comply with those representations.  For example, the Complaint fails to demonstrate that Mr. Robertson knew of the representations regarding the effect of consumer's insurance on costs, *id.* ¶225, "low costs for initial months" of Zealthy's services, *id.* ¶ 226, or initial "flat fee[s]."  *Id.* ¶ 262.  Indeed, even in Count VII itself, the government does not allege that either Dr. Echeverry or Mr. Robertson was aware of Zealthy's allegedly unfair and deceptive practices.  *Id.* ¶¶ 347–54.  That failure to allege knowledge is fatal to Count VII.  *See Swish Mktg.*, 2010 WL 653486, at *6 (ordering dismissal where "the complaint presents virtually no facts to tie [Defendants] to the [alleged] scheme or to suggest [their] knowledge moves from the conceivable to the plausible").

### 5. The Claim Regarding Zealthy's Marketing and Consumer Review Practices Against Mr. Robertson and Zealthy (Count VIII) Fails.

In Count VIII, the government brings a Section 5 claim for unfair and deceptive practices based on Zealthy's consumer review practices, specifically, "multiple" unspecified positive reviews purportedly prepared by Zealthy employees. This cause of action fails for similar reasons to the consumer review claim related to Cerebral. First, this claim fails because the Complaint contains no allegations regarding the content of Zealthy's representations in the customer reviews at issue, when they were made, or whether consumers even saw them. The government merely alleges in conclusory fashion that Zealthy "employees have authored and posted hundreds of fictitious reviews…." SAC ¶ 283. Without providing any details regarding these purported fictitious reviews—not even exemplars—the government fails to satisfy its burden under Rule 9(b). *See Marksman Sec*, 2020 WL 12188373, at *8. Second, the government does not set out any non-conclusory allegations that Zealthy's review practices were likely to cause substantial consumer injury, and such injury cannot be inferred from the government's vague allegations that the reviews in question may have reached an unspecified number of consumers. *See LendingClub Corp.*, 2018 WL 11436309, at *13.

### B. THE FTC RULE CLAIM (COUNT IX) LIKEWISE FAILS.

The government's claim for violation of the FTC Rule regarding the use of consumer reviews and testimonials is without merit. As with the substantively identical allegations regarding Zealthy's consumer review practices at issue in Count VIII, the government fails to identify "the precise statements, documents, or misrepresentations made," "the time, place and person responsible for the statement," and "the content and manner in which these statements" that were misleading. *Wilding*, 941 F.3d at 1128. Second, the government has not properly alleged that the conduct at issue in this claim occurred after the effective date of this FTC Rule—which is October

21, 2024. *See* Trade Regulation Rule on the Use of Consumer Reviews and Testimonials, 89 Fed. Reg. 68,077 (Aug. 22, 2024) (codified at 16 C.F.R. § 465.2) ("This rule is effective October 21, 2024"). The government's only allegation regarding the relevant timeframe states that Mr. Robertson engaged in unspecified consumer review "practices during this litigation…and after enactment of [the FTC rule]." SAC ¶ 294. But this vague allegation—that fails to specify exactly what conduct occurred after the rule's effective date—is not sufficient to properly allege violations of a rule that went into effect after the Zealthy-related practices alleged in the Complaint.

## C.   THE ROSCA CLAIMS (COUNTS VI, X) ARE ALSO FATALLY FLAWED.

Finally, the Complaint also asserts ROSCA claims against Mr. Robertson and Cerebral regarding Cerebral's privacy, data-security, and cancelation practices, and against Mr. Robertson, Dr. Echeverry, and Zealthy regarding Zealthy's general sales and marketing practices.  Under ROSCA, it is unlawful for a seller to offer a "negative option feature" unless the seller "(1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before charging the consumer; and (3) provides simple mechanisms for a consumer to stop recurring charges."  *F.T.C. v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 769 (7th Cir. 2019) (alteration omitted) (quoting 15 U.S.C. § 8403).  A "negative option feature," in turn, is defined by reference to the FTC's Telemarketing Sales Rule (TSR) as "a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w); *see* 15 U.S.C. § 8403 (incorporating the TSR's definition by reference). A violation of ROSCA is "treated as a violation of a rule under section 18 of the Federal Trade Commission Act," 15 U.S.C. § 8404(a), meaning that a defendant may be liable for civil penalties if the defendant has "actual

knowledge or knowledge fairly implied on the basis of objective circumstances that" his conduct was "unfair or deceptive and is prohibited by such rule [(i.e., ROSCA)]," 15 U.S.C. § 45(m)(1)(A).

Here, the ROSCA claims fail for two fundamental reasons.  First, the government fails to show that Cerebral or Zealthy had inadequate disclosures, insufficient user consent, or unduly complicated cancelation mechanisms.  And second, the Complaint lacks adequate allegations that Mr. Robertson or Dr. Echeverry knew that their conduct was prohibited by ROSCA, or even that it was unfair or deceptive.[15]

### 1.     Cerebral and Zealthy Satisfied ROSCA's Disclosure, Consent, and Cancelation Requirements.

The ROSCA claims fail out of the gates because—even accepting the government's allegations as true—Cerebral and Zealthy satisfied the requirements applicable to sellers who offer a negative option feature.  As noted, a seller who offers such a feature must "(1) provide[] text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtain[] a consumer's express informed consent before charging the consumer; and (3) provide[] simple mechanisms for a consumer to stop recurring charges."  *Credit Bureau Ctr., LLC*, 937 F.3d at 769 (alteration omitted) (quoting 15 U.S.C. § 8403).  The Complaint makes clear that Cerebral and Zealthy complied with those obligations.

#### a.   Cerebral and Zealthy adequately disclosed all material terms of the transaction and obtained consumers' express informed consent.

Beginning with disclosure and consent, the Complaint appears to concede that both Cerebral and Zealthy fully informed users of their payment, renewal, and cancelation terms, and that users agreed to those terms during the enrollment process.  *See* SAC ¶ 70 (Cerebral's signup required agreement to "payment terms and recurring billing policy); *id.* ¶ 231 (Zealthy's Terms of

---

[15] For the reasons identified above, the Court should also dismiss the ROSCA claim against Gronk.

Use provided disclosure).  That concession by itself is fatal to the government's disclosure- and consent-based theories of ROSCA liability.  Indeed, courts routinely dismiss disclosure-related claims on the pleadings where defendants provided, and consumers consented to, clear explanations of the relevant terms.  *See Mullinax v. United Mktg. Grp., LLC*, 2011 WL 4085933, at *8 (N.D. Ga. Sept. 13, 2011) ("As the webpages proffered by defendant seem clear as to the relevant terms, they may well be fatal to plaintiff's claim, if proved to be authentic."); *In re Vistaprint Corp Mktg. & Sales Pracs. Litig.*, No. 4:08-md-1994, 2009 WL 2884727, at *8 (S.D. Tex. Aug. 31, 2009) (dismissing claims where disclosures were "clear and in language that can be easily understood by anyone who is capable of placing an online order for business cards"), *aff'd sub nom. Bott v. Vistaprint USA Inc.*, 392 F. App'x 327 (5th Cir. 2010); *Baxter v. Intelius, Inc.*, 2010 WL 3791487, at *4 (C.D. Cal. Sept. 16, 2010) (dismissing claims where "Defendants disclosed the full terms of the newly offered membership in the Offer Details section").

Both Cerebral's and Zealthy's enrollment paths clearly indicated that users were signing up for a subscription service, that the company would charge subscribers on a recurring basis, and that users could cancel their subscriptions by following the process detailed by the company.  *See* SAC ¶ 128 (clear disclosure that Cerebral subscriptions were "[b]illed monthly"); *id.* ¶ 66 (link in Cerebral enrollment path to Terms and Conditions); Ex. H at 9–10, 13–14 (explanation in Terms and Conditions that users would be charged for each subscription period, and providing process for cancelation); pp. 33–34, *supra* (link in Zealthy enrollment path to Terms of Use); Ex. D, at 3–6 (explanation in Zealthy Terms of Use that subscribers would be billed for each renewal period and providing cancelation process).  Similar disclosures appeared elsewhere on the companies' websites, thereby reinforcing consumers' awareness of the material terms of the transaction.  *See* Ex. I (Cerebral FAQ), at 9–10; Ex. J (Zealthy FAQ Excerpts), at 1–3.  And the detailed nature of

both companies' enrollment processes underscores that consumers who navigated those processes would have understood the companies' multiple disclosures regarding their services and monthly pricing. *See Vistaprint*, 2009 WL 2884727, at *6 (finding adequate disclosure by business card website where disclosures were "easily understandable by anyone capable of making an online purchase of business cards"). The government does not appear to dispute any of that.

Faced with facts showing that consumers did in fact consent to Cerebral's and Zealthy's subscription and cancellation policies, it appears that the government tries to support the ROSCA claim based on the companies' alleged privacy and data-security issues. Specifically, in an attempt to convert those separate Section 5 allegations into a basis for monetary recovery under ROSCA, the government contends that statements regarding privacy and data security are "material terms of the transaction" within the meaning of ROSCA. *See, e.g.*, SAC ¶¶ 120, 223; see also Count VI (¶ 344(A)), Count X (¶ 368(A)). But there is no court that has found such statements to be "material terms of the transaction" for purposes of ROSCA, and for good reason: the "material terms" that ROSCA addresses are those relating to negative option features, not every representation that a company might make to its customers.

ROSCA was enacted to prevent undisclosed charges for unwanted products. *See* 15 U.S.C. § 8401(8) (declaring policy of preventing "'free-to-pay conversion' and 'negative option' sales" that "took advantage of consumers' expectations that they would have an opportunity to accept or reject the membership club offer at the end of the trial period"). And the TSR—whose definition of "negative option feature" ROSCA adopts by references, 15 U.S.C. § 8403—explains that the "material terms" of a negative option are terms like "the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid

the charge(s)."  F.T.C. Telemarketing Sales Rule, 75 Fed. Reg. 48458, 48518 (Aug. 10, 2010).

Given that ROSCA was enacted against the backdrop of, and with express reference to, the TSR,

the statute's use of the phrase "material terms of the transaction" must be read in light of that

regulation.  *See George v. McDonough*, 596 U.S. 740, 746 (2022) ("Where Congress employs a

term of art obviously transplanted from another legal source, it brings the old soil with it." (internal

quotations omitted)); *Cf. Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 159 (2013) ("When

Congress revisits a statute giving rise to a longstanding administrative interpretation without

pertinent change, the congressional failure to revise or repeal the agency's interpretation is

persuasive evidence that the interpretation is the one intended by Congress." (internal quotations

omitted)).

Unsurprisingly, courts interpreting ROSCA have understood the "material terms of the

transaction" to be those terms relating to the negative option itself.  *See, e.g.*, *Health Formulas,*

*LLC*, 2015 WL 2130504, at *16–17 (equating "the material terms of the transaction" with "the

material terms of the negative option feature").   Indeed, until recently, the FTC understood

ROSCA that way as well.  As Commissioner Phillips explained in his dissenting statement in *In*

*the Matter of MoviePass, Inc.*, Commission File No. 1923000 (June 7, 2021) (Phillips Dissent),

for the first decade following ROSCA's enactment, "all the complaints filed by the Commission

that allege[d] ROSCA violations in the negative option context with a first party seller…involved

defendants hiding a negative option feature, not obtaining express informed consent before

charging the consumer, or failing to provide a simple mechanism for cancelling the recurring

charge."  *Id.* at 2.  The FTC did not allege violations of ROSCA based on "the characteristics of

the product that [defendants] sold."  *Id.*  And that was no coincidence: As Commissioner Wilson

more recently explained, "[t]he requirement in ROSCA to disclose 'all material terms of the

transaction' cannot reasonably be interpreted to include all product efficacy claims or any material fact about the underlying good or service."  Dissenting Statement of Commissioner Christine S. Wilson, Negative Option Rule, 88 Fed. Reg. 24716, 24739 (Apr. 24, 2023).

It was only after the Supreme Court's decision in *AMG Capital Management, LLC v. FTC*—which rejected the FTC's longstanding use of Section 13(b) of the FTC Act to obtain monetary relief under the guise of an "equitable" order to pay money, 593 U.S. at 70—that the Commission decided "dramatically to re-interpret ROSCA and expand liability" in order to establish a new mechanism for obtaining retrospective monetary relief.  Phillips Dissent at 4.  But the Commission's "loss of authority under one statute" does not "somehow create[] authority elsewhere."  *Id.*  And adopting the government's interpretation would make a hash of Congress's careful handiwork, unjustifiably extending ROSCA's reach to cover any technical glitch, disruption of service, or other deviation from a company's terms of use, as long as that company happened to offer its service using a negative option feature.  Congress did not intend for ROSCA to be an all-purpose enforcement tool that the FTC could use to police every representation made by online merchants.  Of course, "[i]f the Commission believes [its existing] authority too cumbersome or otherwise inadequate, it is . . . free to ask Congress to grant it further remedial authority."  *AMG Cap. Mgmt*, 593 U.S. at 82.  But this Court should not bless its attempt to "discover…an unheralded power" in ROSCA, years after enactment, to impose wide-ranging monetary sanctions for conduct far removed from ROSCA's limited scope.  *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

### b.  *Cerebral and Zealthy provided a simple mechanism for cancelation.*

The government also fails to allege that Cerebral and Zealthy lacked "simple mechanisms for a consumer to stop recurring charges."  15 U.S.C. § 8403(3).  According to the FTC's own policy statement, "[t]o meet this standard, negative option sellers should provide cancellation

mechanisms at least as easy to use as the method the consumer used to initiate the negative option feature." F.T.C. Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg. 60822, 60826 (Nov. 4, 2021). And the Complaint does not show that it was harder for Cerebral and Zealthy subscribers to cancel than it was for them to sign up.

With respect to Cerebral, the government alleges that customers had to undergo a complex, multi-step evaluation before even arriving at the subscription page. SAC ¶ 65. By contrast, cancelation required only that users send an email and complete a brief cancelation assessment to help Cerebral understand why they were canceling. *Id.* ¶¶ 136–41. Even on the government's account, the latter process was easier than the former, and the standard set forth in the policy statement was therefore satisfied.

Meanwhile, the Complaint makes little effort to describe Zealthy's cancelation processes, let alone plausibly allege that they are inadequate and more onerous than the company's sign-up process. In fact, Zealthy does and always has offered a brief, in-application cancellation process that allows users to cancel without requiring an email or any additional steps. The government relies instead on vague references to unspecified anonymous consumer complaints, *id.* ¶¶ 241–43, including that customers were allegedly unable to cancel their subscription because the online cancellation process was "broken for long periods of time." *Id.* ¶ 244. The government fails to make this allegation with sufficient specificity. The government does not state when the cancellation process was "broken" or how many consumers this affected. While ROSCA requires a simple cancellation mechanism, it does not require that a cancellation mechanism have 100% uptime. And the government's assertion that Zealthy "has forbidden" representatives from canceling subscriptions for customers and ordered employees not to provide refunds, *id.* ¶¶ 243, 245, does not support the ROSCA allegation because the relevant question is whether consumers

are provided a simple mechanism to cancel their subscription, not whether they are given the specific option of cancelling through a customer service representative.

Accordingly, the government is left with only its conclusory assertion that Zealthy's cancelation process was not "similarly easy" to its sign-up process, even though Zealthy's sign-up process also is not described. *Id.* ¶ 242. Those gaps in the Complaint are fatal to the government's cancelation-based theory of ROSCA liability and—taken together with the deficiencies above—require dismissal of Counts VII and IX.

## 2.    The Complaint Fails to Plead Knowledge.

As explained above, Complaint fails to allege that Mr. Robertson had sufficient knowledge to subject him to liability for Cerebral's cancelation practices. *See* Section A.2.b, *supra*. And the government fails to allege *anything* about Mr. Robertson's or Dr. Echeverry's knowledge with respect to Zealthy's alleged misconduct. *See* Section A.4.b, *supra*. It necessarily follows that those Defendants lacked the requisite mental state to support civil penalties under ROSCA. *See* 15 U.S.C. § 45(m)(1)(A).

To recover such penalties, the government must establish that a defendant knew not only that his conduct was "unfair or deceptive," but also, more specifically, that it was "prohibited by [ROSCA]." *Id.* The government offers no plausible allegations of such knowledge. Its claim that Mr. Robertson knew that Cerebral was violating ROSCA rests only on the allegations that Mr. Robertson helped perform compliance functions at Cerebral, where he "received guidance regarding applicable FTC rules and consumer protection laws," SAC ¶ 52–54, and "reviewed and discussed" a Forbes article about how "Cerebral's problematic cancellation processes could constitute a violation of ROSCA." SAC ¶ 56. The government's vague allegation that Mr. Robertson was apprised of FTC Rules and consumer protection laws fails to identify the specific rules or laws that this alleged guidance covered. In other words, the government does not allege

that Mr. Robertson had knowledge of ROSCA or its requirements.  As for the article the government discusses, remarkably, the relevant portion of this article contains a discussion with a law professor who said that Cerebral was "complying with the letter" of ROSCA because the company's "separate links to the billing and cancellation policies are 'conspicuously disclosed and there is a specific consent.'"  Ex. G (Forbes Article), at 5.  The government cannot show that Mr. Robertson knew Cerebral was violating ROSCA because he read an article that said Cerebral was complying with ROSCA.

The government's further attempt to impute Mr. Robertson's knowledge to Zealthy and Dr. Echeverry is just as unfounded.  The Complaint alleges that knowledge can be imputed first from Mr. Robertson to Bruno Health, and then from Bruno Health to Dr. Echeverry.  SAC ¶¶ 252–53.  Even if Mr. Robertson had the requisite knowledge, though, the second half of that attempted imputation chain is legally invalid.  Under the imputed knowledge rule, "the acts and knowledge of an agent are imputed to the principal." *Tew v. Chase Manhattan Bank, N.A.*, 728 F. Supp. 1551, 1559 (S.D. Fla.), *amended on other grounds*, 741 F. Supp. 220 (S.D. Fla. 1990).  But the rule does not work the other way around.  "[A] principal's knowledge 'is not imputed downward to an agent.'" *United States v. Planes*, 2019 WL 3024895, at *10 (M.D. Fla. July 11, 2019) (quoting Restatement (Third) of Agency § 5.03 cmt. g (Am. L. Inst. 2006)).  And an officer of a corporation is an agent of that corporation.  *See Tew*, 728 F. Supp. at 1559.  Thus, Dr. Echeverry would have been Bruno Health's agent, and Bruno Health's knowledge cannot be imputed downward to him.

The Complaint also asserts that, "[b]ased on their close collaboration and Echeverry's compliance role, Robertson's knowledge of ROSCA issues is therefore imputed to Echeverry." SAC ¶ 254.  But there is no legal rule that, because one person works with another person, the first person can be assumed to know what the second person knows.  Such a rule would drastically

expand the number of individuals who could be held liable for civil penalties under ROSCA by stripping the protection offered by the statute's knowledge requirement. And the Complaint does not include a single allegation that Mr. Robertson and Dr. Echeverry ever discussed ROSCA together, or that Dr. Echeverry—as Senior Medical Director of Zealthy and head of the Bruno Health clinical operation—even knew that ROSCA existed. Thus, there is no basis to impute knowledge of ROSCA to Dr. Echeverry.

## **<u>CONCLUSION</u>**

The Complaint should be dismissed with prejudice. The government's claims in this action have no merit and betray an overzealous regulatory approach that is disproportionate and untethered to the facts alleged here. Most of this case pertains to years-old prior conduct by Cerebral, which has settled with the government and is no longer a party to this suit. The government's claims seeking injunctive relief against Mr. Robertson based on this historical conduct by Cerebral comprise the brunt of this meritless lawsuit—and they should be quickly dismissed. The Court should not waste its time with injunctive claims exclusively based upon stale allegations of conduct occurring over three years ago. The remainder of the case related to Zealthy's practices is a failed effort to prop up a suit that should be dismissed now that Cerebral settled. Cerebral and Zealthy's practices and conduct are very different, and the government's allegations regarding Zealthy's purported violations are unfounded. In sum, the Court should dismiss this case entirely. The matter at hand has been resolved through the government's settlement with Cerebral. Nothing more is left to be litigated. What is left are stale, specious claims.

Dated: June 27, 2025

Respectfully submitted,

*/s/ Michael A. Pineiro*

Michael Pineiro, Bar # 41897
Daniel Rashbaum, Bar # 75084
Kathryn Meyers, Bar # 711152
MARCUS NEIMAN RASHBAUM & PINEIRO LLP
2 South Biscayne Boulevard
Suite 2530
Miami, Florida 33131
305-400-4260
mpineiro@mnrlawfirm.com
drashbaum@mnrlawfirm.com
kmeyers@mnrlawfirm.com

**Counsel for Defendant Kyle Robertson**

Fernando L. Tamayo (FBN: 28530)
**VEDDER PRICE**
600 Brickell Avenue, Suite 1500
Miami, FL 33131
Telephone: 305-741-3200
ftamayo@vedderprice.com

Philip Tankovich (admitted *pro hac vice*)
**VEDDER PRICE**
1925 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: 424-204-7787
ptankovich@vedderprice.com

**Counsel for Defendants Zealthy, Inc.,**
**Gronk, Inc., and Bruno Health, P.A.**

Marissel Descalzo (FBN: 669318)
**TACHE, BRONIS, CHRISTIANSON AND**
**DESCALZO, P.A.**
150 S.E. Second Avenue, Suite 600
Miami, FL 33131
Telephone: 305-537-9565
mdescalzo@tachebronis.com

Andrew George (admitted *pro hac vice*)
**BOURELLY, GEORGE + BRODEY PLLC**
1050 30th Street, N.W.

Washington, D.C. 20007
Telephone: 202-341-8805
andrew.george@bglawyers.com

***Counsel for Defendant German Echeverry***

Gerald Greenberg (FBN: 440094)
Chris Sundby (FBN: 1026060)
**GELBER SCHACHTER & GREENBERG, P.A.**
One Southeast Third Avenue, Suite 2600
Miami, FL 33131-1715
Telephone: 305-728-0950
ggreenberg@gsgpa.com
csundby@gsgpa.com

Ellen London (admitted *pro hac vice*)
Rachel Naor (admitted *pro hac vice*)
**LONDON & NAOR P.C.**
1999 Harrison Street, Suite 2010
Oakland, CA 94612
Telephone: 415-862-8485
elondon@londonnaor.com
rnaor@londonnaor.com

***Counsel for Defendant Alex Martelli***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 27, 2025, I electronically filed the foregoing with the Court via its CM/ECF electronic filing system.

*/s/ Michael A. Pineiro*