# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
## Case No. 24-cv-21376-RUIZ/LOUIS

---

**UNITED STATES OF AMERICA,**

                **Plaintiff,**

**v.**

**CEREBRAL, INC., *et al.*,**

                **Defendants.**

---

**PLAINTIFF THE UNITED STATES OF AMERICA'S OPPOSITION TO
DEFENDANTS KYLE ROBERTSON; ALEX MARTELLI; GERMAN ECHEVERRY;
ZEALTHY, INC.; GRONK, INC.; AND BRUNO HEALTH, P.A.'s
<u>JOINT MOTION TO DISMISS THE SECOND AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................1

LEGAL STANDARDS ...............................................................................................2

    I.  Rule 12(b)(6) Prohibits Factual Arguments Beyond the Four Corners of the
Complaint. .........................................................................................................2

    II. Rule 8(a)'s Pleading Standards Apply to the Complaint ............................4

SUMMARY OF ALLEGED FACTS ..........................................................................5

    I.  The Unlawful Acts and Practices of Cerebral, Robertson, and Martelli ....................5

    II. The Unlawful Acts and Practices of Zealthy, Bruno Health, Robertson, and
Echeverry ...........................................................................................................8

ARGUMENT ............................................................................................................10

    I.  THE COMPLAINT ADEQUATELY PLEADS VIOLATIONS OF THE FTC ACT
AGAINST ALL DEFENDANTS. ...........................................................................10

        A. Relevant Legal Standards for an FTC Act Claim ...............................11

            1. Unfair or Deceptive Acts and Practices .......................................11

            2. Individual Liability Under the FTC Act .......................................11

        B. The Complaint States Claims Against Robertson for Unfair and Deceptive Data
Privacy and Data Security Practices (Counts I-III). ...........................12

            1. The Complaint Adequately Alleges Deceptive and Unfair Data Security and
Data Privacy Practices (Counts I-III). .......................................12

            2. Robertson Directly Participated in and Had Knowledge of the Data Security
and Data Privacy Violations by Cerebral. ...................................16

        C. The Complaint Adequately Pleads the Section 5 Claim Against Robertson for
Cerebral-Related Cancellation Misconduct (Count IV). ....................20

        D. The Complaint States a Claim Against Robertson and Martelli for Deceptive and
Unfair Marketing and Consumer Review Practices (Count V). .........21

        E. The Complaint States a Claim Against Zealthy, Bruno Health, Gronk, Robertson,
and Echeverry for Unfair and Deceptive Practices (Count VII). ........25

            1. Zealthy's Alleged Actions Constitute Deceptive Practices. .........26

            2. Zealthy's Alleged Actions Constitute Unfair Practices ...............29

            3. Contrary to Defendants' Argument, Count VII is not Duplicative .............33

        F. The Complaint States a Section 5 Claim (Count VIII) Against Zealthy, Bruno
Health, and Robertson for Unfair and Deceptive Marketing and Review
Practices. ...........................................................................................34

    II. THE COMPLAINT STATES A CLAIM FOR VIOLATING THE FTC RULE FOR
USE OF CONSUMER REVIEWS AND TESTIMONIALS (COUNT IX). ............34

III. THE COMPLAINT ADEQUATELY PLEADS ROSCA VIOLATIONS BY
DEFENDANTS (COUNTS VI AND X)..................................................................35

A. The Complaint States Claims For Violations of ROSCA (Counts VI and X)...........35

1. Defendants Allegedly Did Not "Clearly and Conspicuously" Disclose
Material Terms. .......................................................................................35

a. Defendants' Alleged Disclosures Have Plausibly Violated ROSCA..35

b. ROSCA Requires Disclosure of "All Material Terms," Not Just Those
Involving Negative Option Features....................................................39

2. Defendants Allegedly Failed to Provide "Simple Mechanisms" to Cancel
Subscriptions..........................................................................................43

B. The Complaint Adequately Pleads That Defendants Had Knowledge of ROSCA
Violations. ..................................................................................................46

IV.     INJUNCTIVE RELIEF IS WARRANTED AGAINST ALL DEFENDANTS
FOR THEIR PATTERN OF UNFAIR AND DECEPTIVE ACTS AND
PRACTICES ...............................................................................................50

A. Relevant Legal Standard for Injunctive Relief...................................................51

B. The Complaint Alleges Significant Ongoing Violations, Supporting Injunctive
Relief. ........................................................................................................53

C. The Basis for Injunctive Relief Does Not Depend On Whether Individual
Defendants Are Still Employed At, Or Operating, the Same Company. ............54

D. Additionally, the Complaint Demonstrates the Risk of Recurring Violations by
All Defendants............................................................................................55

E. The Substantial, Recent Consumer Complaints Allegedly Generated by
Robertson's Ventures Further Support Injunctive Relief. ..................................58

F. The Out-of-Circuit *Shire ViroPharma* Decision Is Not Binding in the 11th
Circuit, Does Not Match the Facts, and Does Not Negate the Need for Injunctive
Relief.........................................................................................................59

CONCLUSION.................................................................................................60

**<u>TABLE OF AUTHORITIES</u>**

**<u>Cases</u>**

*A.W. by & Through J.W. v. Coweta Cnty. Sch. Dist.*,
    110 F.4th 1309 (11th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

*Baxter v. Intelius, Inc.*,
    2010 WL 3791487 (C.D. Cal. Sept. 16, 2010) . . . . . . . . . . . . . . . . .  36, 38

*Bonner v. Chambers Cnty.*,
    2006 WL 1731135 (M.D. Ala. Jun. 19, 2006) . . . . . . . . . . . . . . . . .  50

*Bryant v. Avado Brands, Inc.*,
    87 F.3d 1271 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*Burgess v. Religious Tech. Ctr., Inc.*,
    600 F. App'x 657 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 23, 24, 27

*Casper Sleep, Inc. v. Mitcham*,
    204 F. Supp. 3d 632 (S.D.N.Y. 2016) . . . . . . . . . . . . . . . . . . . . . . . .  24

*CFPB v. Ocwen Fin. Corp.*,
    2019 WL 13203853 (S.D. Fla. Sept. 5, 2019). . . . . . . . . . . . . . . . . .  5

*CFTC v. Matrix Trading Grp.*,
    2002 WL 31936799 (S.D. Fla. Oct. 3, 2002) . . . . . . . . . . . . . . . . . .  56

*Conley v. Gibson*,
    355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 4

*Copeland v. Housing Auth. Of Hollywood*,
    358 F. App'x 144 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Cote v. Countrywide Home Loans, Inc.*,
    2010 WL 11646975 (N.D. Ga. Feb. 11, 2010) . . . . . . . . . . . . . . . .  36

*Davis v. Avvo, Inc.*,
    345 F. Supp. 3d 534 (S.D.N.Y. 2018) . . . . . . . . . . . . . . . . . . . . . . . .  25

*Davis v. Skullcandy, Inc.*,
    2018 WL 1415192 (D. Utah Mar. 21, 2018) . . . . . . . . . . . . . . . . . . .  19

*Doe v. Royal Caribbean Cruises, Ltd.*,
    2012 WL 920675 (S.D. Fla. Mar. 19, 2012) . . . . . . . . . . . . . . . . . . .  50

*Doebereiner v. Sohio Oil Co.*,

893 F.2d 1275 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

*Dusek v. JP Morgan Chase & Co.,*
832 F.3d 1243 (11th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

*Farmer v. BarkBox, Inc.*,
2023 WL 8522984 (C.D. Cal. Oct. 6, 2023) . . . . . . . . . . . . . . . . . . .   38

*FTC v. Alcoholism Cure Corp.,*
2011 WL 13137951 (M.D. Fla. Sept. 16, 2011),
*aff'd sub nom.*, *FTC v. Krotzer*,
2013 WL 7860383 (11th Cir. May 3, 2013) . . . . . . . . . . . . . . . . . . . .   43

*FTC v. Amazon.com, Inc.*,
735 F. Supp. 3d 1297 (W.D. Wash. May 28, 2024) . . . . . . . . . . . . . . .   *passim*

*FTC v. Am. Entm't Distribs., Inc.*,
2012 WL 12964783 (S.D. Fla. Aug. 31, 2012) . . . . . . . . . . . . . . . . . .   12, 17, 32

*FTC v. Am. Precious Metals*, *LLC*,
2012 WL 13114034 (S.D. Fla., Apr. 12, 2012) . . . . . . . . . . . . . . . . . .   4

*FTC v. Cap. Choice Consumer Credit, Inc.*,
2004 WL 5149998 (S.D. Fla. Feb. 20, 2004) . . . . . . . . . . . . . . . . . . .   52

*FTC v. Cardiff,*
2021 WL 3616071 (C.D. Cal. Jun. 29, 2021) . . . . . . . . . . . . . . . . . . .   45, 50

*FTC v. Direct Benefits Grp., LLC,*
2013 WL 3771322 (M.D. Fla. Jul. 18, 2013) . . . . . . . . . . . . . . . . . . .   22, 29

*FTC v. Directv, Inc.*,
2016 WL 5339797 (N.D. Cal. Sept. 23, 2016) . . . . . . . . . . . . . . . . .   41

*FTC v. Doxo, Inc.,*
771 F. Supp. 3d 1162 (W.D. Wash. 2025) . . . . . . . . . . . . . . . . . . . . .   41

*FTC v. Dluca,*
2018 WL 4775634 (S.D. Fla. Sept. 5, 2018) . . . . . . . . . . . . . . . . . . .   4

*FTC v. Fleetcor Techs., Inc.*,
620 F. Supp. 3d 1313 (N.D. Ga. 2022) . . . . . . . . . . . . . . . . . . . . . . .   52

v

*FTC v. Freecom Commc'ns. Inc.*,
    401 F.3d 1192 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4, 5

*FTC v. Global Marketing Group, Inc.*,
    594 F. Supp. 2d 1281 (M.D. Fla. 2008) . . . . . . . . . . . . . . . . . . . . . .    29, 30

*FTC v. Health Formulas, LLC*,
    2015 WL 2130504 (D. Nev. May 6, 2015) . . . . . . . . . . . . . . . . . . .    37, 39, 41

*FTC v. HES Merch. Servs. Co., Inc.*,
    2014 WL 1261127 (M.D. Fla. Feb. 20, 2014) . . . . . . . . . . . . . . . .    4, 17

*FTC v. Hispanic Global Way, Corp.*,
    2014 WL 12531538 (S.D. Fla. Jul. 1, 2014) . . . . . . . . . . . . . . . . . .    30

*FTC v. Hornbeam Special Situations, LLC*,
    308 F. Supp. 3d 1280 (N.D. Ga. 2018) . . . . . . . . . . . . . . . . . . . . . . .    4, 5, 49, 54

*FTC v. Hornbeam Special Situations, LLC*,
    391 F. Supp. 3d 1218 (N.D. Ga. 2019) . . . . . . . . . . . . . . . . . . . . . . .    51, 59

*FTC v. IAB Mktg. Assocs.*,
    746 F.3d 1228 (11th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11, 17

*FTC v. Kochava, Inc.*,
    715 S. Spp. 3d 1319 (D. Idaho 2024) . . . . . . . . . . . . . . . . . . . . . . . .    16

*FTC v. Lanier Law, LLC*,
    194 F. Supp. 3d 1238 (M.D. Fla. 2016) . . . . . . . . . . . . . . . . . . . . . .    54, 59

*FTC v. Lucaslaw Ctr.*,
    2010 WL 11506885 (C.D. Cal. June 3, 2010) . . . . . . . . . . . . . . . . .    43

*FTC v. Nat'l Urological Grp., Inc.*,
    645 F. Supp.2d 1167 (N.D. Ga. 2008),
    aff'd, 356 F.App'x 358 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . . .    51, 53, 57

*FTC v. Network Servs. Depot, Inc.*,
    617 F.3d 1127 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    47

*FTC v. On Point Capital Partners*,
    17 F. 4th 1066 (11th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11, 31

*FTC v. Partners In Health Care Ass'n, Inc.*,
    189 F. Supp. 3d 1356 (S.D. Fla. 2016) . . . . . . . . . . . . . . . . . . . . . . . .   *passim*

*FTC v. Peoples Credit First, LLC*,
    244 F. App'x 942, 944 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . .   26

*FTC v. Pointbreak Media, LLC*,
    376 F. Supp. 3d 1257 (S.D. Fla. 2019). . . . . . . . . . . . . . . . . . . . . . . .   11, 12, 16, 22

*FTC v. Roca Labs, Inc.,*
    345 F. Supp. 3d 1375 (M.D. Fla. Sep. 14, 2018) . . . . . . . . . . . . . . .   23, 42, 43

*FTC v. Shire ViroPharma, Inc.*,
    917 F.3d 147 (3d Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   59

*FTC v. Shopper Sys., LLC*,
    2013 WL 12382957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   52, 55, 57

*FTC v. Simple Health Plans, LLC*,
    2024 WL 473995 (S.D. Fla. Feb. 7, 2024) . . . . . . . . . . . . . . . . . . . .   26, 31

*FTC v. Simple Health Plans LLC*,
    379 F. Supp. 3d 1346 (S.D. Fla. 2019). . . . . . . . . . . . . . . . . . . . . . . .   11, 13, 41

*FTC v. SlimAmerica, Inc.*,
    77 F. Supp. 2d 1263 (S.D. Fla. 1999) . . . . . . . . . . . . . . . . . . . . . . . .   24, 42, 52, 57

*FTC v. SPM Thermo-shield, Inc.*,
    2020 WL 6545975 (M.D. Fla. Nov. 6, 2020) . . . . . . . . . . . . . . . . . .   51, 59

*FTC v. Sterling Precious Metals*,
    2013 WL 595713 (S.D. Fla. Feb. 15, 2013) . . . . . . . . . . . . . . . . . . .   4

*FTC v. Student Aid Ctr., Inc.*,
    281 F. Supp. 3d 1324 (S.D. Fla. 2016) . . . . . . . . . . . . . . . . . . . . . . .   4

*FTC v. Swish Mktg., Inc.,*
    2010 WL 653486 (N.D. Cal. Feb. 22, 2010) . . . . . . . . . . . . . . . . . .   19, 21

*FTC v. Tashman*,
    318 F.3d 1273 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11, 22

*FTC v. Transnet Wireless Corp.,*

506 F. Supp. 2d 1247 (S.D. Fla. 2007) . . . . . . . . . . . . . . . . . . . . . . . .   15, 16, 18, 47

*FTC v. USA Fin., LLC*,
    415 F. App'x 970 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . .   51, 52, 53, 54,
    55

*FTC v. Wolf*,
    1996 WL 812940 (S.D. Fla. Jan. 31, 1996). . . . . . . . . . . . . . . . . . .   12, 32

*FTC v. Wyndham Worldwide Corp.*,
    799 F.3d 236, 244-245 (3d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . .   13, 15

*GoPlus Corp. v. Crown Equip. Corp.*,
    533 F. Supp. 3d 1344 (S.D. Ga. 2021) . . . . . . . . . . . . . . . . . . . . . . . .   3

*Gose v. Native Am. Servs. Corp.*,
    109 F.4th 1297 (11th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5, 24

*Horsley v. Feldt*,
    304 F.3d 115, 1135 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*,
    910 F.3d 1186 (11th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*In re Cliffdale Assocs.*,
    103 F.T.C. 110 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

*In re Jones*,
    2007 WL 1725593 (Bankr. N.D. Ala. Jun. 13, 2007),
    *aff'd*, 279 F. App'x 85 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . .   38

*In re LexinFinTech Holdings Ltd. Sec. Litig.*,
    2021 WL 5530949 (D. Or. Nov. 24, 2021) . . . . . . . . . . . . . . . . . . . .   58, 59

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
    440 F. Supp. 3d 447 (D. Md. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . .   43

*In re Takata Airbag Prod. Liab. Litig.*,
    396 F. Supp. 3d 1101 (S.D. Fla. 2019) . . . . . . . . . . . . . . . . . . . . . . . .   31

*In re Vistaprint Corp Mktg. & Sales Pracs. Litig.*,

2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) . . . . . . . . . . . . . . . . . .   36, 38

*Interlink Prods. Int'l v. F&W Trading LLC*,
    2016 WL 1260713 (D.N.J. March 31, 2016) . . . . . . . . . . . . . . . . .   24

*Johnson v. City of Atlanta*,
    107 F.4th 1292 (11th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*Krinsk v. SunTrust Banks*, Inc.,
    2010 WL 1475608 (M.D. Fla. Jan. 8, 2010) . . . . . . . . . . . . . . . . . .   19

*Luke v. Gulley*,
    975 F.3d 1140 (11th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*Marksman Sec. Corp. v. P.G. Sec., Inc.*,
    2020 WL 12188373 (S.D. Fla. Jun. 25, 2020) . . . . . . . . . . . . . . . .   24

*MSP Recovery Claims Series 44, LLC v. State Farm Mut. Auto. Ins. Co.*,
    2023 WL 4683538 (S.D. Fla. July 21, 2023) . . . . . . . . . . . . . . . . . .   33

*Magluta v. Samples*,
    256 F.3d 1282 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

*Mullinax v. United Mktg. Grp., LLC*,
    2011 WL 4085933 (N.D. Ga. Sept 13, 2011) . . . . . . . . . . . . . . . . . .   36

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*,
    522 F.3d 1211 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

*New York by James v. Sirius XM Radio Inc.*,
    2024 WL 2348206 (S.D.N.Y. May 23, 2024) . . . . . . . . . . . . . . . . . .   45

*Orkin Exterminating Co. v. FTC*,
    849 F.2d 1354 (11th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

*Ramnarine v. Spiegel*,
    2013 WL 1490482 (S.D. Fla. Apr. 10, 2013) . . . . . . . . . . . . . . . . . .   35

*Russello v. United States*,
    464 U.S. 16 (Nov. 1, 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   41

*Sawinski v. Bill Currie Ford, Inc.*,
    866 F. Supp. 1383 (M.D. Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

*S.E.C. v. Carriba Air, Inc.*,
    681 F.2d 1318 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   51

*Scottsdale Ins. Co. v. Sec. Fire Prevention, Inc.*,
    2011 WL 772779 (S.D. Fla. Feb. 28, 2011) . . . . . . . . . . . . . . . . . . .   2

*SIG, Inc. v. AT&T Digital Life, Inc.*,
    971 F. Supp. 2d 1178 (S.D. Fla. 2013) . . . . . . . . . . . . . . . . . . . . . . . .   3

*Smith v. Facebook*,
    262 F. Supp. 3d 942 (N.D. Cal. 2017) . . . . . . . . . . . . . . . . . . . . . . . .   14

*Turnier v. Bed Bath & Beyond Inc.*,
    517 F. Supp. 3d 1132 (S.D. Cal. Feb 5, 2021) . . . . . . . . . . . . . . . . . .   38

*United States v. Adobe, Inc.*,
    2025 WL 1303419 (N.D. Cal. May 2, 2025) . . . . . . . . . . . . . . . . . . .   37

*United States v. Dawson*,
    64 F.4th 1227 (11th Cir.),
    *cert. denied*, 144 S. Ct. 343 (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

*United States ex rel. Clausen v. Lab'y Corp. of Am.*,
    290 F.3d 1301 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   47

*United States v. MyLife.com, Inc.*,
    567 F. Supp. 3d 1152 (C.D. Cal. 2021) . . . . . . . . . . . . . . . . . . . . . . . .   44, 45

*United States v. Prochnow*,
    2007 WL 3082139 (11th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . .   46

*Vitamins Online, Inc. v. Heartwise, Inc.*,
    71 F.4th 1222 (10th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24, 25

*Wainberg v. Mellichamp*,
    93 F.4th 1221 (11th Cir. 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35

*Ziemba v. Cascade Int'l, Inc.,*
    256 F.3d 1194 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

### **Statutes**

15 U.S.C. § 45(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11, 22

15 U.S.C. § 45(n) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11, 13, 22

15 U.S.C. § 8403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35, 39, 43

15 U.S.C. § 8404 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   50

Fla. Stat. § 607.1405(2)(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31

### **Regulations**

16 C.F.R § 310.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   40

### **Rules**

Fed. R. Civ. P. 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4, 5, 23, 34, 44

Fed. R. Civ. P. 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   *passim*

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

### **Other**

Black's Law Dictionary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44, 46

**INTRODUCTION**

This case involves telehealth companies founded by Kyle Robertson. Robertson seeks to portray himself as a conscientious telehealth founder, but the record tells a different story. As alleged in the Second Amended Complaint, since 2019, Robertson has demonstrated a brazen disregard for the rights of his telehealth patients, for their privacy, for fair business practices, and for federal consumer protection law, including the Restore Online Shoppers' Confidence Act ("ROSCA"), which sets bedrock standards for automatically recurring online subscriptions.

Robertson has betrayed the trust of his companies' telehealth patients many times over. He has hidden the material terms of subscriptions. He has exploited patients' private health information for online marketing purposes. He has misled patients about his companies' abysmal data security practices. He has locked consumers into subscriptions against their will by making it challenging to cancel despite assuring them that they can "Cancel anytime." And he has subjected consumers to unauthorized significant charges — filching money from the patients who have entrusted his virtual companies with their care.

When he has faced a tide of online complaints from consumers attempting to warn others about his companies' mischief, Robertson has directed his employees to clutter review platforms with fake reviews praising their own companies, purporting to be written by real patients. Indeed, this tech CEO has stooped to writing and posting fake reviews himself.

Robertson was fired from his first telehealth company, Cerebral. In the aftermath of that firing, Robertson was the subject of an FTC investigation into serial FTC Act violations he directed while at Cerebral, including one of the largest mass telehealth data privacy violations on record. Robertson then doubled down on his misconduct, founding a new venture, Zealthy, that quickly resumed violation of the same laws and added new misconduct as well.

1

Because he is a purveyor of telehealth treatment for sensitive medical conditions — entrusted with consumers' most private medical data, their care, and their payment information — Robertson's wrongdoing is especially alarming. Robertson's ventures have harmed countless patients, and are on track to keep harming many more.

Robertson's undeterred misconduct shows that he and his new ventures will not mend their ways until they are forced to do so. Robertson's co-defendants are also likely to replicate the misconduct they first engaged in alongside Robertson if they are not enjoined. As the Complaint's detailed allegations make clear, the Defendants are plausibly liable not only for injunctive relief and consumer redress, but also for significant civil monetary penalties. This Court should deny Defendants' Motion to Dismiss in full.

## LEGAL STANDARDS

### I.  Rule 12(b)(6) Prohibits Factual Arguments Beyond the Four Corners of the Complaint.

A motion to dismiss is designed to test "the legal sufficiency of the complaint, not the weight of the evidence." *Sawinski v. Bill Currie Ford, Inc.*, 866 F. Supp. 1383, 1385 (M.D. Fla. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).[1] Accordingly, the Court must "accept all factual allegations in [the] complaint as true and take them in the light most favorable to [the United States]." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). To deny a motion to dismiss, the Court need only determine that the Complaint "raise[s] a right to relief above the speculative level." *Scottsdale Ins. Co. v. Sec. Fire Prevention, Inc.*, 2011 WL 772779, at *1 (S.D. Fla. Feb. 28, 2011). Dismissal is inappropriate unless it "appears beyond

---

[1] All emphases added and internal citations and quotation marks omitted unless otherwise indicated.

doubt that the plaintiff can prove no set of facts … which would entitle him to relief." *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

Because a motion to dismiss is not intended to resolve factual disputes, the Court properly "confine[s] [its review] to the allegations within the complaint." *SIG, Inc. v. AT&T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1188 (S.D. Fla. 2013). The limited exception to this rule is the incorporation-by-reference doctrine, which permits a court to consider documents beyond the four corners of a complaint if they are both "(1) central to the plaintiff's claim; and (2) undisputed, meaning that [their] authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). This doctrine, however, does not permit a defendant to introduce every document so much as mentioned in a complaint.  To be central to a claim, a document must be a "necessary part" of proving up the cause of action. *GoPlus Corp. v. Crown Equip. Corp.*, 533 F. Supp. 3d 1344, 1353 (S.D. Ga. 2021) ("[A] single reference does not automatically make [a document] central to [plaintiff's] claims.").  Moreover, a document is not "undisputed" unless it is an accurate, complete version of the document referenced in the complaint.  *See Kalpackchian v. Bank of Am. Corp.*, 832 F. App'x 579, 583 (11th Cir. 2020) ("[P]laintiff can dispute … [authenticity] simply by saying … [a document] is not the one referred to in her complaint."); *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002) (declining to incorporate an excerpt).

Even where a document is incorporated by reference, the Court must still "construe [it] in the light most favorable to [the plaintiff] and resolve all reasonable inferences in …  favor" of denying the motion to dismiss. *Luke v. Gulley*, 975 F.3d 1140, 1144-45 (11th Cir. 2020) (vacating dismissal where incorporated document did "not eliminate every reasonable inference" supporting claim); *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1197-98 (11th Cir.

2018) (vacating dismissal where court failed to interpret incorporated label in the light most favorable to plaintiff and credit allegations that certain portions of the label were false).

## II.    Rule 8(a)'s Pleading Standards Apply to the Complaint.

Federal Rule of Civil Procedure 8(a) sets forth the pleading standard that governs the Complaint. Under Rule 8(a), a complaint need only provide "a short and plain statement," sufficient to "give the defendant fair notice of" a claim and "the grounds upon which it rests." *Conley*, 355 U.S. at 47.

Relying on a handful of cases from districts in the Ninth Circuit and a single, decade-old outlier case from within this Circuit, Defendants erroneously assert that FTC Act claims are subject to Rule 9(b). *See* Mot. at 13 (citing *FTC v. Am. Precious Metals, LLC*, 2012 WL 13114034 (S.D. Fla., Apr. 12, 2012)). This is incorrect. No other court in this district or Circuit has ever relied on that case, and, instead, they have consistently rejected this argument. *See, e.g.*, *FTC v. Dluca*, 2018 WL 4775634, at *1 (S.D. Fla. Sept. 5, 2018) ("[C]ourts in this district uniformly apply the pleading standard set forth in Rule 8(a) to claims under Section 5 of the FTCA.").[2]

The consensus in this district that Rule 9(b) does not apply to FTC Act claims recognizes that, unlike a plaintiff raising a fraud claim, a plaintiff in a Section 5 action "need not prove scienter, reliance, or injury to establish a [Section] 5 violation." *FTC v. Sterling Precious Metals*, 2013 WL 595713, at *3 (S.D. Fla. Feb. 15, 2013). Moreover, an FTC action is not "designed to

---

[2] *See also, e.g.*, *FTC v. Student Aid Ctr., Inc.*, 281 F. Supp. 3d 1324, 1331-32 (S.D. Fla. 2016) ("Rule 9(b) does not apply because the complaint does not assert claims based on fraud or mistake."); *FTC v. Sterling Precious Metals, LLC*, 2013 WL 595713, at *3 (S.D. Fla. Feb. 15, 2013) ("A § 5 claim simply is not a claim of fraud as that term is … contemplated by Rule 9(b)."); *FTC v. HES Merch. Servs. Co.*, 2014 WL 12611275, at *2 (M.D. Fla. Feb. 20, 2014) ("The Court finds the conclusion [declining to apply Rule 9(b)] … superior."); *FTC v. Hornbeam Special Situations, LLC*, 308 F. Supp. 3d 1280, 1287 (N.D. Ga. 2018) ("Contrasting the elements of fraud with the elements of an FTC Act claim … warrants a conclusion that Rule 9(b) does not apply.").

remedy a singular harm, but [is] a government action brought to deter deceptive acts and practices aimed at the public…" *FTC v. Freecom Commc'ns. Inc.*, 401 F.3d 1192, 1203-04 n.7 (10th Cir. 2005).[3]  Defendants provide this Court no reason to depart from the consensus among courts in this district that Rule 9(b) does not apply to FTC Act claims.[4]

Nonetheless, even if Rule 9(b) applied, the Eleventh Circuit has repeatedly emphasized that "[s]pecificity under Rule 9(b) does not ... eliminate the concept of notice pleading." *Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 662 (11th Cir. 2015); *see also Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (same).  For that reason, the Eleventh Circuit disfavors dismissing complaints based on an alleged failure to comply with Rule 9(b) so long as "the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial." *Gose v. Native Am. Servs. Corp.*, 109 F.4th 1297, 1318 (11th Cir. 2024).  This is particularly true in the context of "prolonged multi-act schemes," where Rule 9(b) "permits a plaintiff to plead the overall nature of the fraud" accompanied by a limited set of illustrative examples.  *Burgess*, 600 F. App'x at 662-63.

Moreover, even where Rule 9(b) applies, "knowledge[] and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  Accordingly, Defendants' arguments based on an alleged failure to plead issues of knowledge and control with heightened particularity (*see, e.g.*, Mot. at 23) are baseless, regardless of whether the Court applies Rule 8(a) or Rule 9(b).

## SUMMARY OF ALLEGED FACTS

### I.   The Unlawful Acts and Practices of Cerebral, Robertson, and Martelli

---

[3] Courts within the Eleventh Circuit have found *Freecom Communications. E.g., Sterling Previous Metals*, 2013 WL 59573, at *3; *Hornbeam Special Situations*, 308 F. Supp. 3d at 1287.

[4] Courts have also cautioned against applying Rule 9(b) to consumer protection claims in the absence of any "clear, binding directive from Congress, the Supreme Court, or the Eleventh Circuit." *See CFPB v. Ocwen Fin. Corp.*, 2019 WL 13203853, at *14 (S.D. Fla. Sept. 5, 2019).

Cerebral is a telehealth company marketed to consumers seeking private and secure treatment for mental health concerns and substance abuse disorders. SAC ¶¶ 35-36. Cerebral has operated through a "negative option" subscription service, in which consumers are charged a monthly fee for subscriptions that automatically renew unless the customer cancels them. *Id.* ¶ 37. Since 2019, hundreds of thousands of patients have used Cerebral's online service. *Id.* ¶ 35.

Robertson co-founded Cerebral in 2019 and served as its CEO until he was fired in May 2022. *Id.* ¶ 41. He was intimately involved in formulating, directing and controlling Cerebral's policies and practices. *Id.* ¶¶ 42-49. He drafted company policies, including those related to privacy and user data. *Id.* ¶¶ 45-46. He also defined company strategy; directed the employees working on legal, compliance, and data-security issues; supervised Cerebral's marketing team; and approved Cerebral's budgets. *Id.* ¶¶ 43-44, 47, 49. Defendant Alex Martelli, who served as the company's Director of Product and Group Product Manager until he departed in early 2023, worked alongside Robertson, focusing on growth and marketing. *Id.* ¶¶ 9, 177.

As part of its provision of mental health services, Cerebral collected extensive personal health information from its patients. *Id.* ¶ 38. Cerebral falsely claimed on its website that it "use[d] the latest information security to protect [this] data," so that patients could trust their personal information was "safe, secure, and discreet." *Id.* ¶¶ 39, 63. In reality, driven by Robertson's unilateral focus on growth, Cerebral and Robertson repeatedly and knowingly violated these promises to patients to keep their data secure. *Id.* ¶¶ 58, 59, 60-76, 95-119.

Throughout Robertson's tenure, Cerebral suffered from chronic data security problems that resulted in dozens of data breach incidents. *Id.* ¶¶ 77-108. For example, in 2021 Cerebral released the confidential medical files of 880 patients to persons unauthorized to review them. *Id.* ¶ 97. In a separate incident that same year, Cerebral failed to implement systems to stop former employees

from accessing patient files after termination, resulting in a breach of at least 266 files and including unauthorized access by more than a dozen terminated employees more than three weeks after their terminations, and by one former agent 197 days after separation. *Id.* ¶¶ 98-101. In another structural data security issue, Cerebral's single sign-on method for all patients to access its patient portal led to numerous patients logging in to find that they had been given access to another patient's medical file. *Id.* ¶ 104. These chronic data breaches stemmed from Cerebral's structurally deficient data security practices. *Id.* ¶ 116.

In addition to failing to protect Cerebral patients from these data breaches, Robertson also intentionally misused Cerebral patients' personal health information in unauthorized online marketing efforts. *Id.* ¶¶ 79-93. Specifically, he caused Cerebral to integrate third-party tracking tools into its website and app for the purpose of collecting personal health information from patients and using that information to guide advertising on search engines and social media platforms. *Id.* ¶¶ 77-81, 91-92. Robertson directed the tracking of health data, such as patients' responses to Cerebral's enrollment mental health questionnaire, *id.* ¶ 78, and detailed information regarding treatments. *Id.* ¶ 92. This health information was transmitted to numerous third parties — including Facebook, TikTok, and Google — for use in online targeted advertisements. *Id.* ¶¶ 79, 86-87, 92. Ultimately, Robertson's intentional misuse of private information caused the nonconsensual release of private information of 3.2 Cerebral website users. *Id.* ¶ 93.

Robertson and Martelli also drove Cerebral's growth by writing and publishing fictitious online reviews that praised Cerebral and purported to be written by actual patients, and by suppressing and manipulating authentic, negative patient reviews. *Id.* ¶¶ 177-180. They manipulated authentic reviews by (1) offering financial incentives to patients who posted negative reviews so that they would alter or remove them, (2) directing employees to "downvot[e]" negative

patient reviews to bury them in search results, and (3) falsely reporting valid reviews as inauthentic to get them removed from review platforms. *Id.* ¶¶ 187-200. Robertson also went further, directing Cerebral employees to post fictitious positive reviews, emphasizing, "I'm fine wi[th] fake ones." *Id.* ¶ 184. Martelli himself drafted and posted multiple fake reviews praising Cerebral. *Id.* ¶ 185.

Robertson also took actions ensuring that many patients could not easily cancel subscriptions, contravening the claim Cerebral repeatedly made that patients could "[c]ancel anytime." *Id.* ¶¶ 147-161, 233. He directed Cerebral to remove its online cancellation button entirely, *id.* ¶¶ 153-156, and, instead, implemented a protracted cancellation process that included time-consuming interactions with the company. *Id.* ¶¶ 152-157. The resulting cancellation process caused confusion and frustration for many patients who were unable to cancel. *Id.* ¶ 157. Even after many patients complied with the company's stated procedure, they were still subjected to continued charges totaling, in the aggregate, over $8 million. *Id.* ¶¶ 145-146.

## II. The Unlawful Acts and Practices of Zealthy, Bruno Health, Robertson, and Echeverry

After Cerebral terminated him, Robertson founded Zealthy, another telehealth company, in partnership with Defendant Dr. German Echeverry. *Id.* ¶¶ 10, 13, 14, 201. Using a negative option feature, Zealthy enrolls patients in automatically renewing subscriptions to telehealth services to help with issues such as weight loss, erectile disfunction, hair loss, and depression. *Id.* ¶¶ 13, 202. Those services are provided by Bruno Health. *Id.* ¶¶ 15, 17. Robertson is Zealthy's CEO and Bruno Health's CFO, while Echeverry was Zealthy's Senior Medical Director and Bruno Health's President, Director, and Compliance Director. *Id.* ¶¶ 10, 15, 18, 19, 253.

Under their leadership, Zealthy and Bruno Health have repeated several of Cerebral's unlawful practices. *Id.* ¶¶ 223-305. They have made numerous false or misleading representations about the costs of their services, the services covered by those costs, a subscription's term and

auto-renewal features, a consumer's ability to cancel and obtain a refund, the availability of insurance coverage, and the use and disclosure of consumers' private information. *Id.* ¶¶ 223, 225-226, 231-233, 234-239, 257-261. Zealthy and Bruno Health have also failed to disclose several material terms of their subscriptions and instead have buried them in fine print and locations that patients are unlikely to see. *Id.* ¶¶ 230-233. Those hidden terms include subscription costs, whether medications were likely to receive insurance coverage, patients' ability to cancel their subscriptions and to obtain refunds, and how patients' personal data may be used and disclosed. *Id.* ¶¶ 223-224, 234, 236, 257.

Moreover, Zealthy and Bruno Health have undertaken several unfair practices. They have charged patients for costs that patients did not agree to pay (¶¶ 226-227, 229, 263); disregarded patients' cancellation requests (and continued charging them) (¶¶ 243, 245, 247); made it challenging for patients to cancel (¶¶ 240-247); and tracked, collected, disclosed, and used consumers' sensitive personal health data in ways they did not adequately disclose to consumers and that consumers did not knowingly authorize (¶¶ 234-238, 261). Consumers have complained that Zealthy imposed serial and duplicative charges on their credit cards, and that it continued to do so *even after consumers cancelled the cards*. *Id.* ¶ 264. The Better Business Bureau has warned consumers of these same misleading representations and unfair practices, including "a Pattern of Complaints" regarding billing, surprise fees, and order fulfillment. *Id.* ¶ 265. Zealthy also promised consumers refunds for services not rendered or when they cancelled their membership, but it did not actually refund their money as promised. *Id.* ¶¶ 265, 310.

Zealthy and Bruno Health also have represented that they keep consumers' private information secure from unauthorized access, use, or disclosure, but they have failed to do so. *Id.* ¶¶ 261, 269-270. Their inadequate systems have allowed unauthorized people to see all other

patients' private medical data and to use other patients' credit card information to make unauthorized purchases. *Id.* ¶¶ 271-273.

Zealthy and Bruno Health's unfair and deceptive practices have extended to their telemedicine practices. With Robertson's knowledge, and at his direction, Zealthy, acting as Bruno Health's agent, has used two Medical Directors' names and National Provider Identifiers without their knowledge or consent to submit thousands of prior authorization requests for prescriptions, many of which the insurers unwittingly approved. *Id.* ¶ 276.

As he did while leading Cerebral, to counter large numbers of negative reviews, Robertson also directed his colleagues to impersonate Zealthy subscribers in authoring and posting fake online reviews. *Id.* ¶¶ 279-297. He even authored fictitious reviews himself. *Id.* ¶ 280. He also has directed his subordinates to dishonestly contest negative reviews' authenticity (the same tactic he directed at Cerebral), even when Zealthy knew the review was by an authentic Zealthy subscriber, as a method of trying to get these reviews taken down from review platforms. *Id.* ¶¶ 298-301. This practice has caused online review websites to remove authentic negative reviews. *Id.* ¶ 301.

## ARGUMENT

### I. THE COMPLAINT ADEQUATELY PLEADS VIOLATIONS OF THE FTC ACT AGAINST ALL DEFENDANTS.

The Complaint brings seven counts under Section 5 of the FTC Act for Defendants' deceptive and unfair acts and practices (Counts I-V, VII, and VIII). Defendants challenge each of these counts, by arguing that they fail to allege either (1) an unfair or deceptive act or practice and/or (2) a basis for individual liability. Those arguments misstate both the law and the alleged facts. Applying the correct legal standards to the Complaint's actual allegations shows that Plaintiff has adequately pleaded a sustained pattern of deceptive and unfair acts and practices and a basis for individual liability.

### A.  Relevant Legal Standards for an FTC Act Claim

#### 1.  <u>Unfair or Deceptive Acts and Practices</u>

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An act or practice is deceptive when "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances[;] and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003). Whether a representation is likely to mislead consumers turns on the "overall, net impression rather than the literal truth or falsity" of the representation. *FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1360 (S.D. Fla. 2019). An act or practice is "unfair" under Section 5 if it is (1) "likely to cause substantial injury to consumers"; (2) "not reasonably avoidable by consumers"; and (3) "not outweighed by any countervailing benefits to consumers or competition." *See* 15 U.S.C. § 45(n); *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1285 (S.D. Fla. 2019). A practice can be "unfair without being deceptive." *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1367 (11th Cir. 1988).

#### 2.  <u>Individual Liability Under the FTC Act</u>

For an individual to be liable under Section 5, he needs to have only "some knowledge of the [deceptive] practices." *FTC v. On Point Capital Partners*, 17 F. 4th 1066, 1083 (11th Cir. 2021); *see also FTC v. IAB Mktg. Assocs.*, 746 F.3d 1228, 1233 (11th Cir. 2014) (requiring participation or control and "some knowledge" of the practices). Knowledge can be shown by (1) "actual knowledge," (2) "reckless[] indifferen[ce] to [a practice's] deceptiveness," or (3) "an awareness of a high probability of deceptiveness and intentional[] avoid[ance of] learning of the truth." *FTC v. Primary Grp., Inc.,* 713 F. App'x 805, 807 (11th Cir. 2017). Moreover, "[a]n individual's degree of participation in the business is probative of knowledge." *Partners in*

*HealthCare Ass'n., Inc.*, 189 F. Supp. 3d at 1367. Individuals should know of deceptive conduct where the "misrepresentations at issue formed a central part of" their business and they participated in it. *FTC v. Wolf*, 1996 WL 812940, at \*8 (S.D. Fla. Jan. 31, 1996). In such circumstances, it is "'simply not plausible that an individual with control over the company did not know of the deceptive practices." *FTC v. Am. Entm't Distribs., Inc.*, 2012 WL 12964783, at \*12 n.23 (S.D. Fla. Aug. 31, 2012). In addition, an individual's direct participation in wrongdoing establishes liability. *See Pointbreak Media*, 376 F. Supp. 3d at 1271.

**B. The Complaint States Claims Against Robertson for Unfair and Deceptive Data Privacy and Data Security Practices (Counts I-III).**

Counts I-III allege that, as Cerebral's CEO, Robertson directed practices that violated Cerebral's assurances to users that their sensitive, personal data would be safeguarded from improper disclosure. *See, e.g.*, SAC ¶¶ 39-40, 58-76, 318-331. By directing practices that flouted Cerebral's misleading assurances, Robertson violated the FTC Act. Defendants argue that the Complaint fails to allege any materially misleading conduct, that the alleged harms were speculative and legally insufficient, and that Cerebral's disclosures or users' consent defeat any unfairness or deception claim. Mot. at 15-27. These defenses are belied by the Complaint's detailed factual allegations and by well-established precedent.

**1. <u>The Complaint Adequately Alleges Deceptive and Unfair Data Security and Data Privacy Practices (Counts I-III).</u>**

Defendants challenge the sufficiency of the Complaint's allegations under both the deception and unfairness prongs of Section 5. Mot. at 21-26. The Complaint describes, however, precisely the kind of conduct the FTC Act prohibits: a company that promised consumers confidentiality while secretly transmitting sensitive health data for commercial purposes, then failed to protect that data from repeated breaches.

Counts I and II of the Complaint allege that Defendants violated Section 5 of the FTC Act by engaging in deceptive privacy and security practices. As previously noted, to state a claim for deception under Section 5, the Government must allege: (1) a representation, omission or practice; (2) that is likely to mislead consumers acting reasonably under the circumstances; and (3) is material. *See FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1360 (S.D. Fla. 2019), *aff'd*, 801 F. App'x 685 (11th Cir. 2020). The Complaint readily meets that standard. It alleges that Cerebral repeatedly assured users that their sensitive health data would remain confidential, while in fact disclosing it to third-party ad platforms through tracking technology and for use in online marketing, including to Google, Facebook, and TikTok. *See* SAC ¶¶ 39, 60-64, 79, 91, 93. These representations were not only misleading to reasonable consumers, but also material: they concerned the confidentiality of patients' sensitive health data — a matter likely to influence consumers' decisions about whether to entrust Cerebral with their information and seek treatment.

Count III alleges that the same conduct was also unfair. To state a claim for unfairness under Section 5, the Government must allege that Defendants' practices caused or were likely to cause substantial injury that was neither reasonably avoidable nor outweighed by countervailing benefits to consumers. *See* 15 U.S.C. § 45(n); *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244-245 (3d Cir. 2015). Here again, the Complaint meets that standard: it alleges that Robertson knowingly exposed consumers' deeply sensitive mental health information (including diagnoses, treatment searches, and prescription data) to third parties without safeguards or consent, causing ongoing harm. *See* SAC ¶¶ 77-84, 90-92.

As discussed above (*see* p. 7, supra), the Complaint further specifically alleges that Robertson personally directed the deployment of tracking technologies — such as the Meta Pixel — used by Cerebral to collect and transmit sensitive health data, including information about

patients' mental health conditions, treatments, and medication searches, to third-party advertising platforms without user consent.[5] These actions were deliberate and sustained, and easily support a finding of individual liability under Section 5.

Having failed to refute the core allegations of deception and unfairness, Defendants offer a series of unavailing arguments. For example, Defendants argue that their data privacy assurances could not have misled consumers because the Complaint alleges only what Defendants inaccurately reframe as "isolated" incidents, "glitches," or technical errors. Mot. at 26. In fact, the Complaint alleges nearly three years of intentional, systemic misconduct — personally directed by Robertson — that caused concrete harm to hundreds of thousands of consumers and violated their reasonable expectations of privacy. *Id.* ¶¶ 92-93. During that time, Cerebral assured patients their information was protected, even as it disclosed patients' sensitive health data to a large number of third-party platforms. *See* SAC ¶¶ 77-80, 89-90. Defendants' attempts to minimize these actions contradict the Complaint.

Similarly, arguments that Cerebral disclosed its practices (Mot. at 22-23) or that advertising was harmless (*id.* at 24) misunderstand the relevant legal standards. For example, Defendants do not meaningfully dispute that Cerebral's statements to consumers — including assurances that patients could trust it with sensitive information — conveyed a misleading net impression. *See* SAC ¶¶ 60-64. Defendants cite *Smith v. Facebook*, 262 F. Supp. 3d 942 (N.D. Cal. 2017), to argue that no deception occurred because users were notified of Cerebral's data practices. Mot. at 24.

---

[5] *See* SAC ¶¶ 77-88. Robertson directed Cerebral's use of hidden tracking technologies to mine users' health data (*id.* ¶¶ 79-88); personally directed implementation of the Meta Pixel for tracking purposes on Cerebral's enrollment webpages where users provided health information including on detailed "mental health questionnaire" pages (*id.* ¶¶ 78-79); reviewed and approved advertising practices that exploited the data (*id.* ¶¶ 82-85); and monitored resulting ad performance using accounts registered in his name. *Id.* ¶ 82.

But *Smith* involved explicit disclosures and express user consent, not assurances of confidentiality paired with secret tracking. Here, by contrast, the Complaint alleges that Cerebral assured users their data would remain private (SAC ¶¶ 58-63, 75-76), while secretly transmitting their mental health treatment information to third parties via tracking technologies (¶¶ 79-93). A privacy policy disclaimer buried in fine print cannot cure that misrepresentation, particularly where the net impression was that the users' medical and mental health information would not be disclosed. *See Transnet Wireless*, 506 F. Supp. 2d at 1272 (materiality turns on "net impression" and likelihood to mislead, not intent).

Defendants also wrongly argue that liability turns on whether the disclosed data qualifies as Protected Health Information ("PHI") under HIPAA, and that the Complaint defines PHI too broadly. *See* Mot. at 24-25. This is a red herring. The government has not brought a claim under HIPAA. The relevant inquiry here is only whether the Complaint plausibly alleges an unfair or deceptive practice under Section 5 involving the unauthorized disclosure of health information. *See, e.g., Wyndham Worldwide Corp.*, 799 F.3d at 247. The Complaint does so by alleging systemic violations by Cerebral of its assurances that it would keep consumers' health information private. SAC ¶¶ 39-40, 60-63, 78-79. The nuances of HIPAA are not in dispute.

Finally, Defendants wrongly suggest that the Complaint fails to meet the substantial injury standard, citing *American Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 972 (D.C. Cir. 1985) (*AFSA*) to argue that the Complaint fails to allege a concrete, non-speculative injury. *See* Mot. at 25. Defendants misread the law. As already explained, unauthorized disclosure of health information satisfies the Section 5 unfairness standard, and *AFSA* confirms that a practice is unfair if it "causes or is likely to cause substantial injury[.]" The Complaint alleges multiple separate breaches involving health information belonging to hundreds of consumers, including patients whose

records were accessed by terminated employees or other patients. *See SAC* ¶¶ 97-101, 103-104. These allegations reflect concrete privacy harms — not hypothetical risks — and easily meet the substantial injury prong. *See FTC v. Kochava, Inc.*, 2024 WL 449363, at *4; *In re TJX*, 564 F.3d 489, 498 (1st Cir. 2009).

The Complaint therefore states plausible claims under Counts I-III for unfair and deceptive data privacy and data security practices.

### 2. Robertson Directly Participated in and Had Knowledge of the Data Security and Data Privacy Violations by Cerebral.

At Robertson's direction, Cerebral flouted its strong data security and privacy assurances and exploited its patients' most sensitive health information for marketing purposes (SAC ¶¶ 77-96) and repeatedly mishandled and exposed that information. (*Id.* ¶¶ 97-108). By directing practices that rendered misleading, Cerebral's assurances to patients, Robertson knowingly engaged in unfair or deceptive acts under Section 5. In seeking to avoid liability, Robertson argues that he lacked knowledge of Cerebral's unfair and deceptive acts despite his role as CEO and founder of a company that initially had a small number of employees. Mot. at 26-28; SAC ¶¶ 41-42. These assertions fail on even a cursory review of the Complaint, which shows Robertson allegedly (1) directly participated in, (2) knew about, and (3) directed the relevant misconduct. These allegations more than meet the pleading standard to show knowledge.

First, the Complaint alleges Robertson's direct participation in the wrongdoing. For example, Robertson allegedly knowingly directed, and *micromanaged*, Cerebral's unauthorized use of tracking technologies, and he gave directives regarding data security practices that increased the risk of, and led to, foreseeable breaches. *See SAC* ¶¶ 109-114. Robertson's alleged direct role in shaping Cerebral's deceptive data practices renders him liable. *Pointbreak Media*, 376 F. Supp. 3d at 1271 (direct participation in deceptive practices establishes liability); *FTC v. Transnet*

*Wireless Corp.*, 506 F. Supp. 2d 1247, 1272 (S.D. Fla. 2007) (holding executive who participated in misleading representations liable). To be clear, the law does not require that Robertson have "personally perform[ed]" the unfair or deceptive acts. *FTC v. HES Merch. Servs.*, 2014 WL 12611275, at *3 (M.D. Fla. Feb. 20, 2014). But because the Complaint alleges his personal involvement, it incriminates him all the more resoundingly. *See, e.g.*, SAC ¶ 82 (targeted advertising accounts using patient data set up in Robertson's name); ¶ 83 (Robertson personally helped direct "Pixel placement" on website to collect patient data for targeted advertising); ¶¶ 110-111 (Robertson participated in addressing security problems and responses); ¶ 114 (Robertson reviewed and approved company policies on data security and data breaches); ¶ 118 ("Robertson overrode significant data security concerns raised by his top data security reports.").

Second, in addition to his participation, other allegations more than satisfy the standard to show that Robertson plausibly had "some knowledge" of the misconduct. *IAB Mktg.*, 746 F.3d at 1233. The Complaint details data-security policies Robertson approved (SAC ¶¶ 6, 45), teams he oversaw *(id.* ¶¶ 7, 43, 46-47), and relevant practices he directed *(id.* ¶¶ 77-88, 105-119), none of which would be possible without his specific knowledge. Moreover, Robertson's "degree of participation in the business" as Cerebral's CEO is itself probative of the requisite knowledge. *Partners In Health Care*, 189 F. Supp. 3d at 1367-68. And where, as here, the practices at issue "formed a central part of the business," it is "simply not plausible that an individual with control over the company did not know of the deceptive practices." *Am. Entm't Distribs.*, 2012 WL 12964783, at *13, n.23 (granting summary judgment in favor of the FTC). Robertson's claim that he "had no expertise to click through the code, design the privacy architecture, or evaluate security tickets as incidents arose" is a strawman (Mot. at 26-27): he allegedly understood that Cerebral used tracking technologies to exploit users' personal health information for marketing. SAC ¶¶

77-91.[6][7] After all, he allegedly directed use of this technology for precisely this purpose, for years. *Id.* ¶¶ 79, 81, 87. Thus, any argument that the harm or scope of these illicit practices was not discovered until later (Mot. at 22) is unavailing, as the Complaint alleges that Robertson had real time knowledge of the problematic practices. *Id.* ¶¶ 78-93.

Third, the Complaint details Robertson's oversight and participation in Cerebral's data security and privacy practices. It describes his review and approval of key policies (*id.* ¶¶ 6, 7, 45) and his strategic staffing and budgetary decisions that shaped the practices (*id.* ¶¶ 46-49, 81-83, 118). The allegations show his substantial influence on day-to-day practices, undermining Defendants' claims of executive "remoteness." Mot. at 26-28. This inference is further supported by Robertson's role in founding Cerebral with a small team, all "under [his] supervision." SAC ¶ 42. That hands-on structure supports a reasonable inference of authority and knowledge.

Defendants depart from the allegations when they argue that Robertson should not be liable for misleading disclosures related to Cerebral's unauthorized pixel tracking because, they contend, an inadvertent technical issue was not discovered until January 2023, after his departure. Mot. at 28. This revisionary account has nothing in keeping with the pleading. The Complaint alleges,

---

[6] Defendants rely on *FTC v. Primary Group, Inc.*, 713 F. App'x 805 (11th Cir. 2017), and *FTC v. Quincy Bioscience Holding Co.*, 389 F. Supp. 3d 211 (S.D.N.Y. 2019), to argue that executive status alone does not support liability. *See* Mot. at 27-28. But those cases turned on the absence of any facts showing the executive's involvement in the challenged conduct, which is inapplicable.

[7] Robertson does not dispute that the Complaint alleges he had authority to direct and control Cerebral's policies and practices, waiving any arguments to the contrary. *See, e.g., Copeland v. Housing Auth. Of Hollywood*, 358 F. App'x 144, 144 (11th Cir. 2009). Nor could he reasonably do so. *See Transnet Wireless*, 506 F. Supp. 2d at 1272 (holding the "authority to control the corporation and … participation [of CEO] is unquestionable.").

instead, that Robertson directed the intentional use of tracking pixels on Cerebral's website to sweep up and exploit individual health data in online ad targeting, for more than two years.[8]

Cerebral's belated acknowledgment to HHS regarding the scope of its hidden tracking efforts (*id.* ¶ 93), which the company investigated *after* Robertson was fired, hardly supplants these allegations. Nor can the company's untested and self-serving gloss contained in that report—and not cited or relied on in the Complaint—replace them. Since the government does not rely on the company's account, and because that description is not undisputed, it is not incorporated by reference into the pleading. *See* p. 3, *supra* (explaining standards for incorporation by reference). Finally, even if it were the case that the full extent of the wrongful data disclosures emerged *after* Robertson's departure—a revisionary account that contradicts the pleading (SAC ¶¶ 79, 87, 90)— that would hardly excuse Robertson's liability.[9] That a full reckoning by others at the company occurred later does not negate the allegations of Robertson's intentional, knowing misconduct.

Defendants' reliance on *FTC v. Swish Mktg., Inc.,* 2010 WL 653486, at *6 (N.D. Cal. Feb. 22, 2010), and *Davis v. Skullcandy, Inc.*, 2018 WL 1415192, at *5 (D. Utah Mar. 21, 2018) is misplaced. In both cases, the courts found a lack of allegations tying executives to misconduct. But here, the Complaint alleges that he personally directed the use of tracking pixels on sensitive medical pages (SAC ¶¶ 78-79, 81, 92, 126, 130), supervised Cerebral's marketing and privacy practices (¶¶ 82-85, 87-88), received briefings about data security risks (¶¶ 7, 111), and directed

---

[8] *See* SAC ¶¶ 79-92 (Robertson directed intentional use, installation, and marketing strategy regarding tracking technologies including the Meta Pixel; Robertson directed use of tracking technologies to exploit user health data; Robertson directed relevant marketing teams).

[9] The case that Defendants cite, *Krinsk v. SunTrust Banks*, Inc., 2010 WL 11475608 (M.D. Fla. Jan. 8, 2010), is inapposite. That case involved no allegations of direction, intent, or affirmative conduct – only post hoc discovery. Here, the Complaint alleges a long-running course of intentional conduct directed by Robertson. SAC ¶¶ 79-93.

the violative practices at issue (¶¶ 79-93). Beyond allegations based on Robertson's position, these allegations specify his hands-on role, decision-making authority, intentional and knowledgeable acts, and repeated failures to mitigate known risks.

### C.  The Complaint Adequately Pleads the Section 5 Claim Against Robertson for Cerebral-Related Cancellation Misconduct (Count IV).

Defendants argue that the Complaint does not allege a continuing violation and that the Complaint fails to allege Robertson's knowledge regarding Cerebral's deceptive cancellation practices. Mot at 29-30.[10] More specifically, Defendants claim that the Complaint fails to support injunctive relief because it does not allege that Robertson knew consumers were denied refunds or that Cerebral's cancellation process was deceptive. But, as discussed above (*see* p. 8, *supra),* the Complaint is replete with detailed allegations showing that Robertson directed the company's cancellation process to make it challenging and that millions in unauthorized charges were issued to patients even after they made cancellation requests. *See* SAC ¶¶ 133-146, 147-161.

Specifically, the Complaint alleges that Robertson designed, oversaw, and received reports regarding Cerebral's efforts to suppress patients' ability to cancel, with the specific intent of suppressing cancellation and maximizing revenue. *Id*. Robertson directed that the company "remove the cancellation button" on its website and instead require patients to cancel only "by reaching out to … a specific support email address[.]" *Id.* ¶¶ 154, 157-158. He also "require[d] [this] complex, multi-step process for cancellation" that was explicitly designed to "reduce cancellations by making them more challenging" to complete. *Id.* These allegations, standing alone, suffice to plead that Robertson knew about the cancellation misconduct.

---

[10] To the extent that Defendants argue for the dismissal of Count IV on the grounds that it fails to allege a continuing violation (Mot. at 29), Plaintiff addresses that argument in turn in Section IV.

Defendants' contention that the Complaint fails to allege Robertson's knowledge of whether specific consumers received refunds (Mot. at 30-31) is misguided. First, the Complaint alleges Robertson's involvement in directing the company's refund practices, including his knowledge of substantial chargeback disputes brought by consumers struggling to obtain refunds.[11] Second, and more importantly, this claim pertains to Robertson's knowledge of Cerebral's challenging cancellation processes, which were allegedly implemented *at his direction,* and which allegedly generated widespread complaints from consumers struggling to cancel, of which Robertson was allegedly made aware through repeated briefings and discussion with his reports. *See* SAC ¶¶ 147-149, 150-161, 162-167. Thus, whether Robertson had knowledge of the status of refund requests is secondary. What matters is that he allegedly knew that Cerebral's cancellation process was unfair and misleading because he directed his employees to make it challenging, and because he knew that the resulting process engendered "a large number of consumer complaints" by consumers struggling to cancel. *Id.* ¶¶ 162-163, 166.

Defendants' reliance on *Swish Marketing* is again misplaced. Mot. at 31. In that case, the Government failed to allege any cognizable injury to consumers. 2010 WL 653486, at *4. Here, by contrast, the Complaint alleges consumers were misled by Cerebral's representations, charged after attempting to cancel, and harmed financially. Accordingly, Count IV should proceed against Robertson as a properly alleged unfair practice under Section 5.

### D.  The Complaint States a Claim Against Robertson and Martelli for Deceptive and Unfair Marketing and Consumer Review Practices (Count V).

Count V alleges that Roberton and Martelli, while at Cerebral, violated Section 5 by engaging in unfair and deceptive marketing and review practices. Section 5(a) prohibits conduct

---

[11] The Complaint alleges Robertson's involvement in directing Cerebral's refund policies and practices. SAC ¶¶ 43, 160, 163, 175-176.

that is either "unfair or deceptive." 15 U.S.C. § 45(a)(1). As explained above, an act or practice is deceptive when "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances[;] and (3) the representation was material." *Tashman*, 318 F.3d at 1277. An act or practice is "unfair" under Section 5 if it is (1) "likely to cause substantial injury to consumers;" (2) "not reasonably avoidable by consumers"; and (3) "not outweighed by any countervailing benefits to consumers or competition." *See* 15 U.S.C. § 45(n); *Pointbreak Media, LLC*, 376 F. Supp. 3d at 1285.

Count V alleges Robertson and Martelli engaged in several forms of misconduct, including authoring and posting fictitious online reviews (SAC ¶¶ 181-186); instructing review websites to remove negative reviews by falsely claiming they were inauthentic (¶¶ 194-196); failing to disclose refunds, discounts, and other incentives provided in exchange for the removal of critical reviews by third parties (¶¶ 179, 187-190); soliciting reviews only from satisfied patients (while excluding dissatisfied ones they expected to leave negative feedback) thereby skewing the overall pool and making the reviews unrepresentative (¶¶ 191-193); and manipulating review ratings by directing Cerebral employees to "upvote" positive reviews and "downvote" negative ones (¶¶ 196-199).

Robertson and Martelli raise a handful of arguments that this misconduct does not state a claim. None withstands scrutiny.

First, Defendants argue that the Complaint fails to allege that the online review misconduct was "likely to cause substantial consumer injury."[12] That argument is meritless. "An act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people.'" *FTC v. Direct Benefits Grp., LLC*, 2013 WL 3771322, at *13 (M.D. Fla. Jul. 18, 2013) (quoting cases). These

[12] The Complaint does, in fact, expressly allege that consumers "have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act." SAC ¶ 371.

22

alleged unlawful practices injured both actual and prospective patients of Cerebral, a company that grew to have hundreds of thousands of patients. SAC ¶¶ 35, 41. These practices included misleading patients who subscribed after reading fictitious and manipulated reviews. *Id*. ¶¶ 182, 187, 194, 197-199, 371. As a result, consumers were given a false impression of others' experiences with Cerebral's services, leading them to enroll based on inaccurate information. The unlawful practices also were "systemic" and widespread, and pertained to multiple websites. *Id*. ¶¶ 178, 184-185, 196.

The Complaint alleges that Robertson stressed the urgency of the online review misconduct precisely because he had grown alarmed by negative reviews that deterred consumers from subscribing. *Id*. ¶ 181. His conduct shows that he knew the reviews would significantly influence consumer decisions, directly undercutting his *post hoc* claim that the reviews could not have plausibly caused harm. The Complaint plausibly alleges that this misconduct continues to injure prospective patients. *See Roca Labs*, 345 F. Supp. 3d at 1395 (finding that suppressing negative reviews likely causes substantial injury because "the absence of negative information could make a consumer more inclined to purchase" products).

Defendants also argue that Count V fails because it does not specify "the content" of the fictitious reviews and other deceptive representations, their dates, or whether consumers saw them. Mot. at 32. But that argument misstates the applicable pleading standard. Rule 8(a), not Rule 9(b), governs the Complaint. And even where Rule 9(b) applies, it "does not … eliminate the concept of notice pleading." *See* p. 5*, supra* (quoting *Burgess*, 600 F. App'x at 662).

Defendants also ignore the Complaint's actual allegations, which specify, for example, that beginning "[i]n or around July 2020," Robertson directed Martelli and others to post fictitious reviews to trustpilot.com that impersonated Cerebral patients. *See* SAC ¶¶ 181-185. The

Complaint quotes Robertson's own directives that he and Martelli "need to generate the good ones [*i.e.*, positive reviews] … stat," that they should "get in a couple of positive ones today and then trickle them in," and that Robertson was "fine w[ith] fake ones." *Id.* ¶¶ 183-184. He further instructed that another employee be tasked with "add[ing] 4-5 reviews per week (positive) [on a particular website] moving forward." *Id.* ¶ 184.

These allegations sufficiently "plead the overall nature of the fraud," provide "illustrative examples," *Burgess*, 600 F. App'x at 663, and make Robertson and Martelli "aware of the particular circumstances for which [they] will have to prepare a defense at trial," *Gose*, 109 F.4th at 1318. The Complaint is not defective for omitting the fictitious reviews' exact content.[13]

Robertson and Martelli also contend that their unlawful conduct amounted to little more than "redressing complaints" and "offering unhappy customers" refunds. Mot. at 33. This characterization misstates the Complaint. Count V arises not from legitimate customer service, but from Defendants' ***failure to disclose*** that they offered incentives "***in exchange for*** positive promotion, and ***for removal of criticisms***." SAC ¶ 179; *see also id.* ¶¶ 188-190. This is a textbook unfair and deceptive practice. *See, e.g.*, *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) ("Misrepresentations or omissions of material facts made to induce [a] purchase … constitute deceptive acts or practices that violate [Section 5].").[14]

---

[13] *Marksman Sec. Corp. v. P.G. Sec., Inc.* is distinguishable. 2020 WL 12188373 (S.D. Fla. June 25, 2020). There, the Court applied Rule 9(b) to a misleading advertising claim, not a Section 5 claim. *Id.* *6. And in contrast to that case (*id.* *7-8), here the Complaint extensively describes several bases and recites Robertson's exact statements. SAC ¶¶ 183-86.

[14] *See also Vitamins Online, Inc. v. Heartwise, Inc.*, 71 F.4th 1222, 1238 (10th Cir. 2023) ("[Incentives] misled consumers about the number of reviews from unbiased customers and the true ratio of putative unbiased positive to negative reviews"); *Interlink Prods. Int'l v. F&W Trading LLC*, 2016 WL 1260713, at *8-9 (D.N.J. March 31, 2016) ("purposefully driv[ing] up … ratings by enlisting inherently biased professional reviewers" was deceptive); *Casper Sleep, Inc. v.*

Similarly, Defendants claim that the Complaint alleges that they merely "solicit[ed] reviews from satisfied customers" (Mot. at 33). In fact, it alleges that they "invited only [Cerebral's most satisfied patients] to review" it and "deliberately caused Cerebral not to send similar requests … to patients it expected to submit negative reviews," thereby intentionally distorting the overall pool of consumer feedback. SAC ¶¶ 191-193.

Finally, Robertson and Martelli fail to address the Complaint's separate allegation that they directed Cerebral's own employees to upvote positive reviews and to downvote negative ones. *Id.* ¶¶ 196-200. That scheme further skewed the visibility and perceived credibility of the reviews, misleading consumers about the company's reputation. *Id.* ¶ 199.[15] *See Vitamins Online v. Heartwise, Inc.*, 71 F.4th 1222, 1237-38 (affirming that "manipulation of ... reviews" by "block voting on the[ir] helpfulness" left a "misleading impression" for consumers).

Defendants' arguments all miss the mark, and Count V should not be dismissed.

### E.  The Complaint States a Claim Against Zealthy, Bruno Health, Gronk, Robertson, and Echeverry for Unfair and Deceptive Practices (Count VII).

Count VII asserts a Section 5 claim against Zealthy, Bruno Health, Gronk, Robertson, and Echeverry for engaging in ongoing unfair and deceptive practices at Robertson's second startup, Zealthy. They argue that the Complaint fails to allege that their practices are unfair or deceptive and that this claim fails to satisfy the — inapplicable —Rule 9(b) standard. Mot. at 33-38. They

---

*Mitcham*, 204 F. Supp. 3d 632, 636, 644 (S.D.N.Y. 2016) (failing to disclose material connections in reviews was deceptive under statute "substantially modeled on the" FTC Act).

[15] *Davis v. Avvo, Inc.* is also inapposite. 345 F. Supp. 3d 534 (S.D.N.Y. 2018). There, positive reviews were "spotlit" by the defendant that ran review website, and the website placed consumers "on notice that every client review might not be posted." *Id.* 543. By contrast, Robertson and Martelli authored fake reviews and manipulated reviews on websites operated *by others*.

also contend that this Count is duplicative and that Robertson and Echeverry lacked knowledge of the alleged wrongdoing. *Id.* at 39-40. As explained below, these arguments fail.

**1.   Zealthy's Alleged Actions Constitute Deceptive Practices.**

Robertson, Echeverry, Zealthy, and Bruno Health contend that Count VII fails to allege a claim for deceptive practices. Not so. Among other things, the Complaint alleges that these Defendants represented that "consumers interested in certain weight loss medications would generally pay $25 with insurance or $150 without insurance," but instead "charg[ed] them multiples of those amounts" and imposed "surprise fees or changes to prices." SAC ¶¶ 225, 265. They also "led users to believe that they would generally be able to obtain insurance coverage for certain drugs," but "numerous subscribers complained that they were not able to receive insurance coverage and were ultimately charged high prices...[.]" *Id.* ¶ 228.

Defendants highlight the word "generally" in these allegations and argue (without any authority) that these representations are not deceptive because "there is no inconsistency between a representation that consumers would generally pay only a particular amount and an assertion that consumers did not always pay only that amount." Mot. at 34. But that argument fails. "In determining whether a representation is likely to mislead consumers acting reasonably under the circumstances, courts consider the overall, net impression rather than the literal truth or falsity of the representation." *FTC v. Simple Health Plans, LLC*, 2024 WL 473995, at *8 (S.D. Fla. Feb. 7, 2024); *see also FTC v. Peoples Credit First, LLC*, 244 F. App'x 942, 944 (11th Cir. 2007) (ruling that "technically or literally true" statements are deceptive if they are "likely to mislead reasonable consumers").

Here, Defendants represented that consumers "would generally pay $25 with insurance or $150 without insurance." SAC ¶ 225. That representation conveyed the impression that those were

the typical prices when, in reality, Defendants "charg[ed] them multiples of those amounts" and imposed "surprise fees or changes to prices." *Id.* ¶¶ 226, 265. That is more than sufficient to state a deceptive practice claim, and, at the very least, it raises questions of fact that are not suitable for resolution at the motion-to-dismiss stage. Similarly, the Complaint alleges that Defendants represented patients "would pay '$0' for their first 3 months, or no more than '$49' for their first month," but "charge[d] them much more, including by charging them for multiple months upfront." *Id.* ¶ 226. Defendants claim that it is possible to provide three months of service for free and yet also collect payment upfront for subsequent months that are not free. Mot. at 34. Even if that were true in a literal sense, the Complaint still plausibly alleges that promoting a service as costing $0 for the first three months gives reasonable consumers a net impression that they will not need to pay anything until *after* that period. Defendants' Motion also ignores allegations that they "led subscribers to believe they will be charged a flat fee of $49 for signing up, when in fact Roberson has directed consumers to be charged upfront the net cost of a three-month subscription." *Id.* ¶ 262. Charging consumers more than the stated price is certainly deceptive.

Defendants also argue that the allegations about Zealthy's representations concerning pricing fail to satisfy Rule 9(b). Mot. at 35. But, once again, that heightened pleading standard does not apply to Section 5 claims. *See* pp. 4-5*, supra*. And even if Rule 9(b) did apply, the "[s]pecificity under Rule 9(b) does not … eliminate the concept of notice pleading." *Burgess*, 600 F. App'x at 662; *Ziemba*, 256 F.3d at 1202. The Complaint's allegations satisfy that standard. The Complaint identifies the specific statements that were likely to mislead (SAC ¶¶ 225-226, 262), where the statements were made to consumers (the "[online] enrollment process for Zealthy and Bruno Health." *see id.* ¶ 224) and the manner in which the representations likely misled consumers

27

(Zealthy "end[ed] up charging them multiples of [the represented] amounts." *Id.* ¶ 225). That is more than sufficient to meet any applicable pleading requirement.

Defendants never address allegations about several other deceptive practices, such as that they falsely represented that prospective patients could "[c]ancel anytime," could obtain refunds, and could expect only certain costs. SAC ¶¶ 233, 257, 259. Defendants ignore these misrepresentations and mistakenly assert that the Complaint alleges only that they hid cancellation terms in the Terms of Use and Privacy Policy. Mot. at 36. But the Complaint alleges more: that contrary to its representations to consumers, Zealthy did not enable patients to cancel at any time, operated a cancellation method that was broken or challenging for extended periods, continued to charge patients despite their cancellation requests, and instructed its employees not to refund patients who had trouble cancelling. SAC ¶¶ 242-245. They also "disregard[ed] consumers' cancellation requests" and failed to provide refunds "despite assurances made to consumers during enrollment regarding the availability of cancellation." *Id.* ¶¶ 259, 263. Similarly, Defendants do not address the allegation that they "promised [their patients] a refund for services not rendered or when they cancel their membership," but never honored that promise. *Id.* ¶ 265. Defendants' Motion raises no challenge to the sufficiency of these allegations, and any of these alleged deceptive practices states a claim under Count VII.

Defendants also fail to address the allegation that Zealthy and Bruno Health falsely represented the security of their patients' health information — claiming use of "strict security protocols," a "secure Zealthy patient portal," and "secure communication channels" — when, in fact, they relied on "insufficient, easily-hacked systems" that failed to safeguard sensitive information. *Id.* ¶¶ 270-274. Their failure to respond waives any argument that these allegations do not suffice to plead deceptive practices.

**2.   Zealthy's Alleged Actions Constitute Unfair Practices.**

Robertson, Echeverry, Zealthy, and Bruno Health argue that the Complaint fails to plead an unfair practice about prices and charges. Mot. at 35. Relying on a single unreported, out-of-circuit decision, they contend that the government cannot allege a likelihood of substantial injury "based on unspecified claims of user dissatisfaction." *Id.* That argument fails.

The Complaint sufficiently alleges the requisite injury. Courts in this Circuit have repeatedly recognized that "an act or practice can cause 'substantial injury' by doing a 'small harm to a large number of people.'" *Direct Benefits Grp., LLC*, 2013 WL 3771322 at *13 (quoting cases). The unfair practices at issue here are alleged to have been so numerous and "so substantial that they have prompted scrutiny from financial organizations," caused a payment processor to threaten to stop allowing members to use its payment cards to pay Zealthy's charges, and caused Robertson to try to lower Zealthy's chargeback rate by processing sham enrollment transactions that do not involve actual sign-ups. SAC ¶¶ 229, 266-68. Patients' complaints have been so pervasive that they caused the Better Business Bureau to issue a standing, formal warning on Zealthy's company page informing consumers that Zealthy's unfair practices "indicate[d] a Pattern of Complaints regarding billing, order fulfillment and customer service practices," as well as a "significant spike" in complaints. *Id.* ¶ 265. These allegations of extensive consumer harm more than suffice to allege a likelihood of substantial injury.

Defendants also tersely contend that the Complaint fails to allege that consumers could not have avoided the harms from these unfair practices. Mot. at 35. But the Complaint squarely alleges that the unfair practices "caused or are likely to cause substantial injury to consumers that … is not reasonably avoidable by consumers." SAC ¶ 353. And while consumers can avoid injury when they have reason to anticipate the impending harm and the means to prevent it, *FTC v. Global*

29

*Marketing Group, Inc.*, 594 F. Supp. 2d 1281, 1289 (M.D. Fla. 2008), the nature of the misconduct here precluded avoidance. Defendants billed consumers for services they never agreed to, misled them about what would be covered, ignored their cancellation requests, and made cancellation difficult, despite promises that it would be easy. SAC ¶¶ 263-265. They also imposed "surprise fees," "changes to prices," and duplicate charges, even after consumers canceled their cards. *Id.* These allegations demonstrate that consumers could not reasonably have avoided the harm. *FTC v. Hispanic Global Way, Corp.*, 2014 WL 12531538 at *2 (S.D. Fla. Jul. 1, 2014) (injury unavoidable because consumers "did not reasonably expect that Defendants would take their money, ship the wrong goods, and fail to remedy that mistake").

Defendants mistakenly assert that Count VII's Section 5 claim relies on allegations that Zealthy "did not adequately disclose 'important terms' relating to fees, cancelation, and membership renewal in its Terms of Use *id.* ¶¶ 230-233; [and] did not adequately disclose terms in its Privacy Policy regarding use of private customer information (and failed to secure customer data) *id.* ¶¶ 234-39, 270-71." Mot. at 33-34. They also incorrectly state that "the government's position is that the (ordinary and unremarkable way) that [Zealthy's] terms were presented is itself unlawful." *Id.* at 38. This brief addresses Defendants' arguments about disclosure of terms in its discussion of Count X's ROSCA claim, below at Section III. Importantly for Count VII, however, Defendant never contests that the allegations of many plainly unfair practices suffice to state a Section 5 claim.[16]

---

[16] Those unfair practices concern costs, including imposing "unauthorized charges … to [patients'] credit cards without their consent." (SAC ¶¶ 227, 246; 259; 263); "imposing serial and duplicative charges on [patients'] credit cards, often even after they had cancelled their cards" (¶ 264); imposing "surprise fees or changes to prices" (¶ 265); disregarding cancellation requests, failing to honor cancellations, making it challenging to cancel, and failing to provide refunds to patients who did actually cancel (¶¶ 259, 263, 265); misleading consumers about the

Similarly, Defendants never dispute that their failure to secure patients' private and sensitive medical and financial information (SAC ¶¶ 269-274) or that their illicit telemedicine (*id.* ¶¶ 275-278) was an unfair or deceptive practice. Mot. at 33-39. As a result, they have waived any arguments that these allegations do not suffice to state a Section 5 claim.

Gronk also contends that the claims against it are deficient because it "was erroneously created and dissolved," asking the Court to take judicial notice of its articles of dissolution. Mot. at 38-39. But this contention fails. The Court need not address this because Florida law is clear that "[d]issolution of a corporation does not … [p]revent commencement of a proceeding by or against the corporation in its corporate name." Fla. Stat. § 607.1405(2)(e). Moreover, a dissolved corporation can be liable for actions that it took before its dissolution. In addition, the Complaint's allegations are that, despite formally filing for dissolution, Gronk "continue[s] to do business." SAC ¶ 12. Even if the Court were to take judicial notice, such notice is limited to the fact that filing occurred, not the truth of its contents. *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1129 (S.D. Fla. 2019); *see also Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1277 (11th Cir. 1999). Thus, judicial notice would not defeat the Complaint's allegation that Gronk continues to operate as Zealthy.

B.     *Robertson and Echeverry Knew of and Directed Zealthy's Misconduct.*

Robertson and Echeverry also contend that the Complaint does not allege they knew of the unlawful practices at issue. Mot. at 40. That contention fails.

For an individual to be liable under Section 5, he needs to have only "some knowledge of the deceptive practices." *On Point Capital Partners*, 17 F. 4th at 1083. "An individual's degree of participation in the business is probative of knowledge." *Simple Health Plans*, 2024 WL

---

services that would be covered by certain costs (¶ 263); and charging patients for medications that they did not receive by the stated timeframe, or that never received at all (¶ 265).

473995, at *12. Individuals should know of deceptive conduct where the misrepresentations at issue formed a central part of" their business and they participated in it. *Wolf*, 1996 WL 812940, at *8.

Here, it is clearly alleged that Robertson and Echeverry had at least "some knowledge" of the alleged unlawful conduct. Each was a leading executive at Zealthy and Bruno Health. They worked together to found and develop Zealthy. SAC ¶ 201. Robertson has been Zealthy's CEO, and Echeverry was its Senior Medical Director. *Id.* ¶ 204. As such, they directed its operations. *Id.* Echeverry served as Bruno Health's President, Director, and Compliance Officer,[17] while Robertson is its CFO. *Id.* ¶ 205. The statements and practices at issue are core to Zealthy's operations and publicized on its website and enrollment flow. *Id.* ¶¶ 262-3, 269-270, 277.

Because the practices at issue "formed a central part of the business," it is "simply not plausible that an individual with control over the company" (here, Robertson and Echeverry) "did not know of the deceptive practices." *Am. Entm't Distribs.*, 2012 WL 12964783, at *12, n.3 (granting summary judgment in favor of the FTC).

In addition, the Complaint alleges that both Defendants made the misleading representations and engaged in the unfair practices at issue. *Id.* ¶¶ 207, 220, 222. Each formed, directed, controlled, and participated in those practices. *Id.* ¶¶ 201-207. They worked closely together to start Zealthy, to "design [its] basic telehealth processes," and to direct its operations, including the seminal practices at issue. *Id.* ¶¶ 15, 201-207. They were directly involved in its day-to-day practices, as shown by their statements that its employees "work closely under both" of them. *Id.* ¶ 211. Moreover, consumers have posted public complaints about Zealthy and Bruno

---

[17] That Zealthy's website allegedly touts Echeverry as Bruno Health's "Compliance Officer" also raises a more than reasonable inference that he is familiar with laws and regulations related to disclosure of patient information. SAC ¶¶ 205, 253.

Health's unlawful business practices. *Id*. ¶¶ 255, 265, 310. The Better Business Bureau also issued a public warning based on consumers' "Pattern of Complaints" based on these same "misleading representations and unfair practices. *Id*. ¶ 265. The Complaint also alleges that Zealthy, "with Robertson's knowledge and at his direction," used a former employee's National Provider Identifier (NPI) behind his back to submit thousands of prior authorization requests for prescriptions. *Id*. ¶¶ 276-278. Consequently, the Complaint sufficiently alleges that they had at least "some knowledge" of the deceptive practices.

### 3.   Contrary to Defendants' Argument, Count VII is not Duplicative.

Defendants Robertson, Echeverry, Zealthy, and Bruno Health claim that Count VII is "duplicative" and should be dismissed to the extent that the Complaint's factual allegations concerning Zealthy "support" or "may color" the claims brought in Counts I-V against Robertson and Martelli for Cerebral-related misconduct. Mot. 39-40. As to Echeverry, Zealthy, and Bruno Health, the argument is patently frivolous. As to Robertson, the argument is erroneous. To be sure, his continuing misconduct at the two companies confirms the need for forward-looking injunctive relief (*see* pp. 25-33, *supra*). But counts are duplicative only if they "stem from identical allegations," will be "decided under identical legal standards," and make "identical relief" available. *MSP Recovery Claims Series 44, LLC v. State Farm Mut. Auto. Ins. Co.*, 2023 WL 4683538, at *3 (S.D. Fla. July 21, 2023) (cleaned up). The factual allegations concerning Robertson's misconduct at the two companies are manifestly not identical, and the corresponding legal claims against him are not duplicative.

**F.  The Complaint States a Section 5 Claim (Count VIII) Against Zealthy, Bruno Health, and Robertson for Unfair and Deceptive Marketing and Review Practices.**

Count VIII alleges that Robertson, Zealthy, and Bruno Health violated Section 5 by impersonating subscribers, fabricating reviews, contesting the authenticity of negative reviews in bad faith, and manipulating online reviews of Zealthy. Defendants contend that this claim fails by relying on the same meritless arguments they used to try to dismiss Count V (a Section 5 claim arising from Robertson and Martelli's unfair and deceptive marketing and review practices at Cerebral). Mot. at 41. In particular, Defendants contend that the Complaint's allegations lack the details required by Rule 9(b). *Id*. They also assert that the Complaint does not allege that these unlawful practices are likely to cause substantial injury. *Id*.

But for the same reasons that those arguments failed as to Count V (*see* pp. 21-25, *supra*), they also fail as to Count VIII. As a result, Count VIII should not be dismissed.

**II.  THE COMPLAINT STATES A CLAIM FOR VIOLATING THE FTC RULE FOR USE OF CONSUMER REVIEWS AND TESTIMONIALS (COUNT IX).**

Count IX alleges that Robertson, Zealthy, and Bruno Health violated the FTC's Rule on the Use of Consumer Reviews and Testimonials (16 C.F.R. Part 465) by, among other things, impersonating subscribers, fabricating online reviews, contesting the authenticity of negative reviews to cause them to be deleted even when they knew the reviews had been written by authentic Zealthy subscribers. SAC ¶ 279. These defendants argue again that the Complaint fails to allege sufficient details under Rule 9(b). Mot. at 41-42. But, as discussed above, that argument fails because Rule 9(b) does not apply. *See* pp. 4-5, *supra*. More practically, the Complaint clearly satisfies either Rule 8(a) or Rule 9(b) by alleging with specificity that Robertson and his subordinates have "authored and posted hundreds of fictitious reviews" on specific sites and

34

review platforms, SAC ¶ 280-284, 288 (alleging posting of numerous fictitious reviews on third-party review platforms including TrustPilot and Reviews.io, and on Zealthy's own website).

These defendants also argue that the Complaint does not "properly" specify what misconduct took place after the Rule became effective. Mot. at 41-42. In fact, they contend that "the government must allege with particularity that the conduct at issue occurred after" the Rule became effective. *Id.* at 5. These contentions ignore that the Complaint specifically alleges misconduct that took place after the effective date. SAC ¶ 294. They are also wrong on the law: a defense that relevant events preceded a law's effective date, like a statute of limitations defense, is a timing-based affirmative defense. Fed. R. Civ. P. 8(c)(1); *Ramnarine v. Spiegel*, No. 12-81222-CIV, 2013 WL 1490482, at *2 (S.D. Fla. Apr. 10, 2013). Such affirmative defenses are for defendants to assert in a responsive pleading, not for complaints to anticipate and negate. *Wainberg v. Mellichamp*, 93 F.4th 1221, 1224 (11th Cir. 2024).

### III. THE COMPLAINT ADEQUATELY PLEADS ROSCA VIOLATIONS BY DEFENDANTS (COUNTS VI AND X).

#### A. The Complaint States Claims For Violations of ROSCA (Counts VI and X).

##### 1. <u>Defendants Allegedly Did Not "Clearly and Conspicuously" Disclose Material Terms.</u>

###### a. Defendants' Alleged Disclosures Have Plausibly Violated ROSCA.

ROSCA requires that negative option sellers disclose material terms "clearly and conspicuously" prior to receiving consumers' billing information. 15 U.S.C. § 8403(1). As alleged in the Complaint, Defendants have violated this stringent standard by burying disclosures in fine print and hyperlinked pages that consumers were unlikely to see, altogether omitting certain material terms from their disclosures, and obfuscating others through misleading representations. Strikingly, Defendants nowhere argue that their disclosures of any of the terms at issue were *conspicuous* under ROSCA. *See* Mot. at 43-47. This is fatal to their argument.

In their second Motion to Dismiss, Defendants err in conflating ROSCA's heightened disclosure requirements with ordinary contract formation principles. But ROSCA's standard is not whether a negative option seller "informed" users of a term by referencing it somewhere in a linked terms page. Mot. at 43. Nor is the standard merely whether a consumer "would have understood" a given disclosure if they had found it. Mot. at 45. Under ROSCA, the quality, not the mere fact, of the disclosure is paramount. This includes the disclosure's prominence, location, and context. *See, e.g.*, *FTC v. Amazon.com, Inc.,* 735 F. Supp. 3d 1297, 1319 (W.D. Wash. 2024) (holding disclosures were not clear and conspicuous based on factors including size, location, and color because "a reasonable consumer … could miss [them]").

For this reason, the cases Defendants rely on that evaluate the clarity of disclosures under standards other than ROSCA's clear and *conspicuous* disclosure standard are inapt. *See, e.g.,* Mot. at 44, citing *Mullinax v. United Mktg. Grp., LLC*, 2011 WL 4085933 at *8 (N.D. Ga. Sept 13, 2011) (assessing whether a disclosure was clear under state deceptive trade practices law without evaluating conspicuousness).[18] Those cases are doubly inapt as they involved front-and-center disclosures prominently featured on an enrollment sign-up page, so that courts concluded no reasonable consumer could have overlooked them. Mot. at 44, citing *In re Vistaprint Corp Mktg. & Sales Pracs. Litig.*, 2009 WL 2884727, at *8 (S.D. Tex. Aug. 31, 2009) (under state deceptive trade practices law, evaluating bolded, prominent disclosure of term placed right next to sign-up box and not involving any fine print or linked terms page); *Baxter v. Intelius, Inc.*, 2010 WL 3791487, at *4 (C.D. Cal. Sept. 16, 2010) (same). Such unignorable and clear disclosures displayed next to a sign-

---

[18] Indeed, because these cases analyze whether disclosures were *deceptive* — not inconspicuous — they have no substantive bearing on a ROSCA analysis. *See Cote v. Countrywide Home Loans, Inc.*, 2010 WL 11646975, at *6 (N.D. Ga. Feb. 11, 2010) (whether consumer was deceived is irrelevant to showing violation of a statutory conspicuous disclosure requirement).

up button are not at issue here. *See, e.g.,* SAC ¶¶ 66-68, 72-74 (detailing Cerebral's use of optional, fine print hyperlink to lengthy terms page with buried disclosures).

Despite a second chance to file a lengthy motion to dismiss — and additional months to forage for case law — Defendants have yet again failed to put forward a *single* case in which disclosures found only in fine print or a linked terms page were held to satisfy ROSCA. Of course, no such case exists, because it would subvert ROSCA's plain language and intent. On the contrary, additional recent ROSCA case law has only reinforced the deficiency of such disclosures. *See, e.g., United States v. Adobe, Inc.,* 2025 WL 1303419, at *10 (N.D. Cal. May 2, 2025) (denying motion to dismiss and finding alleged disclosures in fine print and linked terms page plausibly violated ROSCA).

The Complaint alleges that Defendants have failed to provide conspicuous disclosures of material terms by burying them only in fine print (*see, e.g.*, SAC ¶¶ 67, 70-74, 230-231, 234, 236) and in linked Terms and Conditions or policy pages that enrollees are not required to review and are unlikely to see at all (*see, e.g.*, *id.* ¶¶ 67-68, 71-74, 230-231, 234, 236). Defendants' hyperlinked pages, moreover, are alleged to have been dense and lengthy, and to have contained terms not otherwise disclosed within Defendants' enrollment flows. *See, e.g.*, *id.* ¶¶ 66-67, 71, 73-74, 236. Courts have held as a matter of law that such inconspicuous disclosures do not comply with ROSCA. *See, e.g.*, *FTC v. Health Formulas*, *LLC*, 2015 WL 2130504, at *17 (D. Nev. May 6, 2015) (finding disclosures contained in fine print or on separate, linked Terms and Conditions page "are not clear and conspicuous" under ROSCA); *Amazon.com*, 735 F. Supp. 3d at 1318-1320 (holding that disclosures in fine print or on parts of page that are not prominent are not clear and

conspicuous).[19] Defendants do not offer authority for the proposition that hyperlinks and fine print could suffice to meet this "clear and conspicuous" standard. Any such argument would strain credulity given that the plain meaning of "conspicuous" refers to items that are "clearly visible," "obvious," and "written [so that] a reasonable person ... ought to notice it." *Black's Law Dictionary* (9th ed. 2009).

The Complaint's allegations make clear that a reasonable consumer would be susceptible to overlook the disclosures Cerebral and Zealthy buried in multi-page terms and conditions pages accessible only through hyperlinks. *See In re Jones*, 2007 WL 1725593, at *5 (Bankr. N.D. Ala. June 13, 2007), *aff'd*, 279 F. App'x 825 (11th Cir. 2008) (holding that the sufficiency of disclosures is examined "from the standpoint of an ordinary consumer, not the perspective of … [a] federal judge or English professor").

Nor do Defendants manage to rehabilitate these alleged inadequate enrollment flow disclosures by now arguing that disclosures "appeared *elsewhere* on the companies' websites," on purported webpages that are not alleged in the Complaint and that consumers were not presented with during Cerebral's or Zealthy's sign-up processes. Mot. at 44. As the very cases Defendants cite show, a front-and-center, unmissable disclosure must be just that — not placed out of view on a linked page or separate website FAQ page for only the most assiduous consumer to track down. *See In re Vistaprint*, 2009 WL 2884727, at *8; *Baxter*, 2010 WL 3791487, at *4.

In addition to alleging inconspicuous disclosures that failed to comply with ROSCA, the Complaint alleges that Defendants have altogether omitted disclosures of certain key terms (*see,*

---

[19] Courts assessing analogous disclosure standards under state auto-renewal laws have reached the same conclusion. *See Turnier v. Bed Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1139-40 (S.D. Cal. 2021) (rejecting argument that hyperlink provided adequate disclosure, noting that "the terms themselves — not the access point to them — need to be [disclosed]"); *Farmer v. BarkBox, Inc.*, 2023 WL 8522984, at *4 (C.D. Cal. Oct. 6, 2023) (same).

*e.g.*, SAC ¶¶ 120, 125-126) or provided representations to consumers during enrollment that misled consumers regarding Defendants' policies and practices, leaving even cautious consumers in the dark about material terms.  *See*, *e.g.*, *id.* ¶ 125 (misleading privacy assurances); *id.* ¶ 127 (misleading cancellation assurances); *id.* ¶ 233 (misleading cancellation, refund, and cost assurances).  For example, at relevant times, certain Defendants allegedly failed to disclose their extensive data tracking practices, *id.* ¶ 74 (Cerebral first disclosed use of tracking technologies in December 2020), or the full costs of their subscriptions, *id.* ¶¶ 224-228 (Zealthy and Bruno Health have not disclosed full costs).  These alleged omissions are also plausible violations of ROSCA.[20]

### b. ROSCA Requires Disclosure of "All Material Terms," Not Just Those Involving Negative Option Features.

Defendants try to minimize their liability under ROSCA by erroneously arguing that ROSCA only applies to "negative option features," and not to all material terms of a transaction. Mot. at 45. This argument conflicts with the statute's plain language embracing "*all material terms of the transaction,*" 15 U.S.C. § 8403(1), and has never been endorsed by any court construing ROSCA. This Court should decline Defendants' invitation to be the first to artificially cabin ROSCA in a way that Congress clearly did not intend.

Nor is it breaking new ground for the government to allege material terms involving data privacy, cancellation, and other issues important to reasonable consumers. Claims involving such material terms are commonplace in FTC Act case law (*see* pp. 41-42*, infra*), where they have not produced the parade of horribles and out-of-control statutory framework Defendants conjure. Mot.

---

[20] The allegations regarding inadequate disclosures also plausibly allege violations of ROSCA's requirement that sellers only bill consumers after first obtaining "express informed consent." (15 U.S.C. § 8403(2)). *See Health Formulas*, 2015 WL 2130504, at *16 (inadequate disclosures "constitute evidence" of failure to "obtain consumers' express informed consent"); *Amazon.com*, 2024 WL 2723812, at *12 (failure to provide sufficient information regarding service indicates failure to obtain express, informed consent).

at 47. As it happens, courts, and consumers, are perfectly equipped to differentiate material aspects of a service — such as protection of their sensitive health information or how much they must pay (*see, e.g.,* SAC ¶¶ 77-79, 90, 225, 246) — from Defendants' straw men of trivial "glitch[es]" or insignificant accidents. Mot. at 47. Finally, Defendants' extracurricular attempt to argue from public comments and dissenting statements by certain FTC commissioners, and to quarrel with the recent history of the FTC's enforcement priorities, make no difference to ROSCA's plain — and binding — language. Mot. at 46-47.

First, Defendants' attempt to narrow the scope of ROSCA departs from the plain statutory text. Because ROSCA does not define "material," that term's ordinary meaning applies. *See United States v. Dawson*, 64 F.4th 1227, 1236 (11th Cir.), *cert. denied*, 144 S. Ct. 343 (2023). "Material" signifies anything that is "[o]f such a nature that knowledge of the item would affect a person's decision-making," "significant," or "essential." *Black's Law Dictionary* (9th ed. 2009); *see also Doebereiner v. Sohio Oil Co.*, 893 F.2d 1275, 1276 (11th Cir. 1990) (interpreting "material" to mean "of real importance or great consequence").

Had Congress intended to limit "all material terms" to technical negative option features, it would have clearly legislated as much. Indeed, the contrasting approach adopted in the Telemarketing Sales Rule ("TSR") — which enumerates a specific and lengthy list of material terms to which the TSR's disclosure requirements apply[21] — makes the point.[22] Evidently, the

---

[21] *See, e.g.*, Telemarketing Sales Rule, 16 C.F.R § 310.3(a)(2)(i)-(x) (prohibiting misrepresentations of an enumerated list of material terms).

[22] Bizarrely, Defendants argue that materiality should be construed as a "term of art" lifted from the TSR (Mot. at 46). But materiality is hardly an esoteric, technical term introduced by, and only construable in relation to, that one FTC rule. And in any event, the TSR defines "material" as "likely to affect a person's choice of, or conduct regarding, goods or services," 16 C.F.R § 310.2(t), which is consistent with commonplace treatment of materiality in decades of case law under the FTC Act and other federal consumer protection statutes and rules.

drafters of ROSCA, likely reckoning with the ever-expanding variety of online subscription services, sought to ensure that ROSCA's disclosure requirements would broadly encompass all terms material to consumers across myriad subject-matter areas without attempting the fool's errand of predicting and codifying all such material terms *ex ante*.[23]

Second, courts have in fact had no trouble applying ROSCA to terms beyond negative option features, including to some of the very terms Defendants object to here. *See, e.g.*, *Health Formulas*, 2015 WL 2130504, at *10 (assessing cancellation and refund policies under ROSCA); *FTC v. Directv, Inc.*, 2016 WL 5339797, at *3 (N.D. Cal. Sept. 23, 2016) (assessing cancellation policy and temporary promotional offer terms under ROSCA); *FTC v. Doxo, Inc.,* 771 F. Supp. 3d 1162, 1181 (W.D. Wash. 2025) (assessing added delivery fee under ROSCA).

Indeed, ROSCA's broad materiality standard is one routinely applied in the FTC Act context where courts distinguish "information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." *In re Cliffdale Assocs.*, 103 F.T.C. 110, *37 (1984); *see also N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1226 (11th Cir. 2008) (a statement is material if it is "likely to influence the purchasing decision"). This broad materiality standard turns on a fact-specific inquiry regarding what facets of a good or service consumers attach importance to, without arbitrary subject-matter limitation. *See Simple Health Plans*, 379 F. Supp. 3d at 1360 ("If a significant number of prospective purchasers are likely to attach importance to the representation … [it] is material.").

Under this well-established standard of materiality, the Complaint alleges terms plausibly important to patients signing up for telehealth subscriptions online, including (1) costs; (2)

---

[23] Where Congress chose not to include limiting language in ROSCA, it is presumed to have "act[ed] intentionally and purposefully." *Russello v. United States*, 464 U.S. 16, 23 (1983).

treatment of their sensitive, personal data; (3) the availability of cancellations and/or refunds; and (4) whether the healthcare services provided would be covered by insurance. *See* SAC ¶¶ 344, 368. These terms involve key aspects of recurring subscriptions for telehealth services and would plausibly impact a user's decision as to whether to sign up for Defendants' services. Defendants nowhere argue that any of the respective terms at issue would be immaterial for a reasonable consumer. And Defendants appear to forget that their own briefing *stresses* the materiality of terms such as data privacy and data security for telehealth patients. *See* Mot. at 6 (explaining that "the importance of — and stigma associated with — mental health treatment" made Robertson and Cerebral "[seek] to provide care that was both '**secure and discreet**' … [because] **consumers needed to know that the treatment they sought would be private** …"). Similarly, as the Complaint alleges, Defendants highlighted these aspects of their services on their websites and enrollment flows, underscoring that they understood their importance. *See, e.g.*, SAC ¶¶ 39, 58-65, 69 (Cerebral's privacy and data security assurances); ¶¶ 127-129 (Cerebral's cancellation assurances); ¶ 233 (Zealthy and Bruno Health's cancellation assurances); ¶ 228 (Zealthy and Bruno Health's insurance coverage assurances). Far from deeming these terms immaterial, many consumers complained specifically about them. *See, e.g.*, *id.* ¶¶ 162-167, 241 (complaints regarding cancellation), ¶¶ 225, 227, 229 (complaints regarding costs), ¶ 228 (complaints regarding insurance).[24]

---

[24] The terms at issue here are also frequently *presumptively* material in the FTC Act context because, *e.g.,* express or implied claims used to induce a purchase are presumptively material (*SlimAmerica*, 77 F. Supp. 2d at 1272), and terms involving health and safety are, too (*Roca Labs*, 345 F. Supp. 3d at 1386). Defendants allegedly touted privacy protections (SAC ¶¶ 39, 59-64, 69) and flexible cancellation policies (*id.* ¶¶ 127-129, 233) to induce enrollment, and made representations relating to health data (*id.* ¶¶ 39-40, 60-64) and insurance (*id.* ¶¶ 223, 228).

Third, far from breaking new ground (Mot. at 38), the terms that Defendants object to have been deemed material before. This includes data privacy and data security practices[25] (including specifically in the telehealth context) and cancellation or refund terms.[26] And, at a minimum, any fact-intensive disputes over materiality are inappropriate for a motion to dismiss. *See, e.g.*, *FTC v. Alcoholism Cure Corp.*, 2011 WL 13137951, at *53 (M.D. Fla. Sept. 16, 2011), *aff'd sub nom. FTC v. Krotzer*, 2013 WL 7860383 (11th Cir. May 3, 2013) (assessing deposition testimony in evaluating whether certain privacy practices were material).

## 2. Defendants Allegedly Failed to Provide "Simple Mechanisms" to Cancel Subscriptions.

Just as ROSCA protects consumers when they sign up for negative option subscriptions, it also protects their ability to easily exit those subscriptions by requiring "simple mechanisms for a consumer to stop recurring charges." 15 U.S.C. § 8403(3). Defendants have allegedly plausibly violated this simple cancellation requirement by implementing tricky and ineffective cancellation processes (SAC ¶¶ 40, 133-146, 154, 157-158, 164-165, 240-245) and aggressive retention efforts (¶¶ 140-141, 143), and by failing to promptly honor cancellation requests (¶¶ 144-146, 243-245). These well-pleaded allegations amount to violations of ROSCA.

Defendants have allegedly run afoul of ROSCA's simple cancellation requirement in numerous ways, including by: (1) depriving consumers of the ability to easily cancel online (SAC

---

[25] *See, e.g.*, *Roca Labs*, 345 F. Supp. 3d at 1390-91 (company's "where business assured consumers that health information would be kept private"); *FTC v. Alcoholism Cure Corp.*, 2011 WL 13137951, at *53 (M.D. Fla. Sept. 16, 2011), *aff'd sub nom. FTC v. Krotzer*, 2013 WL 7860383 (11th Cir. May 3, 2013) (similar); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 479 (D. Md. 2020) (collecting cases and holding company's representations regarding data security practices were material).

[26] *FTC v. Lucaslaw Ctr.*, 2010 WL 11506885, at *6 (C.D. Cal. June 3, 2010), *aff'd sub nom. FTC v. Lucas*, 483 F. App'x 378 (9th Cir. 2012) ("[A] representation that consumers would receive a full refund is certainly material.").

¶¶ 133-137,[27] 242-243); (2) restricting the availability of cancellation to certain forms of communication and times to make cancelling more onerous (*id.* ¶¶ 134-137, 242-43); (3) requiring consumers to complete multiple, unnecessary steps when trying to request cancellation, including correspondence with customer support representatives, completion of surveys, and navigation of retention offers (*id.* ¶¶ 134, 140-144, 243); (4) subjecting consumers to protracted, sometimes serial, exchanges with sales representatives instead of honoring straightforward cancellation requests (*id.* ¶¶ 133-134, 169-173, 243); and (5) continuing to bill many consumers after their submission of cancellation requests (*id.* ¶¶ 145-146, 166, 171, 243-244).

Defendants argue that the allegations as to Zealthy's cancellation procedures are limited, Mot. at 48, but succinctness is not a pleading defect. Those allegations clearly describe the obstructive tactics Zealthy has engaged in by forcing consumers to navigate protracted cancellation protocols, continuing to charge consumers despite their cancellation requests, and instructing employees to withhold easy cancellation. *Id.* ¶¶ 240-247. These allegations meet Rule 8(a)(2)'s liberal pleading standard.

Courts have found that similar cancellation processes violated ROSCA because they were not "simple." *See, e.g.*, *United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1169 (C.D. Cal. 2021) (granting summary judgment against company that did not provide easy option to cancel online, required interaction with customer service representatives, and subjected customers to retention pitches). Notably, the defendant in *MyLife.com* contended — as Defendants do here (Mot. at 48) — that it offered the option to submit an email request to cancel a subscription, but the court granted summary judgment against it. *MyLife.com*, 567 F. Supp. 3d at 1159. Even

---

[27] The Complaint alleges that Robertson remarked that he was concerned that giving Cerebral consumers a cancellation button made it "really easy" to cancel. When he learned that that button increased patients' cancellation rates, he removed it. SAC ¶¶ 135, 154-156.

companies that, unlike Defendants, have generally offered access to an online cancellation button have been found to have plausibly violated ROSCA. *See Amazon.com*, 735 F. Supp. 3d at 1323 (denying motion to dismiss where complaint alleged consumers had to click through multiple screens to locate cancel button).

The Complaint also plausibly alleges violations of ROSCA to the extent that, even when consumers have submitted cancellation requests, they were not honored. *See, e.g.*, SAC ¶¶ 145-146, 243-244; *MyLife.com*, 567 F. Supp. 3d at 1159-60 (holding cancellation was not simple where email requests to cancel were often disregarded and calls to customer service representatives were ineffectual); *FTC v. Cardiff*, 2021 WL 3616071, at *1 (C.D. Cal. June 29, 2021) (granting summary judgment where "even when [consumers] took [required] step, they were not always able to effectuate a cancellation.").

Defendants again defend their cancellation processes by cherry-picking an informal guideline from an FTC policy statement, arguing that they do not violate ROSCA because their cancellation processes are "at least as easy to use as the method [for signing up]." Mot. at 47-48. But the question of whether a process is "easy" for a reasonable consumer (much less whether it is "as easy" as another process) is "an inherently fact-intensive issue" that is inappropriate for a motion to dismiss. *New York by James v. Sirius XM Radio Inc.*, 2024 WL 2348206, at *5 (S.D.N.Y. May 23, 2024). In any case, the Complaint alleges that subscribers could sign up with the click of a button online without needing to communicate with customer service. *See* SAC ¶ 156 (consumers enrolled in Cerebral "with a few simple clicks of buttons."); *id.* ¶¶ 202, 242 (Zealthy has used "rapid, online enrollment process" and "online enrollment process"). In contrast, consumers were forced to engage in time-consuming, sometimes iterative, exchanges with customer service representatives in order to cancel. *Id.* ¶¶ 133-134,

140-141 (Cerebral has required lengthy, multi-step process to cancel); *id.* ¶¶ 169-173 (Cerebral consumer complaints regarding cancellation challenges); *id.* ¶¶ 241-244 (Zealthy consumer complaints regarding same). Accordingly, even if the Court treats this parity standard as having the force of law, the United States' well-pleaded allegations more than suffice.

### B. The Complaint Adequately Pleads That Defendants Had Knowledge of ROSCA Violations.

ROSCA authorizes civil penalties against a person or corporation "with actual knowledge or knowledge fairly implied on the basis of objective circumstances" of rule violations. 15 U.S.C. § 45(m)(1)(A). Implied knowledge is assessed under the objective standard of what "a reasonable person under the circumstances would have known." *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 139 (4th Cir. 1996); *United States v. Prochnow*, 2007 WL 3082139, at *3 (11th Cir. 2007) (executive who controlled operations and "did not personally know" of FTC Rule violations had implied knowledge because he "should have known" of misconduct). Robertson and Echeverry overlook the plausible allegations of their knowledge under either theory.

The Complaint plausibly alleges their actual knowledge of ROSCA violations based on their leadership roles, their companies' pervasive use of hidden or misleading disclosures and challenging cancellation procedures, and the many relevant consumer complaints these practices engendered. *See, e.g.,* SAC ¶¶ 6-7, 15-16, 18-19, 65-68, 71-76, 140-146, 224-239, 240-247. Moreover, Defendants do not address the FTC Act's "knowledge fairly implied," or constructive knowledge, hook at all (Mot. at 49-51), even though the Complaint makes clear why executives in Robertson and Echeverry's roles, at a minimum, *should have known* of ROSCA violations based on their companies' hide-the-ball enrollment practices, obstructive retention practices, numerous consumer complaints, and, with respect to Zealthy, Mr. Robertson's history of eliciting regulatory investigation of similar offenses.

46

First, knowledge need only be pleaded generally. *See United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1308 (11th Cir. 2002); *see also* p. 5, *supra*. Here, the pleading adequately alleges Robertson had the requisite knowledge of ROSCA violations while leading Cerebral. He was Cerebral's onetime head of Legal (SAC ¶¶ 43, 51), was steeped in legal and regulatory issues (*id.* ¶¶ 45, 50-51, 56), worked closely with its top compliance officials, and received "guidance regarding applicable FTC rules and consumer protection laws." *See id.* ¶¶ 7, 43, 51, 55; *Partners in Health*, 189 F. Supp. 3d at 1367 (degree of participation in business affairs is probative of knowledge). Robertson also allegedly *directly participated in* and steered Cerebral's relevant practices, such as its violative data privacy and cancellation practices. *See* pp. 16-21, *supra*; *Transnet Wireless*, 506 F. Supp. 2d at 1271 (direct participation underscores knowledge). Defendants reiterate the fallacy of a detached CEO at layers of remove from, and uninvolved in, the alleged misconduct. Mot. at 49-50. But this portrait has nothing in keeping with the allegations, which directly and personally implicate Robertson in spearheading and tightly controlling the alleged ROSCA violations. *See, e.g.,* SAC ¶¶ 79-83, 87, 135 (detailing Robertson's personal direction of allegedly violative disclosures, practices, and cancellation mechanisms).

Moreover, Cerebral's inadequate disclosures of key terms and complicated cancellation process generated scores of consumer complaints (*see id.* ¶¶ 55, 162-163, 166-173), and Robertson was aware of these complaints, including by managing the company's messaging efforts in response (*id.* ¶¶ 55, 162-163, 167, 181, 188); *Amazon.com*, 735 F. Supp. 3d at 1334 (holding knowledge of customer difficulties plausibly suggested ROSCA violation knowledge); *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1141 (9th Cir. 2010) (same). These facts plausibly suggest his knowledge of ROSCA violations. Defendants again ignore this wealth of allegations, instead responding to a straw man version of the pleading by arguing that its knowledge allegations

are limited to Robertson's performance of "compliance functions" and review of a news article.[28] Mot. at 49.

Second, the pleading also sufficiently alleges Robertson and Echeverry's knowledge of ROSCA violations while leading Zealthy and Bruno Health. Indeed, Robertson's knowledge while at Zealthy includes what he learned as Cerebral's CEO and the unavoidable awareness of ROSCA he gained as the subject of an active FTC investigation into ROSCA violations under his supervision at Cerebral. *See* SAC ¶¶ 248, 309. While that investigation was ongoing, Robertson and Echeverry worked together closely to direct the online subscription and marketing practices of Zealthy and Bruno Health (*id.* ¶¶ 206-207, 220, 222), and their companies, in turn, generated a steady stream of consumer complaints about those practices — all suggesting additional ROSCA violations. *Id.* ¶¶ 225-228 (consumer complaints regarding undisclosed costs), ¶¶ 241-244 (consumer complaints regarding difficulty of cancelling). Taken together, these allegations not only plausibly allege knowledge — they do so decisively.

Their plausibly alleged knowledge is reinforced by Robertson and Echeverry's professional roles. *Amazon.com*, 735 F. Supp. 3d at 1327-1328 (degree of participation in business affairs is probative of knowledge). Both played key leadership roles at Zealthy and Bruno Health, including compliance responsibilities. *See* SAC ¶¶ 10, 19 (Robertson founded Zealthy, was Zealthy's CEO, and was Bruno Health's Chief Financial Officer); ¶¶ 18, 204-205, 253 (Echeverry's leadership roles at Bruno Health and Zealthy, including as Bruno Health's Compliance Officer). That their companies were premised on offering negative option subscription services further suggests these

---

[28] Defendants misconstrue (Mot. at 49) the import of an allegation about Robertson's discussion of a news article. The allegation is not offered for the truth of the commentator's opinion but for Robertson's awareness of ROSCA. *See* SAC ¶ 249. In any case, the article is not central to any claim and therefore is not incorporated into the Complaint.

sophisticated actors were well aware of the cornerstone federal statute applicable to their business model.  *Amazon.com*, 735 F. Supp. 3d at 1334 ("[A] reasonable executive overseeing a large subscription service that offers auto-renewing subscriptions would know that there are … federal regulatory requirements for auto-renewal offers [including ROSCA's requirements].").  These allegations more than surpass the modest threshold courts have applied in determining whether knowledge is adequately pled.[29]

The respective knowledge of Robertson and Echeverry continues to be properly imputed to Zealthy and Bruno Health.[30]  In tackling imputation, Defendants again misunderstand the connections between the parties. Mot. at 50. Zealthy (led by Robertson) purported to be the agent of Bruno Health, rather than vice versa.  *See* SAC ¶¶ 212-16. Accordingly, Zealthy and Robertson's knowledge of ROSCA violations are fairly imputed to the principals, *i.e.*, to Bruno Health (and its head, Echeverry). Nor is there anything unusual in contending that someone who goes into business as a co-executive with a notorious and serial alleged violator of a law—one who, for good measure, is subject to an active federal investigation and then lawsuit concerning those offenses—plausibly has implied knowledge of the genre of misconduct at issue. Mot. at 50-51.

Defendants' arguments remain futile in two larger respects that Defendants do not address.  First, the actual or implied knowledge standard only determines if monetary penalties are supported, not if ROSCA violations are adequately alleged at the pleading stage.  *See* 15 U.S.C.

---

[29] *See, e.g.*, *Amazon.com*, 735 F. Supp. 3d at 1328-1329 (executives' participation in business affairs plausibly alleged knowledge); *Hornbeam Special Situations*, 308 F. Supp. 3d at 1288-89 (executives' control, day-to-day involvement, and operational knowledge supported liability).

[30] *Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998) (under Florida law, knowledge of corporate officers and directors is imputed to corporation); *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017) (under Florida law, knowledge of agent or employee is generally imputed to principal or employer).

§ 8404 (violation of ROSCA triggers all available remedies under FTC Act); *Cardiff*, 2021 WL 3616071, at *2 (civil enforcement actions concerning ROSCA violations may seek broad equitable relief).[31]   Accordingly, it is both premature (because prior to fact discovery), and substantively irrelevant, for Defendants to argue at this stage over which remedies should apply.

Second, and relatedly, the allegations about Defendants' knowledge raise fact questions that cannot be resolved on a motion to dismiss. *See Bonner v. Chambers Cnty.*, 2006 WL 1731135, at *3 (M.D. Ala. Jun. 19, 2006). For example, Defendants argue that there is no "allegation that Mr. Robertson and Dr. Echeverry ever discussed ROSCA," (Mot. at 51) but of course the content of any such discussions must be probed through discovery. Whether actual or implied knowledge are ultimately shown is a question for a later day — for now, it suffices that both are plausibly alleged.

## IV.  INJUNCTIVE RELIEF IS WARRANTED AGAINST ALL DEFENDANTS FOR THEIR PATTERN OF UNFAIR AND DECEPTIVE ACTS AND PRACTICES

Defendants argue that injunctive relief is unwarranted for two reasons: (1) the Complaint fails to allege that Robertson and Martelli are currently engaged in the misconduct alleged in Counts I–V because they no longer work at Cerebral (Mot. 18-19, 29, 31); and (2) the Zealthy-related allegations cannot support the claims arising from misconduct at Cerebral (*Id*. 19-20, 29). Neither argument withstands scrutiny. The Complaint alleges that Robertson and his new companies continue to engage in pervasive violations of the FTC Act and FTC Rules including ROSCA *through the present*. What is more, the Complaint makes clear that, based on Defendants' significant, long-running, and relatively recent misconduct, there is a reasonable risk that they will break the law again if they are not enjoined from doing so. The need for injunctive relief is

---

[31] *See Doe v. Royal Caribbean Cruises, Ltd.*, 2012 WL 920675, at *2 (S.D. Fla. Mar. 19, 2012) ("[T]he test of a complaint pursuant to a motion to dismiss lies in the claim, not in the demand."); *see also A.W. by & Through J.W. v. Coweta Cnty. Sch. Dist.*, 110 F.4th 1309, 1315 (11th Cir. 2024) ("[T]he selection of an improper remedy ... will not be fatal to a party's pleading if … the pleader may be entitled to relief of some other type.").

especially acute here given the Defendants' continued, or potential, new activity in the telehealth subscription field in which they have allegedly broken the law.

### A.  Relevant Legal Standard for Injunctive Relief

The "FTC Act authorizes [suit] … when [the government] has a reason to believe a defendant is violating or about to violate" the law. *FTC v. SPM Thermo-shield, Inc.*, 2020 WL 6545975, at *1 (M.D. Fla. Nov. 6, 2020). Whether misconduct has ceased as of the time of a lawsuit, or when a court is considering entering an injunction, is not dispositive. Rather, an injunction is appropriate if "the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *FTC v. USA Fin., LLC*, 415 F. App'x 970, 975 (11th Cir. 2011); s*ee also FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1209 (N.D. Ga. 2008), *aff'd* 356 F. App'x 358 (11th Cir. 2009) ("[T]he fact that illegal conduct has ceased does not foreclose injunctive relief ... [so long as] the FTC is able to demonstrate that there is some cognizable danger of recurrent violation."); *FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218, 1223 (N.D. Ga. 2019) (denying motion to dismiss where past pattern of conduct supported "a reasonable inference that the behavior will reoccur in the future").

Courts evaluating the likelihood of future violations under this standard assess factors including: "[T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *S.E.C. v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982).

Accordingly, courts routinely enter permanent injunctions under the FTC Act even where misconduct has ceased based on considerations such as the egregiousness of past violations or

severity of harm to consumers,[32] the "protracted nature" of violations,[33] a defendant's failure to

take responsibility or acknowledge wrongdoing,[34] a defendant's significant role in participating in

or controlling wrongdoing,[35] or a defendant's actual or potential continued activity in the same

industry.[36] As discussed below, these factors straightforwardly apply to the Defendants.

These factors can support injunctive relief even *years* after the alleged misconduct has

ceased, or after an individual has separated from a company in question. *See, e.g., FTC v. USA

Fin., LLC,* 2010 WL 11508193, at *2 (M.D. Fla. Apr. 5, 2010) (entering injunction three years

after misconduct had ceased and involving misconduct dating back six years); *FTC v. Shopper

Sys., LLC,* 2013 WL 12382957, at *4 (S.D. Fla. July 3, 2013) (discussing appropriate entry of an

injunction even where an individual defendant had sold the implicated business).

And where a defendant "is easily able to" resume misconduct, courts generally find that

temporary cessation is "not adequate to protect against future violations." *FTC v. Fleetcor Techs.,

Inc.,* 620 F. Supp. 3d 1313, 1346 (N.D. Ga. 2022). Moreover, injunctive relief is particularly

---

[32] *FTC v. Cap. Choice Consumer Credit, Inc.,* 2004 WL 5149998, at *43 (S.D. Fla. Feb. 20, 2004), *aff'd,* 157 F. App'x 248 (11th Cir. 2005) (finding the "egregiousness nature of past violations of the FTC Act shows a likelihood of future violations and a need for permanent injunctive relief…").

[33] *FTC v. Shopper Sys., LLC,* 2013 WL 12382957, at *4 (S.D. Fla. July 3, 2013) (holding degree of past misconduct, "protracted nature" of misconduct, and severity of harm to consumers supported injunctive relief).

[34] *FTC v. Partners In Health Care Ass'n, Inc.,* 189 F. Supp. 3d 1356, 1370 (S.D. Fla. 2016) (holding that defendant's "continued denial that he did anything wrong," his ignoring of consumer complaints, and "blam[ing]" of government supported need for injunction).

[35] *FTC v. SlimAmerica, Inc.,* 77 F. Supp. 2d 1263, 1275 (S.D. Fla. 1999) (holding injunction was warranted against individuals who "master minded … or had considerable control over" the FTC Act violations).

[36] *Partners In Health Care,* 189 F. Supp. 3d at 1370 (finding defendant's operation of multiple companies in industry demonstrated opportunities for future violations).

necessary where a defendant — like Robertson, after he was fired and founded Zealthy, or like Echeverry, who recently founded a new telehealth venture — creates a new corporate entity through which he can continue to act in the same field. *See, e.g., USA Fin.*, 415 F. App'x at 975 ("[T]he transformation of Capital Financial into American Financial, [then] ... into USA Financial indicated a reasonable likelihood of future violations."); *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1209-10 ("[I]t is readily apparent that [defendants'] current business endeavors could serve as a platform for continuing violations [despite no longer selling the product at issue].").

**B.  The Complaint Alleges Significant Ongoing Violations, Supporting Injunctive Relief.**

Defendants wrongly portray the claims involving Cerebral as involving misconduct that ceased long ago. This contradicts the Complaint, which alleges that the exact forms of misconduct Robertson first directed at Cerebral, far from being "stale," (Mot. at 3) have persisted into the present, albeit through new corporate entities. Thus, contrary to Defendants' revisionary account (*id.* at 19-20, 29), the Complaint alleges that this misconduct is ongoing.

| Cerebral's Misconduct in Operating a Telemedicine Platform | Zealthy and Bruno Health's Misconduct in Operating a Telemedicine Platform |
|---|---|
| Section 5: Deceptive Data Privacy Practices (Count I) | Section 5: Unfair and Deceptive Practices (Including Data Privacy Practices—¶¶ 349-350) (Count VII) |
| Section 5: Unfair and Deceptive Data Security Practices (Counts II & III) | Section 5: Unfair and Deceptive Practices (Including Data Security Practices — ¶¶ 349-350) (Count VII) |
| Section 5: Deceptive Cancellation Practices (Count IV) | Section 5: Unfair and Deceptive Practices (Including Cancellation Practices — ¶¶ 349-350) (Count VII) |
| Section 5: Unfair and Deceptive Consumer Review Practices (Count V) | Section 5: Unfair and Deceptive Consumer Review Practices (Count VIII) |
| ROSCA: Failure to Disclose Data Privacy and Cancellation Terms (Count VI) | ROSCA: Failure to Disclose Data Privacy and Cancellation Terms (Count X) |
| ROSCA: Failure to Provide a Simple Cancellation Mechanism (Count VI) | ROSCA: Failure to Provide a Simple Cancellation Mechanism (Count X) |

The Complaint alleges that Robertson actively leads Zealthy to violate the same laws that Cerebral did and in the same way that Cerebral did. SAC ¶¶ 222-223, 230-232, 234-236, 240-247, 257-261. These are not isolated or historic allegations; they reflect ongoing harm caused by the same marketing tactics, operational strategies, deceptive cancellation practices, and intentionally dishonest review misconduct that Robertson and Martelli used at Cerebral. Because the Complaint alleges ongoing violations up to the filing of this action by Robertson, by Robertson's new telehealth ventures, and by Echeverry, it is unavailing for these defendants to focus on when earlier misconduct at Cerebral may have occurred. The allegations of their ongoing misconduct as of the filing of this action clearly satisfy the Section 13(b) standard for injunctive relief.

### C.  The Basis for Injunctive Relief Does Not Depend On Whether Individual Defendants Are Still Employed At, Or Operating, the Same Company.

Defendants Robertson and Martelli also specifically emphasize that they are no longer employed at Cerebral. Mot. 18-19, 29, 31. This ignores ample case law establishing that past conduct, coupled with the opportunity for future conduct, supports forward-looking relief under the FTC Act. *See, e.g.*, *Lanier Law*, 194 F. Supp. 3d at 1289 (considering defendants' "continuous and persistent involvement" in violative practices, their "history of transforming from one business to another," and their continued attempts to "deny the wrongful nature of their conduct."). Moreover, courts routinely recognize that a corporate executive can be subject to injunctive relief even after moving to another company. *USA Fin.*, 415 F. App'x at 975. Section 5 does not require the misconduct to persist at the same company or under precisely the same circumstances over time. Rather, it prohibits unfair or deceptive practices that are likely to recur, even across companies. *See, e.g.*, *Partners in Health*, 189 F. Supp. 3d at 1370 (injunctive relief warranted where defendant might engage in future wrongdoing through new company); *FTC v. Hornbeam Special Situations, LLC*, 308 F. Supp. 3d 1280, 1288-89 (N.D. Ga. 2018) (same).

Defendants' unsupported argument would countenance an absurd result: a lawbreaker who shifts organization — or who is fired for wrongdoing — could thereby evade an injunction. Of course, courts routinely enter forward-looking injunctions where an individual defendant has severed ties with a previous company at which misconduct occurred. *See, e.g., FTC v. Shopper Sys., LLC*, 2013 WL 12382957, at *4. This is part and parcel of the forward-looking dimension of Section 5 injunctions. *FTC v. USA Fin., LLC* at 975 (FTC Act injunctive relief may be "necessary to prevent future violations"). And because Robertson is alleged to be engaging in ongoing, similar violations, the fact that he is no longer at Cerebral is beside the point.

### D. Additionally, the Complaint Demonstrates the Risk of Recurring Violations by All Defendants.

Moreover, even if no Defendants were alleged to be engaged in ongoing violations as of the filing of this lawsuit — and all but Martelli allegedly *are* — applying the relevant factors that courts use to assess the likelihood of recurrence independently demonstrates the need for injunctive relief as to all of them.

With respect to Martelli, the egregiousness and intentionality of Martelli's alleged misconduct, combined with his ability to resume activities in the same field, clearly support the need for injunctive relief. SAC ¶¶ 314 (Martelli has continued to work in the "digital health," startup field). Martelli allegedly knowingly authored and disseminated made-up online reviews purporting to be by authentic telehealth patients. *Id.* ¶¶ 177-200. This egregious misconduct designed to mislead consumers shows the need for injunctive relief as to Martelli. Nor did this egregious misconduct occur in the distant past.

With respect to Echeverry, his continued involvement in the telehealth field, coupled with the allegations of his recent FTC Act violations, support the need for injunctive relief. Echeverry is alleged to have participated in recent FTC Act and ROSCA violations while occupying a senior

role, including compliance responsibilities, at Robertson's new ventures. *Id.* ¶¶ 15-16, 18, 201, 204, 206-207, 222. And Echeverry has founded a new telehealth subscription venture since the filing of this action. *Id.* ¶ 316. These factors show a reasonable likelihood of future violations by Echeverry if he is not restrained.

As for Robertson and the newer telehealth ventures that he has closely directed, the basis for injunctive relief is overwhelming. As the Complaint details, Robertson's alleged violations of the FTC Act and multiple FTC Rules have been egregious, extensive, long-running, and have caused substantial consumer harm. His continued misconduct has also evinced a reckless attitude of impunity that makes the need for injunctive relief obvious.

Indeed, Robertson's illegal conduct at Cerebral, even on its own, would be "highly suggestive of the likelihood of future violations." *CFTC v. Matrix Trading Grp.*, 2002 WL 31936799, at *12 (S.D. Fla. Oct. 3, 2002). For example, his online review manipulation was "systemic" (SAC ¶¶ 178, 187) and so institutionalized that he established systems to track its results (*id.* ¶¶ 186). Robertson used his position as CEO to make clear to his employees that he was "fine" with manipulating consumers through "fake" reviews. *Id.* ¶ 184. Similarly, Robertson's actions in relation to data-security breaches, data privacy violations, and cancellation manipulation efforts were intentional, chronic, and severe.[37] Such egregious, extensive misconduct justifies the need for injunctive relief, *see, e.g., Cap. Choice*, 2004 WL 5149998, at *43 (egregious past violations support need for injunction), as does Robertson's role as an important "master mind" or

---

[37] *See, e.g.*, SAC ¶ 40 ("Robertson deliberately made the cancellation process burdensome and challenging, while taking millions of dollars from vulnerable consumers … after they had asked [] to cancel [their subscriptions]."); ¶¶ 79, 91 (Robertson "helped direct the 2019 decision to deploy" tracking technologies using private patient information, which continued for "more than two-and-a-half years"); ¶ 118 ("Robertson overrode significant data security concerns raised by his top data security reports."); ¶¶ 160 ("[Robertson] repeatedly directed employees to introduce obstacles and challenges into Cerebral's cancellation process.").

controller of the alleged misconduct. *See SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1275 (finding individuals' key respective roles in misconduct justified injunction).

Robertson has also allegedly acted with extraordinary impunity while refusing to take responsibility for his wrongdoing. *Partners In Health*, 189 F. Supp. 3d 1356 at 1370 (individual defendant's "denial that he did anything wrong" and "blam[ing] everyone [else]… including "counsel for the FTC" showed need for injunction). Rather than using Zealthy as a vehicle to reform his practices, Robertson has used it to entrench them, continuing the same or similar conduct under a new name. *See* SAC ¶¶ 201, 223-305; *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1209 (considering whether defendants' "current occupation positions them to commit future violations"); *Shopper Sys., LLC*, 2013 WL 12382957 at *4 (finding defendants' "formation of new corporate entities to facilitate [FTC Act violations] demonstrates an unwillingness to comply with the law," supporting injunctive relief).

At Zealthy, Robertson has allegedly resumed direction of the same categories of misconduct he first orchestrated at Cerebral, including through directing similar unfair and deceptive practices and FTC Rule violations involving telehealth data privacy and security practices (SAC ¶¶ 223, 234-239, 261, 269-274), surreptitious use of user health data in online marketing (*id.* ¶¶ 234-239, 261, 269), inconspicuous or misleading disclosures for material terms of auto-renewing subscriptions (*id.* ¶¶ 257-261), obstructive cancellation tactics (*id.* ¶¶ 240-247), and review manipulation including, again, the dissemination of fake reviews (*id.* ¶¶ 279-305).

Indeed, Robertson's misconduct has not only persisted, it has in some ways only *expanded* since he was fired from Cerebral, since the FTC investigated him, and since the government filed this lawsuit. *See, e.g., id.* ¶ 268 (at Zealthy, Robertson has directed the use of company-owned accounts to process sham sign-up transactions in order to elude scrutiny from financial

organizations); *id.* ¶ 276 (at Zealthy, Robertson has directed use of a former employee's National Provider Identifier number, without his knowledge or consent, "to submit thousands of prior authorization requests for prescriptions").

Defendants' brief — in keeping with Robertson's refusal to take any responsibility, and in the face of the incriminating evidence of wrongdoing recited in the Complaint — portrays Mr. Robertson as a faultless hero and this action as a witch hunt, while discounting the importance of recent consumer complaints. Mot. 1-2, 30, 48. These self-absolving, fighting words merely serve to reinforce the need for an injunction as to Robertson and his ventures. *See Partners In Health*, 189 F. Supp. 3d at 1370 (denial of responsibility, refusal to acknowledge consumer complaints, and blaming of government counsel supported need for injunction)

### E.  The Substantial, Recent Consumer Complaints Allegedly Generated by Robertson's Ventures Further Support Injunctive Relief.

Robertson's argument that the Court should disregard consumer complaints about Zealthy (*see* Mot. at 30-31) also misunderstands the legal standard and mischaracterizes the law. The Complaint does not rely on online complaints in isolation, but presents them alongside detailed factual allegations of misconduct by Zealthy under Robertson's direction, and by Robertson himself, including that Zealthy's cancellation system was "broken for long periods of time," that employees were instructed not to issue refunds, and that users' cancellation requests were routinely ignored. *See* SAC ¶¶ 243-246. The Complaint further alleges that some users had to cancel their credit cards to stop the charges, and that reviews flagging these problems were removed as "fake." *Id.* ¶ 246. These allegations are more than "threadbare," and far from being distinct from Cerebral's, they mirror the deceptive practices Robertson previously implemented and oversaw. *See id.* ¶¶ 136-137, 144. And as courts have held, consumer complaints — when offered in combination with other evidence — can support a plausible inference of wrongdoing. *In re*

*LexinFinTech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949 (D. Or. Nov. 24, 2021) (consumer complaints can suffice to state a claim when offered in concert with other sources). Moreover, these allegations are only one of many data points to support future relief. *See, e.g.*, *Lanier Law*, 194 F. Supp. 3d at 1288-89 (considering "past conduct," "recognition of the wrongful nature of his conduct" (or lack thereof), and "opportunities for future violations").

**F. The Out-of-Circuit *Shire ViroPharma* Decision Is Not Binding in the 11ᵗʰ Circuit, Does Not Match the Facts, and Does Not Negate the Need for Injunctive Relief.**

Defendants argue that the government cannot obtain injunctive relief under Section 13(b) because it has not alleged an ongoing or imminent violation, relying on the Third Circuit's outlier decision in *Shire ViroPharma*, 917 F.3d 147. The standard in *Shire ViroPharma*, however, has been rejected or declined by courts in this Circuit. *See SPM Thermo-Shield*, 2020 WL 6545975, at *1 (declining to follow *Shire ViroPharma* and denying motion to dismiss based on claim that conduct had ceased); *Hornbeam Special Situations*, 391 F. Supp. 3d at 1223 (same). And as the case law cited above shows (pp. 51-53, *supra*), courts in this Circuit focus on factors bearing on the risk of recurrent misconduct — *i.e.*, they perform a forward-looking analysis — and not merely on when certain earlier, alleged misconduct took place.

In any event, *Shire ViroPharma*, which involved discrete misconduct that had completely ceased nearly *five years* prior to that lawsuit (*Shire ViroPharma*, 917 F.3d at 149) and the conditions for which, the court found, had also been categorically removed, *id.* at 160 (defendant had divested itself of the drug at issue years before the lawsuit), is inapplicable here. The Complaint, by contrast, alleges a multi-year pattern of misconduct led by Robertson at Cerebral that falls *within* the years leading up to the government's lawsuit, followed still more recently by a continuation of similar misconduct by Robertson and his associates through the launch of Zealthy, a company replicating Cerebral's business model and continuing the same alleged

misconduct in the same field. *See* SAC ¶¶ 245-258. This continued, up-to-date activity, paired with Robertson's failure to acknowledge wrongdoing, supports the inference of likely recurrence. There is no overlap between the unabated wrongdoing Robertson has continued to direct and the five-years-or-older, obsolete misconduct that was at issue in *Shire ViroPharma*.

## CONCLUSION

For the foregoing reasons, Plaintiff the United States of America respectfully requests that the Court deny Defendants' Joint Motion to Dismiss the Second Amended Complaint.

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

SARMAD KHOJASTEH
Senior Counsel
Civil Division

LISA K. HSIAO
Acting Director
ZACHARY A. DIETERT
Assistant Director

By: */s/ Francisco L. Unger*
FRANCISCO L. UNGER
JOSHUA A. FOWKES
SHANA C. PRIORE
Trial Attorneys
Telephone: (202) 598-3855 (Unger)
francisco.l.unger@usdoj.gov
joshua.a.fowkes@usdoj.gov
shana.c.priore@usdoj.gov
U.S. Department of Justice
Civil Division
Consumer Protection Branch

60

450 5th Street, N.W. Suite 6400-South
Washington, D.C. 20530

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 1, 2025, a true and correct copy of the foregoing document was electronically filed and served on all counsel of record via the Court's CM/ECF system.

*/s/ Francisco L. Unger*
Francisco L. Unger
Trial Attorney
