**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 24-cv-21376-RAR**

UNITED STATES OF AMERICA,

      **Plaintiff,**

      **v.**

ZEALTHY, INC., a corporation, and
KYLE ROBERTSON, individually,

      **Defendants.**

<span style="color:red">**Redacted for Public Filing**</span>

**JURY TRIAL DEMANDED**

**THE UNITED STATES' THIRD AMENDED COMPLAINT FOR PERMANENT INJUNCTION, MONETARY RELIEF, CIVIL PENALTIES, AND OTHER RELIEF**

Plaintiff, the United States of America, upon referral from the Federal Trade Commission, for its Third Amended Complaint alleges:

1.      At two consecutive telehealth companies that he founded and has led during the past six years—Cerebral, Inc., and then Zealthy, Inc.—defendant Kyle Robertson has engaged in wide-ranging lawbreaking that has harmed tens of thousands of telehealth patients.

2.      Robertson has falsely touted low costs, misrepresented the nature of telemedicine services, and made hollow assurances that consumers! will "Pay $0 today" and can "Cancel anytime"—all to bait consumers into hard-to-cancel subscriptions while often immediately initiating unauthorized charges to their cards.

3.      At both Cerebral and Zealthy, Robertson has charged tens of thousands of consumers without their consent while deliberately stymying their subscription cancellation attempts in violation of the Restore Online Shoppers' Confidence Act (ROSCA).

4.      Robertson has also directed the misuse of patients' private health information without their knowledge—including data on their medical conditions, symptoms, and treatments—to drive millions of dollars' worth of social media marketing campaigns.

5.      To drown out negative online reviews that have warned prospective patients of Cerebral and Zealthy's unauthorized charges and misconduct, he has directed his businesses to post thousands of glowing fake online reviews under aliases, even posting fake reviews himself.

6.      Robertson's own employees have recently remarked that there are "so many illegal things Kyle makes ppl do it's wild," commented that "he needs to save himself from jail and alot [sic] of money for the people he rips off," and expressed shock that he continues to direct his employees to break the same laws this pending lawsuit concerns.

7.      Indeed, Robertson's lawbreaking is only becoming more brazen, and dangerous. He is directing the systemic ordering of prescriptions by non-clinicians with no prescribing authority, including call center workers in the Philippines. And he has directed the issuance of massive numbers of prescriptions under medical providers' names and provider numbers, without those providers' knowledge.

8.      Robertson was personally responsible for one of the largest telehealth data privacy violations in American history when he led Cerebral; he is responsible, across two companies, for billing tens of thousands of consumers against their will; and he is now responsible, at Zealthy, for bilking consumers and jeopardizing their safety.

9.      To protect telehealth consumers, the United States seeks injunctive relief, civil penalties, equitable monetary relief, as well as other relief.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

11.      Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (b)(3), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

## THE PARTIES

12.      Plaintiff is the United States of America.

13.      Defendant Kyle Robertson ("Robertson") is the former CEO and founder of Cerebral, Inc. Since its inception, Cerebral sold automatically recurring online telemedicine subscriptions. Robertson led Cerebral from 2019 through May 2022, when he was fired in the wake of allegations that he misled Cerebral's Board of Directors regarding the company's practices involving telemedical prescribing of controlled substances and in the face of a federal investigation into Cerebral's controlled substances prescribing practices. Robertson then founded Zealthy in 2022, of which he remains the CEO. At the time this action was originally filed, Robertson resided in this District.

14.      Robertson, in connection with the matters alleged in this Third Amended Complaint, transacts or has transacted business in this District and throughout the United States.

15.      Defendant Zealthy, Inc. ("Zealthy") was founded by  Robertson, who has been, at relevant times, Zealthy's CEO and Registered Agent. Zealthy transacts or has transacted business in this District and throughout the United States.

16.      Zealthy is a telemedicine company that provides healthcare services to people who subscribe to it. Zealthy facilitates subscriber access to medical services and medications for birth control and sensitive conditions such as weight loss, erectile dysfunction, hair loss, and

3

depression. Zealthy has sold online subscriptions that, as it has explained to consumers, "[u]nless you have cancelled … will automatically renew."

17.     At both Cerebral and Zealthy, acting alone or in concert with others, Robertson has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Third Amended Complaint.

## COMMERCE

18.     At all times relevant to this Third Amended Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 44.

## THE FTC ACT

19.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

20.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5 of the FTC Act.

21.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

22.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of false advertisements in certain circumstances.

23.     The "dissemination or the causing to be disseminated of any false advertisement" within 15 U.S.C. § 52(a) is an unfair or deceptive act or practice under Section 5 of the FTC Act. 15 U.S.C. § 52(b).

**THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

24.     In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*  In passing ROSCA, Congress declared that "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

25.     ROSCA prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers.  Section 4 of ROSCA, 15 U.S.C. § 8403, prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Federal Trade Commission's ("FTC")'s Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller, among other things, clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, obtains a consumer's express informed consent before charging the consumer's credit card, and provides a simple mechanism for a consumer to stop recurring charges.  15 U.S.C. § 8403.

26.     The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the client's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(u).

27.     ROSCA is considered an FTC Rule under Section 18 of the FTC Act, 15 U.S.C. § 57a. Therefore, a Court can impose a civil penalty "of not more than [$51,744] for each violation" of ROSCA where a defendant acted "with actual knowledge or knowledge fairly

5

implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule." *Id.* § 45(m)(1)(A); 16 C.F.R. § 1.98(d) (adjusting the penalty cap for inflation). Moreover, under Section 19b(b) of the FTC Act, 15 U.S.C. § 57b(b), this Court may award such relief as it finds necessary to redress injury to consumers resulting from each ROSCA violation, including but not limited to monetary relief.

## THE FEDERAL TRADE COMMISSION'S RULE ON THE USE OF CONSUMER REVIEWS AND TESTIMONIALS

28.     The FTC's Rule on the Use of Consumer Reviews and Testimonial bars, among other things, reviews and testimonials that misrepresent that they were written by a person who does not exist, or who did not have actual experience with the business or its products or services. 16 C.F.R. § 465.2.  It also prohibits providing compensation or incentives in exchange for, or conditioned on, preparing certain kinds of reviews about a business or service. 16 C.F.R. § 465.4.

29.     Moreover, the Rule forbids certain kinds of consumer reviews and testimonials that are written by insiders, but fail to clearly and conspicuously disclose the insiders' material relationship to the business or service at issue. 16 C.F.R. § 465.5.

30.     The Rule also prohibits certain actions to suppress online reviews, including trying to stop a review from being written or to cause it to be deleted, or responding to a review with baseless threats or public accusations with the knowledge that the accusation was false or made with reckless disregard as to its truth or falsity. 16 C.F.R. § 465.7.

31.     The Rule is an FTC Rule under 15 U.S.C. § 57a.  A violation of that rule shall be treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a. Section 19b(b) of the FTC Act, 15 U.S.C. § 57b(b), authorizes this Court to award such relief as it finds necessary to redress injury to consumers resulting from each violation of violations of the

provisions of 16 C.F.R. Part 465 specified above, including but not limited to monetary relief.

Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes this Court to award

civil penalties for each knowing violation of the provisions of 16 C.F.R. Part 465 specified

above.

## UNLAWFUL BUSINESS ACTIVITIES AT CEREBRAL

### I.     Robertson's Direction of Unlawful Cancellation Practices at Cerebral

32.     While leading Cerebral from January 2019 through May 2022, Robertson directed

challenging cancellation processes that were intentionally designed to retain subscription

revenues by injecting what Robertson called "friction" into the subscription cancellation process.

This included by deliberately depriving consumers of a cancellation button, forcing consumers to

endure serial exchanges with customer support agents attempting to retain them, and directing

ineffective cancellation processes that frequently led to consumers being charged even after they

followed Cerebral's instructions to request cancellations via an email.

33.     During Robertson's tenure as CEO, Cerebral offered automatically recurring

online subscriptions for telemedicine services. Throughout this time period, Cerebral's online

subscription enrollment flow generally touted that consumers would be able to "Cancel

anytime"—as depicted in the following example screenshot of Cerebral's plan selection page.



34.     Instead, Cerebral's cancellation processes created a number of significant hurdles.

Robertson personally and closely directed these cancellation processes—including by, for

example, directing and approving Cerebral's cancellation policies, personally directing the design and analysis of Cerebral's cancellation flows, and supervising Cerebral's UX designers, engineers, and operations employees who implemented Cerebral's cancellation processes.

35.     To lock in subscription revenues, Roberston directed his employees to make cancellation challenging for consumers.

36.     For example, in April 2020, Cerebral briefly experimented with providing consumers with a cancellation button on their account pages that allowed them to cancel their subscriptions by clicking the button. But after reviewing data showing that this led to higher cancellations, Robertson directed his employees to nix the cancellation button. In doing so, Robertson complained to his reports that the button had made it "really easy to keep hitting 'Continue with cancellation'" and that, when the button was implemented, "churn [*i.e.*, loss of subscribers] has gotten much worse." Robertson instructed his reports that the "best" cancellation flow would be the one that "minimized churn."

37.     At Robertson's direction, Cerebral instead implemented an onerous and ineffective cancellation process that required consumers to email the company to request a cancellation. Instead of immediately honoring those requests, Cerebral frequently subjected the consumers to retention pitches from trained customer support agents instructed to try to save them from cancelling.

38.     Consumers trying to cancel were also forced to fill out detailed questionnaires and to answer questions from retention agents instead of having their subscriptions quickly cancelled. While jumping through these hoops, many consumers continued to be charged.

39. Cerebral also purported to need several days to "process" the emailed cancellation requests that it demanded consumers send. During, and even after, this supposed processing time, many Cerebral subscribers found themselves subjected to new monthly charges.

40. As a result of these hurdles, many consumers who attempted to cancel through this process found themselves bogged down in serial, repetitive exchanges with customer support agents that lasted for weeks while they continued to be subjected to charges.

41. Robertson directed and approved this more onerous cancellation process because he determined that additional friction increased Cerebral's revenues. In advocating for this "email process" in lieu of a cancellation button, Robertson relayed to his team that they should "DEFINITELY do the additional friction on cancellations," emphasizing that requiring customer support exchanges could reduce cancellation rates by up to 30%. Similarly, Robertson and his reports reviewed data showing that, once a cancellation-request process was implemented, "4.6% of cancellation requests [were] retained due to friction in the process…"

42. Following Cerebral's removal of a subscription cancellation button, one employee informed another: "[t]here is **no way… Kyle [Robertson] would sign off** … on rolling out a cancellation button **without data that it wasn't going to drive up # of cancellations**. . . ." (emphasis added).

43. After Robertson nixed use of a cancellation button in or around May of 2020, Cerebral did not reintroduce a cancellation button again until May 2022—two years later, and only after Robertson was pushed out of the company.

44. After Robertson's firing, a Cerebral internal discussion among executives, noted that the new cancellation button led to a "Business impact" of "5-20% Expected increase in

cancellation requests and voluntary churn" but this was "somewhat unavoidable given **we want to make this change for compliance purposes**." (Emphasis added.)

45. Under Robertson's tenure, and because of the challenging cancellation methods he insisted on, tens of thousands of Cerebral consumers were stymied from cancelling. In more than 56,000 instances during Robertson's tenure as CEO, Cerebral charged consumers even after they submitted the required cancellation request or completed a cancellation assessment. Through these post-cancellation charges, Cerebral collected over $8 million from consumers.

46. When Cerebral voluntarily settled this lawsuit after pushing out Robertson (and after finally reintroducing the cancellation button Robertson had vetoed), it agreed to a consumer redress payout that facilitated refunds to over 40,000 Cerebral subscribers whom the company had charged after they completed Cerebral's purported cancellation process under Robertson.

47. Cerebral and Robertson knew throughout Robertson's tenure that their intentional refusal to provide a simple mechanism for cancellation caused voluminous consumer complaints.

48. Robertson was repeatedly briefed on widespread consumer complaints in app stores, social media sites, and online review sites regarding frustration with unsuccessful attempts to cancel and subsequent unauthorized charges. He also expressed his concern about negative reviews posted online by users complaining about Cerebral's cancellation hurdles.

49. When Cerebral employees tested out the cancellation flow for themselves, they ran into the same hurdles and frustrations. For instance, a Cerebral employee who tried to follow the cancellation directions in March 2022 reported to colleagues that "the process is a long (and tedious) user experience" and "In short, its [sic] a burden." The employee highlighted the lack of a cancellation button, the arbitrary requirement to email a support address, and the need to then wait for a response and subsequent steps, with no clear endpoint to cancel.

50.     Similarly, a February 2022 internal Slack message copied to fifteen people, including members of Cerebral's executive team, noted that: "[T]here are multiple points of failure with the current cancelation [sic] flow, and **the difficulty of canceling consistently frustrates clients month over month**[.]" (Emphasis added.)

51.     Cerebral also frequently received impassioned messages from users describing their frustrations trying to cancel, including users who described feeling that they were being sent in circles, being scammed, or being strung along in never-ending exchanges with customer support agents who failed to cancel their subscriptions.

52.     Cerebral's post-cancellation attempt charges were so sweeping that, under Robertson's tenure, Cerebral drew scrutiny from financial organizations for the resulting high charge dispute rates it generated when thousands of consumers were compelled to dispute unauthorized recurring charges from Cerebral through their banks.

53.     As a result of these systemic charge issues, during 2020 and 2021, Cerebral was repeatedly placed in the Visa Dispute Monitoring Program, a program run by Visa to identify merchants with excessively high levels of customer disputes that can indicate the likelihood of fraud. Through May 2022, Cerebral's rate of chargebacks was consistently above 0.5% and often exceeded 1%, a rate that banks and financial organizations generally treat as requiring heightened scrutiny for possible fraud.

### II.     Robertson's Direction of Cerebral's Undisclosed, User Health Data-Driven Online Marketing Efforts at Cerebral

54.     Robertson's misconduct at Cerebral extended to personally directing the rampant disclosure and misuse of patients' most sensitive health data for social media marketing campaigns that aimed to drive Cerebral's growth through targeted online ads.

55.     Throughout Robertson's tenure as CEO, Cerebral promised users that it would keep their health data, and telehealth treatment, private. Cerebral's online subscription enrollment flow, which Robertson closely directed, touted Cerberal's strong privacy protections, while Cerebral's privacy policy assured users their data would never be used for marketing without their consent.

56.     For example, Cerebral's enrollment flows and online marketing touted that Cerebral would "Keep things private and confidential," that "It's private," and that Cerebral offered "Confidential treatment from the privacy of your own home." Cerebral informed users on its website that "your data … is not shared without your consent."

57.     Until May 2022, when Robertson was fired, Cerebral's privacy policy, provided via a hyperlink to users when they enrolled, stated that "Without your authorization, **we are expressly prohibited from using or disclosing your protected health information for marketing purposes**." (Emphasis added.)

58.     Under Robertson's tenure, enrolling subscribers did not receive any upfront disclosure on any enrollment page revealing that their intimate health data might be disclosed to third parties including social media platforms for use in marketing without their authorization.

59.     Instead of adhering to these privacy assurances, for more than two years, Robertson personally directed the use of so-called tracking technologies strategically installed across Cerebral's enrollment flow to mine, disclose, and perform online marketing with users' health data. This included their answers to Cerebral's detailed enrollment questionnaire probing their symptoms, diagnoses, and medical treatments (such as how regularly they felt suicidal, their clinical diagnoses, and what medications they have taken), their signing up for telehealth treatment for conditions such as anxiety, depression, bipolar disorder, or substance abuse

12

disorder, and their purchases of specific treatments and medications from Cerebral. At Robertson's direction, *all* this information was intentionally tracked and transmitted to social media platforms along with user individually identifying information for use in ad targeting.

60.     Robertson personally and intentionally directed the use of tracking technologies, including the Facebook Pixel (or "Meta Pixel") and the Google Tag to track users' health data and to send it, along with users' individually identifying information, to third-party platforms such as Facebook, Google, and TikTok. Roberston helped choose what specific user data to track, where to collect it on Cerebral's website (down to supervising his engineers' installation of the Pixel on the relevant pages), which platforms to send it to, which ad campaigns to use it for, and how much of Cerebral's budget to allocate for these marketing efforts.

61.     In directing these activities, Robertson controlled and regularly accessed and reviewed Cerebral's social media marketing accounts, including in the Google and Facebook platforms, which explicitly summarized the specific user website actions for which Cerebral was actively tracking data—including medical questionnaire answers, telehealth sign-ups, and treatment and medication purchases (indicated by descriptions such as, *e.g.*, "Dep. & Anx Purchase").

62.     Robertson regularly discussed the substance and business objectives of these tracking and user health data disclosure practices with his direct reports, including his marketing leads, and he personally liaised with Cerebral's account reps at major social media and search engine platforms to drive Cerebral's marketing agenda using the intricate user data it tracked.

63.     Cerebral's documents show that Robertson intimately understood that Cerebral was intentionally capturing, disclosing, and monetizing through targeted online ads, the health data of its users, and that this data was being sent *en masse* to social media platforms in tandem

with users' individually identifying information, including their names, phone numbers, addresses, and IP addresses.

64.     In a 2021 Slack message between Robertson and his marketing lead, the marketing lead reported that "we're currently at about 600k MTU (monthly tracked users)." Based on Cerebral's data regarding its total number of paying subscribers, this number appears to effectively represent *all* paying Cerebral telehealth subscribers at the time.

65.     Writing to investors regarding Cerebral's reliance on Facebook and ad targeting for its core marketing strategy, Robertson explained that "we wanted Facebook to have thousands of data points [of tracked users] to optimize from very early on…"

66.     Meanwhile, Robertson's direct reports on his marketing team discussed the fact that Cerebral was actively transmitting protected health information, or "PHI," via the Meta Pixel to third parties, including platforms.

67.     In one such Slack discussion, Robertson's marketing reports discussed the fact that Cerebral was passing information to Facebook that constituted "PHI" because it was linked to individual users. "[T]hat's definitely PHI," one Robertson report observed, adding that Cerebral's detailed user telehealth activity data was "considered PHI data … since we are a service where signing up for us implies that you think you have a mental health condition."

68.     Similarly, in an internal Cerebral marketing meeting, one of Robertson's marketing reports told his team: "As you guys know, when you go to a website, **you're being tracked. The same thing happens at Cerebral**, we do have a Pixel…" (Emphasis added.)

69.     Similarly, in 2023, a Cerebral marketing employee helping mitigate the data privacy violations that had taken place under Robertson noted that, under Cerebral's pre-existing marketing set-up, "**we are sending PHI every answer to in the [medical] assessment [sic] goes**

14

**to FB [Facebook]** it ends up as metadata on the click of each button." (Emphasis added.)  This was the data tracking and transmission paradigm that had been deliberately set up by Robertson and his marketing leads to boost the efficacy of ad targeting efforts.

70.     A Facebook internal message noted that Cerebral was a "top client" of Facebook's ad targeting services and "spent $19M [on Facebook ad targeting]" in 2021 "with plans to scale."

71.     These intentional user health data tracking and ad targeting efforts lasted for more than two years under Robertson's direction. After Robertson was fired, in March 2023, Cerebral formally reported a multi-year, mass data privacy breach to the United States Department of Health and Human Services ("HHS") involving its historical, previously undisclosed use of tracking technologies. Cerebral's HHS report acknowledged that its inappropriate use of tracking tools on its websites and apps constituted a breach of unsecured health information protected under HIPAA. Cerebral admitted that its breach impacted nearly *3.2 million consumers* between October 2019 and March 2023. Robertson personally directed this undisclosed, rampant misuse of sensitive user health data for unauthorized marketing.

### III.     Robertson's Direction of Fake Reviews, and Other Systemic Review Manipulation Efforts, at Cerebral

72.     When he was leading Cerebral, Robertson became concerned by the specter of many negative reviews posted to the internet by aggrieved Cerebral consumers. Many complained about cancellation obstacles and unauthorized charges, including on prominent review platforms such as www.Reviews.io and www.TrustPilot.com.

73.     Resorting to dishonest, deceptive, and unfair measures to protect Cerebral's brand from damage, Robertson directed the mass-production of fake online reviews, including reviews

that Cerebral employees authored and posted through aliases to those review platforms, among others.

74.    Robertson also directed other review manipulation tactics, including paying or incentivizing authors of authentic, negative online reviews to remove or revise those reviews after the fact, and dishonestly using flagging mechanisms provided on review platforms to try to get authentic, negative reviews removed for being supposedly inauthentic, even when Cerebral knew the reviews came from bona fide Cerebral patients.

A.    *Robertson Directed Cerebral's Efforts to Falsely Impersonate Its Patients and Post Fictious Positive Reviews*

75.    In or around July 2020, after growing alarmed by the abundance of negative reviews of Cerebral appearing online, Robertson directed colleagues to author and post many fictitious online reviews that praised Cerebral's services.

76.    Robertson personally directed Cerebral's efforts to impersonate Cerebral's patients, to fabricate online reviews praising Cerebral and its services, and to post those fictitious reviews online so that they would influence other people considering subscribing to Cerebral.

77.    Robertson repeatedly emphasized the importance and urgency of posting these fictitious positive reviews. For example, he urged a high-level employee assisting him with marketing efforts to impersonate real Cerebral patients and to author fictitious reviews praising Cerebral's services: "We need to generate the good ones. We need to move on this stat. Like let's get in a couple of positive ones today and then trickle them in."

78.    Robertson's direction to colleagues was clear: "*I'm fine w fake ones*. … Can you [ask another Cerebral employee] to add 4-5 reviews per week (positive) in trustpilot moving forward …?" (emphasis added).

79.     Robertson's colleague responded by preparing fictitious positive reviews of Cerebral and posting them, for example, on the review platform www.trustpilot.com, violating www.trustpilot.com's policy prohibiting fictitious reviews.

80.     At Robertson's direction, Cerebral also asked its employees to post fake reviews on online review websites, including Trustpilot, and to confirm that they had done so.

81.     Robertson also was informed of a plan in which Cerebral used websites like mailinator.com to create large numbers of temporary, disposable email accounts, including those affiliated with @binkmail.com, @chammy.info, @guerrillmail.org. He knew that Cerebral used those disposable accounts to post hundreds of fake reviews in a way that avoided detection by Trustpilot and other websites that display online reviews.

82.     With Robertson's approval, in February 2021, Cerebral also purchased the services of multiple companies, including AppEnhancer, mobiaso.com and paddle.com, to post fake positive reviews of Cerebral's app, including in Apple's iOS App Store and Android.

83.     Under Robertson's direction, Cerebral systematized its in-house fake review efforts. To increase the number and quality of the fictitious reviews Cerebral posted, Robertson approved and implemented company guidelines and protocols, such as protocols for Cerebral employees to create fake names and accounts they would use to post fake reviews, guidelines for Cerebral employees to follow when generating positive reviews and for supervisors to track the results of Cerebral's review manipulation efforts.

84.     Robertson's direction and approval of Cerebral's online review practices caused Cerebral staffers and others under its control to post hundreds of fake positive reviews on various websites, including Reviews.io, Trustpilot, Apple's App Store, and Google.

85.     Significant numbers of prospective Cerebral subscribers read and relied on these reviews when they made decisions to subscribe.  For instance, Trustpilot notified Cerebral that, as to just one of its fake reviews, "eighty-two people have already read your review."  Robertson also stressed that investors were greatly concerned about Cerebral's online review scores.

   *B. Robertson's Direction of Efforts to Manipulate and Suppress Authentic Negative Online Reviews of Cerebral*

86.     Robertson also directed Cerebral's systemic efforts to manipulate and suppress authentic negative online reviews, thereby deceiving consumers.

87.     For example, Robertson helped direct Cerebral's practices of offering refunds, discounts, and financial incentives to patients who had posted negative reviews online so they would either take down or revise reviews to be more favorable.

88.     After Cerebral's patients received these refunds or discounts, many who had posted unfavorable reviews revised their reviews to make them more positive. Cerebral's documents show that this was part of a specific barter system that Cerebral implemented at Robertson's direction: for example, providing refunds Cerebral had previously refused to provide just to get damaging reviews taken down.

89.     Such reviewers who made their reviews more positive after receiving a quid pro quo from Cerebral did not disclose, nor did Cerebral disclose, that they had received a refund, discount, or financial incentive in exchange.

90.     Robertson also led Cerebral's efforts to increase the number of positive reviews that appeared online in other ways that were deceptive and unfair. For example, Robertson and Cerebral worked to develop and implement an automated process to identify Cerebral's most satisfied patients and invited only them to review Cerebral on review platforms such as Trustpilot, Reviews.io, Apple's App Store, and the Google Play Store, including by sending links

and invitations to submit reviews only to patients who had left positive internal feedback or had subscribed to Cerebral for several months.

91.     In contrast, Robertson directed Cerebral not to send similar online review requests, links, and invitations to patients whom Cerebral expected to submit negative reviews, including because these patients had left more middling, or negative, internal feedback for the company.

92.     These manipulative actions increased the likelihood that Cerebral would receive disproportionately positive reviews on review platforms, causing the reviews posted to be skewed and not representative of reviews by Cerebral's patients.

93.     Robertson also approved additional efforts by Cerebral to manipulate the public record of online reviews. This involved using flagging mechanisms on external review platforms to dispute negative reviews of Cerebral as inauthentic  to get them removed, even where Cerebral knew the reviews were from authentic Cerebral users or had no actual reason to believe they were inauthentic. Robertson directed and approved this practice despite Cerebral's knowledge that many of the negative reviews that Cerebral flagged for removal as inauthentic were, in fact, authored by its actual patients.

94.     As a result, online review platforms and applications have removed legitimate online reviews posted by Cerebral's patients.

95.     Cerebral also systemically manipulated the appearance, sequence, and significance of its patients' comments. On some platforms, users can "upvote" an online review (for instance, by clicking a thumbs-up or similar symbol next to the review) to communicate that they found the review useful in deciding whether to use the company or app being reviewed.  Conversely, "downvoting" an online review (by clicking a thumbs-down or similar

symbol next to the review) is a way for users to communicate that they found another person's review not to be useful in making that decision.

96. Cerebral directed its own employees to "up-vote positive reviews as 'helpful' and down vote negative" reviews. It did so with knowledge that these "votes" would cause the positive reviews to be promoted to a higher placement within the reviews or for a longer time, thereby making those positive reviews more likely to be seen and relied on by consumers.

97. Likewise, Cerebral's "downvotes" caused negative reviews to be pushed down in the list of reviews, thereby making them less likely to be seen and relied on by other consumers.

98. All of these actions prevented consumers from seeing a true and accurate depiction of the reviews, opinions, and experiences of Cerebral's patients.

## UNLAWFUL PRACTICES AT ZEALTHY

99. Soon after being fired from Cerebral, Robertson founded Zealthy, another telehealth company. At Zealthy, Robertson has resumed his earlier ROSCA violations and review manipulation efforts while expanding his repertoire into new forms of misconduct, including unauthorized telemedicine practices.

### I. Robertson and Zealthy's Hide-the-Ball Subscription Enrollment Process Violates ROSCA

100. Since Zealthy's launch in 2022 and through the present, Zealthy has, under the control and direction of Robertson, violated ROSCA by burying disclosures of key subscription terms during its online enrollment flow. Zealthy has placed important disclosures, including of critical cost information, in inconspicuous fine print, outside of the enrollment flow in hyperlinked terms pages, and even on pages it displays to consumers only several screens *after* those consumers have already signed up and paid for subscriptions.

101.    Through these enrollment practices, Robertson and Zealthy have signed up and charged tens of thousands of subscribers for Zealthy's auto-recurring subscriptions without providing them with legally required clear and conspicuous disclosures before charging them.

> A.    *Zealthy Has Used Inconspicuous Fine Print to Present Crucial Subscription Terms, Including Auto-Recurring Charges and Limits on Refunds and Cancelling*

102.    Zealthy has used an online enrollment flow that fails to clearly and conspicuously disclose material subscription terms to consumers before collecting their payment information and enrolling them in automatically renewing subscriptions. The flow presents consumers with several pages showing Zealthy's product offerings before taking them to a subscription sign-up and payment page. An example of this initial checkout page is below:



103.    Zealthy has placed important disclosures relating to Zealthy's subscription in a block of fine print that is displayed inconspicuously at the bottom of a webpage, underneath fields on that page in which Zealthy prompts the consumer to fill out to enter payment card information and to click to pay and start their subscription. These terms include the fact that

Zealthy's subscriptions impose recurring charges, the amount of those charges, and cancellation and refund terms.

104. The above image, for example, shows a sign-up page in which Zealthy has displayed in a block of fine print the enrollment flow's only references to the facts that there is an automatic recurring charge of $135 "for every month after unless you cancel your subscription," that these "monthly membership fees are non-refundable," and that users can only "cancel up to 36 hours before any future billing period."

105. These fine print disclosures have been so buried that they have often not even appeared within the *visible* part of the page for users enrolling, whether via a mobile phone or on a computer. Instead, as Zealthy's internal examples of users navigating the enrollment flow have shown, the block of fine print at the bottom of the checkout page has often appeared on the part of the page that is cut-off and invisible, beneath the visible "Pay" or "Confirm" button.

106. Through these design practices, Zealthy has placed important subscription plan disclaimers and terms where users are unlikely to see them at all before signing up and paying.

107. This has led to countless complaints from consumers that they were unaware of, or never agreed to, recurring charges, and complaints from consumers who believed they would be able to cancel or obtain refunds only to be told by Zealthy that they could not do so based on Zealthy's hidden restrictions on cancellations and refunds.

108. Zealthy's enrollment flow has also hidden crucial subscription terms in hyperlinked, dense policy and terms pages that contain information that was not clearly or conspicuously disclosed within the main body of the enrollment flow.

109. For example, a hyperlinked, dense, and small print terms of use page has buried key information regarding Zealthy's "Recurring Payments" structure, a strict "Cancellations and

22

No Refunds" policy, and a provision regarding "Other Charges and Fee Changes," placing these material terms where users are unlikely to notice them while enrolling.

110.    These buried, hyperlinked terms have stipulated, for instance, that Zealthy's charges are generally "not cancellable after purchase," that purchases generally cannot be refunded, that medications cannot be refunded once they have been shipped, and that, by signing up, a consumer agrees to a laundry list of "all other fees and charges associated with your use of Services … [including] the Membership Fee, any no-show fees, late rescheduling fees, cost of prescriptions, delivery charges, and/or any diagnostic testing…" and agrees to "authorize us to bill and charge your payment method … on file for such other fees in full." Yet none of these important—and even draconian—terms have been clearly or conspicuously disclosed in the main body of Zealthy's actual enrollment flow.

111.    These significant provisions have been buried deep in lengthy terms pages. For example, a 2024 Zealthy's Terms of Use document that is forty-three pages long shows that the "Fees – Others Charges and Fee Changes" provision was placed on the thirty-fifth page, the "Cancelations and No Refunds" provision was placed on the thirty-sixth page, and the "Recurring Payments" provision was placed on the thirty-seventh page. A consumer would have to read through upwards of thirty pages of a linked terms page just to find these provisions.

112.    Zealthy's enrollment flow has frequently included a prominent disclosure that consumers can "cancel anytime." But Zealthy's hyperlinked and buried cancellation policy instead has set significant limitations on that supposed flexibility to cancel. Many consumers who have tried to cancel immediately after signing up or after discovering Zealthy's belated, higher pricing disclosures, have been prevented from canceling or obtaining refunds based on Zealthy's hidden restrictions on cancellations and refunds.

> **B.**     *Zealthy Has Delayed Critical Cost Disclosures Until a Second Checkout Page After Consumers Have Already Signed Up For and Paid For a Subscription*

113.    Zealthy's enrollment flow has also delayed providing critical disclosures about price, cancellation, and refunds until several pages *after* users have already entered their payment information and signed up for—and paid for—a subscription on Zealthy's first checkout page.

114.    Generally, after users have already completed an initial checkout page and entered their payment information, Zealthy has required them to navigate more pages relating to treatment options and has only then brought them to another checkout page. This treatment checkout page has, for the first time, presented concrete pricing information relating to Zealthy's treatment options and hyperlinks to additional, important Zealthy policies that were not previously provided.

115.    Below is a representative example of Zealthy's treatment checkout page for a user who has already signed up and paid for Zealthy's subscription membership for weight loss treatment.



116. Many consumers have complained that they were ambushed by important cost information *after* already signing up and paying for a subscription. One Zealthy employee has referred ███████████████████████████████████████████████ ███████ even though it comes after users have already been made to sign up, provide card information, and pay for a Zealthy subscription.

117. Similarly, a Zealthy employee has described Zealthy's enrollment process as involving a ███████████████████████████████████████ ████████████████████████████████ (Emphasis added.)

118. Moreover, the pricing information users have been presented with here has often departed significantly from the attractive pricing representations made by Zealthy earlier on.

119. For example, Zealthy has typically represented that subscribers will be able to access weight loss drugs for a low costs, both in social media marketing and on the landing page and pre-subscription checkout pages of its enrollment flows. For example, Zealthy's marketing has sometimes touted low costs of between $25 and $100 to obtain GLP-1 medications. Similarly, Zealthy's enrollment flow disclosures before the second, detailed medication cost

page, have often touted low costs without revealing the actual costs of medications. This includes, for example, by touting "affordable medication without insurance" without disclosing that the costs of the medications without insurance might total hundreds of dollars. This language has been compounded by the misleading language in Zealthy's enrollment flow leading to the first checkout page suggesting to consumers that prescriptions are included within the Zealthy monthly membership cost, including through multiple pages prior to the first checkout page that tout access to medications as a key feature of Zealthy's membership plan. But the enrollment flow's second, detailed checkout page has revealed to many users for the first time that they will be charged much larger amounts for the weight loss medications they sought through Zealthy.

120. This later page has also at times disclosed for the first time that a patient seeking a medication would be required to buy a minimum of multiple months of the medication in a bundled package, requiring a higher upfront payment to obtain the medications through Zealthy.

121. Moreover, in some Zealthy enrollment flows that have featured this two checkout-page structure, and as illustrated in the example above, Zealthy's key subscription term policies—including its cancellations and refunds policy—have been hyperlinked on only the *second* checkout page, well after consumers have already paid for and signed up for the Zealthy subscription.

122. As with Zealthy's deferred disclosure of pricing information, providing links to these policies only at this late stage of the user flow has further deprived consumers of critical information regarding Zealthy's subscriptions until they have already provided their payment information, paid, and signed up for a subscription. Zealthy not only failed to provide these consumers with clear and conspicuous disclosures of those policy terms, it also deprived them of

any ability to locate and access them at all until after being signed up and charged for a subscription.

### C. Zealthy's Enrollment Flow Has Not Disclosed Zealthy's Surreptitious Tracking and Use of User Data For Marketing Purposes

123.    Zealthy's enrollment flow has also omitted any upfront disclosure notifying users that their personal data or health data might be used or disclosed by the company in its marketing efforts, including through tracking technologies or for dissemination to social media platforms.

124.    Yet as Robertson directed at Cerebral before it, ███████████████████████



127.    At no point has Zealthy clearly or conspicuously disclosed these data tracking and disclosure practices anywhere in the body of the subscription enrollment flow.

128.    Instead, at most, in the fine print of a buried, hyperlinked privacy policy that users are not forced to open or review in order to sign up, Zealthy has inconspicuously mentioned several pages in that companies may use "information about your visits to our website" collected through "tracking technologies in order to provide advertisements…" and "[w]e may use your information for other legitimate interests as a business, such as … evaluating and improve [sic]

marketing…" Meanwhile, nothing in Zealthy's enrollment flow has told users that their

telehealth treatment activities might be used for unauthorized marketing purposes.

> D.    Robertson Has Closely Directed Zealthy's Enrollment Flow
> Design, Including the Wording, Design, and Placement of its Disclosures

129.    In addition to having the authority to generally control and steer Zealthy's

enrollment practices as its CEO, Robertson has █████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

130.    Robertson has regularly provided detailed design instructions to his team of

engineers and designers regarding ████████████████████████████████████

████████████████████████████████

131.    Robertson has directed his employees on ████████████████████████

████████████████████████████████████████████

██████████

132.    For example, Zealthy's internal documents show Robertson directing his

employees to ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

133.    An illustrative marching order from Robertson exemplifies his ██████████

████████████████████████████████████████████

████████████████████████████████████████████

134.    Robertson has regularly, personally assigned work tasks ██████████

████████████████████████████████████████████. And

Robertson has routinely, personally ███████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████

135.    As a result of Zealthy's inconspicuous disclosures of key terms, and after-the-fact pricing disclosures through its second checkout page, many consumers have complained that the enrollment flow did not inform them of important pricing information before signing them up and charging them, did not clarify whether the initial subscription they signed up for on the first checkout page covered the cost of medications, and did not reveal important limits on their ability to obtain refunds or cancellations that were stated only in terms page outside of the enrollment flow.

136.    Roberston and Zealthy have been aware of these consumer complaints through multiple channels of consumer sentiment they have monitored and responded to, including online reviews, ████████████████████████, and complaints to regulators and the BBB.

## II.    Zealthy's Surprise Fees That Contradict Its Disclosed Fees

137.    Robertson and Zealthy have been especially manipulative in failing to clearly and conspicuously disclose the costs of Zealthy's subscriptions and services. Zealthy has regularly charged consumers far more than was advertised or touted in its marketing materials and enrollment flow. As a result, consumers have been deprived of clear and conspicuous disclosures of material cost information.

138.    For example, Zealthy's enrollment flow has routinely touted that consumers would pay only a low initial fee for the first month—for example $39. Even more enticingly, has often, Zealthy has promised consumers completing checkout that they would "Pay $0 today" or "$0 due today." This assurance has compelled many consumers to try signing up in the belief

that they would not have to pay any immediate charge (an assurance reinforced by the separate

disclosure promising that they can "cancel anytime"). This representation is reflected in the

below example from a Zealthy checkout page:



But many consumers have found that after they signed up,

140. For example, the following is a small sample from the voluminous complaints of

Zealthy consumers who report



141. Zealthy has also failed to clearly or conspicuously disclose to consumers that the significant costs of medications would *not* be covered by the overall subscription cost Zealthy touted, while leading consumers to believe they were paying for obtaining the medications.

142. For example, consumers signing up for a weight loss subscription plan with Zealthy have frequently been provided with a set of pre-subscription checkout enrollment pages that feature the following bolded headings and language on successive pages before reaching the checkout page: "**Let's find the safest, most effective weight loss treatment for you**"; "**GLP-1 medication such as Wegovy, Zepbound, Ozempic**…"; "**Zealthy's weight loss program includes** … Provider review of request for GLP-1's…"; "**Congratulations [Patient name],** You've qualified for the prescription Zealthy Weight Loss Program!'; "**Your customized prescription plan** … a personalized plan that includes medication and support."

143. These enrollment page disclosures have strongly suggested to consumers that they were signing up, in large part, for a subscription that covered access to medications.

144. Similarly, Zealthy's subscription membership checkout page has generally featured the bolded title at the top: "**[Your] prescription plan has been *approved*!,**" (emphasis in original) while presenting consumers with only the Zealthy <u>monthly</u> subscription price (*i.e.*, typically a $135 monthly fee or a discounted initial price).

145. In many of Zealthy's enrollment flows, Zealthy has only later—after the subscription checkout page—clarified that the substantial cost of medications is not included.

146. These bait-and-switch cost tactics have harmed thousands of consumers enticed into signing up while Zealthy obscured, or misrepresented, critical pricing information.

147.    And numerous consumers who have been told they would pay zero dollars today and can cancel anytime have found themselves doubly fooled: they have incurred immediate, substantial charges, and have also been prevented from cancelling and told by Zealthy that refunds are not available when they have promptly contested charges.

148.    These consumers have been victimized by a series of stacked ROSCA violations, while Robertson and Zealthy have hidden substantial, material pricing information from them, buried important provisions restricting cancellations and refunds in linked, dense terms pages, and misleadingly touted that consumers would be able to "Pay $0 today" and "Cancel anytime."

149.    Consumers have been similarly misled by Zealthy's marketing, which has routinely touted that Zealthy provides access to treatments such as GLP-1 drugs for extremely low costs, such as $25 with insurance or a little over a hundred dollars for compounded medications, exacerbating the misleading representations in Zealthy's enrollment flow. Consumers have been baited by these too-good-to-be-true ads on platforms such as TikTok, Facebook, and Instagram, only to discover after they signed up for a subscription that Zealthy's medication costs have been substantially greater.

150.    Robertson and Zealthy have received thousands of consumer complaints and negative reviews, relating to these unclear and misleading pricing disclosures during enrollment.

151.    Zealthy's surprise fees have led to a Better Business Bureau standing warning to consumers, ████████████████████████████████████████████████, myriad online consumer reviews decrying Zealthy's hidden costs, ████████████████████

152.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



153. Robertson has

154. For example,

155. Similarly reflecting Robertson's

156.

### III.   Robertson's Direction of Unlawful Cancellation Practices at Zealthy

157.   Zealthy has also, like Cerebral before it, deprived consumers of a simple cancellation mechanism to avoid recurring charges.

158.    Trafficking in the same assurance as Cerebral, Zealthy's enrollment flow has assured consumers that they can "cancel any time." And Zealthy has specifically told consumers in the enrollment flow that they will be able to do so by cancelling "through your account or by contacting customer support at support@getzealthy.com," suggesting a quick and easy process.

159.    Instead, Robertson has once again directed a challenging cancellation flow intentionally filled with "friction" designed to stymy cancellations, and he has expressly instructed employees *not* to cancel for consumers who have emailed the support email address requesting cancellation, preventing cancellations through that route as well. As a result, a huge number of Zealthy consumers have been prevented from easily cancelling their subscriptions while continuing to be subjected to Zealthy's costly recurring charges.

*A.    Zealthy's Unlawful, Convoluted Cancellation Flow*

160.    First, despite Robertson's deep familiarity with ROSCA's simple cancellation requirement, Zealthy has generally provided a cancellation flow that is complex, convoluted, multi-step, and that has been hard for consumers to find and use.

161.    Instead of allowing consumers to easily cancel by clicking a button, ███████

███████████████████████████████████████

███████████████████████████████████████

██████████████████

162.    ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████



Step-by-Step Screen Capture of Zealthy Cancellation Flow:

[**Step 1**]                    [**Step 2**]                    [**Step 3**]

[**Step 4**]                    [**Step 5**]                    [**Step 6**]

[**Step 7**]                    [**Step 8**]                    [**Step 9**]



**[Step 10]**                    **[Step 11]**                    **[Step 12]**



substantially similar flows Robertson has directed Zealthy to provide to consumers from 2022 through the present. ████████████████████████████████████

████████████████████████████████████████████

164.   For example, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

165.   Zealthy's convoluted cancellation flow has been intentionally designed by Robertson to be this difficult. Robertson has given blunt, direct instructions to his employees to ensure that cancellation remains challenging for consumers, instructing them to introduce more of what he calls "friction" (*i.e.*, obstacles) into the cancellation flow to deter cancellations—the same cancellation obstacle buzzword he insisted his reports emphasize at Cerebral.

166.   ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████.

167.     One high-ranking former Zealthy employee who participated in meetings where Robertson discussed and gave design directions regarding Zealthy's cancellation flow remembers Robertson exhorting the team to add more "friction," and has recalled that, under Robertson's lead, Zealthy's cancellation flow was made difficult deliberately and "by design."

168.

**B.      Zealthy's Online and In-App Cancellation Flow Has Not Even Been Accessible or Usable for Many Consumers**

169.     For many consumers, Zealthy's online and in-app cancellation flow has not even been made available or usable *at all*.

170.     Numerous consumers have found that Zealthy either removed any link to access the cancellation flow from their Manage Account page, or that, even when they followed the company's instructions and navigated through Zealthy's cancellation flow, it merely froze and failed to proceed at the cancel step—no matter how many times they tried to proceed. Consumers have reported encountering these hurdles for days or weeks at a time while trying, and failing, to cancel over and over again.

171.     These consumers have been deprived of a simple cancellation mechanism while continuing to be subjected to recurring charges by Zealthy.

172.     For example,

173.



174.   Similarly, ██████████████████████████████████████████

175.   ██████████████████████████████████████████████████

176.   Consumers have been prevented from canceling their subscriptions due to these systemic, technical barriers while continuing to face recurring charges they are trying to stop.

177.   Zealthy and Robertson have █████████████████████████

*C.   Robertson Has Directed Zealthy Employees* ████████

178.   Robertson and Zealthy have informed users during the enrollment process that they would be able to easily "cancel anytime," including by simply emailing a Zealthy support

email address to request cancellation. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

179. Because of Zealthy's complex and, for many consumers, inaccessible or unusable cancellation flow, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

180. Consumers have also attempted to cancel their subscriptions by emailing Zealthy's customer support email address as Zealthy's enrollment disclosure has at times expressly stated they would be able to.

181. For example, numerous consumers have corresponded with Zealthy's customer support agents by email, message, or phone to ask, and even eventually to beg them, to cancel the consumer's account and stop recurring charges.

182. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

183. Despite Zealthy's sometimes telling consumers during enrollment that they would be able to cancel by email, ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

184. ████████████████████████████████████████████████████

████████████████████████████, consumers struggling to cancel have been bogged down in serial,

week-, and even months, long exchanges where they asked Zealthy employees, again and again, to cancel their accounts. ███████████████████████████████████████████

185. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

186.    Many consumers who have tried to request cancellation by calling Zealthy's customer support phone line have reported their calls never being answered, being disconnected or hung up on, and enduring lengthy hold or wait times. Consumers who have finally reached a Zealthy phone agent have been informed that the company will not cancel an account on their behalf.

187.    Because Zealthy has refused or failed to timely cancel consumers' accounts, numerous consumers have been forced to issue chargeback disputes, or cancel payment cards, just to get Zealthy's unauthorized, recurring charges to stop.

<em>D.    Robertson and Zealthy Have Issued a</em> ███████████████████
███████████████████████

188.    Robertson's aggressive violations of ROSCA through the above cancellation obstacles are borne out by company data.

189.    In particular, Robertson and Zealthy's systemic violations of ROSCA's cancellation mechanism requirement are ███████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████

190. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████

191.





*E.    Zealthy is Drowning in Consumer Complaints Regarding its Serious Cancellation Obstacles and Post-Cancellation Charge Tactics*

199.    Zealthy's systemic cancellation obstacles and post-cancellation charges have generated voluminous complaints from aggrieved consumers.

200.    For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

201.    Similarly, numerous consumers have submitted complaints to the Better Business Bureau and the FTC regarding Zealthy's cancellation obstacles and post-cancellation charging

practices. In fact, so many consumers have registered these complaints that the Better Business Bureau has posted a standing warning to consumers on Zealthy's page alerting them to a "Pattern of Complaints regarding billing…"

202.    Zealthy has also received voluminous online reviews from consumers complaining about these cancellation and charge practices, including on major review platforms such as www.TrustPilot.com and www.Reviews.io, ███████████████████████

███████████████████████████████████████████

### IV.    Robertson and Zealthy's Undisclosed, and Unfair and Deceptive, Telemedicine Practices

203.    Robertson's misconduct at Zealthy extends to unlawful telemedical practices that have never been disclosed to consumers pursuing telehealth through Zealthy.

204.    With Robertson's knowledge and approval, Zealthy used its medical director's National Provider Identifier ("NPI") number and other credentials without his knowledge or consent to submit many requests for prior authorization of medications and to order any resulting prescriptions. The (now-former) medical director had no knowledge of the underlying patient visits, did not write any prescriptions, did not supervise or collaborate with any of the providers who saw patients, and was not even licensed in many of the states where patients were located, and therefore could not attest to the medical necessity of the prescriptions. Zealthy did this despite Robertson's previous assurances to the medical director that his name would not be used for prior authorization requests or prescriptions and that he was not responsible for supervising any providers who saw patients. The former medical director submitted a whistleblower report to the U.S. Department of Justice reporting this conduct.

205.

Another whistleblower reported this to the U.S. Department of Justice, and ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ the whistleblower reports, showing that at Zealthy, Robertson has directed the systemic use of non-clinicians to issue prescriptions and to formulate and submit prior authorization requests to insurers, and also to direct clinical decisions in other ways.

207. For example, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

208. These exchanges are not unique. ▆▆▆▆▆▆▆▆

209. Screenshots of Zealthy's clinical portal provided by one of the whistleblowers show the names of non-clinical employees who have issued large numbers of prescriptions.



210.

215.     Robertson and Zealthy have furthered this systemic, illegitimate practice of

medicine by abusing the NPI numbers of medical providers to engage in rote, mass submission

of prior authorization requests and prescription orders to pharmacies—including without the provider's knowledge, consent, or clinical participation.

216.    For example,

219.    Zealthy has also used non-clinical employees to make decisions regarding what amounts or dosages of medications to send to patients, and to send prescription orders to pharmacies nominally under the name and NPI number of a provider who did not actually participate in clinically evaluating the patient or ordering a specific prescription.

220.

221.    Zealthy's problematic prescription practices are far outside the usual course of appropriate professional medical practice, jeopardize the safety of patients, mislead insurers and pharmacies, and misrepresent to Zealthy's patients the nature of the telemedical services they are receiving through Zealthy.

222.    These practices include, for example, misusing and impersonating licensed prescribers and their National Provider Identifier ("NPI") numbers without their knowledge, consent, or clinical participation to order prescriptions for patients; violating applicable state telemedicine laws, including by having providers prescribe medication without legal authority in relevant states; and allowing non-clinicians to issue prescriptions, including by using the name and NPI of medical providers with no role in the clinical decision.

223.    Zealthy never discloses to consumers signing up for Zealthy's services that they may receive unauthorized prescriptions or medical care that are outside the course of the legitimate practice of medicine, or as directed and ordered by non-clinicians.

224.    These practices are of the utmost importance to telehealth consumers, and go to the core of the services being offered, as well as their fundamental integrity, safety, and legality.

225.    Under Robertson's direction, Zealthy jeopardizes the basic safety of its unwitting patients, while misleading insurers, pharmacies, and medical providers along the way.

### V.    Robertson and Zealthy's Fake Review, and Review Manipulation, Practices

226.    Robertson's direction of fake prescriptions, and his mass issuance of bogus, unauthorized charges, have been complemented by his old penchant for doctored online reviews—in the face of a groundswell of consumer complaints regarding Zealthy's practices.

227. Robertson and Zealthy have engaged in the mass production of fake reviews, and other review manipulation practices, picking up where Robertson left off at Cerebral, and despite a recently enacted law that subjects this misconduct to significant civil penalties.

228. First, Robertson has again directed the systematic authoring and posting of fake reviews online by Zealthy employees, including to major review platforms such as www.TrustPilot.com and www.Reviews.io.

229. As part of this misconduct, Robertson has expressly directed his subordinates to write glowing reviews purporting to be by Zealthy patients and to post them to review platforms. Evidence shows that Robertson has himself written and posted such fictitious reviews, such as a review of Zealthy that he attempted to submit and post to the review platform www.TrustPilot.com under an email donning the alias "Kimberly."

230. For example, a former Zealthy employee described Robertson setting up his laptop in the middle of Zealthy's shared, co-working office and proceeding to work on writing and posting fake online reviews to review platforms, while cajoling his subordinates that they needed to work on getting more fake reviews posted given Zealthy's declining review platform aggregate scores.

231.



233.    Former Zealthy employees have explained that Robertson has directed the mass-generation of email accounts intended for use in posting fictitious online reviews given that review platforms typically set limits on how many reviews a single email address can post.

234.    The misconduct has continued. A 5-star review for Zealthy's iPhone app

235.

239. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

██ ██ ████████████████████████████████████

████████████████████████████████████

██ ██ ██████████████████████████████████

███████████████████████████████████

██ ██ ██████████████████████████████████

████████████████████████████████████

████████████████████████████

██ ██ ██████████████████████████████████

████████████████████████████████████

████████████████████████████████

██ ██ ████████████████████████████

████████████████████████████████

245.    Zealthy posted a series of supposed rave reviews from patients on its website—

before the company had even launched its services.

246. ██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

247.    Robertson's direction of, and personal participation in, these review manipulation

practices at Zealthy reflect a brazen commitment to falsifying the public record regarding

Zealthy even in the face of a new law prohibiting, and heavily penalizing, these acts, and in the face of this pending lawsuit, addressing his exact same record of misconduct at Cerebral before.

248. Robertson's direction and approval of Zealthy's online review practices caused its staffers and others under its control to post hundreds of fake positive reviews on various websites, including Reviews.io, Trustpilot, Apple's App Store, and Google.

249. Prospective subscribers read these reviews when they consider subscribing and, as a result, are intentionally misled by Zealthy regarding actual consumer feedback.

## ROBERTSON AND ZEALTHY'S ACTUAL OR IMPLIED KNOWLEDGE
## OF THEIR VIOLATIONS OF LAW

250. Robertson and Zealthy have been well aware of ROSCA and the FTC's Rule on the Use of Consumer Reviews and Testimonials while persisting in violations of them.

251. Most straightforwardly, they have known of this pending lawsuit, which has alleged systemic violations of these very laws. And all the while, Robertson and Zealthy have been in receipt of voluminous consumer complaints attesting to ROSCA violations such as deficient upfront disclosures and obstacles to simply cancelling subscriptions.

252. Robertson has also had ample knowledge of ROSCA, and actual or fairly implied knowledge of his violative practices, well in advance of this lawsuit. This includes based on a preceding, 2022 FTC investigation that probed ROSCA violations under Robertson's leadership at Cerebral. It also includes Robertson's knowledge of voluminous consumer complaints while at Cerebral involving cancellation obstacles and unauthorized charges that he directed there, as well as Cerebral's multi-year, hidden use of user health data to drive social media marketing efforts, which was spearheaded by Robertson and ultimately led to a breach report to HHS, and notifications to consumers, disclosing these practices for the first time in 2023.

253. █████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

254. Bolstering their knowledge of ROSCA, ███████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████



██ █████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████

██ █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██ █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████

258. Robertson was also aware of scrutiny into his consumer protection law violations during his time at Cerebral, including, for example, from published reporting and his receipt of questions from investigative reporters that explored apparent legal misconduct being perpetrated under Robertson's watch, including with reference to ROSCA.

259. This included a February 2022 Forbes article reporting on Cerebral's problematic cancellation obstacles and discussing ROSCA, and Robertson's earlier receipt of investigative questions from journalists covering Cerebral's concerning billing and cancellation practices.

260. As Cerebral's CEO, Robertson was also regularly briefed on and participated in responding to regulatory and legal issues, including regarding Cerebral's cancellation and subscription auto-renewal practices.

261. Cerebral's documents also show that, as CEO, Robertson discussed, and stayed abreast of, FTC rules applicable to Cerebral's business.

262. At Cerebral, Robertson helped head up Cerebral's Legal function and helped draft many of its core legal and compliance policies. Later on, he directly supervised Cerebral's compliance personnel. At Zealthy, he has been similarly involved in helping to direct Zealthy's Compliance functions, including participating personally in directing and reviewing the findings of compliance audits evaluating Zealthy's practices and legal compliance.

263. Robertson has also had knowledge that earlier obstructive cancellation and review manipulation practices he directed have been deemed unlawful.

264. For example, Cerebral previously resolved an investigation brought by the Office of the New York Attorney General, which found that, under Robertson, Cerebral had engaged in systemic authoring of fake reviews and had unfairly made it excessively difficult for subscribers to cancel their subscriptions.

265.     Finally, even apart from his clearcut, actual knowledge of ROSCA, Robertson has had fairly implied knowledge of ROSCA's requirements because he has twice founded companies whose entire business model focuses on providing negative option subscriptions online, and ROSCA is the major federal law applying to such businesses.

266.     Zealthy has had ample knowledge of these laws, including because Robertson has known of them while he has led the company, because Zealthy's in-house counsel has been well aware of applicable consumer protection laws, and because Zealthy has discussed applicable laws enjoining review manipulation practices, cancellation obstacles, and inadequate disclosures of material terms in both internal and outward-facing discussions (such as with auditors, financial organizations, and third parties providing services to Zealthy).

267.     Robertson and Zealthy have also been aware of voluminous consumer complaints and                        related to Zealthy's cancellation obstacles and surprise fees, and have been directly aware of their use of improper telemedicine practices, deliberate review manipulation efforts, and hidden tracking and transmission of user data to social media platforms for marketing.

268.     Robertson and Zealthy have at relevant times had actual knowledge, or knowledge fairly implied, of their ROSCA and FTC Review Rule violations.

## ONGOING HARM TO CONSUMERS STEMMMING FROM ZEALTHY AND ROBERTSON'S MISCONDUCT

269.     The evidence shows that Robertson and Zealthy continue to engage in their misconduct through the present.

270.



278. The Terms of Use on Zealthy's website have provided that they "govern your access to and use of the FitRX, LLC dba Zealthy ('Zealthy') website or app …"



281. Robertson and Zealthy are continuing to harm consumers through pervasive ROSCA violations, thousands of unauthorized charges to consumers each month, willfully dangerous and illegitimate telemedicine practices, fake review writing, and other unfair and deceptive practices.

281. They are also actively deceiving pharmacies and financial organizations in the process.

## COUNT I

### Violations of the Restore Online Shoppers' Confidence Act

*Against Robertson and Zealthy*

282. Paragraphs 1 through 281 are incorporated as if set forth herein.

283. In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described above, Robertson and Zealthy have failed to (1) clearly and conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information, (2) obtain the consumer's express, informed consent before charging the consumer, and (3) provide simple mechanisms for a consumer to stop recurring charges for the good or service. Each of these categories of misconduct represents an independent ROSCA violation.

284. For example, Robertson participated in, directed, or had the ability to control Cerebral's failure to clearly and conspicuously disclose before obtaining consumers' billing information all material transaction terms, including Cerebral's systematic tracking, use, and sharing of subscribers' sensitive health data in its marketing campaigns, and the bulk sending of that data to third parties including social media platforms.

285. Robertson has similarly participated in, directed, or had the ability to control Zealthy's failure to clearly and conspicuously disclose before obtaining consumers' billing information all material transaction terms, including relating to the automatically recurring nature of Zealthy's subscriptions; the costs consumers pay; policies, practices, and restrictions on cancellations and refunds; and other core aspects of Zealthy's subscription services, such as the

nature and legitimacy of Zealthy's telemedicine services and Zealthy's tracking and use of subscribers' personal health data in online advertising efforts.

286. Robertson has participated in, directed, or had the ability to control both Cerebral's and Zealthy's failures to provide subscribers a simple mechanism to stop recurring charges.

287. And across both companies, Robertson has participated in, directed, or had the ability to control issuance of charges to subscribers without first obtaining their express, informed consent, including by charging consumers even when they cancelled their subscriptions or requested cancellation, and charging consumers for surprise fees they did not agree to.

288. Robertson and Zealthy's practices as set forth herein are violations of ROSCA, 15 U.S.C. § 8403(1)-(3), and thus violations of Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

289. Robertson and Zealthy have engaged in these unlawful acts knowingly, with knowledge of applicable regulations and with knowledge of numerous consumer complaints.

## COUNT II

### FTC Act Section 5—Unfair and Deceptive Practices

*Against Robertson and Zealthy*

290. Paragraphs 1 through 289 are incorporated as if set forth herein.

291. In numerous instances, in connection with the promotion or sale of services offering online health care or treatment, Robertson and Zealthy have represented, directly or indirectly, expressly or by implication, that consumers: can easily cancel subscriptions; can cancel subscriptions by emailing a support email address; are obligated to pay costs in line with

the explicit cost disclosures provided in Zealthy's enrollment flow; would be able to obtain medications covered by the general subscription cost for Zealthy's subscription services; would be able to sign up while paying $0 today, or a low fee for the first month of services, such as $39 or $49; and would receive telemedical services conducted within the ordinary course of medical practice (including with legitimate prior authorization requests or prescriptions ordered or issued by a competent, licensed medical professional).

292.	In point of fact, Zealthy and Robertson have prevented consumers from easily cancelling subscriptions, have refused to cancel subscriptions when consumers emailed the support email address the company provided to request cancellation, have forced consumers to pay charges significantly in excess of what Zealthy has touted in its enrollment flows (including substantial first day, or first month, charges exceeding what Zealthy's enrollment flow indicated), have required consumers to pay the cost of medications independently of their subscription payments to Zealthy even when that distinction has not been clearly disclosed, and have engaged in wide-ranging, illegitimate telemedicine practices outside of the ordinary course of medical practice.

293.	These representations, omissions, and acts have harmed and deceived Zealthy's consumers, including by misleading them regarding the services provided by Zealthy, the costs of the services, and material aspects of Zealthy's services and subscriptions, and by subjecting them to unlawful and potentially dangerous medical practices. Consumers cannot reasonably avoid them because Defendants do not clearly and conspicuously disclose them upfront, and they do not provide any benefits to consumers or competition.

294.	These practices of Robertson and Zealthy as set forth above constitute unfair or deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III

## Violations of the FTC Rule on the Use of

## Consumer Reviews and Testimonials

*Against Robertson and Zealthy*

295.    Paragraphs 1 through 294 are incorporated as if set forth herein.

296.    As described above, Robertson and Zealthy have engaged in prolific, unlawful fake review writing and other unlawful review manipulation practices.

297.    These include the following practices by Zealthy that Robertson has participated in, directed, or had the ability to control: writing and posting fictitious reviews purporting to be from Zealthy patients but are in fact written and disseminated by Zealthy employees or contractors, including by Robertson himself; dishonestly flagging as inauthentic authentic, negative reviews by real Zealthy patients that Zealthy had no reason to believe were inauthentic in efforts to get them taken down; hiring third parties to perform coordinated suppression of online search results relating to Zealthy in order to make negative consumer reviews and feedback harder for the public to find; paying for online testimonials and endorsements provided to the public without any disclosure of the quid pro quo involved; and manipulating the results of Zealthy's publicly available reviews by consumers, such as by inviting only consumers whom Zealthy expects to produce favorable reviews to write and post public reviews, and burying or deleting negative feedback from webpages controlled by Zealthy.

298.    These acts have violated the FTC's Rule on the Use of Consumer Reviews and Testimonials, 16 C.F.R. § 465.2.

## ONGOING MISCONDUCT

299.    Based on the facts and violations of law alleged in this Complaint, the United States has reason to believe that Defendants are violating or are about to violate the FTC Act, ROSCA, and the Rule on the Use of Consumer Reviews and Testimonials, including the reasons set forth below.

300.    First, Defendants have a long history of continuous misconduct of the type described above.

301.    Second, Defendants have continued to engage in their unlawful practices through the present and despite this pending lawsuit. In Robertson's case, his misconduct has also persisted despite being the subject of a previous, lengthy FTC investigation probing parallel ROSCA and FTC Act violations that he directed while at Cerebral.

302.    Third, Defendants have repeatedly failed to rectify their unlawful practices even in the face of voluminous consumer complaints and sanctions imposed by outside entities.

303.    Fourth, Defendants retain the means, ability, and incentive to continue or resume their pattern of unlawful conduct.

304.    Fifth, Defendants have recently created and operated several additional corporate entities being used to secretly process Zealthy's transactions while hiding Zealthy's business and assets from outside entities including financial organizations.

## CONSUMER INJURY

305.    Consumers have suffered and will continue to suffer substantial injury as a result of Robertson's and Zealthy's violations of the FTC Act, ROSCA, and the Rule on the Use of Consumer Reviews and Testimonials.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

306.    Wherefore, Plaintiff requests that the Court:

A.  Enter a permanent injunction to prevent future violations of the FTC Act, ROSCA, and the Rule on the Use of Consumer Reviews and Testimonials by Defendants;

B.  Award monetary civil penalties from Defendants for every violation of ROSCA and the Rule on the Use of Consumer Reviews and Testimonials;

C.  Award monetary and other relief within the Court's power to grant; and

D.  Award any additional relief as the Court determines to be just and proper.

## DEMAND FOR JURY TRIAL

The United States hereby demands a jury trial on all claims alleged herein.


Dated: April 10, 2026                    Respectfully submitted,

                                         FOR THE UNITED STATES OF AMERICA

                                         By: */s/ Francisco L. Unger*
                                         Francisco L. Unger (A5503216)
                                         Joshua A. Fowkes (A5503218)
                                         Daniel K. Crane-Hirsch (A5501215)
                                         Trial Attorneys

                                         BRETT A. SHUMATE
                                         Assistant Attorney General
                                         SARMAD KHOJASTEH
                                         Deputy Assistant Attorney General
                                         Civil Division
                                         LISA K. HSIAO
                                         Acting Director
                                         ZACHARY A. DIETERT
                                         Assistant Director
                                         U.S. Department of Justice, Civil Division
                                         Enforcement & Affirmative Litigation Branch
                                         450 5th Street, N.W. Suite 6400-South

Washington, D.C. 20044
joshua.a.fowkes@usdoj.gov
daniel.crane-hirsch@usdoj.gov
francisco.l.unger@usdoj.gov
Telephone: (202) 598-3855 (Unger)

Jason A. Reding Quiñones
United States Attorney
Southern District of Florida

Rosaline Chan
Assistant United States Attorney
Fla. Bar No. 1008816
United States Attorney's Office
99 N.E. 4th Street Miami, FL 33132
Telephone: (305) 961-9335
Rosaline.Chan@usdoj.gov

***Counsel for Plaintiff the United States of America***