Exhibit 4

DECLARATION OF SHAYAN SHAMS

I, Shayan Shams, hereby state that I have personal knowledge of the facts set forth below. If called as a witness, I would testify as follows:

1. My name is Shayan Shams. I currently reside in Miami, Florida. I am a former employee of Zealthy, Inc.

2. I worked at Zealthy as an Operations Manager from August 2023 through June 2024. In that role, I helped work on several aspects of Zealthy's business operations. I led Zealthy's Customer Support team and helped direct trainings of providers. I was part of Zealthy's core office team that worked under the CEO, Kyle Robertson, at an office in Miami, Florida.

3. At the time that I worked at Zealthy, it was a small company and we all worked together in a shared co-working office space. My desk was close to Mr. Robertson's. I routinely worked directly with Mr. Robertson and he was my supervisor.

4. Among other standing meetings we had at the time, I participated in a routine, company-wide Objectives and Key Results, or "OKR," meeting where we all presented to Mr. Robertson regarding the key metrics that we were personally assigned with handling for the company. For part of my time at the company, this OKR meeting was held weekly.

**Charge Disputes and Test Accounts**

5. During my time at the company, I became aware that Zealthy was struggling with high charge dispute rates being submitted by many Zealthy consumers. I recall that Zealthy was, in particular, struggling with high charge dispute rates on Mastercard transactions. I recall company discussions about how we were in a bad spot with Mastercard and had a charge dispute rate that was too high. My understanding is that all Zealthy's Mastercard transactions were being facilitated by the payment processor, Stripe.

6.      Zealthy's charge dispute rate was one of the business metrics that the company was routinely tracking while I worked there. This issue was assigned to an employee named Carolina Macias who helped work under Mr. Robertson to direct the company's financial operations. During my time at Zealthy, Ms. Macias generally owned any topic related to the company's finances.

7.      I recall that our OKR meetings would cover the company's charge dispute rate issue. At these meetings, I recall the company would discuss up-to-date data on its charge dispute rates with different card networks and discuss efforts it was making to tackle charge dispute rates. My recollection is that the charge dispute data the company discussed was broken down in these discussions by card network, such as Mastercard.

8.      I was aware that one factor behind Zealthy's charge dispute rate at the time was that many consumers did not realize that they were being signed up for a recurring subscription. Connected to that issue, I recall several consumers who did not know that they had to cancel their subscription to avoid additional charges from occurring. When I worked at Zealthy, especially at the beginning of my time at the company, I did not think it was clear to consumers based on the enrollment flow that they were signing up for a subscription and I routinely dealt with consumer complaints about unauthorized charges or demanding refunds.

9.      I regularly encountered these sources of consumer confusion through my work leading Zealthy's Customer Support team. I occasionally brought up these consumer issues to Mr. Robertson during our standing Clin-Ops meetings and would explain to him that, based on what I was seeing, many consumers were not aware they were being signed up for a recurring subscription with Zealthy. I remember advocating to Mr. Robertson that Zealthy should clarify to consumers that they were being signed up for a subscription prior to arriving at the medication

subscription check-out. In particular, I also advocated to Mr. Robertson that when consumers never completed the whole sign-up process and completed the section where they could make a prescription request, Zealthy should make it easier for those people to cancel and obtain refunds given that they had never requested a medication.

10.     While I was at the company, Zealthy employees created various internal test accounts with company payment card information associated with them. These test accounts could be used to test how Zealthy's website and enrollment flows performed in what we called production or "prod."

11.     I do not know how many test accounts Zealthy had in total at the time. That said, Zealthy conducted a lot of testing all the time. Ms. Macias would assign testing tasks and helped direct the use of company cards to pay for the testing sign-ups. Mr. Robertson also personally participated in testing. My general understanding is that test account sign ups generally used company cards to perform a sign up to test the full process out.

12.     I recall that, in the context of discussions including Mr. Robertson and Ms. Macias about how Zealthy's charge dispute rate with Mastercard was becoming a problem for the company. I recall overhearing Mr. Robertson and Ms. Macias discuss a plan to shift all the company payment cards that would be used to pay for test account sign-ups over to a Brex account that used Mastercard.

13.     As I understood it, the switch to Mastercard was specifically to try to help lower Zealthy's charge dispute rate on Mastercard transactions by increasing the number of successful test account sign-up payments that went through on cards that would impact the Mastercard charge dispute number. I recall at some point after this conversation that Ms. Macias instructed all employees to use a Brex card for the test account sign-up payments.

14.     During my time at the company, test accounts were regularly used to pay for and sign up for Zealthy memberships. This could be, for example, for membership sign-ups at the normal monthly rate of $135 or a discounted first month rate, such as $49. I do not know whether these test accounts sign-ups carried forward through recurring monthly payments. I am not aware of any formal effort or audit at the company related to cancelling out the test account memberships after employees had signed up for them.

15.     I am not aware of any way that Zealthy informed payment processors or card networks about the nature of test account sign-ups or distinguished them from actual sign-ups where a real consumer paid to sign up for a subscription. I am not aware of any way in which Zealthy flagged the nature of the test account sign-up purchases for Mastercard or Stripe.

**Dr. Risheet Patel**

16.     While I was at Zealthy, some of my work involved helping the clinical side of the company's operations. For example, I helped run operational training and onboarding for providers. As part of my work, I helped to personally onboard a doctor named Dr. Risheet Patel and I had a standing meeting with him after he started at the company. I also helped set up occasional meetings where Dr. Patel would join a call with Zealthy's clinical providers, though these were infrequent.

17.     Dr. Patel was brought on specifically to serve as a formal legal owner, or "PC" owner, meaning Professional Corporation owner, of Zealthy's affiliated medical company, Bruno Health. Dr. Patel's main role in this capacity was to sign off on corporate application forms for Bruno Health and to serve in this formal, corporate role. His role also formally included the ability to serve as a supervisory physician to some nurse practitioners.

18.     My understanding is that Dr. Patel was not hired by Zealthy to personally see or evaluate patients. My general understanding was that he never saw a Zealthy patient because he was not performing clinical evaluations for Zealthy patients. My understanding is that Dr. Patel would not have personally ordered any prescriptions for Zealthy patients, and I would have been surprised if he had done so during the time I worked at Zealthy.

19.     My understanding is that Dr. Patel also worked full-time as a primary care physician in Indiana. My understanding is that the role Zealthy brought him on for was more of a part-time, corporate role for him to hold on the side.

20.     I have worked for around seven years in the telehealth field, including at another telehealth company called Hims & Hers. Based on this work, I am very familiar with industry norms for telehealth prescribing. My understanding is that it is generally common for the name of a provider who evaluates a patient and orders a prescription to be the name that appears on the actual prescription.

**Michael Repplier**

21.     While I was at Zealthy, I was aware that Mr. Robertson's romantic partner at the time was named Michael Repplier. I met Mr. Repplier a few times when he would visit the office to see Mr. Robertson.

22.     One time while I worked at Zealthy, I recall seeing Mr. Repplier's name listed on an incorporation document for an entity called Gronk, Inc., on a Florida corporation registry database. I recall seeing documents that mentioned both Gronk, Inc., and Zealthy, which made it appear that Gronk. Inc., and Zealthy were connected.

23. I have no idea why Mr. Repplier's name might have been used in a document relating to Gronk, Inc. or Zealthy. I am not aware of any role that Mr. Repplier played in Zealthy's business, or in operating any telehealth businesses, during my time at the company.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on April __8th__, 2026 in __Miami, FL__

Shayan Shams