**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 24-cv-21376-RAR-LFL**

UNITED STATES OF AMERICA,

     *Plaintiff,*

v.

ZEALTHY, INC., a corporation, and,
KYLE ROBERTSON, individually,

     *Defendants.*

_____/

## DEFENDANTS KYLE ROBERTSON AND ZEALTHY, INC.'S RESPONSE IN OPPOSITION TO THE MOTION FOR PRELIMINARY INJUNCTION

Respectfully submitted,

**MARCUS, RASHBAUM, PINEIRO
& MEYERS LLP**

By: /s/ Michael A. Pineiro
Michael A. Pineiro
Daniel L. Rashbaum

*Counsel for Mr. Robertson*

**GREENBERG TRAURIG**

By: /s/ Benjamin Greenberg
Benjamin Greenberg
Jack Keller

*Counsel for Zealthy, Inc.*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 5

      A.   Procedural Background........................................................................................... 5

      B.   Factual Background ............................................................................................... 6

ARGUMENT ..................................................................................................................... 14

   I.   THE COURT'S AUTHORITY AND LEGAL STANDARD ............................................... 14

      A.   The Government's Authority to Seek Preliminary Injunctive Relief Has Been Significantly Limited by the Supreme Court's Ruling in *AMG*............................... 14

      B.   Standard for a Preliminary Injunction.................................................................. 15

      C.   The Government's Claims for an Injunction, Asset Freeze and Receivership ........ 16

   II.   THE GOVERNMENT WILL NOT SUCCEED ON ITS CLAIM THAT ZEALTHY HAS ENGAGED IN IMPROPER TELEMEDICINE PRACTICES IN VIOLATION OF ROSCA OR SECTION 5 ................................................................................... 17

      A.   The Prescription Allegations Fail Because All Prescriptions Issued to Zealthy Patients Are Authorized by Clinical Providers ........................................... 18

      B.   ROSCA Does Not Cover the Prescription Allegations ........................................... 23

   III.   THE GOVERNMENT WILL NOT SUCCEED IN ITS ROSCA OR SECTION 5 CLAIMS BASED ON THE ALLEGED MASS UNAUTHORIZED CHARGES ........................................ 24

      A.   Zealthy's Cancellation Flow is Consistent with Standard Marketing Practices ...... 24

      B.   Zealthy's Chargeback Allegations Do Not Prove a Violation................................. 26

   IV.   THE COURT MUST DENY THE ASSET FREEZE AND RECEIVERSHIP ............................... 29

      A.   The Request for an Asset Freeze is Baseless ........................................................ 29

      B.   The Request for a Receivership is Similarly Meritless............................................ 36

Defendants Kyle Robertson and Zealthy Inc. ("Zealthy") (collectively, "Defendants"), respectfully submit this response memorandum in opposition to Plaintiff's ("Plaintiff" or the "Government") motion for preliminary injunction (the "Motion"). [ECF No. 223.]

### INTRODUCTION

The Court should deny the Government's motion for a preliminary injunction, asset freeze, and receivership. Two years into this case, the Government decided to file this motion only after the Court warned that a potential ruling on its last complaint could "absolutely dramatically impact the Government's vision of their enforcement capabilities." [ECF No. 213, Tr. 2/27/26. at 12:5-13.] In its haste to salvage this long-standing case, the Government filed the Motion, which seeks extraordinary, case dispositive injunctive relief based on an incomplete and negligent investigation of the facts, on faulty and readily disproven assumptions, and relying on outdated law overturned by the Supreme Court. As the Court will see, the Motion is baseless—a factually and legally unfounded effort to test novel and unsupported legal theories and expand the Government's regulatory boundaries following *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021), which substantially curtailed the Government's equitable authority under the FTC Act. The Government does not show it will succeed on its claims, and it does not come remotely close to satisfying the steep and newly heightened criteria for the extraordinary relief that it seeks.

Zealthy is a telemedicine company founded by Kyle Robertson that currently serves tens of thousands of customers who use Zealthy's services to connect with medical providers and obtain important medical treatment and prescriptions, including related to weight loss, anxiety, and depression. As verified by renowned healthcare systems, marketing, and accounting experts, Zealthy's operations are not deceptive or violative of FTC statutes; on the contrary, all prescriptions issued to Zealthy patients are authorized by licensed medical providers; its customer

sign up and subscription process is detailed and readily accessible; and its cancellation processes are simple and consistent with industry standards, among other things.  While no company is perfect, the record shows that Zealthy has never sought to deceive or take advantage of its customers, nor has it engaged in any wrongdoing in its telemedicine and cancellation practices.

In its new complaint and the Motion, the Government raises two sets of allegations in support of claims for violation of the Restore Online Shoppers Confidence Act, 15 U.S.C. § 8403, and for deceptive and unfair practices in violation of Section 5(a) of the FTC Act: (i) that Zealthy uses non-clinicians to issue prescriptions and has bulk issued thousands of bogus prescriptions under a single doctor's name, and (ii) that Zealthy has imposed mass unauthorized recurring charges arising from an allegedly flawed cancellation process. Both allegations rest on a slipshod investigation that sought a predetermined result. The deposition of the Government's lead investigator, Giovan Aloisio, lays bare how little work underlies these claims. Mr. Aloisio admitted that the Government refused to consider evidence of "legitimate business practices"; that it saw no need to "consider any other possibility" than wrongdoing by Zealthy; that it had interviewed only "two or three" Zealthy consumers who had lodged complaints; and that it never examined the screenshots it offers as proof of invalid prescriptions, among other things. Making matters worse, the Government filed its Motion before taking depositions of witnesses who could elucidate key facts that undermine its claims here. As shown below, the Government's investigative shortcuts resulted in a Motion that is premised largely on false assumptions and that fundamentally misrepresents how Zealthy actually operates. The Government cannot succeed on its claims.

*First*, the Government will not prevail on its claims based on unauthorized telemedicine practices. As verified by Defendants' healthcare data systems expert, the Government's submission is demonstrably false: of the over 760,000 prescriptions Zealthy has issued since

2

inception, not a single prescription has been issued to a patient without the review and approval of a licensed medical provider. Rather, the screenshots the Government submits as evidence of non-clinical employees being listed as "prescribers" are the result of an immature technical configuration between the data underlying the prescriptions and the way such data is displayed on Zealthy's user interface screen. As is plain from a review of the data (which the Government did not do), all screenshots purporting to show non-clinical employees listed as "prescribers" pertain and trace back to legitimate prescriptions issued by licensed medical providers. The errant screenshots merely reflect non-clinicians addressing technical errors in the transmission of authorized orders to a pharmacy—such as, for example, when a pharmacy was out of stock of a medication, requiring a non-clinician to transfer that prescription to another pharmacy.

Similarly, the allegation that Zealthy "bulk" issues prescriptions is equally specious. Based on its understanding of direction provided by its pharmacy partners, Zealthy had set up its order integration to apply the name of a supervising clinical physician to all of its transmitted orders as opposed to the underlying issuing provider. Neither Zealthy nor the pharmacies understood this to be anything but a matter of administration at the time of implementation.

Setting aside that Zealthy's prescriptions are all legitimately issued, the telemedicine allegations do not even give rise to a ROSCA.  That statute pertains to negative option features and only applies to misrepresentations regarding recurring charges. The Court must reject the Government's unfounded attempt to fundamentally expand the scope of ROSCA—which is part of an effort to try to counterbalance the momentous loss of regulatory authority in *AMG*.

***Second,*** the Government's claims regarding Zealthy's cancellation process—which the Government made back in 2024—are equally specious. As shown through detailed analysis of Zealthy's sign-up and cancellation processes, website screenshots, and an expert submission,

3

Zealthy's sign up and cancellation practices are not misleading, but rather straightforward, fair, and aligned with industry standard. The Government's Motion did not even address Zealthy's sign-up, prescription, or cancellation processes. Rather, the Government contends that because Zealthy's rate of customer charge disputes—*i.e.*, chargeback rate—is "incredibly high," this "strongly suggest[s] that Zealthy's charge practices are awash with systemic, unauthorized charges to consumers." (Mot. at 10.)  But the Government's depiction and use of this chargeback data is unsupported. The Government manipulates and overstates Zealthy's chargeback rate; it failed to investigate how Zealthy's chargeback rate fares within the industry; and, importantly, it failed to investigate the reasons for these chargebacks—despite acknowledging that customers may raise charge disputes for a host of reasons. The Government cannot create a ROSCA or Section 5 violation merely by pointing to distorted chargeback data.

Moreover, the Government's investigation of customer complaints was defective: it failed to verify the validity of almost all of the complaints, spoke to no more than 2-3 customers, and relied on an unsigned declaration from a disgruntled former customer service representative who performed poorly for the three short months she worked for Zealthy. Conversely, Defendants' renowned marketing expert confirms that a "large proportion" of Zealthy's customers are satisfied.

***Finally***, the Government's requests for an asset freeze and receivership are completely baseless. In *AMG*, the Supreme Court held that the Government cannot seek disgorgement under Section 13(b) of the FTC Act. Based on that, the Eleventh Circuit found that freezes and receiverships are no longer available under Section 13(b). Post-*AMG*, based on the claims in this case, the Government can only seek those extraordinary remedies under Section 19(b), by which it seeks consumer redress for purported ROSCA violations. But the standard for obtaining a freeze and receiver under Section 19(b) is substantially higher. The Government tries to avoid its burden

by citing almost exclusively pre-*AMG* caselaw. Indeed, the Government has not identified—nor have we found—any case where a court has implemented an asset freeze or receivership solely to preserve funds for ROSCA violations. Just as important, none of the criteria for an asset freeze or receiver are satisfied. The Government has not even tried to establish the amount of consumer loss requiring the preservation of funds, and the Government concedes that Defendants have not dissipated any funds. Defendants' accounting expert confirms that Zealthy's operations and financial transactions give rise to zero concern of dissipation—the company retains virtually all of its earnings, it does not distribute or lend funds to Mr. Robertson or its affiliates, and it has steadily amassed a significant cash position and increased its equity in a short period of time. Indeed, none of the customary hallmarks giving rise to a freeze and receiver are present here.

## BACKGROUND

### A. Procedural Background

#### (1) *The First Three Complaints*

The Government has filed four complaints. The Government's initial Complaint named Mr. Robertson and Cerebral as defendants. On May 31, 2024, the Government amended its complaint, [ECF No. 21], adding Zealthy and other defendants. On May 15, 2025, one year later, the Government filed the Second Amended Complaint (SAC), which expanded its allegations regarding Zealthy's alleged privacy violations, misrepresentations in subscription pricing, and unauthorized charging practices. [ECF No. 119]. Notably, the SAC contained a single paragraph— out of 369—referring to the alleged misuse of Dr. German Echeverry's NPI "to submit thousands of prior authorization requests for prescriptions." [1] (SAC ¶ 276)

---

[1] Indeed, as the Government points out in its Motion, the reference to this issue was so trivial (and perplexing) that Defendants did not even address it in moving to dismiss the SAC. *See* Mot. at 6.

### (2)      *The Court's Skepticism of the SAC and the Filing of the TAC*

Defendants moved to dismiss the SAC on June 27, 2025 [ECF No. 150]. The Court held a status conference on February 27, 2026, where it expressed skepticism about aspects of the SAC. *See* 2/27/26 Tr. at 12:5-13 (Court: "there's risks that you take by filing a case this expansive, if you're the government, because you may not like what comes out of the court. And it could absolutely dramatically impact the FTC's vision of their enforcement capabilities…."). In response to the Court's pointed comments, the Government agreed to file a new complaint. [ECF No. 210].

The Government filed its Third Amended Complaint (TAC") on April 10, 2026, which drops all previously named defendants except Defendants Robertson and Zealthy. [ECF No. 220 (TAC ¶ 8).]  In contrast to the three prior complaints, the Government now—more than two-years since commencing this litigation—alleges that Robertson and Zealthy are violating the FTC Act and ROSCA by purportedly failing to make disclosures regarding Zealthy's prescription practices. (TAC ¶ 223.)   The TAC's telemedicine allegations are based in part on two whistleblower complaints submitted over a year ago: a complaint by Dr. Steven McDonald, Zealthy's medical director for just two months in 2024, and a complaint by former Zealthy clinical provider, █████, which attaches voluminous screenshots of the Zealthy provider platform. Three days after filing the TAC, the Government filed the motion for preliminary injunction at issue.

### B.  Factual Background

### (1)      *Kyle Robertson Founds Zealthy Inc.*

In 2019, Kyle Robertson co-founded Cerebral, Inc., a company dedicated to providing patients with online healthcare treatment. (*See* Ex. A, Decl. of Kyle Robertson ("Robertson Decl.") ¶ 3). During his three-year stewardship as CEO, Cerebral grew from a small start-up with a limited number of employees into a national success that works with hundreds of thousands of patients struggling with depression, anxiety, and other issues.  (*Id*. ¶ 3)

Following his departure from Cerebral, Mr. Robertson remained committed to the mission of making healthcare accessible and affordable for everyone. In 2022, he founded Zealthy. Mr. Robertson hired Dr. German Echeverry, who served as Zealthy's Medical Director and who was an initial owner of Bruno Health, P.A. ("Bruno"), an affiliated professional medical organization that operates a telemedicine practice through a physician-controlled structure where it retains sole responsibility for clinical care, medical decision-making, and patient relationships. (*Id*. ¶ 5). Under a management services agreement between Zealthy and Bruno, patients have access to a telehealth platform that offers membership-based access to healthcare services and treatments for a range of conditions, including weight loss, hair loss, erectile dysfunction, birth control, and mental health conditions. (*Id*.; *see also* Ex. B, Expert Report of Punam A. Keller, PhD ("Keller Rep.") at ¶ 12)

### (2)  *Zealthy's Membership Enrollment and Cancellation Processes*

Defendants retained expert, Dr. Punam Keller, a chaired professor in the marketing area at the Tuck School of Business at Dartmouth College and who holds a PhD in marketing, to review Zealthy's enrollment process and cancellation processes. (Ex. B, Keller Rep. ¶ 1.) As shown below Zealthy's enrollment processes is thorough, with clear, express, and repeated disclosures to customers ensuring that they are not confused about the pricing of the membership as distinct from the price of medications, among other things. Similarly, its cancellation process is not confusing, overly complicated, or dissimilar from that of other comparable companies.

### (3)  *Zealthy Membership Enrollment and Medication Plan Selection*

Upon accessing the Zealthy website, a consumer is presented with a two-stage enrollment process.  (*Id*. ¶ 14)  In the first stage, consumers obtain access to the platform by enrolling in a Zealthy membership (the "Membership"), which provides consumers with the ability to engage with a network of telehealth services, including provider consultations and the evaluation of treatment options. (*Id*.) Once eligibility is confirmed and the consumer is enrolled, then the

consumer then may incur additional, transaction-specific costs associated with the utilization of particular services, most notably prescription medications, depending on their individualized treatment. (*Id.*)

With regard to membership enrollment, consumers first answer a series of questions to determine eligibility. For example, the membership enrollment process for Zealthy's weight loss program explicitly identifies the services offered in connection with the membership.  (*Id.* ¶ 15). Zealthy presents customers with those disclosures in at least four separate screens before entering any payment information to obtain a membership.  (*Id.* at 9-23, Ex. 1A). Customers are also presented several additional screens reiterating that the price of medication is "***not included in membership.***" (*Id.*). And before entering payment information at the final weight loss screen, customers are again informed that "***Medication cost is separate***."  (*Id.*)

Following payment of the membership, the consumer is next directed to the treatment plan screens where they are required to complete a medical background intake through a series of 13 screens.  (*Id.* at 24-38, Ex. 1B).  At the fourteenth screen, consumers are reminded that there "are a number of GLP-1 medications," and that they will need to answer an additional set of questions to determine the "best treatment for you," and on the following screen the consumer is again informed that "medication prices may vary based on quantity and dosing."  (*Id.* at 31-33, Ex. 1B). Beneath that button is a summary of Zealthy's terms and conditions.

The consumer is then presented with various medication plans and pricing options depending on the type of medication in which the consumer is interested. (*Id.* at 32, Ex. 1B). Pricing is scaled depending on the plan chosen; for example, if prescribed, compounded GLP-1 medications—such as semaglutide—are available as low as $151 per month when purchasing a 3-month supply.  (*Id.* at 33, Ex. 1B). Following selection of the desired plan, consumers are

8

ultimately routed to the payment page. Prior to paying, consumers are required to check a box which states: "***By proceeding, you confirm you're aware that compound GLP-1 is not included in the price of the membership***." (emphasis added). The text goes on to provide links to various terms of service and policies, including Zealthy's Subscription Policy, which reiterates that Zealthy's "Membership Fee does not inherently include the cost of medication and pharmacy fulfillment, which are additional costs." (*Id*. at 35, Ex. 1B).

In total, a prospective Zealthy customer must complete 24 separate screens before initially submitting payment information and enrolling in a membership—which is more than three times the number of screens a customer must review to cancel their membership, as discussed below.

### (4)   *Zealthy's Cancellation Process is Consistent with Standard Marketing Practices*

Zealthy's cancellation process, which employs standard retention screens throughout the flow, is consistent with other member-based platforms and consumer expectations. (*Id*. ¶ 53-54; *see also* Ex. C, Decl. of Andrew Jones ("Jones Decl.") at ¶ 10)  In fact, such retention screens "are standard practices employed by firms to build long-term value with their customers." (Ex. B, Keller Rep. ¶ 53.)  Zealthy's cancellation flow is accessed through the member's profile page, a standard location for accessing a cancellation link on member-based platforms. (Ex. C, Jones Decl. ¶¶ 16, 19)  Under "Membership," there is a link titled "Manage membership," which then displays a screen reflecting the member's "Weight Loss Plan," which contains hyperlinked text reflecting "Manage your plan." (Ex. B, Keller Rep. ¶ 54, Ex. 6).)  Logically, the consumer is then presented with a "Manage Your Plan" screen that reflects hyperlinked text stating "Cancel weight loss plan" at the bottom. Once a user clicks the "Cancel weight loss plan" button, they are then presented with a number of "retention" screens—7 in total—offering reduced rates not to cancel and requesting further information about why the consumer is canceling. (*Id*. at 80-86, Ex. 6)  At each

9

retention screen, the consumer is given two buttons to choose from, the second of which is "continue unsubscribe" on each screen. (*Id*. at 83-85, Ex. 6).

Consistent with her finding regarding the sign-up and cancellation processes, Dr. Keller's review of the "customer ratings in various online platforms, such as App Store and Trustpilot.com, for Zealthy indicates a large proportion of customers with positive reviews, indicating there are consumers who are satisfied with and see value in Zealthy's services." (*Id*. ¶ 26, Ex. 2A).

### (5)   *Licensed Clinical Providers Authorize All Prescriptions Issued to Zealthy Patients*

Defendants retained James D. Murray, M.S., a Managing Director at BDO USA with over thirty years of experience in healthcare information technology, including senior clinical-systems roles at CVS Health, CVS MinuteClinic, and Mass General Brigham. (Ex. D, Murray Report ¶¶ 3–5). Mr. Murray was engaged to evaluate the Zealthy platform's prescription-issuance process from initial patient request through transmission to the pharmacy, including the historical prescription data underlying that process. (*Id*. ¶ 1.). The Zealthy platform routes each patient medication request to a queue for review by a clinical provider licensed in the state of treatment. (*Id*. ¶ 22.) The provider reviews the patient's intake information, documents the assessment—including diagnosis and treatment plan—in a system-timestamped clinical note, and, where appropriate, authorizes a prescription specifying medication, strength, dosage form, and quantity, which is then transmitted electronically to a pharmacy. (*Id*. ¶¶ 22–24.)

Mr. Murray analyzed Zealthy's user interface platform (UI) and its master prescription data—an extraction of more than 760,000 order-level records spanning September 20, 2023, through May 18, 2026. He identified the configuration defect in Zealthy's UI that produced the screenshots featured in the Government's submission that purport to show non-clinicians as prescribers. Specifically, when a non-clinician support agent opens or edits a prescription that a

10

provider has already authorized—as occurs, for example, when a pharmacy stock-out requires retransmission of an order (*id*. ¶ 29)—the platform's UI inaccurately displays the support agent's name in the "Prescriber" field. (*Id*. ¶¶ 33, 56–57.)  In each such instance, however, the underlying master data reflects the licensed medical provider and valid NPI associated with the order, corroborated by the clinical note that the provider created and signed. As verified by Mr. Murray, the on-screen display "is an error in the way the system is configured," not a record of who authorized the prescription. (*Id*. ¶¶ 35–37, 58–64.)

Mr. Murray also examined the pharmacy-side data attached to the Aloisio declaration—which is the centerpiece of the Motion that submits almost all supporting evidence. After filtering the master data to actual (non-test) prescriptions transmitted to pharmacies and applying a documented mapping logic connecting the pharmacy's records to Zealthy's order-level data, he determined that Dr. Risheet Patel—whom the Government identifies as the listed prescriber on 11,000 prescriptions in a single month from one pharmacy and more than 100,000 from one pharmacy in less than two years—was not the authorizing prescriber for any such prescriptions that were actually transmitted. *(Id*. ¶¶ 66–71.) Rather, as Mr. Murray establishes, every prescription reflected in the Government's exhibits related to Dr. Patel's purported mass prescribing actually traces to an authorization by a different licensed Zealthy clinician (*Id*. ¶¶ 90-97).

The reason that Dr. Patel and Dr. Echeverry are inaccurately listed on the pharmacy-side data as the prescriber for thousands of prescriptions, even though other licensed clinicians reviewed and authorized the prescriptions, is due to the setup of the Application Programming Interface (API) between Zealthy and its various external pharmacies, which called for a single "clinical" provider account through which prescriptions were sent.  (*See* Ex. E, Declaration of Michael Dadi ("Dadi Decl.") ¶ 12; *see also* Ex. B, Robertson Decl. ¶ 12). Based on its

11

understanding of the single clinical account, and consistent with direction received from its pharmacy partners regarding this setup, Zealthy "hard-coded" certain clinical providers— primarily Drs. Patel and Echeverry as owners and/or medical directors of Zealthy—as the "clinical" prescriber in Zealthy's API integrations with its pharmacy providers. (*See* Dadi Decl. ¶¶ 12; *see also* Robertson Decl. ¶¶ 12-15.).   So, while the pharmacy-side data reflects a single doctor as "prescriber" for all of those prescriptions, Zealthy was unequivocally not issuing "bulk" prescriptions without any provider oversight, as Mr. Murray establishes.

### (6)   *Zealthy's Affiliated Entities are Valid Operating Entities*

Defendants retained Paul M. Ribaudo, CPA, CFE, CFF, CITP, a partner in the Forensic, Litigation & Valuation Services Group of Citrin Cooperman Advisors LLC, who reviewed the organizational and governing documents of Zealthy and its related entities, Zealthy's QuickBooks Online accounting data from May 2023 through March 2026, consolidated federal income tax returns, bank statements, loan and management services agreements, and deposition testimony, including that of the Government's investigator. (Ex. F, Expert Report of Paul Ribaudo ("Ribaudo Rep.") ¶¶ 11-13.). The entity structure the Government characterizes as a network of "shells" is actually a conventional telehealth operating structure.  (*Id*. ¶ 16). Zealthy, a Delaware corporation formed in December 2022 and controlled by Mr. Robertson as CEO and sole director, operates the telehealth platform and serves as the primary business entity. (*Id*. ¶¶ 27–28.) As noted, Bruno is a physician-controlled Florida professional medical organization that retains sole responsibility for clinical care, medical decision-making, and patient relationships; under a Management Services Agreement dated May 1, 2023, Bruno engaged Zealthy as its exclusive provider of non-medical administrative services, including billing, collections, and information technology. (*Id*. ¶ 29.)

FitRX, LLC and RippleRX, LLC are Delaware limited liability companies in which Zealthy holds the Class A membership units carrying all rights to profits and distributions, as well

12

as the authority to designate and remove the Manager and approve significant company actions. (*Id.* ¶¶ 31–32.) In October 2025, RippleRX acquired 100% of the shares of Roen Health, Inc—whose trade name is RoenRx—making Roen a wholly owned subsidiary within the same structure. (*Id.* ¶ 33.) The economic interests in each related entity thus run to Zealthy, not away from it.

The financial activity of Zealthy and the related entities is recorded in a single, centralized accounting  system. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ That structure permits the preparation of entity-specific trial balances, profit and loss statements, and balance sheets, as well as consolidated reporting across all entities. (*Id.* ¶¶ 37–38.) Bookkeeping is performed by an outsourced provider, and an external certified public accountant prepares the Company's tax returns and records year-end adjustments. (*Id.* ¶ 36.) ████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ This shows a company that is retaining virtually all of its earnings and continuously improving its financial position and liquidity, not one dissipating or transferring away its assets.

The Government's contention that Zealthy's affiliates are used "to obtain. . . rogue LegitScript certifications, and access to payment processing to process millions of dollars in

monthly transactions for Zealthy" is false. (Mot. at 14.) For example, when FitRx applied for a LegitScript certification, LegitScripts specifically asked FitRx about its affiliation with Zealthy, which FitRx aptly disclosed. (Robertson Decl. ¶ 27). And RoenRx's connection to Zealthy is expressly disclosed on Zealthy's website, which states, for example that "Zealthy does business under the name RoenRx and your invoice may include a reference to RoenRx or GLP-1s." (*See* Keller Rep. at 24, Ex. 1B).

## ARGUMENT

The Court should reject the Government's request for a preliminary injunction, asset freeze, and receiver. The Government will not prevail on its claims, and it cannot satisfy the demanding criteria for the extraordinary injunctive relief it seeks just months before trial.

I.      THE COURT'S AUTHORITY AND LEGAL STANDARD

A.      **The Government's Authority to Seek Preliminary Injunctive Relief Has Been Significantly Limited by the Supreme Court's Ruling in *AMG***

The Government misstates its authority to seek preliminary injunctive relief following *AMG*. Section 13(b) provides the Government with the ability to seek preliminary injunctive relief based on deceptive or unfair conduct in violation of Section 5(a). 15 U.S.C. § 53(b); *see also AMG*, 593 U.S. at 77-78. Before *AMG*, under Section 13(b), the Government also used to seek disgorgement awards and obtain asset freezes and receiverships to preserve assets for disgorgement. Because *AMG* ruled that Section 13(b) does not authorize disgorgement, courts can no longer impose an asset freeze or receivership under that provision. *See FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1078 (11th Cir. 2021); *see also Perlman v. PNC Bank, N.A.*, 38 F.4th 899, 902 n. 2 (11th Cir. 2022). Despite that, quoting an overturned pre-*AMG* case, the Government misrepresents that Section 13(b)'s "unqualified grant of statutory authority carries within the full

14

range of equitable remedies, including the power to grant consumer redress." *See* Mot. at 4 (quoting *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468 (11th Cir. 1996)). That is not true.

Based on its claims here, while the Government can still move to enjoin deceptive and unfair practices under Section 13(b), the Court only has the authority to enter an asset freeze or receivership under Section 19(b), 15 U.S.C. § 57b, to preserve funds for consumer redress based on the alleged ROSCA violations. *See infra* at 30-32; *FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1330 (11th Cir. 2023). But that is a totally different equitable paradigm than pre-*AMG* freezes and receiverships, because Section 19(b) redress "authority is limited" and based purely on consumer loss—which is much more restrictive than disgorgement. *FTC v. Superior Prods. Int'l II, Inc.*, 2022 WL 4378715, at *13 (D. Kan. Sept. 22, 2022); *FTC v. Zurixx, LLC*, 2021 WL 5179139 (D. Utah Nov. 8, 2021). The Government not only fails to note this significant change in the law, but it misleadingly relies almost exclusively on pre-*AMG* cases in describing the Court's authority. Below, in the sections regarding the asset freeze and receiver, we examine the new post-*AMG* legal standards applicable to those onerous forms of injunctive relief under Section 19(b).

## B. Standard for a Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *FTC v. On Point Capital Partners LLC*, 17 F.4th 1066, 1077 (11th Cir. 2021) (citation, quotation omitted). To obtain a preliminary injunction under Section 13(b), the Government must show that (1) it is likely to ultimately succeed on the merits of the case, and (2) that a balancing of the equities supports the injunctive relief sought. *Id*. at 1079. "In light of the severe adverse consequences of a preliminary injunction," even pre-*AMG*, "the [Government] ha[d] a substantial burden under Section 13(b)." *FTC v. Great Lakes Chem. Corp.*, 528 F. Supp. 84, 86 (N.D. Ill. 1981). The Government can only obtain a preliminary injunction where it can show ongoing violations of the FTC Act, or a likelihood of violations in the near future. *See* § 53(b).

15

Where, as here, the Government seeks extraordinary remedies beyond merely enjoining violative conduct, such as an asset freeze and receivership, it must meet the heightened burden of establishing such relief is appropriate under Section 19(b). *See Simple Health Plans*, 58 F.4th at 1327-30; *Zurixx*, 2021 WL 5179139 at *6 ("Because [the FTC] must now rely on specific violations, the justification for imposing an asset freeze and receivership has also changed significantly."). Given that Section 19(b) only permits "relief 'necessary to redress injury to consumers,'" *Simple Health Plans*, 58 F.4th at 1328 (quoting 15 U.S.C. § 57b(b)), the Government must "demonstrate the individual consumer redress damages" are sufficiently substantial compared with available assets to require an asset freeze or a receivership. *See Zurixx*, LLC, 2021 WL 5179139 at *6. The amount of "potential damages under Section 19" thus constitutes "a significant consideration in determining whether the balance of equities and public interest support an asset freeze and receivership," *id*. at *5, and the Government bears the burden to "demonstrate those damages." *Id*. at *7.

## C. The Government's Claims for an Injunction, Asset Freeze and Receivership

The Government seeks a preliminary injunction based on Counts I and II of its TAC. In Count I, the Government brings a claim for violations of ROSCA, 15 U.S.C. § 8403, which is considered an FTC rule under Section 18, 15 U.S.C. § 57a. Under ROSCA, it is unlawful for a seller to offer a "negative option feature" unless the seller "(1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before charging the consumer; and (3) provides simple mechanisms for a consumer to stop recurring charges." *F.T.C. v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 769 (7th Cir. 2019). A "negative option feature" is "a provision under which the customer's silence or failure to take an affirmative action to reject goods

16

or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w); *see* 15 U.S.C. § 8403 (incorporating the TSR's definition by reference).

In Count II, the Government brings a claim for deceptive and unfair practices in violation of Section 5(a), 15 U.S.C. § 45(a). To allege a deceptive practice under Section 5(a), the Government "must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003).  A representation or omission is material if it is of the kind usually relied on by a reasonably prudent person. *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999).  The Government must satisfy Rule 9(b), where, as here, their allegations sound in fraud. *See FTC v. American Precious Metals, LLC*, 2012 WL 13114034, at *3 (S.D. Fla. Apr. 12, 2012). To allege an unfair practice, the Government must show a likely injury to customers that is "substantial" and is not "outweighed by any countervailing benefits to consumers or competition that the practice produces," and that "consumers themselves could not reasonably have avoided."  *LabMD, Inc. v. FTC,* 894 F.3d 1221, 1229 (11th Cir. 2018).

The Government asserts violations of ROSCA and Section 5(a) based on two theories: (1) that Zealthy engaged in "undisclosed, unlawful telemedicine practices" through the issuance of prescriptions by non-clinicians and the use of providers' NPI numbers without their knowledge (the "Prescription Allegations"), and (2) that Zealthy allegedly has engaged in mass unauthorized charges to consumers (the "Chargeback Allegations"). These claims will not succeed.

## II.   THE GOVERNMENT WILL NOT SUCCEED ON ITS CLAIM THAT ZEALTHY HAS ENGAGED IN IMPROPER TELEMEDICINE PRACTICES IN VIOLATION OF ROSCA OR SECTION 5

The Government cannot succeed on its claims based on the Prescription Allegations for material reasons—*first*, there were no material misrepresentations or unfair practices regarding Zealthy's prescription and telemedicine practices that would give rise to violations of Section 5(a)

17

or ROSCA because every prescription is issued by a licensed provider and *second*, because ROSCA does not even cover these purported violations.

### A.     The Prescription Allegations Fail Because All Prescriptions Issued to Zealthy Patients Are Authorized by Clinical Providers

The Government will not prevail on its claims based on the alleged unauthorized prescription practices because they are factually unfounded.

#### (1)     *The Government Fails to Identify the Representations at Issue*

As a threshold matter, neither the Motion nor the TAC set forth the representations that are allegedly deceptive in Zealthy's website or in its customer sign-up process concerning its telemedicine practices. Instead, the Government alleges that telemedicine practices constitute "implicit misrepresentations," Mot. at 9, and that Defendants "never disclos[ed] (much less clearly or conspicuously) that [Zealthy's] subscribers' medical care and prescriptions *might* be illicit." *Id*. at 5 (emphasis added). But these vague assertions do not actually identify any express misrepresentations or omissions by Zealthy's. The Government's failure in this respect violates its obligation to plead these claims with particularity under Rule 9(b), which applies here. *See* Mot. (thirteen references to "fraud"). In addition to Rule 9(b), this also falls short of the most basic requirements for a Section 5 claim—to identify the material misrepresentations that are likely to mislead consumers. *Tashman*, 318 F.3d at 1277.

#### (2)     *All Prescriptions are Authorized and Issued by Clinical Providers*

But even setting aside this most basic requirement, the Government's unauthorized telemedicine allegations—primarily that non-clinicians issue prescriptions and that Dr. Patel mass prescribed thousands of prescriptions—are patently false.

18

(a)    *Non-Clinical Employees Do Not Prescribe to Zealthy Patients*

The Government claims that non-clinicians have "systemically" issued prescriptions based on screenshots that appear to reflect non-clinicians in the "prescriber" field of an order screen in the Zealthy portal.   (*See* Aloisio Decl., Ex. 1.) But these screenshots do not support the Government's unauthorized prescription allegations.

As Defendants' expert, Mr. Murray, has found through a detailed analysis, there is an "inconsistency in the display" of the data as viewed through the Zealthy UI (from which the Government's screenshots are captured) as compared to the underlying master prescription data (which the Government has not analyzed). ███████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████ Accordingly, when a non-clinician edits an order because, for example, the original pharmacy no longer stocks the medication, the Zealthy UI interface will reflect a change incorrectly identifying the non-clinician as the "Prescriber" of an entirely new order, when in fact the record is accurately captured in the underlying master prescription data, identifying the medical provider in one field and the order support agent in another field.

By way of example, Zealthy Order number ███████ reflects Ana Ancheta, a non-clinician, as the "Prescriber":



**Revive - Tirzepatide 20 mg vial**

Revive Order ID: 7ba5b5b4-2db0-40ee-a71c-9cac55f60547
Order status: DELIVERED
Dosage instructions:
Inject 25 units (2.5 mg) subcutaneously (i.e. under the skin) once per week for four weeks.
Medication: Tirzepatide 20 mg vial
Prescriber: Ana Ancheta
Created at: 05/01/2025 at 01:11 p.m.
Delivered at: 05/11/2025 at 03:24 p.m.

**Actions**

However, when viewed in the underlying prescription data, that order reflects, as it should, the clinician that initially authorized the prescription, Danielle Milazzo. (Murray ¶¶ 59-64.)

This is just one example. As attested to by Mr. Murray, this is similar to what occurred with every instance where a non-clinician appears listed as a "prescriber" in an order screen. Thus, rather than serving as evidence of a widespread health care fraud scheme as alleged by the Government, the screenshots relied on by the Government merely reflect an inconsistency in the technical configuration of data populating the UI in connection with prescriptions that were legitimately reviewed and authorized by medical providers.

The Government failed to identify this simple, innocuous mistake because of its halfhearted investigation prior to filing the Motion. Instead of a serious examination of the facts, the Government just presumed that the screenshots at issue showed wrongdoing. To make up for its lack of diligence, the Government resorted to citing inflammatory Slack messages between Zealthy engineers on this issue. *See* Mot. at 7. Those Slack messages have zero probative value, and should never have been referenced, as shown. Moreover, they stem from banter where the engineers insult Mr. Robertson and vent about their jobs—*i.e.*, "bruh, he's so annoying" and "he's just bipolar."

20

          (b)      *Zealthy Has Not Issued "Bulk" Prescriptions*

According to the Government, Zealthy has also "bulk" ordered prescriptions in the name and NPI of Dr. Risheet Patel, pointing to excerpts of prescription data received from ReviveRx and ClintCorp—two of Zealthy's external pharmacies—without any actual clinical oversight. (Mot. at 8-9; Aloisio Decl ¶¶ 43; 44; 47; Aloisio Exs. 32, 33, & 36 (the "Bulk Prescription Exhibits").) But again, the Government's failure to exercise proper investigatory effort has resulted in the submission of plainly incorrect facts to this Court—as there is a simple explanation behind the Government's myopic presentation of the prescription data.

First, Dr. Risheet Patel is not authorizing each of the individual prescriptions listed in Bulk Prescription Exhibits. Rather, based on Zealthy's understanding of direction it received from its pharmacy providers in connection with configuration of the API integration between Zealthy and the pharmacies, Dr. Patel's name and NPI were "hard-coded" in those integrations. (Robertson Decl. ¶¶ 12-13; *see also* Dadi Decl. ¶ 12).)  For example, a March 2024 email chain between Zealthy and ReviveRx with the subject line "Zealthy API Integration Questions," reflects the confusion by not only Zealthy but ReviveRX itself in how to configure the API integration with respect to the prescribing provider. In the email, a representative from Pharmetika, a software ReviveRX was using to process prescriptions, explains that Zealthy—*i.e.*, the clinic—should "create a clinic staff member account to use as a service account to send on behalf of the practitioners at the clinic." (Robertson Decl. ¶ 12.). In other words, the representative asked Zealthy to create a member account for a single clinical provider to use as a service account for all providers prescribing medications to Zealthy customers. Indeed, this was the general approach used for all pharmacy API integrations. (*Id.; see also,* Dadi Decl., Ex. 5).)

Importantly, as attested by Mr. Murray, even though the pharmacy-side data reflects Dr. Patel as the "prescriber" in the Bulk Prescription Exhibits, every such prescription was issued to and expressly maps back to a Zealthy clinical provider as the issuing provider. (Murray Rep. ¶¶89-96, 105-108, Appx. H-J). For example, clinical provider Holrite Alcy is nowhere listed in the data provided by ReviveRx, which is set forth in Aloisio Exhibit 33. However, when mapped to the corresponding master prescription data in Zealthy's system, the evidence demonstrates that Ms. Alcy in fact issued nine prescriptions that the Government ascribes to Dr. Patel.

(Murray Rep., Appendix I; *see also* Ex. G, Decl. of Holrite Alcy ¶ 11 (reflecting orders attributable to Alcy in Aloisio Exhibit 33)). The same is true for other clinicians, such as Naomi Sharp, Tamara Shipp, Vanessa Guidry and Angie Chang.  (Ex. H, Sharp Decl. ¶ 10; Ex. I, Shipp Decl. ¶ 15; Ex. J, Guidry Decl. ¶ 10; Ex. K, Chang Decl. ¶ 10).). All of them issued prescriptions that the Government incorrectly attributes to Dr. Patel in the data provided by ReviveRX (Aloisio Ex. 33). That is, while the Government provided an excerpt of prescription data at Exhibit 33 to the Aloisio Declaration, Mr. Murray maps every single order in the full version of that file—104,052 prescriptions in total—back to a licensed clinical provider.  (Murray Rep., App. I).)

This same hard-coding API issue explains the ReviveRX prescription data with respect to Dr. Echeverry that the Government produced at Aloisio Exhibit 36. Here again, Mr. Murray has mapped every single prescription in the native version of that data file (as opposed to the extract)—8,509 in total—to prescriptions issued by licensed medical providers who worked at Bruno Health. (Murray Rep., App. J.)  Moreover, it is worth highlighting that, in August 2024, Mr. Robertson

informed ReviveRx that Dr. Echeverry should be removed as a listed clinical provider because he no longer worked at Zealthy. (Robertson Decl. ¶ 12).

In sum, the Government is wrong that Zealthy was bulk prescribing under Dr. Patel or Dr. Echeverry's name and NPI. A better investigation would have quickly revealed that.

**B.     ROSCA Does Not Cover the Prescription Allegations**

Not only are the Government's Prescription Allegations entirely unsubstantiated, the theory as advanced is a novel and unfounded interpretation of ROSCA. It argues that the Defendants have violated ROSCA through "improper and dangerous telemedicine practices that have never clearly or conspicuously been disclosed to subscribers." Mot. at 6. In other words, ROSCA's requirement regarding the disclosure of all "material terms of a transaction" has been violated through Zealthy's alleged prescription practices, according to the Government. 15 U.S.C. § 8403. To be clear, this is an unfounded attempt to use ROSCA as a vehicle to prosecute alleged misrepresentations pertaining to the *underlying characteristics of the services or product at issue*, rather than misrepresentations related to just a negative option feature—which is the actual statutory intent of ROSCA. Indeed, the TSR, whose definition of "negative option feature" ROSCA adopts by reference, 15 U.S.C. § 8403, explains that the "material terms" of a negative option are terms like "the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s)." FTC Telemarketing Sales Rule, 75 Fed. Reg. 48458, 48518 (Aug. 10, 2010).

Further, and notably, in 2023 the FTC implemented a rule that attempted to expand the scope of ROSCA to account for and include its current untenable theory. *See* Negative Option Rule, 88 Fed. Reg. 24716(proposed Apr. 24, 2023). That rule purported to "prohibit[] any person from misrepresenting, expressly or by implication, any material fact regarding the entire

agreement—*not just facts related to a negative option feature*." *Id*. at 24727 (emphasis added). The implementation of this proposed rule was vacated by the Eighth Circuit based on violations of the APA. *Custom Commc'ns, Inc. v. FTC*, 142 F.4th 1060, 1064 (8th Cir. 2025). But the fact of the proposed rule serves as conclusive evidence that ROSCA does *not* cover misrepresentations outside of the negative option feature. *See* 88 Fed. Reg. at 24716 ("[T]he Commission, as detailed in this document, now proposes to amend the existing Rule to implement **new** requirements to provide important information to consumers, obtain consumers' express informed consent, and ensure consumers can easily cancel these programs when they choose." (emphasis added))

This critical threshold legal argument nullifies the Government's entire theory, by which the Government attempts to distort and wrongfully expand the scope of ROSCA in light of *AMG*'s substantial restriction of the Government's equitable authority under Section 13(b). We incorporate the prior and forthcoming motion to dismiss briefing on that issue here, so as to avoid duplication.

## III. THE GOVERNMENT WILL NOT SUCCEED IN ITS ROSCA OR SECTION 5 CLAIMS BASED ON THE ALLEGED MASS UNAUTHORIZED CHARGES

Similarly, the Government's chargeback allegations do not support ROSCA or Section 5 violations. *First*, Zealthy's cancellation and refund processes are transparent, not confusing, and consistent with standard industry practice and consumer expectations. And *second*, these claims fail because they are almost entirely predicated on unsubstantiated inferences drawn from Zealthy's purported chargeback rate, without a thorough underlying investigation.

### A. Zealthy's Cancellation Flow is Consistent with Standard Marketing Practices

The Government will not succeed on its claim that Zealthy's cancellation process deprives the consumer of a simple cancellation mechanism under ROSCA—a claim that it raised back in May 2024, over two years ago. (FAC ¶ 236). The Motion noticeably omits any analysis of Zealthy's cancellation processes. The TAC does contain allegations that purport to support this

24

ROSCA claim, stating that Zealthy's cancellation is not simple within the meaning of ROSCA because it requires consumers to navigate "unsolicited save offers, retention pitches, questions, extra screens, and warnings" before being able to cancel their subscriptions. (TAC ¶¶ 157; 160.)

As explained by Defendants' expert, Dr. Keller, however, the use of retention screens in a cancellation process—especially the seven in total that are present in Zealthy's cancellation flow— are evidence only of standard marketing practices consistent with consumers' expectations in interacting with a cancellation mechanism. While the Government characterizes the cancellation flow as "unlawful" and "convoluted, "the 'surveys, unnecessary steps, repeated discounts and special offers, and other hurdles' identified in [the] cancellation process are commonly used features in online environments." (Keller Rep. ¶¶ 53-54).  In fact, many consumers "are likely to be familiar with such mechanisms independent of any interaction with Zealthy's website or app." (*Id*. ¶ 59)  As such, "consumers' prior online experiences provide important context for how they interpret and navigate the elements at issue when engaging with Zealthy's platform."  (*Id*. ¶¶ 59-60). By way of example, Dr. Keller's review of comparable GLP-1 telehealth providers shows that retention measures—save offers, reason-for-cancelling surveys, benefit-loss reminders, and discounts—are common across the industry (e.g., Fridays, Hers, Mochi Health, Noom, PlushCare, Remedy Meds, Ro, and Weight Watchers). (Keller Rep.§ V, Ex. D1.) Indeed, some major providers offer no in-portal cancellation mechanism at all, requiring customers to cancel by email or chats. (*Id*. ¶ 55 (MEDVi, Sprout).)

Consumer expectations were considered in the original design of Zealthy's enrollment and cancellation flow because "designing something that departs significantly from established conventions may create user confusion." (Jones Decl. ¶ 10).  Accordingly, "the Zealthy platform was designed in a manner consistent with its comparable telehealth competitors."  (*Id*.) As one of

25

Zealthy's original web designers recalls: "At Mr. Robertson's direction, the design of the cancellation flow was intended to provide the user with the ability to cancel their subscription and/or treatment plan from within the Zealthy patient portal. It did not require users to locate a separate external email address or contact a third party in order to cancel." (*Id*. ¶ 16) And there was never a "bulk cancellation function" because, consistent with Zealthy's membership offerings and "standard practice for subscription-based platforms," "a patient might wish to cancel one component while retaining the other." (*Id.* ¶ 16)

Not only has the Government failed in its Motion to address Zealthy's cancellation process or flow, but Mr. Aloisio admits that the Government never even engaged the platform's cancellation function (or enrollment for that matter), let alone evaluated it in any respect. (*See* Ex. L (Aloisio Tr. 174:9-175:1).). Because ROSCA claims are centered upon providing consumers with a "simple mechanism…to stop recurring charges," 15 U.S.C. § 8403(3), the Government's failure to address Zealthy's cancellation process is a dispositive flaw on this claim.

**B.  Zealthy's Chargeback Allegations Do Not Prove a Violation**

Because it cannot show that Zealthy's cancellation process is not simple, the Government instead appears to base its Motion on another novel theory—that evidence of material chargebacks and refunds largely proves that a cancellation process violates ROSCA. In other words, the Government argues that because Zealthy appears to have paid a certain amount of refunds and chargebacks, the Court should infer that every single recurring or other consumer charge by Zealthy violates the FTC Act and ROSCA. Mot. at 10-11. To be clear, we have not found—nor has the Government identified—any federal case finding that chargeback or refunds rates conclusively establish that a cancellation process violates ROSCA—without actual analysis of the cancellation processes. This evidence is, at best, circumstantial. And for several reasons the Government's submission regarding chargebacks and refunds is not reliable.

26

*First*, the Government has manipulated the data regarding purported customer disputes, misrepresenting that Zealthy's so-called customer disputes in 2025 were a "whopping total of $11M" and comprised 35% of Zealthy's sales. (Mot. at 11.)  These assertions simply are not true. The Government misled the Court and proffered these incorrect figures by:

- Incorrectly combining the amount of customer chargebacks (*i.e.*, disputes)—which occur when a customer disputes a charge with his or her credit card company—with customer refunds, which are based on voluntary repayments to customers;



(Ribaudo Rep. ¶¶ 53-54)

*Second*, the Government has proffered purported chargeback rate and refund data without conducting any investigation of the industry standard for customer disputes in the telemedicine industry. (Ex. L, Aloisio Dep. at 221:2). That is critical context required to evaluate whether the chargeback or dispute rate in this case is actually high (and thus potentially probative circumstantial evidence), or whether it is consistent with industry standard given the kind of products at issue here—*i.e.*, weight loss medications. The Government's investigator not only did not evaluate this, but the Government fails to proffer expert or other testimony on this issue.

---

[2] This number is further reduced if you don't select the months with the highest chargebacks and refunds. For example, more recently in Q1 2026, the figure drops to 11%.

***Third***, importantly, the Government's evidence regarding chargebacks is of limited probative value because it was based on the presumption that all chargebacks are valid disputes—something that even the Government's investigator admits is a false assumption "for any business." (Ex. L, Aloisio Dep. 150:1-6).) Indeed, the Government's investigator admits that Zealthy's customers could have sought chargebacks for a host of reasons not related to a ROSCA violation—such as dissatisfaction with the product or even fraud by the customers. (*Id.* at 150:2-11.)  And the Government did not investigate what portion of the purported customer disputes were based on unauthorized recurring charges versus other non-violative reasons. *Id*. at 151:20-24. When we asked whether they sampled the chargebacks to evaluate the reasons for the dispute, the Government objected on privilege grounds and refused to respond. (*Id*. at 159:18-161:8.)

In addition to chargebacks, to support its claim regarding unauthorized recurring charges the Government also marginally relies on a handful of customer complaints, most of which were submitted to an FTC consumer clearinghouse.[3] But the Government's investigator admitted that he did not speak to *any* of the purported customers who lodged complaints with the clearinghouse to verify if they were valid or that the customers were even real people. *Id.* at 178:1-184:25. Indeed, several of these customer complaints appear to note that they were resolved. Further, evidence of a handful of customer complaints out of tens of thousands of customers is not persuasive evidence. Indeed, Dr. Keller finds persuasive evidence of positive customer reviews for Zealthy, indicating that on her analysis of customer review sites there are consumers who are satisfied with Zealthy despite the Government's overly broad brush.  (Keller Rep. ¶ 26).

Finally, Zealthy did not use "test payments" to reduce the chargeback rate. "Test accounts" are commonly used by engineers to test code changes before and after they go live. (Dadi Decl.

---

[3] The Government also refers to a declaration by Melissa Wallburg, who worked as a part-time contract customer service agent for 3 months and was on a team that mostly handles escalations for upset customers.

¶ 16).)  Mr. Dadi, a former Zealthy engineer, states that he "created hundreds of test accounts for the purpose of testing engineering work." (*Id*.)  He confirms that he was never asked to create or use test accounts to dilute or manipulate chargeback rates and was not aware of such a practice. (*Id.).* And contrary to the Government's oversimplification, Mr. Dadi explains that in troubleshooting platform issues through use of test accounts, Zealthy engineers go through the sign-up and payment process for purchasing a membership for $135 and the medication plan that they are testing. (*Id*. ¶ 19.)  Finally, and contrary to any credible allegation that the purpose of test accounts was to dilute the chargeback rate, in November 2024, Zealthy began troubleshooting processes to cancel test accounts—a process that was initially manual and that later was automated in April 2026. (Dadi Decl. ¶ 20; *see also* Robertson Decl. ¶¶ 28-35).

## IV.    THE COURT MUST DENY THE ASSET FREEZE AND RECEIVERSHIP

In addition to the fact that the Government's request for a preliminary injunction should be denied because it will not succeed on the merits, its extraordinary request for an asset freeze and receivership is patently unfounded and unnecessary—as it is based on outdated caselaw and fails to satisfy the most basic threshold requirements for these draconian forms of equitable relief.

### A.  The Request for an Asset Freeze is Baseless

#### (1)    *The Requirements for an Asset Freeze*

##### (a)    *The Government's Heightened Burden for Asset Freezes Under Section 19(b) Requires Establishing Consumer Loss*

At the outset, the recently heightened threshold that the Government must satisfy for these extraordinary forms of equitable relief must be acknowledged. As noted, prior to the Supreme Court's ruling in *AMG Cap. Mgmt*, 593 U.S. 67, the Government used to seek freezes and the appointment of receivers under Section 13(b) of the Act, which authorizes preliminary injunctive relief and which the Government previously used to seek disgorgement awards. Under that prior

framework, the propriety and scope of a freeze was broad, because it was predicated on the Government's reasonable approximation of potential disgorgement, which is based upon "the defendants' unjust gain and ignores consumer loss." *FTC v. Lanier L., LLC*, 194 F. Supp. 3d 1238, 1287 (M.D. Fla. 2016); *see also FTC v. Bishop*, 2011 WL 1560656, at *1 (11th Cir. April 25, 2011). That ill-gotten gain was calculated by estimating net revenue associated with the deceptive or unfair practice—an expansive measure of equitable relief that easily supported broad-based asset freezes. *See, e.g., FTC v. Washington Data Res., Inc.*, 704 F.3d 1323, 1327 (11th Cir. 2013).

*AMG,* however, nullified those cases. Because *AMG* ruled that Section 13(b) does not permit disgorgement, the Court cannot impose an asset freeze or receivership under Section 13(b). *On Point Cap. Partners,* 17 F.4th at 1078 (11th Cir. 2021). Despite that, the Government almost exclusively cites Section 13(b) cases in support of and as setting the standard for the relief it seeks here. *See, e.g.* Mot. at 17. By way of example, the Government says that its "burden of proof in the asset freeze context is relatively light and, moreover, does not require exactitude in describing the basis for the asset freeze." Mot. at 18 (citing cases, cleaned up). But that is an outdated standard for an asset freeze from pre-*AMG* cases—such as *FTC. v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1234 (11th Cir. 2014)—that was explicitly drawn from the highly flexible (and inapplicable standard) for seeking disgorgement. The Government's citation of those cases invites error.

The Government does also seek equitable relief under Section 19(b) of the Act, by which it is seeking consumer redress for alleged ROSCA violations. *See* Mot. at 4. But the Government's burden for an asset freeze under Section 19(b) is significantly higher than under Section 13(b). That is because Section 19(b)—which permits the Government to only seek "relief necessary to redress injury to consumers"—requires a "calculation of consumer loss, as opposed to a calculation of net unlawful profits." *FTC v. Noland*, 672 F. Supp. 3d 721, 790 (D. Ariz. 2023), aff'd sub nom.

30

*FTC v. Success By Media Holdings Inc.*, 159 F.4th 1159 (9th Cir. 2025); 15 U.S.C. § 57b(b). Showing consumer loss or "injury to consumers" is complicated and individualized, because it requires the Court to discern which of Zealthy's customers are entitled to refunds based on actual ROSCA violations stemming from unauthorized recurring charges. *See, e.g., FTC v. Noland*, 2021 WL 5493443, at *7 (D. Ariz. Nov. 23, 2021); *see also FTC v. Zaappaaz, LLC.*, 2023 WL 5020618, at *16 (S.D. Tex. June 9, 2023), R&R adopted sub nom. *FTC v. Zaappaaz*, LLC, 2023 WL 5018433 (S.D. Tex. Aug. 3, 2023). Indeed, as opposed to disgorgement relief, courts have stated that Section 19(b) redress "authority is limited." *See Superior Prods.*, 2022 WL 4378715, at *13.

As a result, in seeking an asset freeze the Government must provide a detailed calculation of and prove the purported consumer loss that it seeks under Section 19(b) for ROSCA violations—which is substantially more exacting than a disgorgement analysis and provides the required threshold basis for a freeze. *Simple Health Plans*, 58 F.4th at 1330 (Section 19(b) asset freeze intended "to ensure that if the court awards final monetary relief, assets will still be available to redress consumers' injuries"); *FTC v. Zurixx, LLC*, 2021 WL 5179139 (D. Utah Nov. 8, 2021) ("The change in this case from the previous gross revenue damages under Section 13(b) to the individualized consumer redress damages under Section 19 is a significant change in not only the amount of damages but the type of evidence needed to demonstrate those damages.").

(b)    *The Government Also Must Show a Likelihood of Dissipation*

Additionally, the Government "must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted." *FTC v. Kutzner*, 2016 WL 9277319, at *7 (C.D. Cal. Aug. 24, 2016); *see also CFTC v. Sterling Trading Group, Inc*, 605 F.Supp.2d 1245, 1304 (S.D. Fla. 2009). This is a key inquiry because the purpose of an asset freeze is to ensure that defendants will not dissipate, conceal, or divert assets before a final judgment,

31

"thereby defeating the possibility of effective final relief in the form of equitable monetary relief."
*See CFTC v. Mad Fin., Inc.*, 2002 WL 1972063, at *7 (S.D. Fla. 2002). While the Government says that it must "only show a concern that the defendants' assets will disappear," *see* Mot. at 20 (citing *Simple Health Plans* at 1364), that concern must be grounded in actual evidence of a material risk of dissipation; the "[Government] cannot rely on conjecture." *See FTC v. Debt Sols., Inc.*, 2006 WL 1041996, at *7 (W.D. Wash. Apr. 3, 2006).

### (2) *The Government Cannot Support its Request for a Freeze*

#### (a) *An Asset Freeze Based on ROSCA is Unprecedented*

As an initial matter, an asset freeze to preserve funds solely for purported ROSCA violations appears to be unprecedented. Nowhere in its Motion did the Government cite even one case where it has previously obtained a pre-judgment asset freeze solely to preserve assets for ROSCA violations. Nor have we identified any such post-*AMG* cases. The Government asks this Court to be the first court that—based on our analysis—enters a post-*AMG* asset freeze to preserve assets in connection with a ROSCA claim and based on the Government's warped interpretation of ROSCA. This is all part of the Government's efforts to stretch the bounds of its regulatory reach after the Supreme Court substantially curbed its equitable remedies under the FTC Act. The Court should decline the Government's unsupported invitation to vastly expand the regulatory state.

#### (b) *The Government Does Not Make a Proffer of Consumer Loss*

In seeking a freeze, the Government fails to satisfy its most basic threshold test: it does not even attempt to quantify the alleged consumer loss or injury to Zealthy's customers based on ROSCA violations that would require an asset freeze. In its only reference to potential amounts of monetary relief sought here, the Government just says that the purported misconduct "implicates, in the aggregate, millions—and potentially tens of millions—of dollars in Zealthy transactions" and that the "equitable relief under the FTC Act may include a refund to the customer of the full

32

amount paid…to the Defendants." Mot. at 19 (quoting *FTC v. Home Assure*, 2009 WL 1043956, at *2). Predictably, in support of this conclusory and unfounded assertion, the Government points the Court to an outdated Section 13(b) disgorgement case. *Id.* But besides this conclusory and legally unfounded assertion regarding the relief it may seek, the Government does not offer any precise or even approximate calculation of *consumer loss* based on ROSCA violations. This omission is striking. Not only does it fail to provide a consumer loss amount, but the Government also does not try to explain how it would purport to calculate Zealthy customer refunds based on ROSCA violations and how it would identify those customers who should receive a refund.

Instead, the Government appears to be relying on its novel position that *all of Zealthy's transactions* violated ROSCA based entirely on purported omissions related to Zealthy's telemedicine practices—even if consumers were not subject to recurring charges without their authorization—and on the volume of chargebacks by and refunds to Zealthy customers (which the Government materially miscalculates). But as noted above, neither approach prevails here.

This outright failure to quantify and prove consumer loss should end the inquiry regarding an asset freeze. Without that, the Court cannot even begin to assess whether a freeze is necessary, given that Zealthy has considerable cash reserves and assets—in excess of $15 million—that are available for any purported consumer redress. By way of example, if the consumer loss here is $500,000, then an asset freeze is completely unsupported because Zealthy has over 30 times that amount of cash and there is virtually no risk that sufficient assets are not available for consumer redress. Because the Government has not made this basic showing, however, the Court cannot even start its analysis of the propriety and scope of a freeze. As such, without a well-supported consumer loss calculation, the Government's requested all-encompassing freeze on Zealthy assets

33

would violate and plainly exceed the scope of Section 19(b), which only permits courts to grant relief that is "*necessary* to redress injury to consumers." 15 U.S.C. § 57b(b) (emphasis added).

Further, even considering the level of chargebacks and refunds (which the Court should not), there is no basis for an asset freeze. According to the Government, "the aggregate, annual charge[backs] and refund totals are relatively substantial weighed against all of Zealthy's liquidity." Mot. at 11. That is a false and frivolous assertion. ***First,*** the Government misunderstands how chargebacks are accounted for in Zealthy's financial statements. Chargebacks do not impact Zealthy's liquidity because revenue associated with those chargebacks is never booked in the first place. Once Zealthy is notified of a chargeback, it does not receive or capture the revenue associated with transactions. ████████████████████████████████████

████████████████████████████████████████████████████████

████ █████████████████████████   ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ There are no liquidity issues here. Notably, the Government did not retain any expert or analyst who proffers that Zealthy does not have sufficient liquidity compared to its chargebacks. These bald, unsupported assertions are totally incredible and without any scintilla of merit.

      (c)    *The Government Cannot Use Civil Penalty Amounts to Justify an Asset Freeze*

In a passing reference in support of the freeze, the Government notes that "FTC rule violation penalty amounts that [it] seeks in this action may bankrupt Zealthy." *See* Mot. at 19. This

---

[4] Zealthy receives dispute alerts from Ethoca or Verifi (*i.e.*, pre-dispute resolution programs). After such an alert, the funds are not accepted by the merchant. The Government incorrectly classified these as so-called "chargebacks" in calculating a net chargeback rate, when in fact these do not represent chargebacks since the transactions are not booked as revenue in Zealthy's financial statements.

assertion is specious. There is no dispute that the Government *cannot* seek civil money penalties under Section 19(b). And it is blackletter law that the Government cannot seek an asset freeze to preserve the recovery of civil money penalties—a legal remedy. *SEC v. Founding Partners Cap. Mgmt.*, 2009 WL 10669238, at *1 (M.D. Fla. May 7, 2009) ("It is clear that a district court does not have the authority to issue an asset freeze order when plaintiff seeks only money damages.") (citing *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999)).

                    (d)        *The Government Does Not Show Any Risk of Dissipation of Assets*

Compounding its failure to satisfy its burden to establish consumer loss, the Government has also failed to demonstrate any material risk of dissipation. ***First***, the Government's own investigator admits that the Defendants have not "hidden assets with the purpose of dissipation." *See* Aliosio Dep. at 243:2-6; *see also* 254:18-20. ***Second***, Mr. Ribaudo's expert report—based on a comprehensive review of Zealthy's financial records dating back to January 1, 2023, through the present—extinguishes any suggestion that the Government has a purported valid concern regarding dissipation. Mr. Ribaudo found that (a) Zealthy's financial activity does not exhibit the characteristics normally associated with dissipation, and (b) that its financial activity does not reflect efforts to conceal or obscure financial transactions or assets.  (Ribaudo Rep. ¶¶ 5, 58 ) Those opinions are based on several specific findings:

- ***Significant Liquidity and Equity***: Zealthy has a substantial level of liquidity and significant accumulation of equity based on cash and cash equivalents.
- ***No Material Distributions or Loans***: Zealthy did not provide material distributions or loans to Mr. Robertson or its affiliates; rather, the majority of earnings and contributed capital were retained within the business.
- ***Robertson Did Not Receive a Salary***: Neither Mr. Robertson nor his spouse received any salary or wage payments from Zealthy.
- ***The Affiliated Entities are All Owned by Zealthy***: FitRx, RippleRx, and Roen Health are all wholly owned affiliates of Zealthy. Through shareholder and operating agreements, Zealthy holds all of the shares representing an economic interest in these

35

affiliates. No individual, including Mr. Robertson, has any right to a share in the profits of these companies pursuant to the applicable operating agreements.

- *The Accounting Records for Zealthy and its Affiliates are Centralized*: Zealthy and its affiliates' transactions are maintained within a centralized accounting system, where all financial activity is recorded in a single general ledger broken out by each entity.

This is the *opposite* of what a Court typically sees in a situation where a threat of dissipation is actually real—and not conjectural, as here. We have not seen any cases where courts granted a freeze with this kind of a factual record, nor has the Government supplied any such cases.

## B.  The Request for a Receivership is Similarly Meritless

The Government's request for a receivership is intertwined with its request for an asset freeze, because the proposed receivership appears to be mostly—if not exclusively—predicated on the preservation of Zealthy's assets. *See*, e.g., Mot. at 2 ("A receivership and asset freeze are necessary to ensure a bulwark against efforts to conceal assets and frustrate recovery in this lawsuit."); at 17-19. So, all of the reasons for denying the freeze apply to the request for a receiver. Nonetheless, we will separately demonstrate why the proposed receiver is equally meritless. And to the extent that the Government seeks a receiver as an ancillary means to enjoin Zealthy's purported violations of the FTC Act, that relief is no longer available following *AMG*.

Receiverships are indisputably considered "an extraordinary remedy, to be employed cautiously and usually when no lesser relief would be effective." *FTC v. Vemma Nutrition Co.*, 2015 WL 11118111, at *9 (D. Ariz. Sept. 18, 2015); *see also FTC v. Crescent Pub. Grp., Inc.*, 129 F. Supp. 2d 311, 326 (S.D.N.Y. 2001). It has been described as a "draconian" and "extreme" remedy in FTC cases. *See Crescent*, 129 F. Supp. 2d at 326. That is because a receivership order "curtail[s] property rights in a way that may cause great harm." *United States v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020) (cleaned up). As with the freeze, almost all of the Government's legal support for a receivership is based on outdated Section 13(b) cases. *See* Mot. at 17. Thus, as

36

with the freeze, the Court must examine the need for a receiver under the substantially narrowed consumer loss remedy under Section 19(b). *Zurixx*, 2021 WL 5179139, at *7.

In deciding whether appointing a receiver is appropriate, courts consider a number of factors, including (i) the nature of the alleged fraud, (ii) the extent to which the property at issue is in imminent danger of being lost, concealed, squandered or otherwise diminished in value, (iii) the adequacy of available legal remedies, (iv) whether any harm to the plaintiff would be greater than any injury to the parties opposing the receiver, and (v) the plaintiff's likelihood of success in the action and the possibility of irreparable injury to his or her interests in the property. *CFTC v. Combest Trading Corp.*, 481 F. Supp. 438, 441 (D. Mass. 1979); *see also FTC v. Am. Fin. Support Servs., Inc.*, 2019 WL 6337435, at *10 (C.D. Cal. Nov. 26, 2019). Courts also determine whether a defendant is compliant with discovery or other requests or "willfully opposing discovery or refusing to answer questions relating to relevant business operations." *CFTC v. Lake Shore Asset Management Ltd.*, 2007 WL 2915647, at *17 (N.D.Ill. 2007). "No one factor is dispositive and there is no precise formula used to determine if a receiver should be appointed." *Am. Fin. Support Servs., Inc.*, 2019 WL 6337435, at *10 (citation and quotation omitted). As shown below, these factors and other issues show that the Government's request for a receiver should be rejected.

### (1)   *A Receiver Is Not Required to Preserve Funds*

All of the arguments demonstrating that an asset freeze is fundamentally improper here land with equal force in opposing the appointment of a receiver to preserve assets under Section 19(b). *First*, requesting a receiver to preserve funds based solely on ROSCA violations under Section 19(b) appears to be unprecedented. *Second*, the Government has failed to proffer any evidence regarding the purported consumer loss based on ROSCA violations that would serve as a threshold basis to evaluate the need to preserve Zealthy's assets, especially given that it has over ████████████████████. *Third*, Zealthy's chargeback levels do not impact its liquidity

position given that revenues subject to chargebacks are not booked as revenue for Zealthy and, thus, chargebacks do not impact its available cash. *Finally,* and critically, Zealthy has none of the hallmarks of a company where a receiver is required to preserve assets given that there is no evidence whatsoever of dissipation. Again, we have not identified any post-*AMG* case where—based on facts similar to those here—a court imposed a receivership to preserve assets.

### (2)    *The Court Cannot Appoint a Receiver to Enjoin Conduct Under Section 13(b)*

The Government also makes passing reference to seeking a receiver to enjoin the purported FTC Act violations at issue here. Mot. at 18. Because Section 19(b) only permits the appointment of a receiver to preserve assets for consumer redress, this appears to be an effort to obtain ancillary injunctive relief under Section 13(b), which permits courts to enter injunctive relief "enjoining ongoing and imminent future violations." *See FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 26 (D.D.C. 2021) (quotations and citations omitted); *see also AMG*, 593 U.S. at 76.

But the Court cannot appoint a receiver on this basis, because following *AMG* a "receivership premised solely on § 53(b) is inappropriate." *On Point Cap. Partners,* 17 F.4th at 1071 (11th Cir. 2021) ("[*AMG*] leaves the asset freeze and receivership aspects of the preliminary injunction unsupported by law"). *See also Perlman.*, 38 F.4th at 902 n. 2 (11th Cir. 2022) (following AMG a "receiver is no longer an appropriate equitable remedy under Section 13(b).

### (3)    *A Receiver Would Cause Consumers Significant Harm*

The appointment of a receiver over Zealthy would also cause significant harm to the very consumers that the Government purports to seek to protect. Zealthy provides telemedicine services and provides valid and medically necessary prescription medications to tens of thousands of customers/patients every month. These medical services assist patients with obesity treatments, birth control, HIV prevention, anxiety and depression, and sleep treatments, among other issues.

38

These customers rely on Zealthy for these incredibly important medical services. And a substantial percentage of these customers have even prepaid for their prescription medications.

The Government's request for the appointment of a receiver is almost certain to disrupt Zealthy's provision of these medical services and prescriptions to Zealthy's numerous customers, as it is incredibly unlikely that the proposed receiver would continue to operate Zealthy. The Government ignores this significant adverse implication of its proposed receivership, while simultaneously failing to proffer a well-supported justification for the receivership.

### (4)     *The Conduct Here Does Not Involve Fraud and Zealthy Has Been Fully Transparent in Discovery*

This is not a case involving fraud. As we have shown, the Government's allegations of fraudulent conduct are unfounded. This, instead, is a garden variety FTC Act case centered around ROSCA violations, allegedly fake customer reviews, and other standard FTC issues. This case does not involve the type of severe fraud or deception that merits a receivership—such as where consumers are duped into purchasing fake products or never receive a product they pay for, where a company is not a legitimate business, or where there is an invasive, Ponzi-scheme style fraud that permeates the business. Quite the contrary, on this record, it is clear that Zealthy is a legitimate telemedicine company, where licensed medical providers assess patients and issue valid, medically necessary prescriptions, and where tens of thousands of patients receive medically-necessary services. Further, Zealthy has been forthcoming and transparent in discovery. Indeed, it did not lodge any material objections to discovery and agreed to hand the Government mailboxes for over 40 Zealthy custodians, along with Slack messages and other ESI. For that reason, there have been minimal discovery disputes in this case.

## CONCLUSION

The Government's request for draconian injunctive relief, more than two years into this case and as we approach trial in December 2026, is a baseless attempt to change the course of an action that has been cumbersome and ineffective and to test the bounds of its post-*AMG* equitable remedies. The motion is a classic example of government overreach: it rests on a bedrock of incorrect, poorly investigated facts; is based on novel, unsupported legal theories and outdated caselaw; and seeks extraordinary relief that goes beyond that available under the FTC Act and that would require unprecedented judicial orders. The motion should be quickly denied.

## REQUEST FOR AN EVIDENTIARY HEARING

Defendants submit that unless the Court summarily *denies* the Motion (which it should), an evidentiary hearing is required because, at a minimum, this response memorandum has clearly shown that the "facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue." *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr*, S.A., 320 F.3d 1205, 1211 (11th Cir. 2003). In this circumstance, an evidentiary hearing must be held before entry of a preliminary injunction. *Id*. At this hearing the Defendants would present several fact and expert witnesses, so, accounting for the Government's presentation of its case, we anticipate the evidentiary hearing will require at least 4-5 days.

Date: June 11, 2026

Respectfully submitted,

**MARCUS, RASHBAUM, PINEIRO
& MEYERS LLP**

By: /s/ Michael A. Pineiro
Michael A. Pineiro
Fla. Bar No. 41897
mpineiro@mnrlawfirm.com
Daniel L. Rashbaum
Florida Bar No. 75084

One Biscayne Tower
2 South Biscayne Boulevard, Suite 2530
Miami, Florida 33131
Telephone: (305) 400-4268

41