**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 24-cv-21376-RAR**

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ZEALTHY, INC., a corporation, and,
KYLE ROBERTSON, individually,

        Defendants.

**PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO**
**<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

**Introduction**

Defendants Zealthy, Inc. ("Zealthy") and Kyle Robertson are systematically engaging in undisclosed and unlawful telemedicine practices, deceiving consumers through unauthorized recurring charges, and impeding consumers' ability to cancel subscription charges. Defendants complain about what they characterize as "government overreach," but they sidestep and fail to address much of Plaintiff's key evidence of this misconduct, including Defendants' own internal documents and employee testimony. That evidence indicates that the United States is likely to succeed in showing deceptive business practices in violation of Section 5 of the FTC Act, unfair practices also in violation of Section 5, and failures to clearly and conspicuously disclose material terms of Zealthy's automatically renewing subscription telehealth service and to provide a simple mechanism to stop charges in violation of the Restore Online Shoppers' Confidence Act (ROSCA). Given the serious and ongoing harms each of those legal violations continues to inflict on Zealthy's patients, a likelihood of government success on any of them warrants preliminary injunctive relief to protect consumers while litigation of this case proceeds. The massive extent of Defendants' likely ROSCA violations and the deceptive nature of their use of other corporate entities to collect payment from Zealthy's patients also support issuance of an asset freeze and appointment of a receiver to ensure funds remain available to provide meaningful consumer redress. Plaintiff thus requests that this Court promptly enter a preliminary injunction to halt Defendants' ongoing misconduct and protect consumer victims.

I. **Defendants Fail to Address Rampant Evidence of Improper, Undisclosed Telemedical Practices**

Plaintiff has put forward evidence of undisclosed and improper systemic telemedical practices by Zealthy. Defendants attempt to sidestep this evidence by pointing to a "configuration defect" in Zealthy's internal user interface and to an Application Programming Interface ("API")

1

between Zealthy and some pharmacies that filled Zealthy prescriptions. Opp. at 3, 10-12, 19, 21. But Zealthy's suggestion that this explains away its alleged misconduct is contradicted by Zealthy's internal discussions of its illicit prescribing efforts and the abundant evidence of external prior authorization and prescription orders that Zealthy has sent to insurers and pharmacies in which non-providers impersonate doctors' credentials.

Former Zealthy Medical Director, Dr. Steven McDonald, provided a sworn declaration attesting to Zealthy's systematic misuse of his name and National Provider Identifier ("NPI") number to issue prescriptions for its patients without his knowledge or consent, and despite the fact that he did not perform or supervise the clinical treatment of any Zealthy patients. Mot. Ex. 2, Decl. of Dr. McDonald; Aloisio Aff. ¶¶ 18-20. Contemporaneous documents, including prior authorization requests Zealthy sent out in his name, clearly evidence this practice. *Id.* ¶¶ 33-39. Documents also show Zealthy systematically directing customer service agents in the Philippines to use Dr. McDonald's name and NPI for prior authorization requests, impersonating him and even justifying prescriptions with detailed clinical and diagnostic notes that were ostensibly from him. *Id.* ¶ 37; Aloisio Exs. 24-25. Astonishingly, Defendants' brief nowhere addresses the pervasive misuse of Dr. McDonald's credentials.

Plaintiff has put forward evidence showing Zealthy's identical misuse of the name and NPI of another of its former medical directors, Dr. German Echeverry, to order prescriptions and submit prior authorization requests, even long after he left the company. Aloisio Aff. ¶¶ 47-48; Aloisio Exs. 37-39. Zealthy's misuse of Dr. Echeverry's name and NPI in 2025 included sending prior authorization requests *to insurers*—which cannot be explained away by a supposed glitch in how the company's database displays data internally or by an API between Zealthy and a pharmacy. Opp. at 10-11.

The telling omissions continue. A former Zealthy employee, Meredith Moore, resigned from the company shortly after refusing the company's pressure to improperly prescribe medication, informing Zealthy that she was not a provider and could not do so. Aloisio Aff. ¶ 31. Zealthy's own contemporaneous meeting notes and an internal staff conversation corroborate Ms. Moore's account. *Id*; Aloisio Exs. 18 and 6 at p. 3. Zealthy nowhere addresses this evidence from its own former employee.

Still another whistleblower, Jonathan Luker, was a former Zealthy nurse practitioner so fluent in Zealthy's clinical platform and practices and respected by Zealthy for his "outstanding performance" there that the company tapped him to deliver its onboarding training to new providers. Bravo Decl. Ex. 1 at 2. Mr. Luker raised his significant concerns with Zealthy's misconduct in a whistleblower report. Aloisio Ex. 1. Defendants try to brush aside Mr. Luker's whistleblower report as "the result of an immature technical configuration" of Zealthy's internal user interface. Opp. at 3. But the company's documents corroborate his concern by also showing that Zealthy's Philippines call center agents, including individuals identified in his whistleblower report, were directed to order prescriptions and submit prior authorization requests while posing as doctors. Aloisio Aff. ¶¶ 21-39.

Defendants' brief effectively concedes that Zealthy has falsely ordered tons of bogus prescriptions purportedly signed, ordered, and endorsed by a provider, Dr. Risheet Patel, who had no actual role in authorizing or ordering them. Aloisio Aff. ¶¶ 40-46; Opp. at 11-12. Defendants' assertion that "Dr. Risheet Patel is not authorizing each of the individual prescriptions," Opp. at 21, is tantamount to Zealthy now admitting that it has issued north of █████ illegitimate, falsely endorsed prescriptions to pharmacies. *Id.* ¶ 44. Through automated

code, Zealthy has issued a staggering volume of prescription orders in Dr. Patel's name—on some workdays, one prescription every thirty seconds. Aloisio Aff. ¶¶ 43-44.

Defendants assert that "the Government ascribes [prescriptions] to Dr. Patel." Opp. at 22. But the government did not make this ascription, Zealthy's prescription orders did. The evidence shows that Zealthy has used Dr. Patel's name, NPI, and e-signature to fill prescriptions. Aloisio Aff. ¶¶ 43-45; *see also* Bravo Decl. Ex. 2 (example prescription order e-signed with name and NPI of Dr. Patel). Just as they were once directed to impersonate Dr. McDonald and then Dr. Echeverry, Zealthy's non-clinical employees have since been enabled to impersonate Dr. Patel, in a process that has allowed Zealthy to mask prescription orders issued by non-clinicians. *See, e.g.,* Bravo Decl. Ex. 3-4 ██████████████████████████

████████████████████████████████

████████████████████████

Zealthy's own high-ranking employees have frankly discussed these practices as illegal, complained that Defendant Robertson has forced them to do this, and discussed at least using accounts unrelated to theirs to issue prescription orders to avoid being found personally responsible. Aloisio Aff. ¶ 22; Aloisio Ex. 6. Confronted with such discussion in a deposition, a Zealthy Senior Engineer who had told a colleague that it was "wild" that "there have been so many illegal things [Defendant Robertson] makes people do" and Defendant Roberson is "cooked" if audited claimed that he was only "joking." Bravo Decl. Ex. 16 at 193-195; Aloisio Ex. 6 at p. 3. Defendants declare this evidence "inflammatory" and say it has "zero probative value." Opp. at 20. But it is difficult to see what could have more probative value than the frank internal discussions of the employees carrying out the practices in question.

Meanwhile, Defendants attempt to explain their improper prescribing by asserting that any prescriptions ordered by non-clinicians must have been tethered to a prior, authorized prescription, asking the court to trust that underlying data in Zealthy's system shows licensed providers associated with each order. Opp. at 19-22. But the evidence shows that non-clinicians have ordered <u>new</u> prescriptions at different times, and with different dosages, than prior prescriptions for the same patient. *See, e.g.,* Aloisio Ex. 1 at 44 (showing separate, new prescription by non-clinician Noor Siddiqi). During a recent deposition, one of the involved non-clinical employees confessed to making such dosage decisions. Bravo Decl. Ex. 14 at 115:19-23. This is not a question of cosmetic alterations to a prescription, but of Zealthy writing new prescriptions, albeit without using a provider to do so. Had Zealthy conducted these prescriptions through its licensed providers, none of the extensive evidence showing the clinical activities of call center agents, showing them being granted clinical account privileges specifically to order prescriptions, or showing Zealthy's portal generating prescription orders e-signed in the name of Dr. Patel, would exist. Aloisio Aff. ¶¶ 21-48.

This process has been conducted, for instance, in scenarios where a pharmacy explained to Zealthy that it did not even carry the medication formulation that had been prescribed. Bravo Decl. Ex. 5 at 2-4. Zealthy then employed non-providers to order new prescriptions after making substantive changes to the prescription. Bravo Decl. Ex. 6 (excerpt of ensuing Zealthy spreadsheet recording Philippines-based agents Mary [Joy Llamas], Chrislyn [Agsalod], and Gee Jel [Asoy] ordering new semaglutide prescriptions from ReviveRx). For example, when a prescriber ordered a formulation containing a single active ingredient, a pharmacy substituted a formulation containing two active ingredients, which Defendant Robertson—who is not a medical professional—deemed a "minor modification" based on his own internet research, and

5

dispensed it to the patient despite the prescriber's express objection. Bravo Decl. Ex. 14 at 125-128 (Ms. Siddiqui agreeing that a prescriber's concern was dismissed by a non- prescriber in this instance.) This conduct went beyond merely "editing" a prescription; it constituted the creation of a new prescription without the prescriber's authorization. *See, e.g.,* Aloisio Ex. 1 at 47 (reflecting non-clinical employee Noor Siddiqi ordering prescription for patient on April 30, 2025); Bravo Decl. Ex. 4 ███████████████████████████████

████████████

The damage caused by Zealthy's improper prescriptions is highlighted by recent consumer declarations. Mot. Ex. 6-8. Consumers testify that they are being sent prescriptions they never ordered or requested, without having submitted an ID or medical records, and without having interacted with a provider. *Id.* Evidence of Zealthy's automated, improper prescribing system, which has impersonated and abused the credentials of doctors for at least two years, shows how this has been made possible, and why it must now be halted.

Defendants' failure to meaningfully refute evidence of their improper prescribing practices indicates Plaintiff is likely to succeed on FTC Act and ROSCA claims. These practices are of course material to telehealth consumers, as the declarations from actual consumers disturbed by Zealthy's undisclosed practices confirm. Mot. at 6, 8-9. Materiality denotes what is significant enough to a consumer to impact their decision to purchase a service. Mot. at 9. FTC Act case law further emphasizes that terms related to health and safety are presumptively material. ECF 162 at 42 n.24. Because omissions of material fact constitute misrepresentations for purposes of a Section 5 FTC Act claim (*see* ECF 162 at 13, 24), Zealthy's failure to disclose that its prescriptions are not issued by legitimate and licensed medical professionals plainly constitutes deception in violation of Section 5. *See* Mot. at 5–6. As Plaintiff's motion explains

and Defendants' opposition does not contest, it is also an unfair practice in violation of Section 5. *Id.* Defendants' hidden improper telemedicine practices additionally constitute failures to clearly and conspicuously disclose material terms of telehealth subscriptions under ROSCA. Mot. at 9.[1] There are thus three independent and sufficient grounds—deception under Section 5, unfairness under Section 5, and failure to clearly and conspicuously disclose under ROSCA—for a preliminary injunction here to enjoin Defendants' years-long telemedicine misconduct.

## II.     Defendants Fail to Explain Away Evidence of Cancellation Obstacles and Voluminous, Unauthorized Charges to Consumers

Plaintiff's motion has put forward extensive evidence showing Plaintiff is likely to prevail on FTC Act and ROSCA violations involving Zealthy's barriers to consumer cancellations and unauthorized charges to consumers after they have cancelled subscriptions. The evidence includes, among other sources, rampant consumer complaints, consumer declarations attesting to challenges cancelling, Zealthy's internal discussion and testimony from Zealthy's own employees regarding these systemic issues, and evidence provided by consumers that they have been prevented from cancelling or charged after cancelling. *See, e.g.,* Aloisio Aff. ¶¶ 59-88; Aloisio Ex. 52; Mot. Ex. 3, 5-7.

Plaintiff's motion papers highlighted extraordinary Zealthy charge dispute data that crystallizes the scale of Zealthy's unauthorized charges. Aloisio Aff. ¶¶ 67-71,76-88. This data shows that Zealthy has continuously posted elevated charge dispute rates due to the number of

---

[1] Defendants wrongly contend that ROSCA does not apply because Plaintiff's allegations concern misrepresentations about the underlying prescription service rather than the negative option feature itself. Opp. at 23-24. Defendants' interpretation improperly narrows the statute to require disclosure only of the terms governing the recurring charge, while ignoring the material terms of the transaction consumers are induced to enter. Courts have rejected this narrow reading, recognizing that ROSCA's requirement to disclose "all material terms of the transaction" encompasses terms that are important to consumers' decisions regarding the product or service offered through the negative option feature. *See, e.g.*, *FTC v. Dave, Inc.,* No. 2:24-CV-09566-MRA-AGR, 2025 WL 2698698 (C.D. Cal. Sept. 12, 2025).

consumers forced to dispute Zealthy's unauthorized charges. Zealthy's charge dispute rates have repeatedly led to significant fines from major credit card networks such as Visa and Mastercard, contributed to Zealthy being booted by its once main payment processor, Stripe, and have led to payment processors refusing to do business with Zealthy. Zealthy's charge and fraud dispute levels, moreover, have soared far above the well-established thresholds that major financial organizations, such as credit card networks, use to monitor merchants for indicia of fraud. Aloisio Aff. ¶¶ 71, 79.

Defendants misunderstand the importance of the charge dispute evidence. Plaintiff nowhere asserts that a chargeback is itself a predicate for a legal violation, or that having charge disputes is illegal. Opp. at 26-27. Rather, Zealthy's charge dispute data, in context, helps demonstrate the extent of its pattern of unauthorized charges to consumers, which violate ROSCA and the FTC Act. Specifically, this data reflects Defendants' continued charges to customers after cancellation, resulting in numerous consumer complaints and disputes over recurring charges. *See, e.g.,* Aloisio Aff. ¶¶ 62-64, 66, 87.

The robust evidence Plaintiff has put forward regarding Zealthy's cancellation obstacles and post-cancellation charges has now been strongly reinforced by a deposition of a Zealthy customer support employee. Bravo Decl. at Ex. 18. This employee testified about handling constant complaints from consumers who complained of unauthorized charges and who were prevented from simply cancelling because Zealthy's cancellation flow did not work at all for them, or because they kept getting charged even after cancelling. *Id*. at 106:7-26; 107:1. She expressed her own frustration that Zealthy implemented express policies prohibiting her from cancelling on behalf of such consumers, leading them to continue to be charged. *Id*. Her testimony broadly reinforces the declaration of another former customer support employee who

has also described triaging endless complaints from consumers facing charges while struggling to cancel, and being disallowed by company policy from helping them. Mot. Ex. 3.

Without addressing what Zealthy's extensive history of consumer complaints and affiliated charge dispute data demonstrates, Defendants instead focus on Zealthy's use of retention screens in its cancellation flow and on the cancellation practices of purposed industry peers. Opp. at 9, 25-26. But Plaintiff's motion challenges far more than the mere use of retention screens or the number of steps in Zealthy's cancellation flow. Accordingly, Defendants' expert declaration, which focuses on the structure of Zealthy's cancellation flow, misses the point. Even setting aside that the cancellation flow itself is confusing and difficult to navigate, a topic that is currently the subject of ongoing discovery, Plaintiff's preliminary injunction motion challenges Defendants' broader unlawful practices, not merely the design of the cancellation process. Plaintiff's evidence shows that consumers were prevented from canceling altogether because the cancellation flow was broken or, in many instances, were changed even after they canceled the subscriptions. *See, e.g.,* Aloisio Aff. ¶¶ 62-64, 66, 87.

Meanwhile, evidence involving Zealthy's own internal discussions echoes Plaintiff's theory regarding the root causes of Zealthy's charge dispute malaise. For example, Zealthy's Finance lead, evaluating Zealthy's running charge dispute rates, concluded that "the most common" Zealthy disputes "indicate[] that cardholder did not authorize the charge," while more than 15 percent of disputes were "because subscription was [already] cancelled." Bravo Decl. Ex. 7 (cover email), ███████ ████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████ ███████████████████

9

Defendants also sidestep a key statistic: namely, Zealthy's data shows it has routinely lost 90 percent of all charge disputes with consumers. Aloisio Aff. ¶¶ 69, 84-85. This hardly conforms to Defendants' unsubstantiated suggestion that these charge disputes are not "valid." Opp. at 28. Paired with the incredible volume of charge disputes Zealthy has faced (*see* Aloisio Aff. ¶¶ 68-69), this statistic indicates endemic, baseless charges to consumers.

Zealthy's recent discussions with its vendor, ▮▮▮▮▮▮ similarly mirror the government's interpretation of the data. The government pointed out in its motion that Zealthy was employing automatic refund thresholds to artificially lower its dispute rates that would otherwise be reported to financial institutions, (*id.* at 81-82) or in Defendant Robertson's own words, to try to get Zealthy out of "hot water." *Id.* at 83. In recently obtained documents, ▮▮▮▮▮▮ repeatedly explained to Zealthy that these automatic refunds had the precise effect of reducing Zealthy's charge dispute rate. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In other words, Zealthy was concealing the true volume of consumer charge disputes by issuing rapid, automated refunds before those disputes could be reflected in its reported metrics. Most significantly, their refunds did nothing to address the underlying causes of the disputes or stop the continuing influx of disputes from consumers who had been wrongly charged.

Defendants assert that Plaintiff ignores "critical context" around these statistics. Opp. at 27. But the applicable industry norms are clear: Zealthy is generating chargeback and fraud dispute rates that would subject it to sanctions or terminations by every major card network and

payment processor. *See, e.g.,* Aloisio Aff. ¶¶ 71, 76-79. Evidence obtained from 2026 shows Zealthy's elevated charge dispute issues continue through the present. Bravo Decl. Exs. 11-12.

Zealthy's financial records, such as a 2025 Profit and Loss statement, further bear out the scale of Zealthy's charge dispute issues. Aloisio Aff. ¶¶ 72-75. Defendants' response to these charge dispute issues do not move the needle. Opp. at 27. Zealthy's own data shows that its consumers are being forced to engage in millions of dollars worth of charge disputes, and that these disputes comprise a significant portion of Zealthy's overall business. Aloisio Aff. ¶¶ 72-75. Defendants cite nothing to controvert these conclusions or to minimize the significance of these numbers.

Defendants attempt to trivialize the government's investigation and the robust factual record in Plaintiff's motion by mischaracterizing both the evidence and the testimony of a government investigator. For example, Defendants falsely claim that the investigator reviewed only a "handful" of consumer complaints. Opp. at 28. In fact, he testified that he reviewed many hundreds of Zealthy consumer complaints, while Plaintiff's motion cited representative examples drawn from such complaints. Opp. Ex. L at 133. Defendants likewise assert that the investigator neither spoke with complaining consumers nor confirmed they exist. That assertion is false: the investigator interviewed multiple consumers, three of whom submitted sworn declarations. Aloisio Aff. ¶ 132; Mot. Ex. 6-8. Plaintiff's motion further documents extensive evidence of unauthorized charges and cancellation obstacles through consumer complaints, Defendants' own records, and other evidence. Aloisio Aff. ¶¶ 62-64, 66, 87. Defendants' efforts to trivialize the government's investigation distracts from the central issue—the overwhelming evidence, including Zealthy's own voluminous records, showing that consumers incurred unauthorized charges and were prevented from cancelling their subscriptions. The voices of these aggrieved

11

consumers are far more probative than Defendants' misplaced attacks on the investigator, whose affidavit largely served to authenticate and introduce Zealthy's own, incriminating documents.

Defendants also attempt to shift focus to supposedly happy customers. Opp. at 10, 28. Defendants even cite Zealthy review scores on online review websites, which takes audacity given the evidence that Zealthy has, at Defendant Robertson's direction, systematically posted fake reviews to manipulate its scores on such websites. *See, e.g.,* Bravo Decl. Ex. 15 at 174:9-13; Ex. 18 at 129:10-13. Further to this point is the extraordinary scope of negative consumer sentiment Zealthy has elicited, as reflected in numerous complaints submitted to the FTC and the Better Business Bureau regarding a pattern of consumer harm, unusually high charge dispute rates, and a flood of consumer complaints directly to the company itself. Aloisio Aff. ¶ 53.

The evidence documenting extraordinary levels of consumer complaints and charge disputes related to unauthorized and post-cancellation charges by Zealthy, along with the testimony of Zealthy's own current and former employees acknowledging these pervasive issues, show that the government is likely to prevail on its FTC Act and ROSCA claims. To protect consumers from ongoing harm, Zealthy's misconduct should be enjoined.

### III. Defendants Pass Over the Accumulating Evidence of Defendants' Ongoing Fraud Scheme

Plaintiff's motion explained that evidence first produced by Defendants to the government as of the winter of 2025 revealed that Zealthy was using the name and information of Mr. Robertson's spouse, Michael Repplier, to apply for financial accounts in the name of a number of nominally separate entities. Aloisio Aff. ¶¶ 94-132. Defendants used these entities to obtain an important industry credential—a LegitScript certification—that Zealthy had lost when its own certification was revoked, and it routed Zealthy customers' payments to those entities instead of to Zealthy. *Id.* ¶ 111.  Remarkably, Defendants do not address the core allegations

Plaintiff has made regarding this ongoing, duplicitous shell game beyond misleadingly asserting that it disclosed affiliations to LegitScript and noting that one of the entities, RoenRx, is mentioned on Zealthy's website. Opp. at 13–14. Moreover, evidence obtained since Plaintiff's motion was filed has only further corroborated Plaintiff's allegations.



Although Defendants contend that FitRx adequately disclosed its relationship with Zealthy, the application was nonetheless misleading.

Bravo Decl.14 at 58-61, 69-72 (Zealthy's current employee, Ms. Siddiqi, testifying that FitRx and RoenRx share "the same employees" and offer "the same product" as Zealthy.) Because a "common enterprise" exists, the entities' distinct "corporateness" should be disregarded here. *FTC v. Lanier Law, LLC*, 715 F. App'x 970, 979 (11th Cir. 2017).

Defendants also attempt to establish the legitimacy of their business by relying on Defendant Robertson's declaration that RoenRx already possessed a LegitScript certification when it was acquired. Opp. Ex. A ¶ 26. That argument misses the point. On June 30, 2026, LegitScript reaffirmed that it "remains committed to not knowingly certifying any new entities that have an ongoing business affiliation to Zealthy or Kyle Robertson." Bravo Decl. Ex. 13 ¶ 9.

13

LegitScript further confirmed that none of the following entities known to be affiliated with Zealthy or Kyle Roberson are currently LegitScript certified: Gronk, FitRx, Roen / RoenRx, AmRx, Topweightloss, and Bioverse. *Id*. ¶ 10.

Some of these same entities were also used to obtain critical payment-processing capabilities after Zealthy lost access to its primary payment processor, Stripe. Aloisio Aff. ¶¶ 100, 103, 118. This further demonstrates Defendants' use of nominally separate entities to evade industry restrictions imposed on Zealthy. Indeed, documents recently obtained confirm that, through 2026, Zealthy has implemented this scheme, processing thousands of transactions on Stripe through non-Zealthy accounts, such as RoenRx of FitRx. Bravo Decl. Ex. 12; Ex. 17 at 90. Deposition testimony has further corroborated that Zealthy is using new entities as fungible entities with Zealthy to process millions of dollars in transactions. Bravo Decl. Ex. 16 at 199-203, Ex. 17 at 97:1-6.

Plaintiff's motion observed that Mr. Robertson's spouse (Mr. Repplier)—a media employee not apparently involved in running telehealth businesses—has been enlisted by Zealthy to submit pro forma financial and other applications for Zealthy's new parallel entities. Deposition testimony obtained since the motion was filed corroborates that Mr. Repplier was, according to Zealthy employees, not involved in running these businesses even as his name and information were used to set up financial accounts for handling millions of dollars in Zealthy transactions. Bravo Decl. Ex. 16 at 199-203; Bravo Decl. Ex. 17 at 97:1-6. Deposition testimony has also confirmed that the financial accounts and statements established via these entities are controlled and operated by Zealthy. Bravo Decl. Ex. 17 at 147:3-7.

This ongoing scheme by Zealthy and Robertson provides compelling context for the need to preliminarily enjoin the unlawful conduct they are going to considerable and deceptive lengths

to continue being able to charge consumers for and for the need to appoint a receiver and impose an asset freeze, ensuring that Defendants cannot conceal, dissipate, or divert assets.

Defendants assert that an expert they retained has reviewed the company's books and concluded that there is nothing of concern. Opp. at 35-36. That self-serving assurance, however, does not negate the evidence of ongoing misconduct or eliminate the risk that assets may be hidden or transferred absent judicial intervention. Plaintiff also notes that this argument comes after Defendants have refused to produce basic, responsive financial documents to Plaintiff for more than a year, after Defendants have further specifically objected to producing documents related to the non-Zealthy parallel entities on grounds of irrelevance, and after Defendants also recently objected to a subpoena served on Robertson's spouse targeting relevant financial materials for the entities set up in his name.[2] *See, e.g.*, ECF Nos. 187, 190, 197-198. Far from acting in the spirit of an open book, Defendants have fought vigorously to deprive Plaintiff from having <u>any</u> visibility into the company's financial structures. The few financial documents Plaintiff obtained in winter of 2025 help to show why Defendants have fought hard against transparency.  For example, a *single* stray Profit and Loss statement produced to Plaintiff, Aloisio Decl. Ex. 69, revealed for the first time the use of FitRx to house ▮▮▮▮▮ dollars in Zealthy assets after the Stripe ban, and it recorded millions of dollars in charge disputes and self-dealing test payments. Against the backdrop of Defendants' evasive tactics and blatant shell game, the opinion of Defendants' expert can hardly allay Plaintiff's well-founded concerns.

---

[2] Defendants have consistently objected to discovery requests to prevent such factfinding, asserting, for instance, that Defendants' "financial information" is "not relevant unless it is in connection with post-judgment collection." Robertson Objections to Plaintiff's First Set of RFPs. On that basis, they categorically refuse to produce any of it.

Defendants' self-serving assertion that all of Zealthy's funds remain on the books and are fully accounted for does nothing to minimize the significance of their conduct, which reflects a deliberate pattern of deception aimed at evading outside scrutiny and checks—and a pattern that extends to the management of millions of dollars in company assets. In light of the evidence in Plaintiff's motion papers (Aloisio Aff. ¶¶ 94-149) Zealthy's bare assurances of good faith are no substitute for meaningful judicial safeguards and do little to alleviate Plaintiff's well-founded concerns that assets may be concealed, diverted, or dissipated while the company confronts significant potential liability.

**IV.      Plaintiff Has Met its Burden of Justifying an Asset Freeze and Receiver**

Plaintiff has established ample grounds for an asset freeze and the appointment of a receiver. The record demonstrates ███████ dollars in unauthorized consumer charges, ███████ ███████ of unlawfully issued prescriptions, undisclosed and unlawful telemedicine practices, and recurring unauthorized billing affecting ███████ consumers each month. This evidence demonstrates that Defendants likely face substantial monetary liability for redress to consumers arising from ROSCA violations. Combined with the substantial risk that Defendants will conceal, divert, or dissipate assets—as evidenced by their use of affiliated shell entities and deceptive financial practices—equitable relief is necessary to preserve the status quo and ensure funds remain available for consumer redress. Mot. at 17-20.

Defendants' reliance on *AMG Capital* is misplaced. Opp. at 29-32. *AMG* addressed only Section 13(b) of the FTC Act and expressly did not disturb the government's ability to obtain monetary relief under Section 19 of the FTC Act, for violations of specific rules or statutes like ROSCA. *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 82 (2021). Plaintiff seeks equitable relief

expressly authorized by Section 19. TAC ¶¶ 27, 31. Accordingly, Defendants' extensive discussion of *AMG* does not bear on the relief requested here. Opp. at 38.

Indeed, as Defendants acknowledge, this Court has already recognized that Section 19 provides authority for the government to obtain redress. In *FTC v. Simple Health Plans LLC*, after the FTC amended its complaint following *AMG* to proceed under Section 19, this Court held that Section 19 of the FTC Act authorized it to issue preliminary equitable relief and accordingly entered a preliminary injunction, imposed an asset freeze, and appointed a receiver. 2021 WL 4050819, at *2-4 (S.D. Fla. Sept. 5, 2021). The Eleventh Circuit affirmed, explaining that *AMG* was limited to Section 13(b) and rejecting the argument that *AMG* broadly curtailed the FTC's remedial authority. *FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1331 (11th Cir. 2023). Rather, the court reaffirmed that Section 19 authorizes district courts to grant relief "necessary to redress injury to consumers," affirming the asset freeze and receivership imposed in that case. *Id*. at 1325. Plaintiff likewise seeks relief under Section 19, making *Simple Health Plans* directly applicable.

Plaintiff specifically cited case law demonstrating that asset freezes and receiverships have been deemed appropriate remedies where the specific facts warranted them—such as in view of legitimate concerns that, absent an asset freeze or receivership, the available funds necessary for redressing consumers will be lacking, or where there is a risk of dissipation of assets absent these safeguards. Mot. at 17-18. Those are precisely the circumstances here. Defendants cite no post-*AMG* authority suggesting that these traditional equitable principles no longer apply.

Defendants contend that Plaintiff asks this Court to enter the first post-*AMG* asset freeze and receivership in a ROSCA action. That characterization is misleading. *AMG* did not involve

17

ROSCA, nor did it limit the Court's authority under Section 19 to order equitable relief for FTC Rule violations. Defendants identify no principled basis for treating ROSCA violations differently from violations of the Telemarketing Sales Rule ("TSR"), where courts have long recognized that asset freezes and receiverships are appropriate to preserve funds for consumer redress. Mot. at 17-19. In any event, the particular facts of this ROSCA case, including the misuse of physicians' identities, deception of pharmacies and financial institutions, operation through shell entities, and chargeback and fraud dispute rates so excessive that major payment processors terminated Defendants' merchant accounts, indicate a receiver and an asset freeze are especially warranted here in light of the extraordinary risk that assets will be dissipated before consumers can obtain redress.

Defendants incorrectly assert that Plaintiff failed to support the requested relief with evidence of likely consumer redress and Defendants' financial condition. Opp. at 32. Plaintiff's motion analyzes Defendants' own financial records, transaction data, prescription records, and 2025 profit-and-loss statements to estimate the scope of provable ROSCA violations and the resulting consumer redress. Mot. at 10-11, 19; Aloisio Aff. ¶¶ 72-75. That analysis demonstrates a substantial likelihood that Defendants' potential liability will exceed the assets reasonably available to satisfy a judgment.

Defendants incorrectly contend that, after *AMG*, Section 19 imposes a heightened burden for obtaining preliminary equitable relief by requiring Plaintiff to prove a precise or even approximate calculation of consumer loss. Opp. at 29-32. That is incorrect. In applying Section 19, this Court has employed the same standard it previously applied under Section 13(b) in granting preliminary injunctions, imposing asset freezes, and appointing receivers. *See, e.g., Simple Health Plans*, at *2-4. Nothing in S*imple Health Plans* imposed any requirement to

18

quantify consumer harm at the preliminary stage. *Id*. Although Defendants cite that decision alongside out-of-circuit cases to argue that *AMG* heightened the standard for preliminary relief, this Court granted such relief under Section 19 without requiring a precise or approximate calculation of consumer harm, and the Eleventh Circuit affirmed. *Id*.; Opp. at 15-16. Thus, *Simple Health Plans* confirms that, in this Circuit, *AMG* did not alter the showing required for preliminary equitable relief under Section 19.

Nor does Plaintiff seek, or need to establish at this stage, the amount of any ultimate monetary judgment or consumer redress. Opp. at 32. As Plaintiff explained, perfect quantification has never been a prerequisite for preliminary equitable relief; the pre-*AMG* authorities recognizing this principle remain good law. Mot. at 18; S*imple Health Plans* at *2-4. Rather, such quantification is appropriately developed through further proceedings, and, in any event, is a task that can be accomplished with greater precision when a receiver has full access to Defendants' books and records. *See id.* (citing cases).

Defendants' reliance on purported balances of "cash reserves and assets" is misplaced. Opp. at 33. Plaintiff's motion shows that the Defendants' potential liability for consumer redress may be several times the ▮▮▮▮▮▮▮ Zealthy claims to have in cash reserves. Mot. at 19. A bank balance may also be subject to other liabilities and obligations, and absent an asset freeze, Defendants could spend or transfer that money before an award is ordered. Mot. at 20. At this stage, Plaintiff need only show a substantial risk that available assets may be insufficient to satisfy eventual relief—a showing amply supported here.

Meanwhile, Defendants put forward the generic opinions of an expert claiming that Zealthy's activities do not evince "characteristics normally associated with dissipation…" Opp. at 35. This should carry little weight in the context of Zealthy's documented efforts to

intentionally deceive financial institutions while proliferating shell entities under the cover of a spouse's identity to circumvent checks and evade scrutiny. The evidence of an intent to "conceal or obscure financial transactions or assets," *id.*, is already in the record. Aloisio Aff. ¶¶ 94-132. If Defendants' expert, Mr. Ribaudo, cannot discern the threat of concealment and dissipation here, then he is not looking very hard.

Defendants also resort to misplaced hyperbole in seeking to fend off an asset freeze and receiver, writing as though these measures would be tantamount to winding down Zealthy. Opp. at 38. This reflects a basic misunderstanding. An asset freeze and receivership would be narrowly tailored to preserve assets and prevent dissipation while allowing legitimate operations to continue under appropriate oversight. Mot. Ex. 10. Given the evidence of systemic unauthorized charges, fraudulent prescription practices, and financial deception, these equitable remedies are necessary to preserve the Court's ability to ensure meaningful consumer redress.

## Conclusion

Based on the substantial evidence Plaintiff has presented in support of its motion, Plaintiff respectfully requests that the Court rule on the motion as soon as practicable based on the papers. Defendants have now enjoyed two full months to take depositions, develop expert testimony, and present their arguments in opposition. Despite this ample opportunity, the core facts remain unchanged. Prompt action by the Court is necessary to prevent Zealthy from continuing to harm and endanger consumers during the pendency of this litigation. An asset freeze and receiver are likewise necessary to preserve funds for consumer redress and to ensure that this multi-year litigation against a financially distressed company does not culminate in a judgment that Zealthy lacks the resources to satisfy.

Dated: July 8, 2026

Respectfully submitted,

**FOR THE UNITED STATES OF AMERICA**


By: */s/ Rodolfo Martinez-Don*
Rodolfo Martinez-Don (A5503499)
Francisco L. Unger (A5503216)
Kyu Yun Kim (A5503524)
Daniel K. Crane-Hirsch (A5501215)
David S. Lee (A5503492)
Trial Attorneys

BRETT A. SHUMATE
Assistant Attorney General

SARMAD M. KHOJASTEH
Deputy Assistant Attorney General

Civil Division
LISA K. HSIAO
Acting Director
ZACHARY A. DIETERT
Assistant Director
U.S. Department of Justice
Civil Division
Enforcement & Affirmative Litigation Branch
450 5th Street, N.W. Suite 6400-South
Washington, D.C. 20044
francisco.l.unger@usdoj.gov
Telephone: (202) 598-3855 (Unger)

Jason A. Reding Quiñones
United States Attorney
Southern District of Florida

Rosaline Chan
Assistant United States Attorney
Fla. Bar No. 1008816
United States Attorney's Office
99 N.E. 4th Street Miami, FL. 33132
Telephone: (305) 961-9335
Rosaline.Chan@usdoj.gov

***Counsel for Plaintiff the United States of America***

21