**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 24-cv-21376-RAR-LFL**

UNITED STATES OF AMERICA,

     *Plaintiff,*

v.

ZEALTHY, INC., a corporation, and,
KYLE ROBERTSON, individually,

     *Defendants.*

_____/

**DEFENDANTS KYLE ROBERTSON AND ZEALTHY, INC.'S**
**<u>MOTION TO DISMISS COUNT I OF THE THIRD AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

      A.     The Government Tries to Improperly Expand the Scope of ROSCA ...................... 3

      B.     The Government's Proposed Rule to Expand ROSCA is Struck Down .................. 5

      C.     The Government's Unfounded ROSCA Claim ......................................................... 6

ARGUMENT ....................................................................................................................... 7

  I.     The Government Overreaches Regarding the Scope of ROSCA ...................................... 7

      A.     ROSCA's "Material Terms" Provision Relates Only to the Negative Option
            Feature, Not the Underlying Goods or Services......................................................... 8

      B.     The Court Should Dismiss the Allegations Outside the Scope of ROSCA............ 13

  II.    The Government's Allegations that Fall Within the Proper Scope of ROSCA Do Not
       Establish a Violation Thereof......................................................................................... 14

      A.     Zealthy Clearly and Conspicuously Discloses the Material Terms of its
            Recurring Subscription.............................................................................................. 15

      B.     Zealthy Obtains Express Informed Consent as a Matter of Law ........................... 17

      C.     The TAC Fails to Plausibly Allege That Zealthy Does Not Provide a Simple
            Mechanism to Stop Recurring Charges.................................................................... 18

  III.   The Government Cannot Seek Civil Penalties for its ROSCA Claim ............................. 19

Defendants Kyle Robertson ("Robertson") and Zealthy, Inc. ("Zealthy"), pursuant to Rule 12(b)(6), respectfully submit this motion to dismiss Count I of Plaintiff the United States of America's ("Plaintiff" or the "Government") Third Amended Complaint ("TAC") [ECF No. 255].

## INTRODUCTION

The stakes for this threshold motion are significant—not only for this case, but for American businesses that transact business online and for the proper circumscription of the Government's enforcement power. The Supreme Court's ruling in *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021), struck down the Government's equitable authority to seek disgorgement under the FTC Act—a powerful enforcement tool that the Government used to seek monetary relief based on deceptive conduct in violation of Section 5 of the Act. Facing that loss of regulatory authority, the Government looked to manipulate other regulatory statutes to fill the void left by its loss in *AMG*. The statute it settled on for its attempted regulatory recapture was Section 8403 of ROSCA—the Restore Online Shoppers' Confidence Act ("ROSCA"). 15 U.S.C. § 8403. This case is now the primary testing ground for the Government's specious regulatory gambit.

Section 8403 of ROSCA was intended to regulate negative option features—full stop. A negative option feature is a provision whereby the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer. For example, a subscription that automatically renews every month unless you cancel—an incredibly common transaction for tens of millions of Americans—is a negative option feature. Based on its plain language, in relevant part, ROSCA is intended to proscribe misrepresentations regarding the terms of a negative option feature, such as the price, the renewal terms, and cancellation terms of the feature. And, before *AMG*, for over a decade following ROSCA's enactment, that is how the FTC interpreted the statute. But almost

immediately after *AMG*, the Government changed its approach to ROSCA—which provides for civil penalties and consumer redress—asserting, for the first time, that the statute proscribes misstatements regarding *any and all* material aspects of an online transaction involving a negative option feature, including regarding the nature and character of the underlying goods or services.

At Count I, the Government asks this Court to be the first in the Eleventh Circuit to bless its new, atextual ROSCA theory. It asserts that the Defendants have violated ROSCA based not only on alleged omissions regarding the terms of Cerebral and Zealthy's negative option features, but on purported omissions regarding the underlying services at issue—such as Zealthy's telemedicine practices and the companies' use of customers' personal health data. *No* federal court has *ever* found that ROSCA covers these types of allegations. This would be the first. The Court should reject the Government's request to exponentially expand the regulatory state. As shown below, the plain meaning of ROSCA's statutory text, as confirmed by the canons of statutory construction, does not apply to the underlying goods or services sold.

The Government knows this. That is why the FTC attempted to implement a rule in 2025— the Negative Option Rule—that purported to expressly proscribe misrepresentations not just as to the terms of a negative option but also as to terms relevant to the underlying products or services offered. The promulgation of that rule is an overt concession that ROSCA's scope is not as broad as the Government proffers here; otherwise, the rule would be superfluous. And though the rule was vacated by the courts, the Government persists in using this case as a testing ground for its impermissible attempts to expand ROSCA's breadth to all aspects of online transactions.

In addition to finding that allegations regarding Cerebral and Zealthy's underlying services do not support a ROSCA claim, the Court also should dismiss the ROSCA claim altogether. The Government also attempts to establish a ROSCA violation based on the proper scope of the statute,

by alleging that Defendants failed to disclose all material terms "relating to the automatically recurring nature of Zealthy's subscriptions; the costs consumers pay; policies, practices, and restrictions on cancellations and refunds." *See* TAC ¶ 286. But the Government's factual allegations are neither sufficient nor plausible, as shown in the very screenshots of Zealthy's enrollment and cancellation flows captured by the Government in its TAC.

The Court should not permit the Government to wield ROSCA as an all-purpose enforcement tool and Count I should be dismissed. Along with it, the Court should dismiss the TAC's request for civil penalties as it is equally premised on a fictional application of ROSCA.

## BACKGROUND

### A.    The Government Tries to Improperly Expand the Scope of ROSCA

Enacted in 2010, ROSCA governs the use of "negative option features" to charge customers in internet transactions involving the sale of goods or services. *See* 15 U.S.C. § 8403. The statute, in turn, explicitly adopts the definition of negative option feature as set forth in the FTC's Telemarketing Sales Rule ("TSR"):  "Negative option feature means, in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  *See* 16 C.F.R. § 310.2(w).

ROSCA prohibits the use of a negative option feature in an internet transaction unless the seller (i) "clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information," (ii) "obtains a consumer's express informed consent before charging the consumer," and (iii) "provides simple mechanisms for a consumer to stop recurring charges." § 8403. ROSCA has no implementing or interpretive regulation regarding the meaning of "all material terms of the transaction"—the language at issue here.

3

For the first decade following its enactment, the Government pursued an appropriately circumscribed interpretation of ROSCA, bringing claims for violation of Section 8403's "material terms" solely based upon the failure to properly disclose the material terms of the *negative option feature* of the transaction. *See* Lindsay Wilson, *Is There A Light at the End of the Dark-Pattern Tunnel?*, 91 Geo. Wash. L. Rev. 1048, 1064 (2023). But that changed after the Court's decision in *AMG*. In July 2021, the Supreme Court struck down the Government's authority to seek disgorgement under Section 5 of the FTC Act—which was the most powerful equitable remedy deployed by the Government in FTC Act cases. *See AMG,* 593 U.S. 67. Attempting to recapture its lost regulatory power, the FTC advanced a novel interpretation of ROSCA a few weeks later in *In re MoviePass, Inc*., FTC File No. 192-3000, in which it construed ROSCA's "material terms" provision to encompass the underlying goods or services sold.[1] *See also* Wilson, *supra*, at 1065-66.  A dissenting statement in *MoviePass* argued that the "novel theory of liability under [ROSCA] accomplishes nothing for consumers and reduces clarity for businesses seeking to follow the law." *See* Dissenting Statement of Commissioner Noah Joshua Phillips at 2, *In re MoviePass, Inc*., FTC File No. 192-3000 (June 7, 2021).[2] Commissioner Phillips further cautioned:

> [F]or the first time, the Commission is treating a deception about the characteristics of the underlying product—not the negative option feature—as a violation of ROSCA. To date, all the complaints filed by the Commission that allege ROSCA violations in the negative option context with a first party seller have involved defendants hiding a negative option feature, not obtaining express informed consent before charging the consumer, or failing to provide a simple mechanism for cancelling the recurring charge.

*Id*.

---

[1] Available at https://www.ftc.gov/system/files/documents/cases/1923000_-_moviepass_order_final.pdf
[2] Available at
Https://www.ftc.gov/system/files/documents/public_statements/1590712/moviepass_statement_phillips_final.pdf.

4

Emboldened by this strategy, a few months post-*MoviePass,* in November 2021, the FTC issued a policy statement regarding negative option marketing. There, it set out its new interpretation of ROSCA for the first time, formally asserting that the "material terms" provision also pertains to disclosures "related to the underlying product or service that are necessary to prevent deception, regardless of whether that term directly relates to the terms of the negative option offer." Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg. 60822, 60825 (Nov. 4, 2021). In that statement, the FTC acknowledged that it had previously pursued ROSCA violations as related only to the material terms of a negative option feature itself, but that in *MoviePass*, for the first time, it applied that provision of ROSCA to the "underlying service." *Id*. at 60823 n.15. That policy statement is not entitled to any consideration whatsoever. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391 (2024).

### B. The Government's Proposed Rule to Expand ROSCA is Struck Down

Under 15 U.S.C. § 57a, the FTC has the authority to issue legislative rules with respect to unfair or deceptive acts or practices under Section 5 of the Act. In January 2025, aware that it had been pursuing a legally unfounded interpretation of ROSCA, the FTC sought to implement the so-called Negative Option Rule to "improve its existing regulations for negative option programs." Negative Option Rule, 88 Fed. Reg. 24716 (proposed Apr. 24, 2023) (to be codified at 16 C.F.R. pt. 425). The rule "prohibit[ed] any person from misrepresenting, expressly or by implication, any material fact regarding the entire agreement—*not just facts related to a negative option feature*." *Id.* at 24726 (emphasis added). The FTC proposed the rule based on its findings that "the existing patchwork of laws and regulations" did not provide "a consistent legal framework"; that ROSCA did not provide "specific steps marketers must follow to comply with [its] requirements"; and that "the current framework [lacked] clarity about how to avoid deceptive negative option disclosures and procedures"—"even for marketers trying to comply with the law." 88 Fed. Reg. at 24718.

As relevant here, the proposed rule stated that it would be a violation of Section 5 of the Act "for any negative option seller to misrepresent. . . any material fact related to the transaction, such as the negative option feature, o*r any material fact related to the underlying good or service*." *Id*. at 24734 (emphasis added); *see also id.* at 24735 (violation of Section 5 to "fail to disclose…any material term related to the underlying good or service that is necessary to prevent deception, regardless of whether that term directly relates to the negative option feature"). In a dissenting opinion, FTC Commissioner Christine Wilson commented that the "'material terms of the transaction' cannot reasonably be interpreted to include all product efficacy claims or any material fact about the underlying good or service"; that "there is no indication in the statute or the legislative history that [the provisions of Section 8403] were intended to confer on the Commission authority to seek civil penalties or redress for representations wholly unrelated to the terms of the negative option feature"; and that the rule "attempts an end-run around the Supreme Court's decision in *AMG* to confer de novo redress and civil penalty authority on the Commission for Section 5 violations unrelated to deceptive or unfair negative option practices." *See* Christine S. Wilson, Comm'r, Fed. Trade Comm'n, Dissenting Statement Regarding the Negative Option Rule Notice of Proposed Rulemaking at 4, FTC File No. P064202 (Mar. 23, 2023).

But the rule would be short-lived. Six days before it became enforceable, the Negative Option Rule was vacated by the Eighth Circuit on APA grounds. *Custom Commc'ns, Inc. v. Fed. Trade Comm'n*, 142 F.4th 1060 (8th Cir. 2025).

### C.    The Government's Unfounded ROSCA Claim

The Government's ROSCA claim as set out in Count I of the TAC is consistent with its efforts to expand the scope of ROSCA since *AMG*, as first seen in *In re MoviePass*. First, as to Mr. Robertson's conduct at Cerebral, the TAC alleges that Mr. Robertson violated ROSCA because, among other things, Cerebral failed to disclose material terms related to "Cerebral's

6

systematic tracking, use, and sharing of subscribers' sensitive health data in its marketing campaigns, and the bulk sending of that data to third parties including social media platforms." TAC ¶ 284. Second, the Government also asserts that Mr. Robertson and Zealthy violated ROSCA by failing to disclose "all material transaction terms, including relating to the automatically recurring nature of Zealthy's subscriptions; the costs consumers pay; policies, practices, and restrictions on cancellations and refunds; and other core aspects of Zealthy's subscription services, *such as the nature and legitimacy of Zealthy's telemedicine services and Zealthy's tracking and use of subscribers' personal health data in online advertising efforts.*" TAC ¶ 285 (emphasis added). The TAC also purports to allege other misrepresentations of material terms as well, relating to, for example, insurance coverage, prescription availability, shipping, and customer support. TAC ¶¶ 113–128, 137–148, 203–220.

## **ARGUMENT**

The Government's ROSCA claim at Count I should be dismissed with prejudice. First, as a threshold matter, the Court should rule that the claim is not supported based on allegations of purported misrepresentations or omissions related to anything outside of the negative option feature and financial terms of Zealthy's subscription services. Second, once the Court has properly circumscribed the boundaries of the ROSCA claim, it should find that the Government's remaining allegations still do not satisfy the properly narrowed scope of the cause of action.

## I.   THE GOVERNMENT OVERREACHES REGARDING THE SCOPE OF ROSCA

The Government's interpretation of ROSCA—that it covers the disclosure of terms material not only related to Zealthy's negative option feature but as to the "core" or underlying aspects of Zealthy's services—is at odds with the statute's text. Under ROSCA, the "material terms of a transaction" pertain to the terms of the negative option feature or recurring subscription, such as the price of the services, renewal terms, and cancellation terms. As a result, in this issue of first

impression in the Eleventh Circuit, the Court should rule that any allegations outside of the material terms related to the negative option do not give rise to a ROSCA violation. This Court should not become the first in the Eleventh Circuit to endorse the Government's unfounded attempt to exponentially expand ROSCA's regulatory scope to make up for its big loss in *AMG*.

> **A.     ROSCA's "Material Terms" Provision Relates Only to the Negative Option Feature, Not the Underlying Goods or Services**

In interpreting ROSCA and evaluating the proper scope of the Government's ROSCA claim, "[w]e begin, as always, with the statutory text." *Johnson v. United States Congress*, 151 F.4th 1287, 1292 (11th Cir. 2025); *Carfagna v. Fisher Island Club, Inc.*, 796 F. Supp. 3d 1178, 1185 (S.D. Fla. 2025) (Ruiz, J.) (citing *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) ("[a]s in all cases involving statutory construction, our starting point must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used") (internal quotation omitted)). "If the statutory language is plain, [the Court] must enforce it according to its terms." *Regueiro v. Am. Airlines, Inc.*, 147 F.4th 1281, 1287 (11th Cir. 2025) (citations and quotation marks omitted). "When deciding whether the language is plain, [the Court] must read the words in their context and with a view to their place in the overall statutory scheme." *Id.* (cleaned up). A "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme." *Id.* (citations and quotation marks omitted). Courts must interpret statutes as part of "a symmetrical and coherent regulatory scheme" and to "fit, if possible, all parts into an harmonious whole." *United States v. Collins*, 854 F.3d 1324, 1332 (11th Cir. 2017) (citations and quotation marks omitted).

Section 8403, entitled "Negative option marketing on the Internet," prohibits a seller from using a negative option feature in an internet transaction unless the seller: (i) "clearly and conspicuously discloses all ***material terms of the transaction*** before obtaining the consumer's

8

billing information," (ii) "obtains a consumer's express informed consent before charging the consumer," and (iii) "provides simple mechanisms for a consumer to stop recurring charges." *See* 15 U.S.C. § 8403 (emphasis added). Adopting the definition set forth in the TSR, a negative option feature is "an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." *See* 16 C.F.R. § 310.2(w); *see also Brown v. United States*, 602 U.S. 101, 116 (2024) (when a statute refers to a regulation "by specific title [and] section number," a proper statutory interpretation "in effect cuts and pastes" this definition into the statute when analyzing the surrounding statutory text).

Further, the key terms in Section 8403—"material," "terms," and "transaction"—are not defined therein. *See* 15 U.S.C. § 8403; 16 C.F.R. pt. 310.  As such, courts must "interpret the words consistent with their ordinary meaning at the time Congress enacted the statute."  *See Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 277 (2018).  "To determine the ordinary meaning of a term, [courts] often look to dictionary definitions for guidance."  *See In re Walter Energy, Inc.*, 911 F.3d 1121, 1143 (11th Cir. 2018). "Material" means "[o]f such a nature that knowledge of the item would affect a person's decision-making," "significant," or "essential." Material, Black's Law (12th ed. 2024). "Term" means a "contractual stipulation" or a "contractual provision that must be include for a contract to exist." Term, Black's Law (12th ed. 2024). A "transaction" ordinarily means "[t]he act or an instance of conducting business or other dealings, esp[ecially] the formation, performance, or discharge of a contract," or "[s]omething performed or carried out; a business agreement or exchange." Transaction, Black's Law (12th ed. 2024).

For several reasons, the Court should find that the "material terms of the transaction" do not include representations as to the underlying goods or services sold through a negative option.

9

### (1)    *Plain Meaning – "Terms"*

Turning first to the statutory text and using the ordinary meanings of key words as set forth above, the "material" "terms" of a "transaction" under Section 8403 mean the essential contractual provisions between a seller and consumer in a transaction involving a negative option feature. This would necessarily include the price of the goods or services, the terms for payment or enrollment, and the terms for cancellation (such as the actions required to avoid the recurring charges and the dates of the recurring charges). There is no support for the Government's proffered interpretation that the "material *terms*" include representations related to the underlying goods or services. Such an interpretation distorts the meaning of the word "term"—which specifically pertains to contractual provisions—and essentially replaces it with the word "facts." If Congress intended "material terms" to mean "facts" related to the description or characteristics of the underlying goods or services, it would have used different language. But the word "terms" specifically relates to contractual stipulations or provisions and cannot be read more broadly to encompass all facts related to the transaction. This would entirely distort the plain meaning of the statute.

### (2)    *Overall Purpose of Section 8403*

Next, the overall purpose of Section 8403 is to protect consumers from misleading negative options and recurring membership subscriptions. Unlike Section 5 of the Act, this is not a broad-based statute intended to proscribe all forms of consumer deception. Rather, the focus of the Section and the language at issue prohibits misrepresentations related to the contractual terms of negative options. Indeed, looking at the context of the "material term of the transaction" provision, it is evident that it pertains to the contractual terms regarding price, charges, and cancellation because the "material terms" disclosure is required "before obtaining the consumer's billing information." § 8403(1). Congress conditioned the receipt of billing information for a negative option transaction on proper disclosure of how the customer would be charged and how he or she

10

could stop the charges. The title of the Section—"Negative option marketing on the Internet"—also makes clear that the focus is on the negative option itself, not on the material aspects of the underlying goods or services. *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("the title of a statute [is a] tool[] available for the resolution of a doubt" about the meaning of a statute).

### (3)   *The Russello Presumption*

Moreover, Congress could have used the words "goods and services" in Section 8403 to describe the "material terms of the transaction," but it did not and that purposeful choice should be decisive under the *Russello* presumption.  "[W]here Congress includes particular language in one section of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *See Russello v. United States*, 464 U.S. 16, 23 (1983)*; see also City & Cty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025). Here, Congress did not reference the underlying goods or services in connection with or describing the "material terms of the transaction" in Section 8403. But, in the immediately preceding section of the very same statute, at Section 8402—entitled "Prohibitions against certain unfair and deceptive Internet sales practices"—Congress did expressly reference disclosures regarding "goods or services" as part of the material terms of a transaction. In relevant part, Section 8402—applicable to "any post-transaction third party seller"—provides that "before obtaining a consumer's billing information," the third-party seller must "clearly and conspicuously disclose[] to the consumer all material terms of the transaction, *including a description of the goods or services being offered*…." § 8402(a)(1)(A) (emphasis added).

This is dispositive to the statutory analysis here. That is, at Section 8402, which is not the subject of this lawsuit, Congress clearly articulated its intent to regulate broader conduct with respect to the relationship between a consumer and a third-party seller—a step removed from the initial merchant—by requiring disclosure of the "material terms of the transaction" and *expressly*

including among them a "description of the goods or services being offered." § 8402(a)(1)(A). Conversely in Section 8403, which pertains to a direct contractual relationship between seller and consumer involving a negative option feature, Congress *intentionally omitted* that language in setting out the material terms of the negative option transactions. § 8403(1). Thus, the Court cannot read—*i.e.*, insert—into the statute language regarding "goods or services" that Congress expressly elected to omit. This should end any further inquiry into this statutory construction.

### (4)  *The TSR Confirms this Interpretation*

Further buttressing this textualist reading is its consistency with the Telemarketing Sales Rule, from which Section 8403 borrows the definition of "negative option feature." 16 C.F.R. § 310.2(w); 15 U.S.C. § 8403. While distinct from ROSCA, under the TSR it is considered a deceptive telemarketing practice to fail to disclose, prior to obtaining a customer's consent to pay, "all material terms and conditions of the negative option feature," "including, but not limited to, the fact that the customer's account will be charged unless the customer takes an affirmative action to avoid the charge(s), the date(s) the charge(s) will be submitted for payment, and the specific steps the customer must take to avoid the charge(s)." 16 C.F.R. § 310.3(a)(1)(vii). Thus, the scope of the TSR's application of "material terms" with respect to a negative option feature is entirely consistent with the interpretation of Section 8403 proffered by Defendants.

### (5)  *The Vacated Negative Option Rule*

Finally, while the Court need not look anywhere beyond the statutory text, the vacated Negative Option Rule is highly persuasive evidence that the Government's interpretation of ROSCA is unfounded. As discussed, with respect to negative option features, the rule purported to prohibit, as a violation of Section 5, the failure to disclose "any material term related to the underlying good or service that is necessary to prevent deception, regardless of whether that term directly relates to the negative option feature." *See supra* at 6. Notably, the FTC sought to

12

promulgate the Negative Option Rule as a legislative rule, whereby it would be "used…pursuant to statutory authority and has the force and effect of law." *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 588 U.S. 1, 7 (2019) (quotations omitted). Of course, if ROSCA already extended its prohibitions to terms "[un]related to the Negative Option Feature," *see* 16 C.F.R. § 425.4(a), then there was no need for the FTC to implement this legislative rule. But recognizing the need to include this verbiage within a legislative rule, the FTC conceded that the interpretation it now advances here—*i.e.*, that ROSCA governs material terms without any nexus to negative options—would "create[] new laws, rights, or duties" that are unmoored from the statutory text. *See Warshauer v. Solis*, 577 F.3d 1330, 1337 (11th Cir. 2009).

**B.      The Court Should Dismiss the Allegations Outside the Scope of ROSCA**

The allegations advanced in support of Count I largely fall outside the scope of "material terms" of the negative option feature and therefore outside of ROSCA. Specifically, the Government grounds much of its ROSCA claim on allegations of a purported wide-ranging telemedicine fraud scheme premised on unauthorized prescription practices. TAC ¶¶ 203-225. Even assuming, as the Court must on a motion to dismiss, that Zealthy's alleged "unlawful telemedicine practices [ ] have never been disclosed to consumers," such failure to disclose would be material only to the underlying services Zealthy purports to provide to consumers as opposed to material to the terms of Zealthy's recurring subscription feature. That is, such allegations concern the alleged quality, legality, or structure of telemedicine services; they do not concern whether consumers understood that a membership would renew, what recurring amount would be charged, when it would be charged, or how to cancel recurring charges.

The same is true with respect to the Government's allegations as to alleged "tracking and use of personal health data in online advertising efforts" TAC ¶¶ 285, 286. These allegations concern privacy or data-use theories under Section 5's deceptive practices, *FTC v. Tashman,* 318

13

F.3d 1273, 1277 (11th Cir. 2003), but they are not material terms of a negative-option feature covered by ROSCA. Moreover, any alleged material omission or misrepresentation by a subscription seller about clinical quality, insurance coverage, prescription availability, privacy practices, advertising, shipping, or customer support similarly have nothing to do with the negative option feature and fall outside the scope of ROSCA. TAC ¶¶ 113–128, 137–148, 203–220, 286–288.

Indeed, if the Government's reading were accepted and the Court credited these allegations as supporting a ROSCA claim, the statute would regulate virtually all conduct by subscription businesses. This was never intended to be the scope of Section 8403. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.") (citations and quotation marks omitted).

## II. THE GOVERNMENT'S ALLEGATIONS THAT FALL WITHIN THE PROPER SCOPE OF ROSCA DO NOT ESTABLISH A VIOLATION THEREOF

Even when applying the proper interpretation and scope of ROSCA, the Government cannot support its ROSCA claims. Critically, the TAC's *own* screenshots and allegations demonstrate that Zealthy (a) disclosed recurring subscription terms on the same page where billing information was collected, (b) obtained affirmative consumer action (clicking a payment button) after those terms were presented, and (c) provided an online, self-service cancellation flow accessible through the consumer's account dashboard. What the TAC actually alleges is not that disclosures, consent, or a cancellation mechanism were *absent*, but that the Government disagrees with their *format, placement, or design*. That disagreement does not state a ROSCA claim.

**A.      Zealthy Clearly and Conspicuously Discloses the Material Terms of its Recurring Subscription**

ROSCA requires that, before obtaining a consumer's billing information, a seller must "clearly and conspicuously" disclose all material terms of the negative option transaction. 15 U.S.C. § 8403(1). Count I purports to allege that Zealthy's enrollment flow fails to clearly and conspicuously disclose the material terms of its recurring subscription. But even a cursory review of the screenshots depicted in the TAC belies this conclusion.

To assess such claims, the "focus is on 'the typical buyer exercising ordinary caution,' not 'the most obtuse consumer.'" *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 509 (6th Cir. 2013) (citations omitted). The ordinary consumer is someone familiar with e-commerce. *See Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 278 (E.D.N.Y. 2019), *aff'd*, 815 F. App'x 612 (2d Cir. 2020) (ordinary internet users "know that there are terms and conditions. . . not because a loud, brightly-colored notice on the screen tells them so, but because it would be difficult to exist in our technological society without some generalized awareness of the fact"). The TAC purports to allege that Zealthy fails to "disclose material subscription terms to consumers before collecting their payment information and enrolling them in automatically renewing subscriptions." TAC ¶ 102.  In furtherance of this allegation, the Government points to a screenshot which explicitly states the precise terms of Zealthy's negative option feature, including that: (i) it consists of an automatic recurring charge of $135 "for every month after unless you cancel your subscription," ¶ 104; (ii) "monthly membership fees are non-refundable," ¶ 104; and (iii) the consumer's ability to "cancel up to 36 hours before any future billing period," ¶ 104. So, while the Government contends on the one hand that Zealthy fails to disclose its material terms, the TAC in fact alleges that such disclosure is instead in fine print too inconspicuous to be

15

meaningful.  Regardless, both the text and the hyperlink disclose all material terms relevant to the negative option feature in a manner consistent both with FTC and court precedent.

Both the FTC and courts acknowledge that presenting terms on the same screen as the offer reflects a clear and conspicuous disclosure. *See* Fed. Trade Comm'n, .com Disclosures: How to Make Effective Disclosures in Digital Advertising (Mar. 2013) ("A disclosure is more likely to be effective if consumers view the disclosure and the claim that raises the need for disclosure. . . together on the same screen."); *In re Vistaprint Corp. Mktg. & Sales Practices Litig.*, 2009 WL 2884727, at *6 (S.D. Tex. Aug. 31, 2009) (terms being "provided on the same webpage in close proximity to the location where the consumer indicates his agreement" prevent those webpages from being deceptive as a matter of law); *Walkingeagle v. Google LLC*, 2023 WL 3981334, at *4 (D. Or. June 12, 2023*)* (dismissing claims where "both checkout pages contain the offer terms"). Moreover, that consumers may need to scroll on the very page where they entered billing information does not render the disclosures "not clear and conspicuous." TAC ¶¶ 105–106. Web pages routinely require scrolling. A disclosure that appears below the fold but on the same page—without any additional navigation or clicks—remains accessible and visible to the consumer before they complete the transaction.  *Feldman v. Google, Inc.,* 513 F. Supp. 2d 229, 236–37 (E.D. Pa. 2007) (terms requiring scrolling on the same page constituted adequate notice to users).  And the mere fact that terms are hyperlinked, TAC ¶¶ 108–109, is of no moment, as that is not prohibited by ROSCA and hyperlinked terms of service are ubiquitous in e-commerce and have been consistently upheld by courts. *See Oberstein v. Live Nation Ent., Inc.*, 2021 WL 4772885, at *1 (C.D. Cal. Sept. 20, 2021), *aff'd*, 60 F.4th 505 (9th Cir. 2023); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75–79 (2d Cir. 2017); *Martin v. Lens.com, Inc.*, 2024 WL 4826048, at

16

*6 (S.D. Fla. Nov. 19, 2024); *Arencibia v. AGA Service Co.*, 533 F. Supp. 3d 1180, 1190 (S.D. Fla. 2021); *Temple v. Best Rate Holdings LLC*, 360 F. Supp. 3d 1289, 1305 (M.D. Fla. 2018).

### B.     Zealthy Obtains Express Informed Consent as a Matter of Law

The Government does not, and cannot, allege that Zealthy failed to obtain "express informed consent" as required by ROSCA because the Government concedes, as it must, that consumers are required to click a button before incurring any charge.  In fact, the TAC fails entirely even to invoke such a phrase, repeating it only in its boilerplate recitation of ROSCA.  *See* TAC ¶¶ 25, 284, 288.  Rather than allege the impossible, the TAC resorts to alleging that consumers were confused about the amount they would initially be charged.  *E.g.*, TAC ¶¶ 137-139.  But as courts have held, "an unambiguous manifestation of assent" occurs when a website calls upon "the consumer [to] take[] some action, such as clicking a button or checking a box" after being told that "[b]y continuing past this page and clicking [the button], you agree to our Terms of Use." *Oberstein*, 60 F.4th at 515–16.  And here, the TAC concedes that consumers clicked a box during checkout "to confirm [they were] aware that Compound GLP-1 is not included in the price of the membership, and [to] agree to Zealthy's Consent in Telehealth, Privacy Policy, Notice of Privacy Practices, and Subscriptions, Cancellations, and Refunds Policy."  *See* TAC ¶ 115.

Under those circumstances, "a party has a duty to learn and know the contents of a proposed contract before he signs and delivers it and is presumed to know and understand its contents, terms, and conditions."  *Valiente v. StockX, Inc.*, 645 F. Supp. 3d 1331, 1340 (S.D. Fla. 2022) (internal brackets omitted). Accordingly, because a consumer who assents to an agreement "must be conclusively presumed to be aware of what the contract contains," the TAC cannot plausibly allege that Defendants failed to obtain express informed consent.  *See Dye v. Tamko Building Products, Inc.*, 908 F.3d 675, 683 (11th Cir. 2018) ("When it comes to warranties and other purchase terms,

17

. . . competent adults are bound by such documents, read or unread.") (quotations omitted); *Royal Ins. Co. of America v. BHRS, LLC*, 333 F. Supp. 2d 1293, 1298 (S.D. Fla. 2004).

### C.   The TAC Fails to Plausibly Allege That Zealthy Does Not Provide a Simple Mechanism to Stop Recurring Charges

Finally, the Government fails to allege that Zealthy does not provide a "simple mechanism[] for a consumer to stop recurring charges." § 8403(3). According to the FTC's own policy statement, "[t]o meet this standard, negative option sellers should provide cancellation mechanisms at least as easy to use as the method the consumer used to initiate the negative option feature." Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg. 60,822, 60,826 (Nov. 4, 2021). The TAC does not show that it is harder for Zealthy subscribers to cancel than it was for them to sign up.  Rather, the TAC includes twelve consecutive screenshots of Zealthy's cancellation flow at ¶ 162, labeled [Step 1] through [Step 12], which it describes as "a page-by-page capture of Zealthy's cancellation flow compiled as part of a 2024 review."[3]

The TAC does not allege the number of screens encountered by consumers to enroll, so on the TAC alone there has been no allegation, let alone a plausible one, that cancellation is more difficult to initiate than enrollment. Rather, the screenshots to which the TAC points are, by definition, evidence that an online, self-service cancellation mechanism existed and was functional. That is, the Government's carefully selected screenshots demonstrate that a consumer can access a cancellation flow through their account dashboard, navigate through it, and cancel their subscription without calling anyone, writing a letter, or visiting a physical location. TAC

---

[3] As noted in the Expert Report of Dr. Keller [ECF No. 262-2] submitted in support of Defendants' Response in Opposition to the Government's Motion for Preliminary Injunction, Zealthy's current cancellation flow consists of 12 screens—roughly half of the 21 steps required to enroll. This is publicly available information and, thus, the Court can take judicial notice of it at this threshold stage. *See Looney v. Moore*, 2014 WL 234676, at *10 (N.D. Ala. Jan. 22, 2014). Accordingly, it is worth noting that even the cancellation flow as alleged complies with the FTC's vacated Negative Option Rule which sought to impose an "equal dignities" cancellation requirement by requiring a cancellation mechanism that was "at least as easy to use as the mechanism the consumer used to consent." 16 C.F.R. § 425.6(a)–(b).

¶ 162.  The mechanism is digital, available 24/7, and accessible from the consumer's existing account. That is a "mechanism" to stop recurring charges.  What is more, ROSCA does not define "simple," and the FTC has not promulgated regulations specifying a maximum number of permissible cancellation steps. The TAC asks this Court to judicially impose a one-click (or few-click) standard that the statute's text does not contain and that Congress did not enact. *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 249 (3d Cir. 2015) (the FTC's enforcement theories must provide fair notice to regulated parties of what conduct is prohibited).

That consumers are alleged to encounter technical errors in effectuating their requests to cancel, *e.g.*, TAC ¶¶ 169-187, is again a Section 5 claim recast as a ROSCA violation. ROSCA requires a simple cancellation mechanism; it does not require that a cancellation mechanism have 100% uptime. Likewise, the Government's assertion that Mr. Robertson has prohibited representatives from canceling subscriptions for customers and ordered employees not to provide refunds, *id.* ¶ 182, does not support the ROSCA allegation because the relevant question is whether consumers are provided a simple mechanism to cancel their subscription, not whether they are given the specific option of cancelling through a customer service representative.  As the TAC makes plain, Zealthy's cancellation flow is a simple cancellation mechanism and compliant with ROSCA.  The Government's expansive allegations concerning issues encountered by consumers in effectuating their request to cancel, while distasteful, do not penetrate the bounds of ROSCA.

III.    THE GOVERNMENT CANNOT SEEK CIVIL PENALTIES FOR ITS ROSCA CLAIM

Even if any portion of Count I survives, the Government's civil-penalty demand should be dismissed. TAC ¶ 307.  A violation of ROSCA is "treated as a violation of a rule under section 18 of the Federal Trade Commission Act," 15 U.S.C. § 8404(a), meaning that a defendant may be liable for civil penalties if the defendant has "actual knowledge or knowledge fairly implied on the basis of objective circumstances that" his conduct was "unfair or deceptive and is prohibited by

19

such rule [(i.e., ROSCA)]," 15 U.S.C. § 45(m)(1)(A). That is, the FTC must allege facts demonstrating that Defendants knew of the specific prohibitions the FTC alleges here and that Zealthy's cancellation flows specifically violated them. *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 929 (C.D. Ill. 2017).

The TAC cannot plausibly allege that Defendants were aware of ROSCA's specific requirements and then purposefully violated them.  Such allegations cannot be maintained where the FTC itself has recognized that ROSCA fails to provide adequate notice in several respects, including that the statute "*does not provide clarity* about how to avoid deceptive negative option disclosures and procedures," "*lacks specificity* about cancellation procedures and the placement, content, and timing of cancellation-related disclosures," and "requires marketers to provide 'simple mechanisms' for the consumer to stop recurring charges *without guidance* about what is simple." 88 Fed. Reg. at 24718.  Importantly, the FTC recognized in 2023, that, absent adoption of its proposed new rules concerning negative option features, "gray areas in current statutes and regulations" render the current "rules of the road" unclear. *Id.* at 24727.  That is, even accepting as true Defendants' alleged knowledge and involvement as detailed in the TAC, they necessarily fall well short of the specificity demanded by ROSCA's penalty provision because no amount of "expertise" in the FTC Act or ROSCA could have provided "actual" knowledge of standards the FTC has never clearly articulated.  *Id*.

**CONCLUSION**

The Court should dismiss Count I of the TAC *with prejudice*. This Court should firmly reject the Government's attempt to distort and warp the meaning and scope of Section 8403 in order to recapture regulatory authority it lost in *AMG*. The Government's interpretation of the statute is atextual and unfounded and should be set aside.

20

Dated: July 10, 2026

Respectfully submitted,

**MARCUS, RASHBAUM,**
**PINEIRO & MEYERS LLP**
2 South Biscayne Boulevard, Suite 2530
Miami, Florida 33131
Telephone: (305) 400-4268

*By: /s/ Michael A. Pineiro*
MICHAEL A. PINEIRO
Florida Bar No. 41897
mpineiro@mrpfirm.com
MIRIAM L. ALINIKOFF
Florida Bar No. 1076401
malinikoff@mrpfirm.com

*Attorneys for Defendant Kyle Robertson*

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500

*By: /s/ Benjamin G. Greenberg*
BENJAMIN G. GREENBERG
Florida Bar No. 192732
Email: greenbergb@gtlaw.com
JOHN PATRICK KELLER
Florida Bar No. 1035320
Email: jack.keller@gtlaw.com
fernandezfe@gtlaw.com

*Attorneys for Defendant Zealthy, Inc.*

21