**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-CV-21376-RAR**

**UNITED STATES OF AMERICA**,

Plaintiff,

v.

**ZEALTHY, INC.**, and **KYLE ROBERTSON**,

Defendants.
______________________________________________/

## ORDER DENYING MOTION TO DISMISS COUNT I OF THE THIRD AMENDED COMPLAINT

**THIS CAUSE** comes before the Court on Defendants Kyle Robertson and Zealthy, Inc.'s Motion to Dismiss Count I of the Third Amended Complaint ("Motion"), [ECF No. 281], filed on July 10, 2026. Having considered Defendants' Motion, the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that the Motion, [ECF No. 281], is **DENIED** for the reasons stated herein.

## BACKGROUND

Plaintiff, the United States of America, upon referral from the Federal Trade Commission ("FTC") filed this case against Defendants Cerebral, Inc. ("Cerebral") and Kyle Robertson ("Robertson") on April 12, 2024. *See* [ECF No. 1]. On May 31, 2024, the Government filed an Amended Complaint adding several defendants, including Defendant Zealthy, Inc. ("Zealthy"). *See* [ECF No. 21]. The Government subsequently filed a Second Amended Complaint on May 15, 2025. *See* [ECF No. 119]. On April 10, 2026, the Government filed the operative Third Amended Complaint ("TAC") against Defendants Robertson and Zealthy. *See* [ECF No. 221].

## I. Defendants

Robertson is the former CEO and founder of Cerebral, a company that sold automatically recurring online telehealth subscriptions. TAC ¶¶ 13, 33. Robertson led Cerebral from January 2019 until he was fired in May 2022. *Id.* ¶¶ 13, 32. In 2022, Robertson founded Zealthy and is currently the CEO. *Id.* ¶ 13. Zealthy is a telemedicine company that provides healthcare services to its subscribers. *Id.* ¶ 16. Such healthcare services include medical services and medications for birth control, weight loss, erectile dysfunction, hair loss, and depression. *Id.* Zealthy's online subscriptions automatically renew unless consumers have cancelled. *Id.*

## II. Defendants' Purported Misrepresentations

### *a. Zealthy's Subscription Enrollment Flow*

Zealthy has an online subscription enrollment flow consisting of two checkout pages. *Id.* ¶ 113. On the initial checkout page, users enter their payment information, sign up for, and pay for a monthly subscription. *Id.* After this initial checkout page, Zealthy requires users to navigate additional pages relating to treatment options. *Id.* ¶ 114. After navigating through these additional pages, users are brought to a second checkout page, which for the first time, presents concrete pricing information relating to Zealthy's treatment options. *Id.* A Zealthy employee has described Zealthy's enrollment process as involving a "first checkout" where "[t]he user puts in a card . . . to sign up for membership," followed by "the second checkout where they commit to a larger purchase." *Id.* ¶ 117. Many consumers have complained that they were ambushed by important cost information only after they had already signed up and paid for a subscription. *Id.* ¶ 116.

The pricing information users have been presented with on the second checkout page has often departed significantly from pricing representations made by Zealthy earlier in the enrollment flow. *Id.* ¶ 118. For example, earlier pages have advertised "affordable medication without

insurance" without disclosing that the costs might total hundreds of dollars. *Id.* ¶ 119. The second checkout page has also disclosed for the first time that a patient seeking medication would be required to buy a minimum of multiple months of the medication in a bundled package, requiring a higher upfront payment to obtain the medications through Zealthy. *Id.*

Robertson has closely directed the content and design of Zealthy's enrollment flows by providing detailed design instructions to his employees. *Id.* ¶¶ 129–31. For example, Zealthy's internal documents indicate that Robertson directed his employees to insert the wording "cancel anytime" into the enrollment flow, including telling them where to place it and how prominent to make it. *Id.* ¶ 132. Additionally, Robertson has routinely, personally tested the enrollment flow in order to provide design feedback. *Id.* ¶ 134. Robertson and Zealthy have been aware of many consumer complaints that Zealthy's enrollment flow did not inform them of important pricing information before signing up and charging them, failed to clarify whether the initial subscription they signed up for on the first checkout page covered the cost of medications, and did not disclose the limits on their ability to cancel their membership or obtain refunds. *Id.* ¶¶ 134–36.

***b. Use of Patients' Sensitive Medical Data for Advertising Purposes***

Throughout Robertson's tenure as CEO, both Cerebral and Zealthy used consumers' sensitive medical data for advertising purposes despite representations to the contrary. *Id.* ¶¶ 54–71, 123–28. While Robertson served as CEO, Cerebral represented in its online subscription enrollment flow and privacy policy that it would not use patients' data for marketing purposes without their consent. *Id.* ¶¶ 55–57. Cerebral's privacy policy held out to users that, without their authorization, "[Cerebral is] expressly prohibited from using or disclosing [their] protected health information for marketing purposes." *Id.* ¶ 57.

But instead of adhering to these privacy assurances, Robertson directed the use of tracking technologies to mine, disclose, and perform online marketing with users' health data, including their answers to Cerebral's detailed enrollment questionnaire. *Id.* ¶¶ 59–60. These tracking technologies would track users' health data and send it to third-party platforms such as Facebook, Google, and TikTok. *Id.* ¶ 60. Robertson regularly discussed the substance and business objectives of these tracking and user health data disclosure practices with his direct reports, and Cerebral's documents show that he understood that this data was being captured and sent to social media platforms in tandem with users' individually identifying information. *Id.* ¶¶ 62–64. After Robertson was fired, in March 2023, Cerebral formally reported a multi-year, mass data privacy breach to the United States Department of Health and Human Services involving its previously undisclosed use of tracking technologies. *Id.* ¶ 71.

Similarly, Zealthy has used tracking technologies to track its users' health data for the purpose of running online targeted advertisements. *Id.* ¶¶ 124–26. Zealthy only mentions such practices to consumers in its hyperlinked privacy policy, which states that companies may use "information about your visits to our website" collected through "tracking technologies in order to provide advertisements" and that Zealthy "may use your information for other legitimate interests as a business, such as . . . evaluating and improve [sic] marketing." *Id.* ¶ 128. And Zealthy has neglected to disclose to consumers that their telehealth treatment activities might be used for unauthorized marketing purposes. *Id.*

***c. Use of Personnel Without Medical Training or Licenses to Prescribe Medication***

With Robertson's knowledge and approval, Zealthy engaged in unauthorized telemedicine and prescription practices. *Id.* ¶¶ 203–25. For example, Zealthy used its now former medical director's National Provider Identifier ("NPI") number without his knowledge or consent to submit

requests for prior authorization of medications and to order prescriptions. *Id.* ¶ 204. The former medical director submitted a whistleblower report to the U.S. Department of Justice reporting this conduct. *Id.* Robertson had previously assured the medical director that his name would not be used for prior authorization requests or prescriptions. *Id.*

Moreover, at Robertson's direction, Zealthy's non-clinician employees and contractors have submitted prior authorization requests to insurers and prescribed medications to subscribers. *Id.* ¶¶ 205–09. Zealthy, through the management and direction of one of Robertson's direct reports, has directed overseas call center agents in the Philippines to submit prior authorization requests and to issue prescriptions for patients. *Id.* ¶¶ 211–12. Zealthy's documents show that medical providers' NPI numbers have been used to submit prior authorization requests and to order prescriptions both before and after they worked at Zealthy and without their knowledge. *Id.* ¶¶ 216–17. Zealthy does not disclose these telemedicine and prescription practices to consumers. *Id.* ¶ 223.

***d. Cancellation Practices and Restrictions***

Throughout Robertson's tenure as CEO, both Cerebral and Zealthy lacked a simple mechanism for users to stop recurring charges. *Id.* ¶¶ 32–53, 157–202. While Robertson served as CEO, Cerebral's online subscription enrollment flow advertised that consumers could "Cancel anytime." *Id.* ¶ 33. To the contrary, Robertson directed cancellation processes designed to create "friction" in the subscription cancellation process. *Id.* ¶¶ 32, 34–35. For example, in April 2020, Robertson directed his employees to remove the cancellation button on subscribers' account pages and instead implemented a process requiring consumers to email the company to request a cancellation. *Id.* ¶¶ 36–37. Then, rather than immediately honoring consumers' requests, Cerebral introduced other obstacles to cancellation, including subjecting consumers to retention pitches,

forcing them to fill out detailed questionnaires, and purporting to need several days to process the requests. *Id.* ¶¶ 37–39. While overcoming these obstacles to cancellation, many consumers continued to be charged. *Id.* ¶¶ 38–39. Robertson advocated for this cancellation process because he determined that additional friction increased Cerebral's revenues, emphasizing to his team that requiring consumer support exchanges could reduce cancellation rates by 30%. *Id.* ¶ 41.

Zealthy's enrollment flow similarly assured consumers that they could "cancel anytime." *Id.* ¶ 158. In its enrollment flow, Zealthy has specifically told consumers that they could do so through their accounts or by contacting customer support. *Id.* ¶ 158. Instead, as he did at Cerebral, Robertson directed a challenging cancellation flow with "friction" designed to disincentivize cancellations. *Id.* ¶ 159. Robertson has directed Zealthy to implement a cancellation flow requiring consumers to navigate unsolicited save offers, retention pitches, questions, extra screens, and warnings before they have the option to cancel their subscriptions. *Id.* ¶ 161. For example, page-by-page captures of Zealthy's cancellation flow show that since 2022, it has involved eight, nine, and even ten-plus steps for consumers to navigate, including retention offers, surveys, and other hurdles. *Id.* ¶¶ 161–64. Robertson has been closely involved in testing the design of Zealthy's cancellation flow and has directed his employees to ensure that cancellation remains challenging for consumers. *Id.* ¶¶ 165–67.

Additionally, despite users being informed during the enrollment process that they can cancel their subscriptions by emailing a Zealthy support email address, Robertson has implemented a policy of refusing to facilitate cancellations through customer support agents—directly prohibiting his employees from cancelling subscriptions on behalf of consumers. *Id.* ¶¶ 178, 182. Zealthy's internal Standard Operating Procedure guideline document states that "All subscription cancellations must be completed by the patient through their dashboard," and support

agents' scripts have directed them to tell patients that they must cancel subscriptions for themselves through the online or in-app cancellation flows. *Id.* ¶ 183.

Moreover, for many consumers, Zealthy's online and in-app cancellation flows have not been made available at all—either because Zealthy removed any link to access the cancellation flow from their Manage Account pages or because when they navigated through Zealthy's cancellation flow, it froze and failed to complete the cancellation no matter how many attempts they made. *Id.* ¶¶ 169–70, 172. As a result, these consumers have continued to be subjected to recurring charges despite attempting to cancel their subscriptions. *Id.* ¶¶ 171, 176.

## III. Defendants' Knowledge and Involvement

### *a. Consumer Complaints and Warnings from Financial Organizations*

Robertson and Zealthy have received several consumer complaints regarding deficient upfront disclosures, cancellation obstacles, and unauthorized charges. *Id.* ¶¶ 251–52. Similarly, Robertson and Zealthy received warnings from financial organizations and payment processors that if Zealthy wanted the financial organizations to facilitate its transactions, Zealthy needed to comply with legal requirements on disclosures and cancellation procedures. *Id.* ¶¶ 256–57. For example, one bank told Robertson and Zealthy that it would not be willing to work with Zealthy unless Zealthy updated its checkout page to provide "clear, conspicuous, and affirmative consent to recurring charges," including disclosures relating to "recurring billing terms," "duration of subscription," and "cancellation terms." *Id.* ¶ 257. The bank specifically noted that "FTC require[s] a simple, online cancellation method." *Id.*

### *b. Charge Disputes*

Under Robertson's leadership, Cerebral and Zealthy have drawn scrutiny from financial organizations due to high charge dispute rates generated by consumers disputing recurring charges.

*Id.* ¶¶ 52–53. In 2020 and 2021, Cerebral was repeatedly placed in the Visa Dispute Monitoring Program, which is used to identify merchants with excessively high levels of customer disputes that can indicate the likelihood of fraud. *Id.* ¶ 53. Through May 2022, Cerebral's charge dispute rate was consistently above 0.5% and often exceeded 1%, which banks and financial organizations generally treat as requiring heightened scrutiny for possible fraud. *Id.*

Zealthy has similarly faced several disputes over its recurring charges. *Id.* ¶¶ 151, 187, 190–98. Zealthy's 2025 financial records show that Zealthy has routinely experienced monthly charge dispute totals ranging between half a million and a million dollars. *Id.* ¶ 192. Much of this total comes from consumers disputing its $135 monthly membership charge. *Id.* Zealthy's charge dispute rates have led to sanctions, fines, and warnings from major financial organizations. *Id.* ¶ 195. For example, each month from February through August 2025, Zealthy received a formal warning and fine for excessive chargeback levels from Stripe, which eventually refused to continue doing business with Zealthy. *Id.* Robertson has been involved in receiving and assessing Zealthy's charge dispute and financial transaction records, discussing these charge dispute issues with payment processors, receiving warnings regarding Zealthy's excessive chargeback levels, and analyzing Zealthy's charge dispute levels. *Id.* ¶ 198.

***c. Robertson's Participation in Legal Regulatory Matters***

As Cerebral's CEO, Robertson was regularly briefed on and participated in responding to regulatory and legal issues. *Id.* ¶ 260. Cerebral's documents specifically show that as CEO, Robertson maintained awareness of FTC rules applicable to Cerebral's business. *Id.* ¶ 261. Robertson helped draft many of Cerebral's core legal and compliance policies. *Id.* ¶ 262. At Zealthy, Robertson has been similarly involved in the company's compliance functions. *Id.* For

example, he has personally participated in directing and reviewing the findings of audits evaluating Zealthy's practices and legal compliance. *Id.*

**IV. Cause of Action**

Based on the foregoing allegations, the Government asserts three violations of the Restore Online Shoppers' Confidence Act ("ROSCA") under Count I of the TAC. The Government alleges that Defendants have knowingly violated ROSCA, 15 U.S.C. § 8403(1)–(3), by failing to (1) clearly and conspicuously disclose all material terms of the transaction; (2) obtain the consumer's express, informed consent; and (3) provide simple mechanisms for cancellation. *See* TAC ¶¶ 284, 290. The Government alleges that such conduct violates Section 18 of the FTC Act ("FTCA"), 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitutes unfair or deceptive acts or practices in violation of Section 5(a) of the FTCA, 15 U.S.C. § 45(a). TAC ¶ 289. For each ROSCA violation, the Government seeks monetary civil penalties under Section 5(m)(1)(A) of the FTCA, 15 U.S.C. § 45(m)(1)(A), in addition to a permanent injunction to prevent future violations. TAC ¶ 307.

**V. Procedural History**

On July 10, 2026, Defendants Robertson and Zealthy filed the instant Motion to Dismiss Count I of the Third Amended Complaint, [ECF No. 281]. The Government filed its Response in Opposition ("Response"), [ECF No. 293], on August 14, 2026. On August 28, 2026, Defendants filed their Reply ("Reply"), [ECF No. 294].

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When

evaluating a Rule 12(b)(6) motion to dismiss, the court must accept all well-pleaded factual allegations as true and draw all inferences in favor of the plaintiff. *Smith v. United States*, 873 F.3d 1348, 1351 (11th Cir. 2017). Although the court is required to accept all allegations contained in the complaint as true, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

As an initial matter, the Court must determine which pleading standard applies to Count I of Plaintiff's TAC. The Government argues that Federal Rule of Civil Procedure 8(a)'s pleading standard applies. *See* Resp. at 3. While "Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions," *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002), Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).

The Eleventh Circuit has not applied Rule 9(b)'s heightened pleading standard to claims brought under Section 5(a) of the FTCA. And district courts in this Circuit and other circuits diverge on whether Rule 9(b)'s heightened pleading standard applies to claims of unfair or deceptive acts or practices brought under Section 5(a) of the FTCA. *Compare Fed. Trade Comm'n v. Am. Precious Metals, LLC*, No. 11-61072, 2012 WL 13114034, at *5 (S.D. Fla. Apr. 12, 2012) ("[W]hile acknowledging that there is a split of authority on the applicability of Rule 9(b) to FTC Act claims, the Court finds the reasoning of the more recent cases applying Rule 9(b) to such claims cogent and persuasive."), *and Fed. Trade Comm'n v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 854 (C.D. Cal. 2010) (finding that "Rule 9(b) applies to claims for violation of the FTC Act"), *with Fed. Trade Comm'n v. Dluca*, No. 18-0379, 2018 WL 4775634, at *1 (S.D. Fla. Sept. 5, 2018) (declining to apply Rule 9(b)'s heightened pleading standard to deceptive-practices claim brought

under Section 5 of the FTCA), *and Fed. Trade Comm'n v. Consumer Health Benefits Ass'n*, No. 10 CIV. 3551 ILG RLM, 2012 WL 1890242, at *6–7 (E.D.N.Y. May 23, 2012) (same).

However, the Eleventh Circuit recently applied Rule 9(b)'s heightened pleading standard to claims brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), holding that "FDUTPA claims that sound in fraud must comply with Rule 9(b)'s particularity requirement." *See Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1294 (11th Cir. 2025). And district courts outside of this Circuit have found *Pop* to be instructive in applying the Rule 9(b) pleading standard to FTCA claims. *See Dubreu v. Celsius Prods. Holdings Inc.*, No. 25-CV-00180, 2026 WL 2078207, at *4–5 (C.D. Cal. June 17, 2026) (applying Rule 9(b)'s heightened pleading standard to claims brought under the FTCA and analogous state law). *Pop* reasoned that when the factual allegations underlying a claim "sound in fraud," Rule 9(b)'s particularity requirement applies, and the complaint must allege "the who, what, when, where, and how of the fraudulent conduct." *Pop*, 145 F.4th at 1293–95 (citation modified). This is true regardless of whether the claims are styled as "fraud" and whether the claims overlap with elements of fraud. *Pop*, 145 F.4th at 1293; *see also Fed. Trade Comm'n v. Swish Mktg.*, No. C 09-03814 RS, 2010 WL 653486, at *4 (N.D. Cal. Feb. 22, 2010) ("As Rule 9(b) particularity is not focused on intent, it would be anomalous to suggest that a section 5 claim is free from Rule 9(b)'s heightened pleading requirement because the FTC need not prove scienter here."). It is similarly irrelevant "whether the statute providing the cause of action at issue is 'remedial' or 'designed to protect consumers.'" *Pop*, 145 F.4th at 1294.

A claim "sounds in fraud" for the purpose of applying Rule 9(b)'s heightened pleading standard when "a plaintiff's allegations closely track the elements of common law fraud[.]" *Id.* at 1294. Common law fraud involves "[a] false representation of a material fact made by one who

knew that it was false . . . made to one who did not know that it was false, with intent to deceive such person and to influence his action, which did deceive such person and influence his action to his damage." *See id.* at 1294–95 (citing *United States v. Feldman*, 931 F.3d 1245, 1266 (11th Cir. 2019) (W. Pryor, C.J., concurring)).

Whether Rule 9(b)'s heightened pleading standard applies to the entire pleading depends on the extent to which the underlying factual allegations rely on fraudulent conduct. When a plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim[,]" the claim "sounds in fraud" and the entirety of its pleading must meet Rule 9(b)'s particularity requirement. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003). But when a pleading alleges some fraudulent and some non-fraudulent conduct to support a claim, "only the allegations of fraud are subject to Rule 9(b)'s heightened pleading requirements." *Id.* at 1104.

Here, while some of the Government's claims do not have to implicate fraudulent conduct, as pled, the Government has rested its ROSCA theories on material misrepresentations underpinning all claims. The Government alleges that three categories of misconduct each represent an independent ROSCA violation: Defendants' failure to (1) clearly and conspicuously disclose all material terms of the transaction before obtaining the consumer's billing information; (2) obtain the consumer's express, informed consent before charging the consumer; and (3) provide simple mechanisms for a consumer to stop recurring charges for the good or service. TAC ¶ 284. The core factual allegations underlying each of these alleged violations rely heavily on a course of fraudulent conduct by Robertson and Zealthy, tracking the elements of common law fraud.

The Government first alleges that Defendants fail to "provide[] text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information." *See* Resp. at 5 (citing 15 U.S.C. § 8403(1)). The factual allegations underlying this claim center on false misrepresentations of material facts regarding Defendants' use of patients' sensitive medical data for advertising purposes, Defendants' use of personnel without medical training or licenses to prescribe medication, the full cost of Zealthy's service, the nature of Zealthy's automatically recurring charges, and the company's practices and restrictions regarding cancellations and refunds. *Id.* at 1.

Specifically, the Government alleges that Zealthy's enrollment flow misleads consumers by failing to disclose material information such as the total cost of the transaction, the fact that Zealthy's subscriptions impose recurring charges, and cancellation and refund terms until after collecting billing information. TAC ¶¶ 100–22. The Government also alleges that Zealthy's enrollment flow omits disclosures notifying users that their data might be used by or disclosed to tracking technologies or social media platforms. *Id.* ¶ 123. And the Government asserts that these amount to intentional misrepresentations of "material terms of the transaction." *See id.* ¶¶ 25, 284–86; *see also* 15 U.S.C. § 8403(1).

The Government also alleges that Defendants fail to "obtain consumers' express informed consent before charging them." *See* Resp. at 15 (citing 15 U.S.C. § 8403(2)). Like those relating to the alleged violations of 15 U.S.C. § 8403(1), the factual allegations underlying this claim revolve around Defendants' material misrepresentations regarding Zealthy's costs and policies. For example, the Government alleges several affirmative misrepresentations in Zealthy's subscription enrollment flow, including that subscribers will be able to access weight loss drugs

for low costs, that prescriptions are included within the Zealthy monthly membership cost, and that consumers would be able to "Pay $0 today" and "Cancel anytime." TAC ¶¶ 119, 148–49.

The Government's final ROSCA claim alleges that Defendants failed to provide "simple mechanisms for a consumer to stop recurring charges." *See* Resp. at 16 (citing 15 U.S.C. § 8403(3)). This theory similarly hinges on Robertson and Zealthy's deceptive conduct. The Government alleges that contrary to Cerebral's and Zealthy's online subscription enrollment flows' representations that consumers could cancel anytime, Robertson has intentionally directed cancellation processes designed to make it difficult for consumers to cancel their subscriptions. *See* TAC ¶¶ 32–53, 157–68.

Across its ROSCA claims, the Government's allegations boil down to "the same basic conduct" as common law fraud: "misrepresenting or concealing material facts." *See Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 125 (2024). The Government also alleges that Defendants' material misrepresentations were made with the intent to deceive and that consumers relied on them in deciding whether to enroll in online subscriptions. Notably, the Government emphasizes the high charge dispute rates that Cerebral and Zealthy have generated, alleging that they demonstrate Robertson and Zealthy's awareness that their enrollment flows and cancellation policies were misleading consumers. *See* TAC ¶¶ 52–53, 190–98, 256–57.

Given the substantial overlap between the Government's factual allegations and the elements of common law fraud, the Government's ROSCA claims sound in fraud. While the ROSCA violations themselves could be plausibly pled without allegations of fraudulent conduct, the Government has chosen to pursue ROSCA theories relying heavily on intentional misrepresentations of material facts. As such, Rule 9(b)'s heightened pleading standard applies to

Count I of the Complaint, and Plaintiff must "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).

As further described herein, the Court finds that the TAC satisfies Rule 9(b)'s requirements. The Government's factual allegations set forth above demonstrate that the TAC identifies "the who, what, when, where, and how of the fraudulent conduct." *Pop*, 145 F.4th at 1293–95. Specifically, the TAC "details the course of deceptive conduct at issue and enumerates the time frame for this conduct," as it describes Defendants' alleged misrepresentations, when they occurred, and who engaged in them. *Fed. Trade Comm'n v. Dave, Inc.*, No. 2:24-CV-09566-MRA-AGR, 2025 WL 2698698, at *10 (C.D. Cal. Sept. 12, 2025); *see also U.S. ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1308 (11th Cir. 2002) (observing that to satisfy Rule 9(b)'s particularity requirement, the complaint "must allege the details of the [defendants'] allegedly fraudulent acts, when they occurred, and who engaged in them"). "Rule 9(b) does not require any greater level of detail." *Dave*, 2025 WL 2698698, at *10.

## ANALYSIS

ROSCA was enacted to provide online consumers with "clear, accurate information and give sellers an opportunity to fairly compete[.]" 15 U.S.C. § 8401(2). ROSCA makes it unlawful for sellers "to charge or attempt to charge any consumer for any goods or services sold in a transaction effected on the Internet through a negative option feature" unless the seller: (1) provides text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (2) obtains a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and (3) provides simple mechanisms for a

consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account. *Id.* § 8403.

The FTC Telemarketing Sales Rule ("TSR") defines a "negative option feature" as "in an offer or agreement to sell or provide any goods or services, a provision under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w). Violations of ROSCA constitute unfair or deceptive acts or practices in violation of the FTCA. 15 U.S.C. § 8404. For ROSCA violations, courts may grant injunctions and other equitable relief to redress consumer injuries. 15 U.S.C. §§ 53(b), 57(b). Courts may impose civil penalties where a ROSCA violation is committed "with actual knowledge or knowledge fairly implied." 15 U.S.C. §§ 45(m)(1)(A).

The parties agree that Cerebral and Zealthy's automatically recurring subscription memberships are negative option features subject to ROSCA. The Government asserts that Defendants have violated ROSCA by failing to (1) clearly and conspicuously disclose all material terms of the transaction; (2) obtain the consumer's express, informed consent; and (3) provide simple mechanisms for cancellation. *See* TAC ¶ 284. Under Count I, the Government alleges that Defendants have violated 15 U.S.C. § 8403(1)–(3). The Court must therefore determine whether the Government states a claim under each of these three subparts.

**I. Disclosure of All Material Terms of the Transaction**

The TAC alleges that Defendants were required to clearly and conspicuously disclose several material terms to consumers before obtaining their billing information: Defendants' use of patients' sensitive medical data for advertising purposes, Defendants' use of personnel without medical training or licenses to prescribe medication, the full cost of Zealthy's service, the nature

of Zealthy's automatically recurring charges, and the company's practices and restrictions regarding cancellations and refunds. *See* Resp. at 1. The TAC asserts that Defendants' failure to disclose these terms violates ROSCA. *See* TAC ¶¶ 284–86, 289.

ROSCA prohibits charging a consumer "for *any goods or services sold in a transaction* effected on the Internet through a negative option feature" unless the seller "provides text that clearly and conspicuously discloses *all material terms of the transaction* before obtaining the consumer's billing information." 15 U.S.C. § 8403(1) (emphasis added). The parties disagree on the applicable definition of "all material terms of the transaction." Defendants argue that ROSCA only covers the material terms of the negative option feature such as the price of the services, renewal terms, and cancellation terms. *See* Mot. at 7. The Government responds that Defendants' construction is at odds with the statute's plain meaning. *See* Resp. at 4.

Several courts have found that under its plain text, ROSCA's disclosure requirement is not limited to the terms of the negative option feature itself. *See Dave*, 2025 WL 2698698, at *13; *Fed. Trade Comm'n v. Doxo, Inc.*, No. C24-0569 TSZ, 2026 WL 1429295, at *15 (W.D. Wash. May 21, 2026); *Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 770 (7th Cir. 2019). Rather, ROSCA requires sellers to disclose "all material terms *of the transaction*," which includes the underlying goods and services sold through the negative option feature. *See Dave*, 2025 WL 2698698, at *13–14.

In *Fed. Trade Comm'n v. Dave, Inc.*, the court rejected Defendants' argument that ROSCA requires disclosure of only the material terms of the negative option feature. 2025 WL 2698698, at *14. Defining "transaction" according to its unambiguous, plain meaning, the court found that where a company advertised cash advances that were only available through enrolling in an automatically recurring membership, the relevant "transaction" was not limited to the recurring

membership itself but rather included the cash advance product that the company offered. *Id.* at *13. Observing that "the ordinary meaning of 'transaction' necessarily implies some type of business dealing between parties," the court reasoned that because "consumers' entry point to [the company's] membership is often the cash advance product, the availability, amount, and cost of that product are all material to a consumer's decision around whether to pay for the subscription." *Id.* at *14.

This Court agrees with the court in *Dave* that although ROSCA does not define "material terms" or "transaction" therein, the phrase "all material terms of the transaction" is unambiguous. *Dave*, 2025 WL 2698698, at *13; *see also Doxo*, 2026 WL 1429295, at *15. "As in all cases involving statutory construction, our starting point must be the language employed by Congress[.]" *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) (citation modified). "If the statutory language is plain, we must enforce it according to its terms." *Regueiro v. Am. Airlines, Inc.*, 147 F.4th 1281, 1287 (11th Cir. 2025) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)). "When deciding whether the language is plain, we must read the words in their context and with a view to their place in the overall statutory scheme." *Id.* (citation modified).

"Courts must assume that Congress intended the ordinary meaning of the words it used . . . To determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance." *United States v. Silvestri*, 409 F.3d 1311, 1333 (11th Cir. 2005). "Transaction" ordinarily means "[t]he act or an instance of conducting business or other dealings," "esp[ecially] the formation, performance, or discharge of a contract." Transaction, Black's Law Dictionary (12th ed. 2024). "Material" describes something "[o]f such a nature that knowledge of the item would affect a person's decision-making." Material, Black's Law Dictionary (12th ed. 2024). "Term" is defined as "[a] contractual stipulation" or "a contractual

provision that specifies an essential purpose of the contract." Term, Black's Law Dictionary (12th ed. 2024). And the Black's Law Dictionary definition of "material term" is "[a] contractual provision dealing with a significant issue such as subject matter, price, payment, quantity, quality, duration, or the work to be done." *Id.*

Defining "material terms of the transaction" using the words' ordinary meanings, the Court agrees with the Government that "the phrase . . . means information about issues important to the parties' agreement to do business together—such as its subject matter, price, payment, quantity, quality, duration, or the work to be done—that is significant enough for knowledge of it to affect a person's decision-making on whether to do business with the seller." Resp. at 6.

The immediately preceding section of ROSCA, Section 8402, is consistent with this definition. Section 8402 of ROSCA describes "all material terms of the transaction" as including "a description of the goods or services being offered" and "the cost of such goods or services." 15 U.S.C. § 8402(a)(1). This further supports that a plain language reading of "material terms of the transaction" in Section 8403 includes the underlying goods and services sold through the negative option feature.[1] Defendants' application of the *Russello* presumption to argue otherwise is inapposite. Courts presume that "[w]here Congress includes particular language in one section of a statute but omits it in another," it has acted intentionally. *Russello v. United States*, 464 U.S. 16, 23 (1983). But such a presumption is irrelevant where, as here, a statute includes the same phrase, "*all* material terms of the transaction," in two provisions. *See Greenberg v. Nat'l Geographic Soc.*, 533 F.3d 1244, 1275 (11th Cir. 2008) (Birch, J., dissenting) ("If a particular word of a section of a statute is not otherwise expressly defined, that word's use elsewhere in the statute is indicative

[1] The contrast between ROSCA's use of the phrase "all material terms *of the transaction*" and the Telemarketing Sales Rule's use of the phrase "all material terms and conditions *of the negative option feature*" similarly supports that the underlying goods and services are included in the former but not the latter. *Compare* 15 U.S.C. § 8403 (emphasis added), *with* 16 C.F.R. § 310.3(a)(1)(vii) (emphasis added).

of how that word should be interpreted within the section itself." (citing *Dep't of Revenue of Or. v. ACF Indus., Inc.*, 510 U.S. 332, 333 (1994))).

Defendants attempt to distinguish disclosures about Zealthy's subscription membership from those regarding its telehealth and medication offerings, arguing that Zealthy's enrollment flow properly discloses "the material terms of a negative option—the fact of the recurring charge, its amount, and how to stop it." *See* Reply at 8. Specifically, Defendants point to a screenshot[2] in the Government's Third Amended Complaint, which includes certain terms of Zealthy's negative option feature such as the automatic recurring charge of $135, the non-refundable nature of monthly membership fees, and the ability to cancel the membership up to 36 hours before any future billing period. *See* Mot. at 15 (citing TAC ¶ 104); *see also* Reply at 7–8. Defendants argue that these disclosures are all that ROSCA requires, and the Government's allegations that Zealthy's enrollment flow delays critical disclosures about price, cancellation, and refunds relating to medication costs until a second checkout "conflates the distinct membership and medication subscription offerings by Zealthy." *See* Reply at 7.

The Court agrees with Defendants that the definition of "all material terms of the transaction" cannot extend to "virtually all conduct by subscription businesses" or "post-hoc allegation[s] that a seller performed its service poorly or unlawfully" without limits. *See* Mot. at 14; Reply at 4 n.1. Reading ROSCA as a coverall that regulates virtually all conduct by subscription businesses would swallow the statute and lead to absurd results. *See Dave*, 2025 WL

[2] "In general, documents attached to a complaint can be considered by a federal court in ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Betterson v. Town of Cutler Bay*, No. 25-11638, 2026 WL 322952, at *1 (11th Cir. Feb. 6, 2026) (quoting *Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014)). As such, in resolving Defendants' Motion to Dismiss, the Court may consider the screenshots attached to the TAC. *See Patton v. Carnival Corp.*, No. 22-13806, 2024 WL 1886504, at *1 n.2 (11th Cir. Apr. 30, 2024) (considering photographs attached to complaint to decide Rule 12(b)(6) motion to dismiss).

2698698, at *14 (observing that interpreting ROSCA to "requir[e] a travel membership program to disclose to every prospective member the terms of every good or service available" could "lead to absurd results").

But on these facts, the specific pricing and full cost of the underlying telehealth services and medications are material to consumers' decisions to enroll in Zealthy's automatically recurring subscription. The relevant "transaction" at issue is not, as Defendants contend, limited to the membership itself but also encompasses the telehealth and medication offerings underpinning consumers' decisions to enroll in Zealthy's subscription services. *See Dave*, 2025 WL 2698698, at *13. Consumers' decisions are not driven solely by the price, enrollment terms, and cancellation processes of the monthly membership. Rather, the monthly subscription serves as a gateway for consumers to access the medical services and medications for their health conditions, and it is reasonable to infer that the full cost of these underlying services influences consumers' decisions regarding whether to sign up for membership. *See Dave*, 2025 WL 2698698, at *16 (finding availability of advertised product material to consumer's decision to enroll in monthly subscription necessary to access product); *Credit Bureau Ctr.*, 937 F.3d at 770 ("The service [Defendant] provided in exchange for the subscription is clearly a material term."). As such, the specific pricing and full cost of these services and medications are "material terms of the transaction."

The Government plausibly alleges that only *after* consumers have signed up for and paid a monthly subscription fee does a second checkout page disclose the material terms of the available treatment options, including concrete pricing information. TAC ¶ 114. For example, a user who signs up and pays for Zealthy's subscription membership in order to receive weight loss treatment is not presented with the full cost of such treatment until navigating to a second "treatment

checkout page"—which occurs after the user's payment information has already been collected. *Id.* ¶ 115.

Thus, the Government has sufficiently alleged that Defendants failed to disclose the full cost of Zealthy's telehealth and medication services before obtaining consumers' billing information. Because the specific pricing of these underlying treatment options are intertwined with Zealthy's monthly membership, such information is material to consumers' decision to enroll in Zealthy's automatically recurring subscription. Accordingly, the Court finds that the Government has plausibly alleged a violation of 15 U.S.C. § 8403(1).[3]

**II. Express Informed Consent**

The TAC further alleges that Defendants' failure to clearly and conspicuously disclose material terms of its subscriptions to consumers before obtaining their billing information also violates ROSCA's requirement to obtain a consumer's express informed consent before charging the consumer. *See* Resp. at 1–2; TAC ¶¶ 284, 288–89. Defendants argue that Zealthy obtained consumers' express informed consent by requiring consumers to click a button before incurring charges for the monthly membership charge and medication charges. *See* Mot. at 17; Reply at 9. The Government responds that because consumers were not given the information they needed to decide whether to enroll in Zealthy's membership, they could not provide "express informed consent" as required by ROSCA. *See* Resp. at 15.

ROSCA requires sellers to "obtain[] a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction." 15 U.S.C. § 8403(2). ROSCA does not define

[3] Because the TAC sufficiently pleads a failure to disclose the specific pricing and full cost of Zealthy's telehealth services and medications, the Court need not decide whether other terms, such as Defendants' use of patients' medical data and prescribing practices, are "material terms of the transaction" to resolve Defendants' Motion to Dismiss.

"express informed consent." Per their dictionary definitions, "express consent" means "[c]onsent that is clearly and unmistakably stated," and "informed consent" is defined as "[a] person's agreement to allow something to happen, made with full knowledge of the risks involved and the alternatives." *See* Consent, Black's Law Dictionary (12th ed. 2024). "When the material terms are not clearly and conspicuously disclosed, these inadequate disclosures constitute evidence that the sellers often do not obtain consumers' express informed consent before charging their cards or accounts." *See Dave*, 2025 WL 2698698, at *16 (citation modified); *Fed. Trade Comm'n v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1321 (W.D. Wash. 2024); *Fed. Trade Comm'n v. Health Formulas, LLC*, No. 2:14-CV-01649-RFB, 2015 WL 2130504, at *16 (D. Nev. May 6, 2015).

As discussed in the preceding section, given the TAC's allegations that Zealthy does not disclose the full cost of the underlying treatment options until a second checkout page, the Government has plausibly alleged that Defendants failed to properly disclose the full cost of Zealthy's telehealth and medication services until consumers had already signed up and paid for a monthly subscription. Additionally, the TAC alleges that Zealthy's disclosures are not just inadequate but misleading. Specifically, the Government alleges that before the first checkout page, Zealthy's enrollment flow suggests that prescriptions are included within the Zealthy monthly membership cost. *See* TAC ¶ 119. And before the second checkout page, Zealthy's enrollment flow advertises "affordable medication" without revealing its true cost. *Id.* As a result of these misleading disclosures, the second checkout page "has revealed to many users for the first time that they will be charged much larger amounts for the weight loss medications they sought through Zealthy." *Id.* ¶ 120. Without adequately and accurately disclosing the full cost of medications up front, Zealthy could not have obtained consumers' informed consent for its subscription membership.

Defendants again try to draw a line between the disclosures at the first checkout page and the second checkout page, arguing that Zealthy obtained separate consents—first, for the monthly subscription charge and subsequently, for the medication charges—at two different stages in the enrollment process. *See* Reply at 9. But as explained above, consumers need to know the full cost of Zealthy's telehealth and medication services to make an informed decision about whether to enroll in Zealthy's subscription. Thus, Zealthy could not have obtained consumers' informed consent without adequately disclosing the full cost of medication and treatment before charging them for the monthly membership. Accordingly, the Court finds that the Government has plausibly alleged a violation of 15 U.S.C. § 8403(2).

**III. Simple Mechanism for Cancellation**

The TAC's final alleged ROSCA violation is that Defendants failed to provide simple mechanisms for a consumer to stop recurring charges. *See* Resp. at 1–2; TAC ¶¶ 284, 287–89. According to Defendants, the only way to plausibly allege that a cancellation mechanism is not "simple" is to show that it is more difficult for subscribers to cancel than to enroll. *See* Mot. at 18. Defendants therefore argue that the Government fails to allege that Zealthy's cancellation flow is not simple because "[t]he TAC does not show that it is harder for Zealthy subscribers to cancel than it was for them to sign up." *See* Mot. at 18.

Defendants take this legal standard from an FTC policy statement, which states that to comply with ROSCA, "negative option sellers should provide cancellation mechanisms at least as easy to use as the method the consumer used to initiate the negative option feature." *See* Enforcement Policy Statement Regarding Negative Option Marketing, 86 Fed. Reg. 60,822, 60,826 (Nov. 4, 2021). However, it is "the responsibility of the court to decide whether the law means what the agency says it means." *Perez v. Mortgage Bankers Ass'n.*, 575 U.S. 92, 109 (2015)

(Scalia, J., concurring in judgment). A cancellation mechanism's relative complexity as compared with the corresponding enrollment flow is one factor that courts consider when determining whether the mechanism is "simple." *See Amazon.com*, 735 F. Supp. 3d at 1322–23; *Fed. Trade Comm'n v. Cardiff*, No. ED 5:18-CV-02104-SJO-PLAX, 2019 WL 9143561, at *10 (C.D. Cal. May 16, 2019). But no court interpreting ROSCA has held that the standard begins and ends with whether the cancellation flow has less steps than the enrollment flow.

Indeed, courts assess the cancellation policies and practices as a whole, including the means by which a consumer may cancel her subscription, the number of steps involved, whether the cancellation flow subjects consumers to retention sales offers attempting to convince consumers not to cancel, whether the process includes features that make cancellation confusing or time-consuming, and whether consumers who intend to cancel their subscriptions can actually do so. *See United States v. MyLife.com, Inc.*, 567 F. Supp. 3d 1152, 1169 (C.D. Cal. 2021); *Amazon.com*, 735 F. Supp. 3d at 1323; *Fed. Trade Comm'n v. Match Grp., Inc.*, No. 3:19-CV-2281-K, 2022 WL 877107, at *2, 5 (N.D. Tex. Mar. 24, 2022).

Here, the Government plausibly alleges that Zealthy failed to provide simple mechanisms for cancellation. In *Fed. Trade Comm'n v. Amazon.com, Inc.*, the court found that the Government had plausibly alleged that the online cancellation process was not a "simple mechanism" where consumers were required to click six times and through four different screens, were presented with multiple alternatives to cancelling, and were redirected to the online cancellation flow when seeking to cancel their subscriptions by telephone. 735 F. Supp. 3d at 1323. Similarly, here, the TAC alleges that page-by-page captures of Zealthy's cancellation flow show that since 2022, it has involved eight, nine, and even ten-plus separate steps containing retention sales offers, survey questions, and other features complicating the cancellation process. *See* TAC ¶¶ 162–65.

Additionally, the Government alleges that despite numerous consumers seeking to cancel their subscriptions by email and phone, per Zealthy's internal Standard Operating Procedure guidelines, customer service representatives are to redirect patients to cancel for themselves through the online or in-app cancellation flows. *See id.* ¶¶ 179–84. The TAC also alleges that Zealthy's online and in-app cancellation flows have not been made available to all consumers and as a result, these consumers have continued to be subjected to recurring charges despite attempting to cancel their subscriptions. *See id.* ¶¶ 169–74. Courts have found that allegations of similarly inaccessible and ineffective cancellation flows state a claim under ROSCA. *See Dave, Inc.*, 2025 WL 2698698, at *17 (denying motion to dismiss ROSCA claim where in-app cancellation flow was not available to all consumers); *Cardiff*, 2021 WL 3616071, at *1 (finding ROSCA violation where consumers could not always cancel their subscriptions despite taking affirmative steps to do so). Accordingly, the Court finds that the Government has plausibly alleged a violation of 15 U.S.C. § 8403(3).[4]

**IV. Civil Penalties**

Defendants argue that the Government's civil-penalty demand should be dismissed. *See* Mot. at 19–20. The Government may recover civil monetary penalties under ROSCA when a defendant violates the statute "with actual knowledge or knowledge fairly implied on the basis of objective circumstances." *See* 15 U.S.C. § 8404(a); 15 U.S.C. § 45(m)(1)(A). The knowledge requirement is satisfied "where a reasonable person under the circumstances would have known of the existence of the provision and that the action charged violated that provision." *Amazon.com*, 735 F. Supp. 3d at 1332 (citation modified); *see also United States v. Prochnow*, No. 07-10273,

[4] Defendants ask the Court to take judicial notice of the fact that Zealthy's current cancellation flow consists of 12 screens as compared with the 21 steps required to enroll in Zealthy's subscription. *See* Mot. at 18 n.3. The Court finds judicial notice of such a comparison unnecessary in concluding that the Government has adequately alleged Zealthy's failure to provide a simple mechanism for cancellation.

2007 WL 3082139, at *3 (11th Cir. Oct. 22, 2007) (holding that an executive who controlled operations had implied knowledge of FTC Rule violations); *United States v. Adobe, Inc.*, 791 F. Supp. 3d 966, 989–90 (N.D. Cal. 2025) (observing that the government can withstand a motion to dismiss by alleging that defendants had constructive knowledge that their conduct violated ROSCA). "[C]ircumstantial evidence as to an individual's degree of participation in business affairs is probative of knowledge." *Adobe*, 791 F. Supp. 3d at 988–90 (citation modified). Knowledge may be pleaded generally. *See Clausen v. Lab'y Corp.*, 290 F.3d 1301, 1308 (11th Cir. 2002) (citing FED. R. CIV. P. 9(b)).

Defendants maintain the Government cannot plausibly allege that Defendants acted with actual or implied knowledge where the FTC itself has observed that ROSCA lacks specificity about what disclosures and cancellation procedures it requires. *See* Mot. at 20. Defendants' argument is based purely on FTC commentary on the proposed Negative Option Rule. *See id.* But as discussed in the preceding sections, this Court finds ROSCA's requirements unambiguous. The FTC's observations about ROSCA's specificity are thus irrelevant where, as here, the statute's "single, best meaning" is "fixed at the time of enactment." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). While the Supreme Court has suggested that the FTCA's civil penalty provisions contain a mistake-of-law defense, *see Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 583–84 (2010), to survive a motion to dismiss, a "Plaintiff need only plausibly state Defendants had knowledge or were on notice that the applicable law applied." *Dave*, 2025 WL 2698698, at *18 (citation modified).

Here, the Government has plausibly alleged that Defendants Robertson and Zealthy acted with actual or implied knowledge that their conduct violated ROSCA. The TAC alleges that both Robertson and Zealthy were aware of numerous consumer complaints regarding cancellation

obstacles and unauthorized charges, *see* TAC ¶¶ 251–52, 256–57, 267, which courts have found indicative of defendants' actual or implied knowledge of ROSCA violations. *See Dave*, 2025 WL 2698698, at *18; *Amazon.com*, 735 F. Supp. 3d at 1333; *United States v. Stratics Networks Inc.*, 721 F. Supp. 3d 1080, 1101 (S.D. Cal. 2024). The TAC further alleges that Robertson and Zealthy received warnings from financial organizations and payment processors that if Zealthy wanted the financial organizations to facilitate its transactions, Zealthy needed to comply with ROSCA's legal requirements on disclosures and cancellation procedures. *See* TAC ¶¶ 256–57.

Courts have also found that a defendant's regular participation in regulatory and legal matters supports that the defendant acted with actual or implied knowledge. *See Dave*, 2025 WL 2698698, at *18 (finding compliance management system indicative that defendants had actual knowledge that ROSCA applied). Here, the TAC alleges that as Cerebral's CEO, Robertson was regularly briefed on and participated in responding to regulatory and legal issues, and that at Zealthy, he has been similarly involved in the company's compliance functions. *See* TAC ¶ 260–62. The TAC also alleges that Robertson had a high degree of participation in Cerebral's business strategy and continues to do the same at Zealthy, which is similarly probative of knowledge. *See Adobe, Inc.*, 791 F. Supp. 3d at 989–90.

Consequently, based on the TAC's allegations, Robertson and Zealthy reasonably would have known of ROSCA's requirements and that their policies and practices violated them. Accordingly, the Court finds that the Government's demand for civil penalties is sufficiently pled.

* * *

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion, [ECF No. 281], is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 27th day of October, 2026.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**